```
 1                      UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF NEW JERSEY
 2
 3   _____
 4   DANIEL D'AMBLY,
 5        Plaintiff,                  CIVIL ACTION NUMBER:
 6            vs.                     2:20-cv-12880-JMV
 7   CHRISTIAN EXOO a/k/a             Telephone Conference -
     ANTIFASH GORDON;                 Status
     ST. LAWRENCE UNIVERSITY;
 8   TRIBUNE PUBLISHING COMPANY;
     NEW YORK DAILY NEWS; VIJAYA
 9   GADDE; TWITTER, INC.; and
     COHEN, WEISS AND SIMON, LLP,
10
11        Defendants.
     _____
12        Frank R. Lautenberg Post Office and Courthouse
          Two Federal Square
13        Newark, New Jersey  07102
          February 4, 2021
14
15   B E F O R E:              THE HONORABLE JOHN MICHAEL VAZQUEZ,
                               UNITED STATES DISTRICT COURT JUDGE
16
17        **  ALL PARTIES PRESENT VIA TELEPHONE CONFERENCE  **
18   A P P E A R A N C E S:
19        LAW OFFICE OF PATRICK TRAINOR, ESQ., LLC, BY:
          PATRICK TRAINOR, ESQ.
20        848 Paterson Avenue
          East Rutherford, New Jersey  07073
21        (201)777-3327
          pt@ptesq.com
22
              appeared on behalf of the Plaintiff;
23
24            /S/Lisa A. Larsen, RPR, RMR, CRR, FCRR
                      Lisalarsen25@gmail.com
25                         (630)338-5069
```

```
 1  A P P E A R A N C E S: (Cont'd.)

 2      THE MARLBOROUGH LAW FIRM, P.C., BY:
        CHRISTOPHER MARLBOROUGH, ESQ.
 3      445 Broad Hollow Road
        Suite 400
 4      Melville, New York  11747
        (212)991-8960
 5      chris@marlboroughlawfirm.com
            and
 6      LAW OFFICE OF RICHARD TORRES, BY:
        RICHARD TORRES, ESQ.
 7      68 Tooker Avenue
        Springfield, New Jersey  07081
 8      (347)742-5362
        richardtorresdna@gmail.com
 9
            appeared on behalf of Defendant Christian Exoo
10          a/k/a Antifash Gordon;

11      McDERMOTT WILL & EMERY, BY:
        RICHARD I. SCHARLAT, ESQ.
12      340 Madison Avenue
        New York, New York  10173
13      (212)547-5421
        rscharlat@mwe.com
14          and
        McDERMOTT WILL & EMERY, BY:
15      JOSEPH K. MULHERIN, ESQ.
        444 West Lake Street
16      Chicago, Illinois  60606
        (312)372-2000
17      jmulherin@mwe.com

18          appeared on behalf of Defendants Tribune Publishing
            Company and New York Daily News; and
19
        GIBBONS P.C., BY:
20      LAUREN JAMES-WEIR, ESQ.
        One Gateway Center
21      Newark, New Jersey  07102
        (973)596-4861
22      ljames-weir@gibbonslaw.com
            and
23

24

25
```

1    **A P P E A R A N C E S**: (Cont'd.)

2        WILMER CUTLER PICKERING HALE and DORR LLP, BY:
         ARI HOLTZBLATT, ESQ.
3        1875 Pennsylvania Avenue, NW
         Washington, District of Columbia  20006
4        (202)663-6000
         ari.holtzblatt@wilmerhale.com
5
             appeared on behalf of Defendants Vijaya Gadde and
6            Twitter, Inc.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (PROCEEDINGS held via telephone conference before

2              The HONORABLE JOHN MICHAEL VAZQUEZ, United States

3              District Judge, on February 4, 2021.)

4         THE COURT:  Hello, this is Judge Vazquez.  We're on

5    the record in the matter of *D'Ambly vs. Exoo*, E-X-O-O, *et al*.

6    The civil number in this case is 20-12880.

7         Can I please have appearances, starting with plaintiff.

8         MR. TRAINOR:  Good afternoon, Your Honor.  This is

9    Patrick Trainor on behalf of Plaintiff, Daniel D'Ambly.

10        THE COURT:  Good afternoon.

11        MR. SCHARLAT:  Good afternoon, Your Honor.  Richard

12   Scharlat from the law firm of McDermott Will & Emery for

13   Defendants Daily News and Tribune Publishing Company.

14        MR. MULHERIN:  Good afternoon, Joe Mulherin, also

15   from McDermott Will & Emery, on behalf of the Daily News and

16   Tribune Publishing.

17        THE COURT:  Good afternoon.

18        Is that all counsel?

19        MR. MARLBOROUGH:  Good afternoon, Your Honor.  This

20   is Chris Marlborough from The Marlborough Law Firm on behalf

21   of Defendant Christian Exoo.

22        THE COURT:  Good afternoon.

23        MS. JAMES-WEIR:  Good afternoon, Your Honor, Lauren

24   James-Weir from Gibbons P.C. on behalf of Defendant Twitter,

25   Inc., and Vijaya Gadde.

```
 1          MR. HOLTZBLATT:  This is Ari Holtzblatt from Wilmer
 2   Hale, also on behalf of Defendants Twitter, Inc., and Vijaya
 3   Gadde.
 4          THE COURT:  Good afternoon.
 5          MR. TORRES:  Good afternoon, this is Richard Torres,
 6   Law Office of Richard Torres, for Defendant Exoo.  I have not
 7   put in my notice of appearance.  I was recently admitted into
 8   the District of New Jersey.  I can do that shortly.
 9          THE COURT:  Okay.  Any other counsel?
10           (No response.)
11          THE COURT:  Okay.  I really wanted to discuss the
12   Daily News' and Tribune's request for leave to file summary
13   judgment.  I do note that, when the original complaint was
14   filed, it was Mr. D'Ambly standing alone as plaintiff; but I
15   also recognize that Mr. Trainer has made a motion to file an
16   amended complaint which includes not only new allegations but
17   also several additional plaintiffs.
18       I did receive the parties' request to file summary
19   judgment.  My essential understanding is that the Tribune and
20   Daily News believe that the settlement agreement -- the
21   separation agreement with Mr. D'Ambly controls and that the
22   release that was included within the separation agreement is
23   dispositive of this case.
24          Then I read Mr. Trainor's response -- by the way, that
25   was at Docket Entry 44 from McDermott Will & Emery's
```

1    submission.

2          Then I saw Mr. Trainor's response at Docket Entry 55

3    where it appears, to me, that the issue being raised is that

4    there was fraud in the inducement to the separation agreement.

5          I'm just trying to understand the complaint as to the

6    Daily News and Tribune, not Mr. Exoo or Twitter or Gadde.

7          Mr. Trainor, as far as Mr. D'Ambly is concerned, you

8    said that he was a member of -- I know that he was a union

9    member who worked at the Daily News and Tribune, but you also

10   said he was a member of the New Jersey European Heritage

11   Association.

12         Is that correct?

13          MR. TRAINOR:  That's correct.  That's the association

14   he's affiliated with.  You know, they describe themselves as

15   a -- sort of a political activist group.  They're proud of

16   their European heritage, and that's what they promote.

17         That's unaffiliated with his employment, though,

18   Your Honor.  That never came into the workplace.  It's a total

19   separate entity.  That's what he's affiliated with.  None of

20   those activities carried over into the workplace.

21          THE COURT:  Okay.  I know, but when I was reading the

22   complaint and also the proposed amended complaint and then

23   also the statement of material facts you have, it seems as

24   though his involvement with this association, at least from

25   your views, was an important factor.

1          Paragraph 26 of the original complaint refers to his

2   association with the European Heritage, and what I was trying

3   to understand essentially, Mr. Trainor, was is this an

4   allegation that your client was accused to be a white

5   supremacist but he's not a white supremacist, or he is a white

6   supremacist but they couldn't take any action against him

7   because he's a white supremacist?

8          I didn't understand exactly how this was framed.

9           MR. TRAINOR:  Sure.  He's been accused of being a

10  white supremacist.  That's the gist of it with this European

11  Heritage Association.  They call him a white supremacist.

12         In the opinion of the ADL, Anti-Defamation League,

13  it's a white supremacist organization.  But he's never done

14  anything that I'm aware of or anybody else has given any

15  indication that he's done anything that would be considered --

16  what I would consider to be a white supremacist.

17         For instance, burning of crosses, you know, desecrating

18  a synagogue or some other sort of organization.  I've never

19  known him to have -- no physical attacks on anybody, any

20  non-white people.

21         I have never seen any of that, so it's really hard

22  for me to say, yeah, he is a white supremacist.  He's a

23  60-some-odd-year-old man who has never even gotten a speeding

24  ticket so it's very hard for me to say that he is a white

25  supremacist.

1        Even if he were, according to the Daily News' -- last

2    and final warning letter he was issued by the Daily News, he

3    never brought those beliefs or those activities into the

4    workplace and never denigrated any of his coworkers or

5    insulted any of his coworkers.

6        It was all off-work activities, political activities,

7    protesting with signs on, this kind of thing, political

8    protests, First Amendment protection stuff.

9        I don't know what a white supremacist is in this day

10   and age, but he's not done anything that I assign to a white

11   supremacist.

12           THE COURT:  You said First Amendment, but this is not

13   a case against the government.  The first amendment applies

14   to --

15           MR. TRAINOR:  No, it's not.

16           THE COURT:  -- or the Fourteenth Amendment to the

17   state.

18           MR. TRAINOR:  I'm aware of that, Your Honor.  I'm

19   just saying that what he's done as far as protesting stuff,

20   it's all been legal, above-board stuff.  He's not done

21   anything violent or criminal or rioting or looting.

22        He's never participated in anything like that.  It is

23   just his normal, routine activities.  They're not illegal or

24   illicit activities.  That's all I was just pointing out with

25   that.

1          THE COURT:  Okay.  One last question, because I

2     didn't understand.  When I read your first complaint -- and I

3     went back and saw the red line changes -- it says that -- let

4     me just see and make sure I have it correct.

5               (Brief pause.)

6          THE COURT:  Here it is.  It describes his job in

7     paragraph 2.  He's a member of the union, the International

8     Brotherhood of Teamsters, and the EHA -- factual allegations,

9     paragraph 14, EHA.

10         Its says:  "In addition to being a Teamster, D'Ambly is

11    a member of the New Jersey European Heritage Association, a

12    non-violent, pro-domestic policy organization."

13         That sounds like -- a non-violent, pro-domestic, does

14    he raise money for veterans?  Is he helping children?  A

15    pro-domestic policy organization?  I didn't understand what

16    you meant by that, a pro-domestic policy organization.

17          MR. TRAINOR:  That's how they describe themselves.

18    He's against illegal immigration.  He wants a border wall

19    along the southern border.

20         He definitely has what you would consider to be

21    conservative or right-wing sort of political viewpoint.  So in

22    that sense -- Mr. D'Ambly is a veteran.  I don't know if he's

23    actively raising funds for veterans, but I know he is himself

24    a veteran, and I'm sure he does make his contributions when he

25    sees them selling poppies and that kind of thing, but I don't

1  think he's actively raising funds for veterans or other folks.

2  I believe his --

3           THE COURT:  No, no.  But your description of the

4  European Heritage Association was that they're a non-violent,

5  pro-domestic policy organization.  I don't know what that

6  means.  What are their tenets?

7           I understand you said he's not a white supremacist.  Do

8  they have views on races, on the Jewish religion?  What are

9  the tenets of the New Jersey European Heritage Association?

10          MR. TRAINOR:  Well, they believe that -- as I said,

11  they believe there needs to be a border -- a wall along the

12  southern border and those type of beliefs.

13          As far as what's considered Jewish elements, from what

14  I've seen that's been assigned to them, it looks to be more

15  maybe conspiracy-theory type stuff than it is hardline

16  anti-Semitic sort of things.

17          A lot of the symbolism I've seen with it are just very

18  old sort of, you know, calling Karl Marx and the Russian

19  revolution -- calling those type of figures Jewish people or

20  they were Jewish communist kind of thing.

21          Really it's more of a very strong anti-communist

22  strain that runs through the belief system, from what my

23  understanding is.

24          THE COURT:  If it's anti-communist, what does Judaism

25  have to do with it?

```
 1            MR. TRAINOR:  I believe they -- in their opinion
 2   that people like Karl Marx and others were also Jewish but
 3   communist, Marxist, and the same thing.  I believe their
 4   opinion -- I'm putting words in their mouth right now, but my
 5   opinion is they believe that the Jewish identity fed into
 6   their communism.
 7            That's me sort of filling in the blanks, from what my
 8   understanding is, but I think it's a pretty accurate
 9   description.
10            THE COURT:  So they're anti-Semitic, basically.  They
11   believe in these old Jewish global conspiracy theories.
12            MR. TRAINOR:  I don't --
13            THE COURT:  I thought Europe had -- obviously before
14   the Holocaust got stronger, but after the Holocaust it seems
15   like the New Jersey European Heritage Association, there's a
16   lot of Jews who trace their heritage back to Europe.
17            MR. TRAINOR:  I agree, Your Honor.  I believe -- from
18   what I understand -- again, I'm filling in some of the blanks
19   here, so their belief system --
20            THE COURT:  Mr. Trainor, why are you filling in the
21   blanks?  This is your client.  You filed a complaint on his
22   behalf.  Why don't you have answers to these questions?
23            You plead the New Jersey European Heritage Association.
24   Why don't you know the organization that you put in your
25   complaint that your client is a member of?
```

1          Why can't you give me hard facts as to what they

2     believe in and what they do?  I'm not asking --

3               MR. TRAINOR:  Because I don't believe --

4               THE COURT:  Because what?

5               MR. TRAINOR:  I'm sorry, Your Honor.  I don't . . .

6               THE COURT:  You don't what?

7               MR. TRAINOR:  I don't believe that his affiliation

8     with New Jersey European Heritage Association has any bearing

9     on his ability to perform his job when he wasn't bringing

10    those activities into the workplace.

11         I don't think that has anything -- my opinion, it

12    doesn't have anything to do with whether or not he performed

13    his job well and certainly has nothing to do with the

14    misrepresentations by the Daily News on when they found

15    certain things and when they got threatening calls.

16         In my opinion, it has no bearing on the case.  Okay,

17    he's part of that.  As I say, he's never committed any crimes,

18    never harmed anybody else --

19              THE COURT:  Wait, Mr. Trainor.  Who drafted your

20    complaint?

21              MR. TRAINOR:  I did, Your Honor.

22              THE COURT:  Then why did you put it in your complaint

23    if it has no bearing on these issues?

24              MR. TRAINOR:  Because it was mentioned in the last

25    and final warning letter to Mr. D'Ambly as well as his

1  termination of employment letter, so I put that in there to

2  comment that, yeah, he is part of that organization.

3       But if you look at the last and final warning that

4  was issued by the Daily News, they acknowledged that those

5  activities with the New Jersey European Heritage Association

6  never carried over into the workplace.  They agree to that.

7       I just put that there just to be, you know, upfront

8  about everything.

9       THE COURT:  Okay.  I was trying to understand this

10  theory, what's going on.  I understand what you're saying

11  about Exoo.

12       Exoo, in your view, doxes people, D-O-X-E-S, he

13  believes to be are white supremacist or fascist, which you

14  think what he's doing is against the law.  And then I see in

15  your second one you have a RICO conspiracy against him.  We'll

16  deal with that in due course.

17       Doesn't Mr. Exoo also have a First Amendment right if

18  your client has a First Amendment right to engage in this

19  activity?

20       MR. TRAINOR:  Of course, but my client has never

21  directed hundreds if not thousands of other people to make

22  threatening phone calls to Mr. Exoo's employer to get him

23  terminated.

24       My client has not directed hundreds and likely

25  thousands of people to go to Mr. Exoo's home to slash his

1   tires and scratch up his car when it's parked outside of his

2   house.  My client has never done that.

3        My client has not directed his speech at other people

4   in an assaultive manner as Mr. Exoo has.  Mr. D'Ambly was

5   physically attacked at his home.

6        THE COURT:  Oh.  I saw that his car was attacked.

7   How was he physically attacked?

8        MR. TRAINOR:  I'm sorry.  His property was attacked

9   outside of his home by somebody who --

10       THE COURT:  Okay.  So you're not saying, then, that

11  Mr. Exoo was -- didn't have a First Amendment right.  You're

12  just saying if you do it too many times it becomes -- you said

13  it was thousands of times or hundreds of times and then it

14  becomes a problem as opposed to if he just protests once or

15  twice, then it's okay?

16       MR. TRAINOR:  I would think so.  When does it become

17  harassment?  One call is probably not harassment, but 500 in

18  like a 2-hour period or a thousand or 2,000.  One client got

19  11,000 calls over like a 16-hour period.

20       Many of those calls are threatening.  "Any blood

21  spilled is your responsibility," as one of the threatening

22  calls that was made to the Daily News.

23       So, yeah, that clearly crosses the line of what's

24  protected if you're threatening somebody.  That isn't

25  protected speech.  That is exactly what's happening here.

1        D'Ambly is also a member of a labor union.  You can't

2   just call his labor union to terminate him.  For what reason?

3   There's no crime.  He hasn't attacked anybody.

4        He went to a rally in Princeton, New Jersey, with tape

5   on his mouth that said something to the effect of -- with tape

6   that we were being silenced.  It was a silent political

7   protest.  There were six people that participated in it.

8        Next thing you know, there's --

9        THE COURT:  I thought you said he made intemperate

10  political remarks, is what I thought I read.  I don't know

11  about the tape over the mouth.

12       MR. TRAINOR:  Well, he protests quite often.  There's

13  more than one time he's protesting.  The one time --

14       THE COURT:  Now that he's done it more than once, has

15  he now crossed the line into improper activity, using your

16  example?

17       MR. TRAINOR:  He wasn't directing it at anybody.  His

18  was just political protest in the public forum.  It wasn't

19  directed at anybody.

20       THE COURT:  What were his intemperate political

21  comments?

22       MR. TRAINOR:  He was holding onto a sign talking with

23  another person he was participating with and he was on video

24  recording describing a third person who was not involved in

25  the conversation -- describing that third person as a kike,

1    and that was recorded on video and it was posted to some -- to

2    a YouTube channel that has been credited to him but he has no

3    affiliation with at all.  He was just videotaped and put on

4    that YouTube channel.

5            THE COURT:  So he used an anti-Semitic slur.  Okay.

6        I'm just trying to get my arms around what the thrust

7    of this case is.  I understand that your client -- and it

8    seems like in the amended complaint a lot of your client's --

9    there's different organizations.

10       I saw the Proud Boys, I saw other organizations where

11   they do protests, and then it seems as though -- I'm just

12   trying to understand the theory of the case.

13       They protest and they say things that they believe in,

14   which is politically -- I'm not talking about action.  Protest

15   action is fine.  I'm not talking about violence.  But they say

16   things that are politically protected speech, and then

17   Mr. Exoo, you're saying, sees them doing these things and then

18   notifies people, Hey, these folks are engaging in this

19   behavior and encourages people to disassociate with them,

20   essentially.

21       It seems like we're having a political discourse back

22   and forth.  Your client has a right to say his beliefs,

23   Mr. Exoo has the right to say his beliefs.

24       You know, taken to a grand level, these anti-Semitic

25   global conspiracy, I would disagree that it's not directed at

```
 1    anybody.  It's directed at a whole ethnic group or religious

 2    group of people that you want to take action against.

 3         It seems as though your client is advocating action

 4    against a certain group of people he disagrees with and

 5    Mr. Exoo is advocating action against a certain group of

 6    people he disagrees with.  They just come at from very

 7    different ideology, whether it be the far right versus the far

 8    left.

 9         So, for instance, if your client called him an Antifa,

10    you say he says he's a self-professed Antifa, but if he says

11    that he's Antifa and he was working and his employer fired him

12    because your client said, Hey, he's Antifa, you're saying that

13    he would then have a cause of action against your client

14    because they were protected in that speech?

15         I'm just trying to understand this entire case because

16    it seems as though one group is participating in political

17    speech that the other group doesn't like, the other group

18    takes action which the other group doesn't like, but it seems

19    as though we keep coming back to people espousing their views,

20    whether they be far right or far left.  The content is not as

21    relevant to me as what we're saying is happening here.

22              MR. TRAINOR:  Okay.  I'll address that.

23         Mr. Exoo has an extremely large Twitter following, over

24    50,000 people.  What he says is --

25              THE COURT:  So certain people like his message or at
```

1    least follow his message.  Maybe a lot of people disagree with

2    him, but they follow him.  Okay.  So he has a large Twitter

3    following.

4         MR. TRAINOR:  Correct.  So Mr. D'Ambly didn't know

5    Mr. Exoo from a hole in the wall.  They had never had any

6    prior interactions, they don't know one another.

7         Mr. D'Ambly, when he participated in his events, he

8    does so anonymously or under a pseudonym, so he was an unknown

9    person.

10        Mr. Exoo, with his associates -- and there are several

11   people, primary people, that have recently been in the news

12   explaining how they do this process.  They discovered

13   Mr. D'Ambly's real identity.  His name is Dan D'Ambly.

14        Mr. Exoo then directs his followers to contact

15   D'Ambly's employer, the Daily News, as well as his labor union

16   demanding that he get terminated.

17        Now, when he did this on October 29th, 2018, almost

18   immediately there were up to 100 direct Twitter messages to

19   the Daily News and Teamster's Twitter account saying, Fire

20   this guy, he's a known Nazi, he's bringing hate and harm to

21   our communities.

22        And then that continued for weeks, you know, dozens,

23   maybe hundreds of calls and messages, a variety of

24   communications.

25        Mr. Exoo then starts giving out additional phone

1   numbers.  The initial dox gives out just the Twitter, maybe a

2   generic customer service number.  Then he says call this

3   number and tell them to get rid of him.  Then call this third

4   number and tell them to get rid of Dan D'Ambly.  Oh, and by

5   the way, Dan D'Ambly is also the chairman of the union's

6   referendum board.  Here's the people that are on that

7   referendum board.  Call all of these people and demand that

8   they terminate Dan D'Ambly.

9        So what seems like they're both expressing political

10  speech is completely not the case.  Mr. D'Ambly goes to a

11  rally in Princeton, New Jersey.  They go there, they have the

12  rally, they go home.

13       Mr. Exoo sees what he's doing, finds out all the people

14  that were participating with Mr. D'Ambly or just Mr. D'Ambly

15  and then directs his followers to make threatening calls,

16  e-mails, Twitter messages, phone calls by the hundreds and

17  oftentimes by the thousands to this person's employer and/or

18  his school -- if it's a college student or something like

19  that, to his school and demand that he gets fired or

20  terminated.  Many of those calls at Mr. Exoo's direction are

21  threatening.

22       For instance, Any violence that befalls your workplace

23  is on your hands because you haven't terminated Mr. D'Ambly.

24       That's not even close to 6, 8, 10, 15 people going to a

25  really in downtown Princeton versus somebody behind the scenes

1   that you've never met, don't know who he is, all the sudden

2   you have thousands of people or hundreds of people calling

3   your employer demanding you get fired.

4        Some of those threats are coming out your way, and then

5   your car gets the tires slashed and all scratched up while

6   it's parked in your parking lot.  And then on top of that,

7   whoever did it then sends a text message to your private

8   cell phone saying, Ha-ha, is your car in good shape?

9        Then you find out that that very same person was one of

10  the people that called the Daily News with a death threat or

11  with a threatening call against you.

12       They're not even close to what D'Ambly does and what

13  MR. Exoo does.  They're not even in the same sphere.

14          THE COURT:  So why don't you go after the person who

15  slashed the tires and made the call with the threats?

16       I'm still trying to figure this out.  I'm not

17  disagreeing that once you cross the line into criminal action,

18  as what we're seeing in the Capitol riot prosecution, it's no

19  longer protected speech.  But you're saying there's a person

20  who slashed the tires and then also made what you interpret to

21  be threats.  Why don't you sue that person?

22          MR. TRAINOR:  That person is an anonymous person on

23  Twitter with an anonymous username.  When I followed up with

24  the South Brunswick Police Department, I was informed early on

25  that our local FBI was involved because of the interstate

```
 1    communications, but they don't return my calls.  They don't

 2    get back to you when you try to follow up on this stuff.  I

 3    have the phone number --

 4         THE COURT:  Listen, there's a big difference between

 5    speech and action.  By "action," I don't mean physically

 6    protesting, peacefully protesting.  That's action, obviously,

 7    but it's protected.

 8         But I understand what you're saying about damage to his

 9    car and what you perceive to be threats.  But that -- okay.

10    We'll deal with this with the motions.  I'm just trying to

11    understand this case, the big picture of this case.

12         Let me turn back to where we started with this motion.

13    Let me ask the Daily News and Tribune.

14         Let me first tell you that I give parties one

15    opportunity to file summary judgment.  That's it.  If you want

16    to have leave to file summary judgment, I will grant it to

17    you, but I will also tell you, as you know, pursuant to

18    Rule 56, that even if Mr. Trainor doesn't raise an issue, if

19    he merely shows that he needs discovery to support his theory

20    that there was fraud in the inducement, pursuant to the rule,

21    I should give him that opportunity to take discovery.

22         I am not passing on the validity of either parties'

23    arguments on the merits.  I understand the Daily News and

24    Tribune are saying, listen, we have a release, it's ironclad,

25    we should be out of this case.
```

1          I understand Mr. Trainor is saying we think we have a

2     claim of fraud in the inducement so that we can knock out the

3     entire separation agreement.

4          All I'm asking the Daily News and Tribune at this

5     time is that if I grant you leave to file and I come to the

6     conclusion that Mr. Trainor should have an opportunity to get

7     discovery on his fraud in the inducement claim, I will not be

8     granting your motion for summary judgment.

9          I just want to make you aware before you file this

10    motion that could be an outcome in light of the defense

11    Mr. Trainor has raised in his papers.

12          MR. MULHERIN:  Your Honor, just so I understand --

13    this is Joe Mulherin on behalf of the Tribune and Daily News.

14          Just so I understand, what would happen is, if we filed

15    a -- if we filed a motion and he justified the need for

16    discovery, you would automatically reject the motion as

17    opposed to letting discovery finish and then deciding the

18    motion?

19          THE COURT:  Right, because I don't want you to

20    prematurely file a motion.  That's why I only let you file

21    one.

22          There's a few ways -- I'm not giving away state

23    secrets.  There's a few ways to attack a release; right?

24          You've laid all the factors out, but beyond the

25    factors, looking at a document you can make an argument saying

1   this is not within the scope of the release.  I understand you

2   say this is any and all claims, it's very broad.

3        But another way to attack a contract is to say fraud

4   in the inducement, the contract is void, in this case the

5   agreement is void from the outset because it was fraud in the

6   inducement.

7        I am not saying that's ultimately what's going to

8   happen.  I'm just saying that's what Mr. Trainor has raised in

9   his papers.

10        I don't want to tell you what to do, but I just want to

11  tell you what the consequences would be.  If you file now and

12  I find that Mr. Trainor is entitled to discovery, I'm going to

13  deny your motion for summary judgment and I'm not going to let

14  you re-file a motion for summary judgment.

15        MR. MULHERIN:  I understand, Your Honor.  I think my

16  inclination at this point is we would take a narrow band of

17  discovery, then, and negate that argument and then re-file

18  this.

19        THE COURT:  That I'm fine with because I understand

20  you believe -- putting aside the allegations and so forth, you

21  believe the release is dispositive.

22        What I can do, then, is I'm going to deny your leave --

23  request for leave without prejudice and when you have the

24  Rule 16 conference -- let me see who the magistrate is on

25  this.

1          The magistrate you have, Judge Dickson, is actually

2     going to be leaving the bench this month.  It will be assigned

3     to a new magistrate.

4          I will tell the new magistrate that as far as the

5     Tribune and the Daily News are concerned I'm fine with focused

6     discovery solely as to the validity of the separation

7     agreement and the release contained therein so you can focus

8     your discovery on those issues.  Okay?

9               MR. MULHERIN:  That would be great.  Thank you.

10              THE COURT:  Mr. Trainor, is that acceptable to you?

11    You said fraud in the inducement.  That is what you're

12    going to be arguing at least at this point; correct?

13              MR. TRAINOR:  That's correct, Your Honor.

14              THE COURT:  Okay.  I think the other folks I know had

15    motions to dismiss.  I administratively terminated those

16    pending the ruling on the filing of the first amended

17    complaint, at which point the other defendants will be free to

18    either just put their -- you can either just put a letter on

19    and say we stand by our original motions to dismiss, or you

20    can do entirely new motions to dismiss, or you can even do a

21    third option which is we stand by our original motions but we

22    want to do a supplement in light of the new allegations.

23         I will give leave to those defendants to address that

24    as they see fit.  Of course you're free to answer, as well.

25    You don't have to do a motion to dismiss.

1          I'm not going to preclude you in that way.  So that

2    would be for Mr. Exoo, Twitter, and Gadde, and I guess also --

3    well, and the new one we're going to have.  We're also going

4    to have St. Lawrence University and then also the law firm

5    accused of malpractice during an arbitration.

6          As far as the Tribune and Daily News are concerned, so

7    the parties know going in, I'm going to allow you to focus

8    your discovery on this issue so we can get this resolved

9    sooner rather than later.  Okay?

10              MR. MULHERIN:  Understood.  Thank you.

11              MR. TRAINOR:  Thank you, Your Honor.

12              THE COURT:  Thank you, Mr. Trainor.  You helped me

13    understand what the case is ultimately about.

14          On behalf of plaintiff, is there anything else,

15    Mr. Trainor?  Or plaintiffs.  I know you're --

16              MR. TRAINOR:  Just one example of the type of

17    messages that Mr. Exoo directs at Mr. D'Ambly.  This is -- he

18    says to Mr. D'Ambly:  I'm going to spend the next week

19    wrecking your f'ing life, Dan D'Ambly.

20          That's the texture and tone of these messages that are

21    directed at D'Ambly and his ancillary employers, coworkers,

22    whoever else is involved in order to get him terminated.

23    That's the type of messages he sends, Mr. Exoo.

24              THE COURT:  Mr. Trainor, you should be down at the

25    Capitol for the impeachment hearings because I understand

1  there's some very interesting arguments about what's protected

2  and what's not protected right now going on, so it's a timely

3  issue if nothing else.  I appreciate that.

4       Let me he go through the Daily News and Tribune.  Is

5  there anything else on behalf of the Daily News and Tribune?

6            MR. MULHERIN:  No, Your Honor.

7            THE COURT:  I don't want to preclude other counsel.

8  I know this really wasn't your issue.

9       As for counsel for Mr. Exoo, Twitter, Mr. Gadde, is

10  there anything else you'd like to address at this time?

11            MR. MARLBOROUGH:  Your Honor, this is Chris

12  Marlborough.  My question to the Court is will a transcript of

13  this call be orderable or --

14            THE COURT:  Yes.  Lisa Larsen is my court reporter,

15  and if you contact my Courtroom Deputy Ms. Olivieri, we'll get

16  you set up so you can order a transcript.  Okay?

17            MR. MARLBOROUGH:  Thank you, Your Honor.

18            MR. TRAINOR:  Thank you, Your Honor.

19            THE COURT:  Thank you, Counsel.

20            (Which were all the proceedings had in

21             the foregoing matter on said day.)

22                    *         *         *

23

24

25

<u>FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE</u>

I, **Lisa A. Larsen, RPR, RMR, CRR, FCRR,** Official Court Reporter of the United States District Court for the District of New Jersey, do hereby certify that the foregoing proceedings are a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place, and on the date hereinbefore set forth.

I further certify that I am neither related to any of the parties by blood or marriage, nor do I have any interest in the outcome of the above matter.




*/S/Lisa A. Larsen, RPR, RMR, CRR, FCRR*

Official U.S. District Court Reporter ~


DATED this February 9, 2021