Michael J. Canning, Esq. (MJC3060)
**GIORDANO, HALLERAN & CIESLA, P.C.**
125 Half Mile Road, Suite 300
Red Bank, N.J. 07701-6777
(732) 741-3900
Attorneys for Defendant, Cohen, Weiss and Simon LLP

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DANIEL D'AMBLY,<br><br>                              Plaintiff,<br><br>                   v.<br><br>CHRISTIAN EXOO a/k/a ANTIFASH GORDON; ST. LAWRENCE UNIVERSITY; TRIBUNE PUBLISHING COMPANY; NEW YORK DAILY NEWS; VIJAY GADDE; TWITTER, INC.; COHEN, WEISS AND SIMON LLP,<br><br>                              Defendants. | Case No. 2:20-cv-12880-JMV-JAD<br><br><br>Civil Action<br><br>**CERTIFICATION OF MICHAEL CANNING, ESQ. IN SUPPORT OF MOTION FOR SANCTIONS AGAINST PLAINTIFF PURSUANT TO FED. R. CIV. P. 11**<br><br>Motion Date: |

MICHAEL J. CANNING, ESQ., by way of certification in lieu of affidavit, hereby states as follows:

1.   I am an attorney at law of the State of New Jersey and an officer and shareholder in the law firm of Giordano, Halleran & Ciesla, P.C. ("GH&C"), attorneys for Cohen, Weiss and Simon LLP ("CWS").  I make this certification in support CWS's motion for sanctions against Plaintiff, Daniel D'Ambly pursuant to Fed.R.Civ.P. 11.

2.    Attached hereto as **Exhibit "A"** is a true and accurate copy of the November 9, 2020 Brief in Support of Motion to Dismiss the Complaint filed by CWS.

3.    Attached hereto as **Exhibit "B"** is a true and accurate copy of Plaintiff's Complaint, signed by his attorney, Patrick Trainor, Esq., on September 21, 2020.

4.    Attached hereto as **Exhibit "C"** is a true and accurate copy of the September 30, 2020 correspondence from counsel for CWS to counsel for Plaintiff (the *"Notice Letter"*).

5.    Attached hereto as **Exhibit "D"** is a true and accurate copy of the October 1, 2020 correspondence from Plaintiff's counsel to counsel for CWS.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

_____
MICHAEL J. CANNING, ESQ.

DATED:  NOVEMBER 17, 2020

Docs #4728637-v1

2

# EXHIBIT "A"

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| DANIEL D'AMBLY,<br><br>                    Plaintiff,<br><br>          v.<br><br>CHRISTIAN EXOO a/k/a ANTIFASH GORDON; ST. LAWRENCE UNIVERSITY; TRIBUNE PUBLISHING COMPANY; NEW YORK DAILY NEWS; VIJAY GADDE; TWITTER, INC.; COHEN, WEISS AND SIMON LLP,<br><br>                    Defendants. | Case No. 2:20-cv-12880-JMV-JAD<br><br><br><u>Civil Action</u><br><br><br>**Motion Date: December 7, 2020** |

---

**MEMORANDUM OF LAW ON BEHALF OF DEFENDANT COHEN, WEISS AND SIMON LLP IN SUPPORT OF ITS MOTION TO DISMISS COUNT XIII OF PLAINTIFF'S COMPLAINT**

---

                    Michael J. Canning, Esq. (MJC3060)
                    Afiyfa H. Ellington, Esq. (AHE4674)
                    **GIORDANO, HALLERAN & CIESLA**
                    A Professional Corporation
                    125 Half Mile Road, Suite 300
                    Red Bank, N.J. 07701-6777
                    (732) 741-3900


                    Attorneys for Defendant Cohen,
                    Weiss and Simon LLP

MICHAEL J. CANNING, ESQ.
   Of Counsel and on the Brief

AFIYFA H. ELLINGTON, ESQ.
   On the Brief

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES......................................... ii

PRELIMINARY STATEMENT.......................................... 1

PROCEDURAL HISTORY............................................. 1

STATEMENT OF FACTS............................................. 2

STANDARD OF REVIEW............................................. 6

LEGAL ARGUMENT................................................. 7

   POINT I

      THIS COURT SHOULD DISMISS COUNT XIII OF PLAINTIFF'S
      COMPLAINT WITH PREJUDICE UNDER RULE 12(C) AS THERE IS
      NO LEGAL BASIS FOR THE LEGAL MALPRACTICE CLAIM
      AGAINST CWS............................................. 7

      A. As a Matter of Law, There Is No Attorney-Client
         Relationship between Plaintiff and CWS, as CWS
         Represented the Union in the Grievance and
         Arbitration.......................................... 7

CONCLUSION.................................................... 13

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**

<u>Arnold v. Air Midwest Inc.</u>, 100 F.3d 857 (10th Cir. 1996)..... 10

<u>Ashcroft v. Iqbal</u>, 556 U.S. 544 (2007)........................ 7

<u>Atkinson v. Sinclair Refinancing Co.</u>, 370 U.S. 238 (1962)
............................................. 8, 10, 11, 12

<u>Breda v. Scott</u>, 1 F.3d 908 (9th Cir. 1993)................... 11

<u>Burtch v. Milberg Factors Inc.</u>, 662 F.3d 212 (3d Cir.
2011) .................................................... 7

<u>Carino v. Stefan</u>, 376 F.3d 156 (3d Cir. 2004)....... 8, 9, 12, 13

<u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203 (3d Cir. 2009).......... 7

<u>Glob. Naps. Inc. v. Bell Atl. N.J. Inc.</u>, 287 F.Supp. 2d
532 (D.N.J. 2003) ........................................ 6

<u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410
(3d Cir. 1997) .......................................... 7

<u>Jabolonski v. Pan Am. World Airways, Inc.</u>, 863 F.2d 289
(3d Cir. 1988) .......................................... 6

<u>Jerista v. Murray</u>, 185 N.J. 175 (2005)...................... 8

<u>Montplaisir v. Leighton</u>, 875 F.2d 1 (1st Cir. 1989)....... 11, 12

<u>Peterson v. Kennedy</u>, 771 F.2d 1244 (9th Cir. 1985), <u>cert.
denied</u>, 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed. 2d 187
(1986) ............................................... 11, 12

<u>Republic Steel Corp. v. United Mine Workers of America</u>,
570 F.2d 467 (3d Cir. 1978) .............................. 10

<u>Rosenau v. Unifund Corp.</u>, 539 F.3d 218 (3d Cir. 2008).......... 6

<u>Waterman v. Transport Workers Union Local 100</u>, 176 F.3d
150 (2d Cir. 1999) ....................................... 10

<u>Wilkes-Barre Pub. Co. v. Newspaper Guild of Wilkes-Barre,
Local 120</u>, 647 F.2d 372 (3d Cir. 1981) ................... 10

**<u>Statutes</u>**

29 U.S.C. §185............................................... 12

29 U.S.C. §160(b)............................................ 12

**Rules**

Fed.R.Civ.P. 12(b)(6)........................................ 6, 9

Fed.R.Civ.P. 12(c)........................................... 6

**Constitutional Provisions**

U.S. Const. Amend. I......................................... 3

N.J. Const. Art. I, ¶6....................................... 3

## PRELIMINARY STATEMENT

Cohen, Weiss and Simon LLP ("CWS") files this motion to dismiss Count XIII of the Complaint of Plaintiff, Daniel D'Ambly ("Plaintiff" or "D'Ambly") with prejudice.  In this Count, the sole Count of the Complaint asserted against CWS, Plaintiff alleges a claim of legal malpractice arising from CWS' representation of Local One-L, Graphic Communications Conference of the International Brotherhood of Teamsters (the "Teamsters Union") in a labor arbitration challenging D'Ambly's termination by the New York Daily News ("Daily News").

This claim of legal malpractice fails as a matter of law. Legal precedent, including binding precedent from the Third Circuit Court of Appeals, compels the dismissal of this claim because there is no attorney-client relationship between Plaintiff and CWS, which represents the Teamsters Union, not its constituent member.

## PROCEDURAL HISTORY

On September 21, 2020, D'Ambly filed a Complaint with jury demand against Defendants, Christian Exoo a/k/a Antifash Gordon ("Exoo"), St. Lawrence University, Tribute Publishing Company ("Tribute"), Daily News, Vijaya Gadde, Twitter, Inc. ("Twitter") and CWS (collectively referred to as "Defendants"). (Certification of Michael J. Canning, Esq. (the "Cert. Canning") at Exhibit A).

- 1 -

Count XIII of the Complaint alleges a claim of legal malpractice against CWS, which is the only count of the Complaint directed to CWS. (Cert. Canning, Exhibit A, pp. 31-32).

On October 22, 2020, CWS filed its Answer to Plaintiff's Complaint, denying all allegations of legal malpractice and setting forth separate defenses and cross claims against Defendants. (Cert. Canning, Exhibit C).[1] CWS pleaded as its second affirmative defense that Plaintiff's Complaint must be dismissed as to CWS for failure to state a claim upon which relief can be granted and reserved its right to move to dismiss the Complaint. Id.

CWS now files this motion to dismiss Plaintiff's Complaint as to CWS with prejudice pursuant to Rule 12(c).

### STATEMENT OF FACTS[2]

Plaintiff D'Ambly was a member of the Teamsters Union and worked as a plate maker for the Daily News in Jersey City, New Jersey until January 18, 2019, when the Daily News terminated him. (Cert. Canning, Exhibit A, ¶2).

---

[1] On October 23, 2020, the Court entered a Consent Order Granting Motion for Extension in which to File Answer or otherwise Move. (Cert. Canning, Exhibit B).

[2] Although the Complaint contains various misstatements of fact, CWS will accept the allegations of the Complaint as true for the purposes of this motion only.

Plaintiff is a member of the European Heritage Association and participates in political rallies, political protests, pamphleteering and speech, which he contends is protected by the U.S. Const. Amend. I and N.J. Const. Art. I, ¶6. (Cert. Canning, Exhibit A, ¶14).

Defendant Exoo is an alleged member of Antifa who uses the Twitter username @Antifash Gordon.  D'Ambly accuses Exoo of conducting "doxing" campaigns to publicly disclose the identity, employer, school, and home addresses of white supremacists and fascists in an attempt to get them fired from their jobs. (Cert. Canning, Exhibit A, ¶¶1, 15).

As alleged in the Complaint, in or about January 2018, Exoo identified D'Ambly as a white supremacist, and in October 2018, revealed D'Ambly's full identity, place of employment and other information.  (Cert. Canning, Exhibit A, ¶¶19, 24, 28). D'Ambly alleges that Exoo and his associates directed harassing, intimidating and death-threatening phone calls and Twitter "tweets" to the Daily News in order to try to get D'Ambly fired. (Cert. Canning, Exhibit. A, ¶25).

In December 2018, the Tribune, the parent company of the Daily News, conducted an investigation resulting in a Private Investigation Report ("Report") that confirmed through videography evidence that D'Ambly and others had used racial slurs and other

hate speech during political rallies.  (Cert. Canning, Exhibit A, ¶¶26, 30).

On January 10, 2019, D'Ambly, accompanied by a representative of the Teamsters Union, met with Tribune and Daily News representatives.  During the meeting, the Report was discussed and D'Ambly acknowledged that he was a member of the European Heritage Association and had used imprudent language at protests.  (Cert. Canning, Exhibit A, ¶30).

D'Ambly alleges that on January 11, 2019, in an attempt to stop a protest the following day by the European Heritage Association, Exoo and his associates sent to the Daily News death threats and threatening calls.  (Cert. Canning, Exhibit A, ¶32). Later that day, the Daily News issued D'Ambly a "Last and Final Warning." (Cert. Canning, Exhibit A, ¶39).

D'Ambly alleges that on January 16, 2019, the Daily News blamed him for death threats it had received, and terminated his employment. (Cert. Canning, Exhibit A, ¶43).

Thereafter, the Teamsters Union filed a grievance against the Daily News challenging D'Ambly's termination, pursuant to the terms of the collective bargaining agreement.  The Teamsters Union engaged CWS, a law firm, to handle the grievance and arbitration. (Cert. Canning, Exhibit A, ¶¶10, 44, 48).

On or about July 15, 2019, the Daily News, the Teamsters Union, and D'Ambly executed a Separation Agreement resolving the

grievance and arbitration.  The Daily News paid D'Ambly a lump sum payment and in exchange the Teamsters Union withdrew the grievance and arbitration with prejudice. (Cert. Canning, Exhibit A, ¶53).

The sole cause of action pleaded against CWS is Count XIII of the Complaint, which alleges legal malpractice relating to the legal services provided by CWS relating solely to the grievance and arbitration between the Teamsters Union and the Daily News. (Cert. Canning, Exhibit A, ¶¶ 48-53, 154-161).  D'Ambly alleges that in connection with the grievance and arbitration, he spoke with CWS attorneys Thomas Kennedy and Kate Swearengen, and that both attorneys allegedly expressed their disagreement as to his political positions.  D'Ambly asserts that CWS failed to adequately represent and protect his rights as a result of its attorneys' personal revulsions to his politics.  (Cert. Canning, Exhibit A, p. 31, ¶155).  D'Ambly alleges that CWS neglected to perform necessary case research, legal research and investigation of the accusations against him and contends that this failure resulted in their inability to protect him from the extortionate and criminal conduct of others.  (Cert. Canning, Exhibit A, p. 31, ¶¶156 & 157).  D'Ambly alleges that an investigation would have determined that @AntiFashGordon publicly announced D'Ambly's termination on January 13, 2019, five days before his official termination date and one day before the Daily News discovered the purported "cause" for his termination.  (Cert. Canning, Exhibit A, p. 31, ¶158).

- 5 -

D'Ambly alleges that CWS failed to challenge blatant misrepresentations by the Daily News regarding the timing of the alleged cause of his termination. (Cert. Canning, Exhibit A, p. 32, ¶159). D'Ambly further alleges that CWS' revulsion of D'Ambly's political views caused CWS to ignore that his termination was racially discriminatory and pre-textual. (Cert. Canning, Exhibit A, p. 32, ¶160). D'Ambly contends that he has suffered adverse consequences and continues to be damaged, and seeks compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees and other damages. (Cert. Canning, Exhibit A, p. 32, ¶161).

## STANDARD OF REVIEW

The Third Circuit has explained that a court may grant a Rule 12(c) motion for judgment on the pleadings when "no material issue of fact remains to be resolved and [the movant] is entitled to judgment as a matter of law." Rosenau v. Unifund Corp., 539 F.3d 218, 221 (3d Cir. 2008)(quoting Jabolonski v. Pan Am. World Airways, Inc., 863 F.2d 289, 290-91 (3d Cir. 1988)(internal quotation marks and citations omitted)).

"The difference between Rule 12(b)(6) and Rule 12(c) is purely procedural and 12(c) requests for dismissal are governed by the same standards as 12(b)(6) motions." Glob. Naps. Inc. v. Bell Atl. N.J. Inc., 287 F.Supp. 2d 532, 530 (D.N.J. 2003). For a complaint to survive dismissal under Rule 12(b)(6), or Rule 12(c),

it must contain sufficient factual matter to state a claim that is plausible on its face.  <u>Ashcroft v. Iqbal</u>, 556 U.S. 544, 570 (2007).  In evaluating the sufficiency of a complaint, district courts must separate the legal and factual elements.  <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210-211 (3d Cir. 2009).  Mere restatements of the elements of a claim are legal conclusions and therefore are not entitled to an assumption of truth.  <u>Burtch v. Milberg Factors Inc.</u>, 662 F.3d 212, 224 (3d Cir. 2011).  The pleading must contain more than "labels and conclusions or a formulaic recitation of the elements of a cause of action."  <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678.  The court "need not credit a complaint's 'bald assertions' or 'legal conclusions.'"  <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1429 (3d Cir. 1997).

### <u>LEGAL ARGUMENT</u>

#### <u>POINT I</u>

**THIS COURT SHOULD DISMISS COUNT XIII OF PLAINTIFF'S COMPLAINT WITH PREJUDICE UNDER RULE 12(C) AS THERE IS NO LEGAL BASIS FOR THE <u>LEGAL MALPRACTICE CLAIM AGAINST CWS.</u>**

**A.    As a Matter of Law, There Is No Attorney-Client Relationship between Plaintiff and CWS, as CWS Represented the Union in the Grievance and Arbitration.**

In order to sustain a cause of action for legal malpractice under New Jersey law, an attorney-client relationship must be established between the plaintiff and the defendant which imposes

upon the defendant a duty of care to the plaintiff.  Jerista v. Murray, 185 N.J. 175, 190-91 (2005).

Where, as here, an attorney represents a union in a labor grievance on behalf of a union member as part of the collective bargaining process, the attorney represents the union and no attorney client relationship is entered into between the attorney and the union member.  Because Plaintiff cannot prove the *prima facie* element of a legal duty owed by CWS to him, his claim for legal malpractice against CWS is unsustainable as a matter of law.

As all of the factual allegations and the sole cause of action against CWS arise out of and relate to the grievance and arbitration which are part of the collective bargaining process, CWS is immune from suit for malpractice by Plaintiff as a member of the Teamsters Union.

In Carino v. Stefan, 376 F.3d 156 (3d Cir. 2004), the Third Circuit Court of Appeals unequivocally ruled that Section 301(b) of the Labor Management Relations Act ("LMRA"), as broadly interpreted by the United States Supreme Court in Atkinson v. Sinclair Refinancing Co., 370 U.S. 238 (1962), immunizes from suit for legal malpractice attorneys hired by unions to perform services related to a collective bargaining agreement.

In Carino, plaintiff was employed as an insurance agent and was a member of the union that had a collective bargaining agreement with her employer.  When plaintiff's employer terminated

her employment (for misconduct in selling insurance policies), the union filed a grievance under the procedures established by the collective bargaining agreement. The union thereafter engaged a law firm to handle the arbitration challenging plaintiff's termination, and the law firm appointed one of its attorneys for this purpose. Plaintiff thereafter executed a settlement agreement in which she agreed to forego arbitration because the attorney assured her that in exchange, her employer would clear her of the charges and reinstate her pension. When plaintiff realized that the documents she signed made no reference to such concessions by her employer, she brought claims of legal malpractice against the firm and the attorney. Carino, 376 F.3d at 158-59.

This Court dismissed the complaint with prejudice under Fed.R.Civ.P. 12(b)(6) for failure to state a claim. The Third Circuit Court of Appeals affirmed the dismissal of the complaint and made clear that the attorney enjoyed immunity:

> This appeal presents a question of first impression for our Court, namely, whether an attorney hired by a union to perform services on behalf of a union member in connection with an arbitration hearing conducted pursuant to a collective bargaining agreement is immune from suit for malpractice by that member. We conclude that the LMRA bars such a suit. [Carino, 376 F.3d at 159.]

In reaching this conclusion, the Third Circuit explained that "the law is clear that individual union officers are not personally

liable to third parties for actions taken on behalf of the union in the collective bargaining process." Id. at 159-160.[3] The Carino court found that "with monotonous regularity [other courts of appeals have] cited Atkinson to foreclose state-law claims, however inventively cloaked, against individuals acting as union representatives within the ambit of the collective bargaining process." Id. at 160 (internal quotation marks and citations omitted).

With respect to the specific issue of the applicability of Atkinson to attorneys who act on behalf of a union to assist a union member in a labor arbitration, the Third Circuit recognized that other courts of appeals had all reached the same result:

> The only courts of appeals to have considered the specific question presented here, where attorneys acted on behalf of the union, have uniformly concluded that Atkinson prohibits claims made by a union member against attorneys employed by or retained by the union to represent the member in a labor dispute. See Waterman v. Transport Workers Union Local 100, 176 F.3d 150 (2d Cir. 1999)("[U]nder Atkinson, a union's attorneys may not be sued by an individual union member for actions taken pursuant to a collective bargaining agreement."); Arnold v. Air Midwest Inc., 100 F.3d 857, 862 (10th Cir. 1996) ("[A]n attorney who performs services for and on behalf of a

---

[3] The Third Circuit had previously recognized that Atkinson protects individual union members and officers from suit from alleged union wrongs. See e.g., Wilkes-Barre Pub. Co. v. Newspaper Guild of Wilkes-Barre, Local 120, 647 F.2d 372, 377 (3d Cir. 1981); Republic Steel Corp. v. United Mine Workers of America, 570 F.2d 467, 478 (3d Cir. 1978).

> union may not be held liable in malpractice to
> individual grievant where the services
> performed constitute a part of the collective
> bargaining process."); Breda v. Scott, 1 F.3d
> 908, 909 (9th Cir. 1993) (holding that
> employees cannot sue inside or outside counsel
> for services rendered under a collective
> bargaining agreement); Montplaisir [v.
> Leighton, 875 F.2d 1, 7 (1st Cir. 1989)]
> ("[F]or purposes of the Atkinson principle,
> [attorneys] must be treated the same as other
> union agents."); Peterson v. Kennedy, 771 F.2d
> 1244, 1258 (9th Cir. 1985), cert. denied, 475
> U.S. 1122, 106 S.Ct. 1642, 90 L.Ed. 2d 187
> (1986) ("[W]here, as here, the attorney
> performs a function in the collective
> bargaining process that would otherwise be
> assumed by the union's business agents or
> representatives, the rationale behind the
> Atkinson rule is squarely applicable.")
> [Id. at 160.]

As one court has explained, a union may choose to have grievances handled by a union representative with no legal training, or by an attorney. When a union chooses to make use of an attorney, that attorney has not "entered into an 'attorney-client' relationship in the ordinary sense with the particular union member" at issue. Peterson, 771 F.2d at 1258 (internal quotations in the original). Rather, the attorney merely "assume[s] a function that often is performed by a union's business agents or representatives." Peterson, 771 F.2d at 1258. When it is the union which provides the services, albeit through assigned counsel, it is the union, rather than the individual business agent or attorney, that represents and is ultimately responsible to the member. Id.

- 11 -

In Carino, the Third Circuit cited several policy considerations for not permitting members to bring malpractice claims against union attorneys handling labor grievances under a collective bargaining agreement. First, the court noted that it would be "anomalous" if the union attorney could be liable for mere negligence where the union would be liable only if a higher standard were met, namely arbitrariness or bad faith. 376 F.3d at 161.

Second, because state statutes of limitation for malpractice are generally longer than the statutes of limitation for a union member to file suit against the union or employer, if union attorneys were subject to such malpractice suits, litigants would be able to proceed against the attorney long after their time for suing the union and the employer had expired. Id. (citing Peterson, 771 F.2d at 1259).[4]

Finally, the Third Circuit recognized that if union members were permitted to sue union attorneys, the attorneys could be held liable for damages "flowing from the union's political or tactical choices" which "could, in turn, severely hamper unions in enlisting quality representation." Id. (citing Montplaisir, 875 F.2d at 7).

---

[4] Any claim against the Teamsters Union is time-barred by the applicable six-month statute of limitations. See §301 of the LMRA, 29 U.S.C. §185; §10(b) of the National Labor Relations Act, as amended, 29 U.S.C. §160(b).

"[G]uided by <u>Atkinson</u> [] and the logic of the opinions" of the other courts of appeals, the Third Circuit held that "§ 301 of the LMRA immunizes attorneys employed by or hired by unions to perform services related to a collective bargaining agreement from suit for malpractice." <u>Id.</u> at 162.

Here, the sole allegations against CWS relate to the services it provided on behalf of the Teamsters Union in the grievance and arbitration process, which are part of the collective bargaining agreement between the Daily News and the Teamsters Union. Under the clear and unequivocal holding in <u>Carino</u>, CWS is immune from D'Ambly's claim of legal malpractice.

<u>**CONCLUSION**</u>

Based on the foregoing arguments, Defendant Cohen, Weiss and Simon LLP respectfully requests that the Court dismiss Count XIII of the Complaint with prejudice.

GIORDANO, HALLERAN & CIESLA
A Professional Corporation
Attorneys for Defendant Cohen,
Weiss and Simon LLP

By: _____
    MICHAEL J. CANNING, ESQ.

Dated:  November 9, 2020

Docs #4724538-v1

- 13 -

# EXHIBIT "B"

Patrick Trainor, Esquire (Attorney ID 242682019)
LAW OFFICE OF PATRICK TRAINOR, ESQ., LLC
848 Paterson Avenue
East Rutherford, New Jersey 07073
P: (201) 777-3327
pt@ptesq.com
*Attorney for Plaintiff Daniel D'Ambly*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| DANIEL D'AMBLY, | |
| Plaintiff, | CIVIL ACTION NO.: |
| vs. | COMPLAINT |
| CHRISTIAN EXOO a/k/a ANTIFASH GORDON; ST. LAWRENCE UNIVERSITY; TRIBUNE PUBLISHING COMPANY; NEW YORK DAILY NEWS; VIJAYA GADDE; TWITTER, INC; COHEN, WEISS AND SIMON, LLP; | JURY TRIAL DEMAND |
| Defendants. | |

Plaintiff, Daniel D'Ambly by and through his attorney the Law Office of Patrick Trainor,

Esq., LLC, as and for its Complaint against defendants Christian Exoo a/k/a @AntifashGordon,

St. Lawrence University, Tribune Publishing Company, LLC, New York Daily News, Vijaya

Gadde, Twitter, Inc., and Cohen, Weiss, and Simon, LLP, hereby alleges as follows:

### STATEMENT OF THE CASE

1.      This action arises out of the repugnant conduct of defendant Christian Exoo, an

extortionist, known habitual doxer, and member of Antifa, associates with others to conduct

patterns of racketeering activities.  Defendant Exoo under the Twitter username

"AntiFashGordon" directs his associates in the "Exoo Enterprise" to conduct violent and

1

extortionate patterns of racketeering activities devoted to "doxing" complete strangers that the Exoo Enterprise has labeled "fascists" and/or "white supremacists." To "dox" someone means to publicly disclose a person's identity, employer, school, home address, etc., for the purpose of causing harm to that person. Once the target has been doxed, Exoo directs the Enterprise to commence a pattern of violent and threatening emails, Tweets, and phone calls to the target's employers, professional clients, schools, prospective employers or schools to extort the target's termination from employment, expulsion from school, and compel the targets exit from society. Exoo is aware of the potential illegality of his directives, because he instructs his associates to use the telephone *67 feature to block their phone numbers when making threatening calls.

Defendant Exoo identified D'Ambly as a white supremacist and thereafter, directed the Exoo Enterprise to stalk him in order to learn his true identity. Upon discovering D'Ambly's identity, Exoo directed the enterprise to deluge D'Ambly's employer, the New York Daily News their parent Tribune Publishing Company and D'Ambly's labor union the Teamsters, with violent and threatening Tweets, and phone calls threatening death and personal and physical harm to their employees and property, in order to extort D'Ambly's termination. Defendant Exoo unmistakably directs the Exoo Enterprise's patterns of racketeering activities through interstate communications.

One-person hellbent on destroying the lives of other persons, conspires with, participates in, and directs an enterprise that engages in patterns of racketeering activities every day by using interstate communications to threaten physical violence to extort and cause harm to their target. The enterprise's associates and co-conspirators include, a major religious university, top lawyer of a publicly traded corporation and the publicly traded corporation. The Exoo Enterprise's associates are motivated by a shared disdain of people labeled fascists and white supremacists.

## THE PARTIES

2.      Plaintiff Daniel D'Ambly (Hereinafter "Plaintiff" or "D'Ambly"), is a twenty-seven (27) year member of Local One-L, Graphic Communications Conference of the International Brotherhood of Teamsters, who was employed as a was a plate maker for the New York Daily News in Jersey City, New Jersey until January 18, 2019.  D'Ambly was labeled a 'fascist' and/or a 'white supremacist.'  Plaintiff is an individual domiciled in the State of New Jersey and a "person" as defined under 18 U.S.C. § 1961(3).

3.      Defendant Christian Exoo ("Exoo" or "@AntiFashGordon") is a library building supervisor and lecturer at St. Lawrence University.  Exoo is a self-described anti-fascist, notorious doxer, and leader of Antifa, who by doxing others has acquired a great deal of notoriety and infamy.[1]  Exoo currently publishes Tweets under Twitter username "@AntiFashGordon."  Exoo is an individual domiciled in the State of New York and a "person" as defined under 18 U.S.C. § 1961(3).

4.      St, Lawrence University ("St. Lawrence" or "STL") is a private four-year university with its principal place of business located at 116 Vilas Hall, 23 Romoda Drive, Canton, New York 13617, and a "person" as defined under 18 U.S.C. § 1961(3).

---

[1] *Anti-Fascists Are Waging A Cyber War – And They're Winning*, Medium.com (Sep. 9, 2019) https://gen.medium.com/antifas-keyboard-warriors-254f62be2a95 (last accessed Sep. 15, 2020); *Comcast fires employee with alleged ties to Proud Boys, We the People Rally*, PhillyVoice.com (November 15, 2018) https://www.phillyvoice.com/comcast-fires-employee-proud-boys-alt-right-philadelphia-rally/ (last accessed Sep. 15, 2020); *The Right Wing Is Trying to Make It a Crime to Oppose Fascism*, Truthout.org (Aug. 9, 2019) https://truthout.org/articles/the-right-wing-is-trying-to-make-it-a-crime-to-oppose-fascism/ (last accessed Sep. 15, 2020); *How to Spot An Abuser, Featuring Antifash Gordon, In His Own Words: A Step By Step Guide, and Also F\*\*\* That Guy*, Medium.com (Jun. 25, 2020) https://medium.com/@abuse_isnt_revolutionary/how-to-spot-an-abuser-featuring-antifash-gordon-in-his-own-abuser-words-7b39f4657b19 (last accessed Sep. 15, 2020).

5.     Tribune Publishing Company ("Tribune") is a media company organized under the laws of the State of Delaware with its principal place of business located at 160 N. Stetson Avenue, Chicago, Illinois 60601 that conducts its business throughout the United States, and is a "person" as defined under 18 U.S.C. § 1961(3).

6.     New York Daily News Company ("Daily News") is owned by the Tribune Publishing Company (Tribune and Daily News are sometimes hereinafter referred to collectively 00000as Daily News) with a place of business located at 125 Theodore Conrad Drive, Jersey City, New Jersey 07305, and 4 New York Plaza, New York, NY 10004.  The Daily News is a "person" as defined under 18 U.S.C. § 1961(3).  At all times relevant, the Tribune Publishing Company had the right and did exercise control over the actions of the New York Daily News.

7.     Vijaya Gadde ("Gadde") is the Head of Legal, Public Policy, and Trust and Safety Lead at Twitter, Inc.  At all times relevant, Vijaya Gadde was the sole decision maker and person authorized to permanently ban Twitter users 0who violated Twitter's Terms of Service and Rules.  She is a "person" as defined under 18 U.S.C. § 1961(3).  Gadde is believed to be domiciled in the State of California.

8.     Twitter, Inc. ("Twitter"), is a company organized under the laws of the State of Delaware with its principal place of business located at 1355 Market Street, San Francisco, CA 94103, that conducts its business globally and a "person" as defined under 18 U.S.C. § 1961(3).

9.     The Exoo Enterprise is a criminal enterprise as defined under 18 U.S.C. § 1961(4), consisting of Defendant Christian Exoo a/k/a "AntiFashGordon," who directs the Exoo Enterprise, St. Lawrence University, Vijaya Gadde, Twitter, Inc., and unidentified associates.

4

10.     Cohen, Weiss, and Simon, LLP ("CWS") is a law firm with its principal place of business located at 900 3rd Avenue, #2100, New York, New York 10022 and a "person" as defined under 18 U.S.C. § 1961(3).

## JURISDICTION AND VENUE

11.     Jurisdiction of this Court is proper because this litigation arises under federal law, namely 18 U.S.C. §§ 1961 to 1968.  This Court has jurisdiction over this matter under 28 U.S.C. § 1331.

12.     The Court has supplemental jurisdiction over the state law claims asserted in this case under 28 U.S.C. § 1367(a).

13.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and the threatened and actual harm to Plaintiff occurred in this District by reason of Defendants' conduct as alleged below.

## FACTUAL ALLEGATIONS

14.     In addition to being a Teamster, D'Ambly is a member of the New Jersey European Heritage Association ("EHA"), a non-violent, pro-domestic policy organization that the Exoo Enterprise has labeled a white supremacist hate group.  D'Ambly, who the Exoo Enterprise identifies as the leader of EHA, actively participates with other EHA members in political rallies, peaceful political protests, pamphleteering, and speech that is protected by U.S. Const. amend. I and N.J. Const. art. I, ¶ 6.

15.     Defendant Exoo publishes Tweets and doxes others using Twitter username "@AntiFashGordon" the leading Antifa Twitter account that as of September 16, 2020, has 37,518 followers.  The headline of @AntiFashGordon's public profile states "I expose fascists

via #OSINT, get them fired, de-homed, kicked out of school, etc." Based on the substance of @AntiFashGordon's Tweets he broadly identifies persons who do not share his radical far left political ideology as fascists and/or white supremacists. Exoo's definition of fascists and white supremacists is indiscernible, because he uses the terms broadly and interchangeably.

16.     Upon information and belief, Exoo is known to Twitter's Trust & Safety Council ("TSC") as a habitual doxer and ban evader. A ban evader is a person who creates a new Twitter account after receiving a permanent ban. The ban evader's new account is called a "ban evasion account."

17.     Doxing is prohibited by Twitter's Private Information Policy within their Terms of Service and Rules ("TOS").[2] Twitter's TOS do not permit permanently banned persons to create new accounts,[3] a permanent ban means a lifetime ban.

18.     Upon information and belief, Exoo has had two Twitter accounts permanently banned for doxing. Twitter has previously permanently banned @ChrisExoo,[4] @ChristianExoo,[5] in addition, Twitter allowed @DoxSavage to change its name @AntiFashGordon.

19.     Upon information and belief, the Exoo Enterprise targeted D'Ambly as a white supremacist at some point in or about January 2018. Thereafter, Exoo directed his associates via Twitter to uncover D'Ambly's true identity, for the sole purpose of doxing him.

---

[2] https://help.twitter.com/en/rules-and-policies/personal-information "You may not publish or post other people's private information without their express authorization and permission. We also prohibit threatening to expose private information or incentivizing others to do so."
[3] https://help.twitter.com/en/rules-and-policies/enforcement-options "Permanent suspension: This is our most severe enforcement action. Permanently suspending an account will remove it from global view, and the violator will not be allowed to create new accounts."
[4] https://twitter.com/ChrisExoo (last accessed Sep. 15, 2020)
[5] https://twitter.com/ChristianExoo (last accessed Sep. 15, 2020)

6

20.     Upon information and belief, by September 2018, Twitter received dozens of complaints directly Tweeted to Twitter Support and Twitter Trust and Safety informing them that Exoo's previous Twitter account @DoxSavage was aggressively doxing, which forced Twitter to investigate the accounts activities. Under Twitter's normal protocol, accounts being investigated for violating the TOS are prevented from Tweeting during the investigation. [6]

21.     Twitter ignored their TOS and allowed @DoxSavage to continue Tweeting during their investigation.

22.     Upon information and belief, at some point on or about October 1, 2018, Gadde and Twitter agreed to allow @DoxSavage to undergo a name change in lieu of a permanent ban. Instead of receiving his third permanent ban, Twitter agreed to change Exoo's username to @AntiFashGordon. The unprecedented agreement to allow the name change under these circumstances was done to ensure the approximate 20,000 @DoxSavage followers were not lost.

23.     On October 11, 2018, @DoxSavage Tweeted a farewell announcement to his followers: "Hey folks—I just underwent a name change from @DoxSavage to @AntiFash Gordon. I'll be back tomorrow to expose more violent fascists who were on the ground in Providence on 10/6." The name change kept the Exoo Enterprise intact, and their ability to effectively conduct its patterns of racketeering activities was not harmed.

24.     On October 29, 2018, at 11:49 a.m., @AntiFashGordon published a massive twenty-two count Tweet thread (a thread is a series of related Tweets) that doxed D'Ambly to his estimated 20,000 followers. The dox publicly disclosed for the first time D'Ambly's name, hometown, photograph, employer, occupation, employer's location, multiple telephone numbers

---

[6] https://help.twitter.com/en/rules-and-policies/enforcement-options (last accessed Sep. 15, 2020)

7

for his employer, a labor union Referendum Board he chaired, and the names of the other Referendum Board members.

25.     In the dox, @AntiFashGordon labeled D'Ambly a "Nazi" and directed the Exoo Enterprise associates to send harassing, intimidating, and threatening phone calls and Tweets to the Daily News's Twitter username @NYDailyNews, to extort D'Ambly's termination. Exoo's dox directed:

   a.   In the 19th Tweet, @AntiFashGordon directed his associates "stay on top of this, too. If you don't hear back from @NYDailyNews, keep tweeting at them." Call their printing facilities in Jersey City at (201) ***-**** (number provided in original Tweet) and warn them about Daniel D'Ambly…"

   b.   A follow up Tweet included a second telephone number for the New York Daily News and a subsequent Tweet included the direct telephone number to D'Ambly's print shop.

   c.   Within minutes the Exoo Enterprise obeyed Exoo's directive and flooded @NYDailyNews and @Teamsters with Tweets and phone calls that threatened the Daily News with violent attacks if D'Ambly was not terminated.

   d.   Upon information and belief, from October 29, 2018, to January 11, 2019, the Exoo Enterprise directed no less than fifty-four (54) threatening Tweets to @Daily News plus an unknown number of threatening phone calls.

   e.   D'Ambly was never told of the threats or warned to take safety precautions by anyone from the Daily News or Tribune.

26.     On October 30, 2018, without warning D'Ambly of the dangerous threats, Tribune engaged Insite Risk Management ("Insite") to investigate D'Ambly. At the conclusion

of their investigation, Insite produced the "Private Investigation Report" ("Report") and provided it to the Tribune on December 4, 2018. The Report acknowledged @AntiFashGordon's doxing was the impetus for the investigation and confirmed D'Ambly's association with EHA. The Report included videos of D'Ambly and others using imprudent language during political rallies.

27.     On or before January 8, 2019, EHA posted flyers on public bulletin boards in Princeton, New Jersey that announced an "It's okay to be white" protest march purportedly scheduled for January 12, 2019.

28.     On January 9, 2019, @AntiFashGordon re-Tweeted the "It's okay to be white" march to his associates and again doxed D'Ambly by Tweeting, "If anyone wants their leaders name, it's Dan D'Ambly."

29.     On January 10, 2019, @AntiFashGordon published a second Tweet that referenced EHA's purported march and directed his associates to "show up and shut down" the purported march "And please say hi to their leader, Dan D'Ambly for me."

30.     On January 10, 2019, D'Ambly was called to an interview with Jean Nechvatal ("Nechvatal), Tribune's Vice President, Talent Management & Learning and James R. Brill ("Brill"), Daily News's Sr. Vice President of Operations. D'Ambly was accompanied at the meeting by Union Steward Pete Cairnie. During the meeting, D'Ambly was confronted with content of the Report, but not informed of the report's existence. D'Ambly acknowledged using imprudent language in a private conversation during a protest.

31.     On January 11, 2019, at 10:14 a.m., @AntiFashGordon again directed his associates to shut down EHA's purported January 12, 2019 "It's okay to be white" march and exhorted his associates "if you can, show up and show these pricks that we don't tolerate hate in our streets." The Tweet included @NYDailyNews and doxed D'Ambly's hometown again.

9

Exoo encouraged violence to shut down the purported protest, but warned "Remember that the police won't protect us here."

32.　　Upon information and belief, at some point before 10:21 a.m. on January 11, 2019, Edward Bushey, Sr. Vice President, General Manager, Manufacturing and Distribution at Tribune delivered recordings of the death threats to the Daily News.  The callers threatened D'Ambly and stated the Daily News was responsible for "any violence or blood spilled is also on your hands."  One threatening caller's phone number was captured.

33.　　On January 11, 2019, from 9:30 a.m. to 10:14 a.m., Twitter usernames @hubcityantifa, @NYCAntifa, and @Nstricklanded replied via Tweet to @AntiFashGordon's instructions with coded messages that confirmed they followed his instructions and made threats.

34.　　Upon reason and belief, one of the death threat phone numbers is owned by a person who Tweeted mission confirmation to @AntiFashGordon on January 11, 2019.

35.　　On January 11, 2019, at 2:20 p.m., EHA Tweeted that the "It's okay to be white" protest was a prank.

36.　　On January 11, 2019, at 3:30 p.m., D'Ambly was called to a second meeting with James Brill, Sr. Vice President of Operations for the Daily News to recap the previous days meeting.  In the meeting, Brill issued D'Ambly a "Last and Final Warning" that stated the "ONLY reason that you are not being terminated immediately is because, thus far, we have not determined that your activities with NJEHA has occurred at work and/or derogatory comments were made about any co-workers."  The warning continued "should we learn that you engaged in any inappropriate speech or behavior in the workplace or with regard to any other employee, or if the Company or any of its employees suffer any backlash as a result of your association with

the NJEHA, your conduct will be considered "work-related" and you will be terminated immediately."

37.     This meeting with Brill was a pre-text for D'Ambly's termination.  The meeting occurred five (5) hours after death threats were received, but Brill did not inform Plaintiff, because the Daily News intended to use the threats as evidence the company received "backlash" from D'Ambly's conduct and was the "cause" of his termination.

38.     At 4:34 p.m. on January 11, 2019, @AntiFashGordon replied to EHA's Tweet by threatening D'Ambly whereby @AntiFashGordon threatened "Regardless, I'm gonna spend the next week wrecking your fucking life, Dan D'Ambly."

39.     In the evening of January 11, 2019, the Exoo Enterprise's extended campaign of violent Tweets and threats of physical violence to D'Ambly came to fruition and his vehicle was "keyed" (scratched) and tires slashed while parked outside of his home on private property.  An investigation report for a bias incident, criminal mischief, and harassment was filed with the South Brunswick Police Department.

40.     Plaintiff reported to work the following day on January 12, 2019, but was not informed of the death threats received the day before.

41.     On Sunday, January 13, 2019, at 10:16 a.m., five (5) days before D'Ambly's official termination date @AntiFashGordon Tweeted to four of his associates that he "got a pretty reliable tip this morning that he's not at the @NYDailyNews anymore…" in reference to Plaintiff.

42.     On Monday, January 14, 2019, the Daily News called D'Ambly and told him not to report to work until informed otherwise.

43.     On January 16, 2019, during a phone conference with Brill, Nechvatal, and a Union representative, D'Ambly was played the recorded death threats and asked to identify the caller. D'Ambly was unable to identify the caller, but said it was the behavior of "Antifa types." Brill was scornful of D'Ambly's inability to identify the caller and blamed him for the threats. D'Ambly was terminated during this phone conference.

44.     On January 23, 2019, Patrick LoPresti, President of Local One-L informed the Daily News that they were appealing D'Ambly's termination pursuant to terms of the Contract.

45.     On or about January 25, 2019, D'Ambly received his "Termination of Employment" letter, , signed by Brill and dated January 22, 2019.  The letter informed Plaintiff his termination was effective January 18, 2019.  The termination letter is imbued with Brill's animus for D'Ambly.  In the letter, Brill stated "your choice to take these repulsive actions has now put our workplace and employees at risk of counter attacks by Antifa."

46.     The termination letter falsely stated the Daily News learned of the death threats on January 14, 2019, contrary to emails that confirm the Daily News learned of the threats on January 11, 2019.

47.     In the termination letter, Brill claimed the death threats received on January 11, 2019, were the "cause" of D'Ambly's termination, because the death threats meant D'Ambly "brought his activities" into the workplace, therefore, "we deem your actions to be work related and are terminating your employment for cause."

48.     At some point after January 23, 2019, the Union on behalf of D'Ambly filed a grievance with the American Arbitration Association, case number 01-19-0000-7178.  The Union retained attorneys Thomas Kennedy ("Kennedy") and Kate M. Swearengen

("Swearengen") of Cohen, Weiss, and Simon, LLP (collectively Kennedy, Swearengen and Cohen. Weiss and Simon, LLP shall be referred to as "CWS") to represent Plaintiff.

49.     Thereafter, D'Ambly had a phone conference with Kennedy to discuss the case. D'Ambly was acquainted with Kennedy for approximately twenty years due to his Union activities. D'Ambly explained the threats he received, property damage, and that his tires were slashed. D'Ambly stated "Tom, this Antifa are terrorists…" Kennedy angrily responded, "I do not consider Antifa to be terrorists and if you are going to continue referring to them (Antifa) as terrorists we are going to end this call." Kennedy scoffed at D'Ambly's desire to have his employment reinstated at the Daily News.

50.     At some point thereafter, D'Ambly had his first case discussion phone conference with Kate Swearengen, who assumed representation. Without prompting, Swearengen explicitly informed D'Ambly that "she doesn't agree with his politics and she doesn't want to discuss them any further." Like Kennedy, Swearengen dismissed D'Ambly's wish to have his employment reinstated.

51.     Kennedy and Swearengen's revulsion of D'Ambly directed their representation and they failed to adequately research basic facts favorable to D'Ambly's wish to be reinstated. CWS ignored Brill's misrepresentation and veracity of the claimed "cause" of their client's termination.

52.     CWS failed to adequately investigate the sources of the doxing campaign. Had CWS engaged in reasonable investigation of the source of the dox they would have discovered @AntiFashGordon's January 13, 2019, announcement that D'Ambly was terminated, which was one day before the Daily News claimed they learned of the "cause" of D'Ambly's termination.

13

53.     On or about July 15, 2019, D'Ambly dejectedly executed the "Separation Agreement and Mutual General Release" negotiated by CWS that paid him a lump sum payment in exchange the Union would withdraw the pending arbitration case with prejudice.

54.     As a result of Defendants' misconduct D'Ambly has suffered substantial personal and property damage and been severely financially harmed.

<u>CLAIMS FOR RELIEF</u>

<u>COUNT I</u>

**Violation of New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to – 49
(as to Defendants Tribune Publishing Company and the New York Daily News)**

55.     Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 54 with the same force and effect as if set forth in detail herein again.

56.     Defendants Tribune and Daily News are employers as defined in N.J.S.A. 10:5-5.

57.     Plaintiff  is older than forty years (40) old and was an employee as defined in N.J.S.A. 10:5-5.

58.     Defendants Tribune and Daily News discharged D'Ambly due to their enmity towards his racially identifiable associations, whereas non-white Tribune and Daily News employees who participate in racially identifiable associations are not punished or terminated, violated N.J.S.A. 10:5-12.

59.     Defendants Tribune and Daily News undertook several pre-textual steps to mask D'Ambly's discriminatory termination:

    a.   Tribune hired a private investigation firm to invade D'Ambly's privacy in an unsuccessful effort to catch D'Ambly engaged in unlawful activity.

b. In the morning of January 11, 2019, the Daily News received death threats intended to extort D'Ambly's termination that they did not immediately disclose, because they intended to use the threats pre-textually as the "cause" of Plaintiff's termination.

c. In the afternoon of January 11, 2019, the Daily News issued D'Ambly a "Last and Final Warning," that warned him he would be immediately terminated if it were discovered he brought his political activities into the workplace, but they did not inform or warn D'Ambly of the death threats earlier received.

d. D'Ambly was informed he was terminated on January 16, 2019.

e. Subsequently, D'Ambly received a "Termination of Employment" letter dated January 22, 2019, whereby, the Daily News falsely stated they discovered the death threats on January 14, 2019, contrary to indisputable evidence they received the death threats on January 11, 2019, which meant he "brought his activities into the workplace" after he was warned. Daily News cited this fabrication as the "cause" of D'Ambly's termination.

60. As a direct and proximate result of defendants Tribune Publishing Company and the New York Daily News racially discriminatory termination, D'Ambly has suffered adverse consequences and continues to be damaged. D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

<u>COUNT II</u>

**Tortious Interference with Prospective Economic Benefit**

**(as to defendant Christian Exoo a/k/a "AntiFashGordon")**

15

61.     Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 60 with the same force and effect as if set forth in detail herein again.

62.     D'Ambly was rightfully entitled to pursue lawful employment with the Daily News as a plate maker and dues paying member of the Union.

63.     D'Ambly reasonably expected his employment to continue into the future and to benefit economically from his employment.

64.     Defendant Exoo knew D'Ambly was employed by the Daily News and intentionally interfered with D'Ambly's prospective economic benefits to be gained from continued employment.

65.     Defendant Exoo intentionally and unjustifiably interfered with D'Ambly's rights to pursue a lawful business.

66.     Defendant Exoo's interference caused D'Ambly's employer to terminate his employment.

67.     D'Ambly has suffered and will continue to suffer irreparable harm in the form of damage to his reputation, loss of income and financial hardship as a result of Exoo's interference.

68.     As a direct and proximate result of defendant Exoo's interference with D'Ambly's prospective economic benefits, D'Ambly has suffered adverse consequences and continues to be damaged.  D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

<u>COUNT III</u>

16

**Intrusion Upon Seclusion – Public Disclosure of Private Personal Information**

**(as to defendant Christian Exoo a/k/a "AntiFashGordon")**

69.     Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 68 with the same force and effect as if set forth in detail herein again.

70.     In directing and carrying out a sustained effort to embarrass, defame and publicize private facts, including D'Ambly's home address and familial relations without his consent, Defendant Exoo intentionally intruded upon the D'Ambly's solitude and seclusion.

71.     By conducting a sustained effort to embarrass, defame and publicize private facts without the consent of the D'Ambly, including D'Ambly's home address and familial relations, defendants intentionally intruded upon the D'Ambly's solitude and seclusion.

72.     Defendant Exoo intentionally intruded on D'Ambly's solitude and seclusion in a manner that is highly offensive to a reasonable person.

73.     D'Ambly did not consent to Defendants intrusion.

74.     As a direct and proximate result of defendant Exoo's intrusion upon his seclusion, D'Ambly has suffered adverse consequences and continues to be damaged.  D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT IV

**Violation of N.J.S.A. 2C:33-4.1 and N.J.S.A. 2C:30-31(a) Cyber-Harassment and Stalking**

**(as to defendant Christian Exoo a/k/a "AntiFashGordon")**

17

75.     Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 74 with the same force and effect as if set forth in detail herein again.

76.     Defendant Exoo encouraged and incited others to violence against D'Ambly and conducted an ongoing campaign that intruded D'Ambly's life.

77.     Defendant Exoo intentionally and knowingly sent, commented, and posted D'Ambly's private and involuntarily disclosed personal information to social media networking sites to purposely harass, intimidate, and threaten D'Ambly.

78.     By encouraging others to inflict physical harm to D'Ambly's person and property.

79.     By encouraging others to commit crimes against D'Ambly that resulted in D'Ambly receiving death threats and sustaining physical damage to his personal property

80.     As a direct and proximate result of Defendant Exoo's cyber-harassment and stalking D'Ambly has suffered adverse consequences and continues to be damaged.  D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT V

### Violation of 18 U.S.C. § 875(c) – Interstate Communications

### (as to defendant Christian Exoo a/k/a "AntiFashGordon")

81.     Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 80 with the same force and effect as if set forth in detail herein again.

82.    By using an interactive computer service to intentionally transmit threats of physical violence to Plaintiff via interstate communications.

83.    By directing an enterprise that is engaged in an interstate campaign of violent threats to Plaintiff for the purpose of injuring and endangering D'Ambly's personal safety.

84.    By directing associates to "stay on top of this, too.  If you don't hear back from @NYDailyNews, keep tweeting at them" Exoo transmitted threats in interstate commerce.

85.    By explicitly threatening D'Ambly via an interactive computer service, by Tweeting "Regardless, I'm gonna spend the next week wrecking your fucking life, Dan D'Ambly" Exoo transmitted threats in interstate commerce.

86.    As a direct and proximate result of defendant Exoo's use of interstate communications to threaten and harm D'Ambly he suffered adverse consequences and continues to be damaged.  D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT VI

### Violation of 18 U.S.C. 2261A(2) –Stalking

### (as to defendant Christian Exoo a/k/a "AntiFashGordon")

87.    Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 86 with the same force and effect as if set forth in detail herein again.

88.    Beginning in or about January 2018, Defendant Exoo used an interactive computer service to surveil and stalk D'Ambly with the intent to harass, intimidate, threaten, and injure D'Ambly.

19

89.     As a result of stalking D'Ambly, Defendant discovered D'Ambly's true personal identity and then disseminated the information using an interactive computer service with instructions to associates to harass, intimidate, and endanger D'Ambly's personal safety.

90.     Defendant Exoo used an interactive computer service to direct others to harass, intimidate, and threaten others in order to extort D'Ambly's termination from lawful employment.

91.     Defendant Exoo's conduct caused D'Ambly to reasonably fear for the safety of himself and his family, and caused him to suffer severe emotional and financial distress.

92.     As a direct and proximate result of defendant Exoo's stalking in violation of 18 U.S.C. § 2261A(2) D'Ambly has suffered adverse consequences and continues to be damaged. D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT VII

### Employer's Breach of its Duty to Warn

### (as to Defendants Tribune Publishing Company and the New York Daily News)

93.     Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 92 with the same force and effect as if set forth in detail herein again.

94.     Defendants Tribune and Daily News received a stream of death threats directed at Plaintiff over a two and one-half month period, but they never warned D'Ambly.

95.     Defendants Tribune and Daily News never warned D'Ambly to take precautionary measures as he entered or exited the workplace.

20

96.     Defendants Tribune and Daily News did not take steps to increase the safety of D'Ambly and other employees as they entered and exited the workplace.

97.     Defendants Tribune and Daily News did not secure the workplace in order to protect D'Ambly and others.

98.     As he was not aware of the threats, D'Ambly could not take steps to protect himself and his property and as a result his property was damaged on January 11, 2019.

99.     Defendants Tribune and Daily News had a duty to warn their employee he was the direct target of the death threats they received.

100.    As a direct and proximate result of defendants Tribune and Daily News' failure to warn D'Ambly has suffered adverse consequences and continues to be damaged.  D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT VIII

### Violations of N.J.S.A 2C:41-1 to – 2C:41-6.2 (Racketeering)

### (as to defendant Christian Exoo a/k/a "AntiFashGordon," St. Lawrence University, Vijaya Gadde, and Twitter, Inc., the "Exoo Enterprise")

101.    Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 100 with the same force and effect as if set forth in detail herein again.

102.    The "Exoo Enterprise" is directed by defendant Christian Exoo a/k/a "AntiFashGordon," and consists of associates St. Lawrence University, including their employees and agents, Vijaya Gadde, and Twitter, Inc., including their employees and agents, and unknown associates.

21

103.    Defendant Exoo used an interactive computer service to direct the Exoo
Enterprise's patterns of racketeering activities as defined by N.J.S.A. 2C:41(a)(1) to extort
D'Ambly's termination from the Daily News.

   a.   The Exoo Enterprise threatened the Daily News via Tweets and phone calls and
        related activities prohibited by N.J.S.A. 2C:41-2.

   b.   Exoo Enterprise committed multiple prohibited by N.J.S.A. 2C:41(a)(1)(h).

   c.   Exoo Enterprise committed multiple prohibited by N.J.S.A. 2C:41(a)(1)(bb)

104.    As a direct result of the Exoo Enterprises patterns of racketeering activities,
D'Ambly was terminated from his employment.

105.    As a direct and proximate result of Defendants' patterns of racketeering activities
D'Ambly has suffered adverse consequences and continues to be damaged.  D'Ambly is entitled
to compensatory damages, equitable and declaratory relief, punitive damages, costs, and
reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of
$75,000.00.

## COUNT IX

### Violations of 18 U.S.C. §§ 1962(c) – Racketeering

### Multiple violations of RICO predicates 18 U.S.C. §§ 1951 and 1952

### (as to defendant Christian Exoo a/k/a "AntiFashGordon," St. Lawrence University, Vijaya Gadde, and Twitter, Inc., the "Exoo Enterprise")

106.    Plaintiff repeats and incorporates herein by reference each and every one of the
allegations contained in paragraphs 1 through 105 with the same force and effect as if set forth in
detail herein again.

22

107.     Each of the individuals and entities is a "person" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

108.     The Exoo Enterprise is an enterprise within the meaning of 18 U.S.C. 1961(4), directed by defendant Christian Exoo a/k/a "AntiFashGordon," and consisting of St. Lawrence University, including their employees and agents, Vijaya Gadde, and Twitter, Inc., including their employees and agents, and unknown associates.  The Exoo Enterprise was created to dox fascists and white supremacists in order to use the doxed information to conduct patterns of racketeering activities to threaten violence, intimidate, harass, and extort others to achieve the enterprises mission of causing employment terminations, educational expulsions, physical injury, and personal harm to the persons doxed.  The Exoo Enterprise functions as an organization and continuing unit to effectuate patterns of racketeering activity.

109.     Upon information and belief, multiple generations of Exoo's family are or were employed by St. Lawrence University.  Exoo's activities are well known to St. Lawrence faculty and administrators, who allow Exoo to direct the enterprise from St. Lawrence property, from his place of employment, during his normal work hours using St. Lawrence equipment and information technology.  St. Lawrence consents to Exoo's use of St. Lawrence property to direct the enterprise, and participates in the Exoo Enterprise, because they believe the patterns of racketeering activities helps St. Lawrence's achieve their global mission.

110.     Defendant Exoo uses his employment, teaching, and lecturing at St. Lawrence with the consent and approval of St. Lawrence to recruit students to join the Exoo Enterprise as associates.  In concert with other associates, the Exoo Enterprise, directed by defendant Exoo

created and maintained systematic links for the common purpose of doxing targeted fascists and white supremacists, and then threaten, harass, and extort others to cause harm to their targets.

111.   At all times relevant, Gadde was the only Twitter employee authorized to permanently ban Twitter users.[7]

112.   Defendant Exoo is and was well known to Gadde and Twitter, because Gadde and Twitter have twice before permanently banned Exoo due to habitual doxing.

113.   Gadde and Twitter agreed to associate with the Exoo Enterprise when they breached their own TOS to conspire with a recidivist ban evader, and permitted the enterprise leader to create ban evasion account "@AntiFashGordon," which Gadde and Twitter knew was purposely created to dox unsuspecting persons, in order to direct associates in patterns of racketeering activities.

114.   Gadde and Twitter associate and participate in the Exoo Enterprise's patterns of racketeering, by virtue of their affirmative decision to allow Exoo, a three-time ban evader and known habitual doxer, create a ban evasion account in direct contradiction of their TOS and enforcement rules, through which, the Exoo Enterprise conducts its patterns of racketeering.

115.   Upon information and belief Gadde and Twitter have received hundreds and likely thousands of complaints directly to their individual Twitter accounts and through Twitter's

---

[7] *Meet Vijaya Gadde, an Indian-born Twitter head who decides on blocking tweets, users*, The Economic Times, (Jan. 16, 2020) https://economictimes.indiatimes.com/tech/internet/meet-vijaya-gadde-an-indian-born-twitter-head-who-decides-on-blocking-tweets/articleshow/73281445.cms, last accessed September 12, 2020.  See also, *Twitter's Top Lawyer Is Final Word On Blocking Tweets – Even Donald Trump's*, Bloomberg.com,(Jan. 15, 2020)  https://www.bloomberg.com/news/articles/2020-01-15/twitter-s-gadde-is-final-word-on-blocking-tweets-even-trump-s, last accessed September 12, 2020; *Meet Twitter's top lawyer, who has the final word on blocking tweets – including Donald Trump's,* Fortune.com, (Jan. 15, 2020) https://fortune.com/2020/01/15/twitter-top-lawyer-vijaya-gadde-blocks-tweets-donald-trump/, last accessed September 12, 2020.

Case 2:20-cv-12880   Document 1-1   Filed 09/21/20   Page 25 of 35 PageID: 27

TSC regarding the Exoo Enterprise's doxing.  But Gadde and Twitter choose to ignore the avalanche of doxing and abusive behavior complaints and refuse to enforce their own policies in order to facilitate the patterns of racketeering activities directed by known ban evasion account, @AntiFashGordon.

116.    Gadde personally participates in, and benefits from the Exoo Enterprise's patterns of racketeering activities, because she has publicly stated her personal disdain for fascists and white supremacists, and she is "very, very focused on that…the KKK, the American Nazi Party," because that "was what my parents had to deal with" where she grew up on the Texas-Louisiana border.[8]  Gadde participates in the Exoo Enterprise, because of an Oresteian desire to avenge her parents perceived mistreatment.  Gadde and Twitter are the lynchpin of the Exoo Enterprise. Without Gadde and Twitter's consent and participation, the Exoo Enterprise could not conduct its patterns of racketeering activities.

117.    Twitter benefits economically from the Exoo Enterprise's patterns of racketeering activities, because @AntiFashGordon has an extremely large Twitter following, one of the largest follower bases of all Twitter users, and the account drives a tremendous amount of internet traffic to Twitter, which potentially increases Twitter's ad revenue.

118.    Twitter benefits socially from the Exoo Enterprise's patterns of racketeering activities because the Exoo Enterprise's doxing of fascists and white supremacists imparts a social benefit on Twitter as it is seen as a defender of "marginalized communities" and provides cover for their stated business goal of creating what Twitter describes as "safer" conversations.

---

[8] *Twitter's Kayvon Beykpour and Vijaya Gadde: the Code Conference interview (transcript)*, Vox.com (June 27, 2019) https://www.vox.com/recode/2019/6/27/18760444/twitter-kayvon-beykpour-vijaya-gadde-kara-swisher-peter-kafka-code-conference-interview-transcript, last accessed September 12, 2020.

119.    The Exoo Enterprise engages in and affects interstate commerce, because, *inter alia,* it threatens violence to persons and property of others throughout the United States in furtherance of a plan that reaches into the several states to disrupt economic activity.  The Exoo Enterprise has caused severe economic hardship to targeted persons, such as D'Ambly and negatively impacted local economies throughout the United States.

120.    Pursuant to and in furtherance of their violent doxing campaign, Defendants directed and participated in the affairs of the Exoo Enterprise through patterns of racketeering activity, including multiple acts indictable under 18 U.S.C. §§ 1951 (Interference with commerce by threats or violence) and 1952 (use of interstate facilities to conduct unlawful activity).

121.    The conduct of the Exoo Enterprise described above constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).  Defendants' decisions and activity in connection with the Exoo Enterprise to routinely conduct its transactions in such a manner constitutes "patterns of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

122.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are liable to D'Ambly for three times the damages sustained, plus the costs of this suit, including reasonable attorneys' fees.

123.    As a direct and proximate result of Defendants patterns of racketeering activity D'Ambly has suffered adverse consequences and continues to be damaged in an amount to be determined at trial, but which is in excess of $75,000.00.

124.    As a direct and proximate result of the Exoo Enterprise's patterns of racketeering activities D'Ambly has suffered adverse consequences and continues to be damaged.  D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs,

and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT X

### Violation of 18 U.S.C. § 1962(d) (Conspiracy)

### (as to defendant Christian Exoo a/k/a "AntiFashGordon," St. Lawrence University, Vijaya Gadde, and Twitter, Inc., the "Exoo Enterprise")

125.    Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 124 with the same force and effect as if set forth in detail herein again.

126.    Section 1962(d) of RICO provides "shall be unlawful for any person to conspire to violate any provisions of subsection (a), (b), or (c) of this section."

127.    Defendants have violated 18 U.S.C. § 1962(d) by conspiring to associate and participate in the Exoo Enterprise's patterns of racketeering activities as defined in 18 U.S.C. 1962(c).  The object of this conspiracy is to conduct, direct and participate in, directly or indirectly, the Exoo Enterprise's patterns of racketeering activity.

128.    Defendants have engaged in numerous overt and predicate racketeering acts in furtherance of the conspiracy, including threatening, intimidating, and extorting others to cause harm to their targets.

129.    The nature of the above-described acts of Defendants and co-conspirators acts in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. 1962(d) violation, but they were aware that their ongoing extortionate acts have been, and are part of an overall pattern of racketeering activity demonstrated through related and continuous acts.

130.    Defendants sought to and have engaged in the commission of, and continue to commit overt acts, including the following unlawful racketeering predicate acts:

    a.  Multiple instances of interference with commerce by threats of violence in violation of 18 U.S.C. § 1951; and

    b.  Multiple instances of use of interstate facilities to conduct unlawful activity violations of 18 U.S.C. § 1952.

131.    As a direct and proximate result of Defendants' multiple overt acts and predicate acts in furtherance of the Exoo Enterprise, in violation of 18 U.S.C. § 1962(d), by conspiring to violate 18 U.S.C. 1962(c), Plaintiff has been and continues to be injured by Defendants' conduct.

132.    By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are liable to D'Ambly for three times the damages sustained, plus the costs of this suit, including reasonable attorneys' fees.

133.    As a direct and proximate result of Defendants patterns of racketeering activity D'Ambly has suffered adverse consequences and continues to be damaged.  D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT XI

### Negligent Entrustment

#### (as to defendants Vijaya Gadde and Twitter, Inc.)

134.    Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 133 with the same force and effect as if set forth in detail herein again.

135.    Defendant Exoo is a notorious and infamous doxer, who relies on Twitter to dox unsuspecting people and direct his enterprise.

136.    Due to habitual doxing and abusive behavior, Twitter has previously permanently banned two accounts controlled by defendant Exoo, @ChrisExoo and @ChristianExoo.

137.    Upon information and belief, Twitter received hundreds of complaints that defendant Exoo was habitually doxing under Twitter username @DoxSavage.

138.    In lieu of a third permanent ban Twitter agreed to allow defendant Exoo to undergo a name change from @DoxSavage to @AntifashGordon, contrary to Twitter's TOS.

139.    Subsequent to Twitter's agreement to allow defendant Exoo to change his Twitter username to @AntiFashGordon, Vijaya Gadde and Twitter's Safety Council have received numerous doxing complaints.

140.    Gadde was the only person at Twitter with authority to decide permanent bans and she knew Exoo is a habitual doxer, but she ignored that knowledge and agreed to allow him to change his username and continue doxing.

141.    Gadde recklessly ignored Twitter's TOS against ban evasion accounts and allowed Exoo to change his name from @DoxSavage to @AntiFashGordon, thereby, entrusting Exoo with the instrumentality to direct the Exoo Enterprise's patterns of racketeering activities.

142.    As a direct and proximate result of defendant Gadde and Twitter's negligent entrustment D'Ambly has suffered adverse consequences and continues to be damaged. D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

**COUNT XII**

29

## Breach of Implied Covenant of Good Faith – Promissory Estoppel

### (as to defendants Vijaya Gadde and Twitter, Inc.)

143.    Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 142 with the same force and effect as if set forth in detail herein again.

144.    Defendant Twitter's TOS prohibit doxing and ban evasion accounts.

145.    Defendant Twitter created a Trust and Safety Council department to investigate violations of their TOS to remove abusive content and protect others from abusive behaviors of others.

146.    Twitter's created the Trust and Safety Council to prohibit abusive behavior by Twitter users and promised victims of abusive behavior would be protected.

147.    Gadde is the executive in charge of Twitter's Trust and Safety council, and the only person at Twitter with authority to allow Exoo to create a ban evasion account.

148.    Defendant Twitter allowed defendant Exoo to create a ban evasion account fully aware he was a habitual doxer, who used Twitter to harm others.

149.    Defendant Exoo as @AntiFashGordon doxed D'Ambly, threatened violence to D'Ambly and his employer to extort his termination.

150.    Gadde, Twitter Support and Twitter Trust and Safety received contemporaneous complaints that @AntiFashGordon doxed D'Ambly, but took no action.

151.    Twitter refused to protect Plaintiff from the Exoo Enterprise's abusive behavior and has not removed Plaintiff's doxed information or banned the Exoo Enterprise, who continues to abuse and habitually dox.

152.    Twitter assumed liability for the harm that flows from defendant Exoo's doxing when they neglected to remove D'Ambly's doxed information in violation of their TOS.

153.    As a direct and proximate result of defendant Gadde and Twitter's breach of their assumed duty to remove D'Ambly's doxed private information D'Ambly has suffered adverse consequences and continues to be damaged.  D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

<u>COUNT XIII</u>

Legal Malpractice

(as to defendant Cohen, Weiss, and Simon, L.L.P.)

154.    Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 153 with the same force and effect as if set forth in detail herein again.

155.    As a result of their personal revulsion of D'Ambly and his political beliefs CWS failed to adequately represent and protect D'Ambly's rights.

156.    Defendant CWS neglected to perform necessary case research, legal research, and investigation of the accusations against D'Ambly.

157.    As a result of CWS's inadequate legal research and investigation they failed to protect D'Ambly from the extortionate and criminal conduct of others.

158.    As a result of CWS's failure to adequately investigate D'Ambly's doxing they failed to learn that @AntiFashGordon publicly announced D'Ambly's termination on January 13, 2019, which occurred five days before his official termination date, and one day before the purported "cause" of his termination was discovered.

31

159.   CWS failed to challenge Brill's blatant misrepresentations regarding the timing of the alleged 'cause' of D'Ambly's termination.

160.   CWS's revulsion of D'Ambly and his political beliefs caused them to ignore an obvious racially discriminatory pre-textual termination spotlighted by the private investigation, last and final warning, and falsely claimed cause of D'Ambly's termination.

161.   As a direct and proximate result of CWS's legal malpractice that flowed from their firmwide enmity of D'Ambly's political beliefs D'Ambly has suffered adverse consequences and continues to be damaged.  D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff pray for relief as follows:

1.   Demands judgment against Defendants, jointly and severally, in an amount to be determined at trial plus interest, including, but not limited to, all emotional distress, back pay, punitive damages, liquidated damages, statutory damages, attorneys' fees, costs, and disbursements, and for such relief as the Court deems just and proper.

2.   On Plaintiff's RICO claims: compensatory damages and enhancement of damages Plaintiff has sustained as a result of Defendants' conduct as may be permitted under the relevant statutes, such amount to be determined at trial, plus Plaintiff's costs in this suit, including reasonable attorneys' fees;

3.   On Plaintiff's tortious interference, legal malpractice, intrusion upon seclusion, stalking and harassment claims: compensatory and punitive damages in an amount to be determined at trial.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

Dated:          September 21, 2020

                              Respectfully Submitted,
                              LAW OFFICE OF PATRICK TRAINOR, ESQ., LLC
                              *Attorney for Plaintiff*

                              Patrick Trainor
                              848 Paterson Avenue
                              East Rutherford, New Jersey 07073
                              (201) 777-3327
                              pt@ptesq.com

33

# EXHIBIT "C"

# GIORDANO, HALLERAN & CIESLA, P.C.

A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
WWW.GHCLAW.COM

**MICHAEL J. CANNING, ESQ.**
SHAREHOLDER
CERTIFIED CIVIL TRIAL ATTORNEY
MCANNING@GHCLAW.COM
DIRECT DIAL: (732) 219-5482

*Please Reply To:*
125 HALF MILE ROAD
SUITE 300
RED BANK, NJ 07701
(732) 741-3900
FAX: (732) 224-6599

September 30, 2020

Client/Matter No. 22826/1

***Via email pt@ptesq.com and Regular Mail***
Patrick Trainor, Esq.
Law Office of Patrick Trainor, Esq., LLC
848 Paterson Avenue
East Rutherford, New Jersey 07073

Re:   Daniel D'Ambly v. Christian Exoo a/k/a Antifash Gordon, *et als.*
      Civil Action No. 2:20-cv-12880-JMV-JAD

Dear Mr. Trainor:

This office represents Cohen, Weiss and Simon LLP ("*CWS*"), whom you have named as a defendant in the above action.  We write to you to demand the dismissal of the Complaint with prejudice as to CWS since, as a matter of law, there is no legal basis for the legal malpractice action pleaded against CWS in Count XIII of the Complaint.

In order to sustain a cause of action for legal malpractice under New Jersey law, an attorney client relationship must be established between the plaintiff and the defendant which imposes upon the defendant a duty of care to the plaintiff.  Jerista v. Murray, 185 N.J. 175, 190-91 (2005).  Where, as here, an attorney represents a union in a labor grievance on behalf of a union member as part of the collective bargaining process, the attorney represents the union and no attorney client relationship is entered into between the attorney and the union member.  Because Plaintiff cannot prove the *prima facie* element of a legal duty owed by CWS to him, his claim for legal malpractice against CWS is unsustainable as a matter of law.

In Plaintiff's Complaint he alleges that he is a 27-year member of Local One-L, Graphic Communications Conference of the International Brotherhood of Teamsters (the "*Teamsters*

---

RED BANK   •   TRENTON   •   NEW YORK CITY

GIORDANO, HALLERAN & CIESLA
A Professional Corporation
ATTORNEYS-AT-LAW

Patrick Trainor, Esq.
September 30, 2020
Page 2

*Union*").  See ¶ 2 of the Complaint.  Plaintiff further alleges he was employed as a plate maker
for the New York Daily News ("*Daily News*") in Jersey City, New Jersey until January 18, 2019.
Id.

      Throughout the Complaint Plaintiff alleges that he was wrongfully terminated from his
employment with the Daily News.  In response to his termination of employment, Plaintiff
alleges that at some point after January 23, 2019, the Teamsters Union on behalf of D'Ambly
filed a grievance with the American Arbitration Association, Case No. 01-19-0000-7178.  The
Teamsters Union retained CWS to handle the grievance and arbitration.  See ¶ 48 of the
Complaint, erroneously stating that the union retained attorneys Thomas Kennedy and Kate M.
Swearengen to represent Plaintiff.

      All of the factual allegations in the Complaint against CWS arise out of or relate to the
grievance and arbitration filed by CWS on behalf of the Teamsters Union.  See ¶¶ 49-53 of the
Complaint.  The sole cause of action pleaded against CWS is set forth in Count XIII of the
Complaint in which Plaintiff alleges legal malpractice relating to the legal services provided by
CWS relating to the grievance and arbitration which were part of the collective bargaining
process between the Teamsters Union and the Daily News.

      As all of the factual allegations and the sole cause of action against CWS arise out of and
relate to the grievance and arbitration which are part of the collective bargaining process, CWS is
immune from suit for malpractice by Plaintiff as a member of the Teamsters Union.  In Carino v.
Stefan, 76 F.3d 156 (2004), the Third Circuit Court of Appeals unequivocally ruled that § 301(b)
of the Labor Management Relations Act ("*LMRA*"), as broadly interpreted by the United States
Supreme Court in Atkinson v. Sinclair Refinancing Co., 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed. 2d
462 (1962), immunizes attorneys hired by unions to perform services related to a collective
bargaining agreement from suit for legal malpractice.

RED BANK  •  TRENTON  •  NEW YORK CITY

GIORDANO, HALLERAN & CIESLA
A Professional Corporation
ATTORNEYS-AT-LAW

Patrick Trainor, Esq.
September 30, 2020
Page 3

In Carino, plaintiff was employed as an insurance agent with Prudential Insurance

Company ("*Prudential*").  During the period of her employment, plaintiff was a member of the

United Food and Commercial Workers International Union, which had entered into a Collective

Bargaining Agreement with Prudential.  Prudential terminated Carino's employment because of

alleged professional misconduct in selling insurance policies.  Under the procedures established

by the collective bargaining agreement, the union filed a grievance on plaintiff's behalf,

contesting her termination, and further exercised its right to take the matter to arbitration.  The

union retained defendant law firm to handle at the arbitration stage its grievance challenging

plaintiff's termination, and the law firm appointed defendant Stefan for this purpose.

Plaintiff alleged that she signed a "Grievance Release" in which she gave up her right to

arbitrate her claims based on Stefan's assurances that Prudential would clear her of false charges,

close an FBI investigation, not sue her for attorney's fees and have her pension reinstated.  When

plaintiff realized that the documents she signed made no reference to Prudential's concessions in

return for her withdrawal and release, she contacted Stefan but received no reply and never heard

from him or his firm again.

Plaintiff filed a four-count complaint against Stefan and his firm, including claims of

legal malpractice.  The United States Federal District Court for the District of New Jersey

dismissed the complaint under Fed.R.Civ. P. 12(b)(6) for failure to state a claim.  The Third

Circuit Court of Appeals affirmed the dismissal of the complaint with prejudice and summarized

the issue on appeal as follows:

> This appeal presents a question of first impression for our Court,
> namely, whether an attorney hired by a union to perform services on
> behalf of a union member in connection with an arbitration hearing
> conducted pursuant to a collective bargaining agreement is immune
> from suit for malpractice by that member.  We conclude that the
> LMRA bars such a suit.

[Carino, 376 F.3d 156, 159.]

GIORDANO, HALLERAN & CIESLA
A Professional Corporation
ATTORNEYS-AT-LAW

Patrick Trainor, Esq.
September 30, 2020
Page 4

In affirming the dismissal of the complaint, the Third Circuit relied upon § 301(b) of the LMRA which provides in relevant part that, "Any money judgment against a labor organization in a District Court of the United States shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against any individual member or his assets." 29 U.S.C. § 185(b).  Id.  The Third Circuit recognized that the Supreme Court gave the statute a more expansive reading in Atkinson, supra., stating that § 301(b) "evidences a congressional intention that the union as an entity, like a corporation, should in the absence of an agreement be the sole recovery for injury inflicted by it."  Atkinson, 370 U.S. 238, 249, 82 S.Ct. 1318, 8 L.Ed. 2d 462 (1962) quoting Lewis v. Benedict Coal Corp., 361 U.S. 459, 470, 80 S.Ct. 489, 4 L.Ed. 2d 442 (1960).  In Atkinson the court dismissed the complaint against the union officers who were sued in their individual capacities stating that § 301 "cannot be evaded or truncated by the simple device of suing union agents or members, whether in contract or tort, or both, in a separate count or in a separate action for damages for violation of a collective bargaining contract for which damages the union itself is liable."  Id.  As stated by Carino, "As a result, the law is clear that individual union officers are not personally liable to third parties for actions taken on behalf of the union in the collective bargaining process."  Id.  The Third Circuit had previously recognized that Atkinson provides individual union members and officers immunity from suit from union wrongs.  See e.g. Wilkes-Barre Pub. Co. v. Newspaper Guild of Wilkes-Barre, Local 120, 647 F.2d 372, 377 (3d Cir. 1981); Republic Steel Corp. v. United Mine Workers of America, 570 F.2d 467, 478 (3d Cir. 1978).  The Carino court found that "With monotonous regularity [other courts of appeals have] cited Atkinson to foreclose state-law claims, however inventively cloaked, against individuals acting as union representatives within the ambit of the collective bargaining process."  Id. at 160.

With respect to the specific issue of the applicability of Atkinson to attorneys who act on behalf of grievants as part of the collective bargaining process, the Third Circuit stated:

RED BANK  •  TRENTON  •  NEW YORK CITY

GIORDANO, HALLERAN & CIESLA
A Professional Corporation
ATTORNEYS-AT-LAW

Patrick Trainor, Esq.
September 30, 2020
Page 5

> The only courts of appeals to have considered the specific question presented here, where attorneys acted on behalf of the union, have uniformly concluded that <u>Atkinson</u> prohibits claims made by a union member against attorneys employed by or retained by the union to represent the member in a labor dispute.

> [<u>Id.</u>]

See <u>Waterman v. Transport Workers Union Local 100</u>, 176 F.3d 150 (2d Cir. 1999); ("[U]nder <u>Atkinson</u>, a union's attorneys may not be sued by an individual union member for actions taken pursuant to a collective bargaining agreement."); <u>Arnold v. Air Midwest Inc.</u>, 100 F.3d 857, 862 (10th Cir. 1996) ("[A]n attorney who performs services for and on behalf of a union may not be held liable in malpractice to individual grievants where the services performed constitute a part of the collective bargaining process."); <u>Breda v. Scott</u>, 1 F.3d 908, 909 (9th Cir. 1993) (holding that employees cannot sue inside or outside counsel for services rendered under a collective bargaining agreement); <u>Montplasier</u>, 875 F.2d at 7 ("[F]or purposes of the <u>Atkinson</u> principle, [attorneys] must be treated the same as other union agents."); <u>Peterson v. Kennedy</u>, 771 F.2d 1244, 1258 (9th Cir. 1985), <u>cert. denied</u>, 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed. 2d 187 (1986) ("[W]here, as here, the attorney performs a function in the collective bargaining process that would otherwise be assumed by the union's business agents or representatives, the rationale behind the <u>Atkinson</u> rule is squarely applicable.") <u>Id.</u> at 160.

In <u>Peterson</u>, the 9th Circuit Court of Appeals rejected the plaintiff's contention that an exception to the <u>Atkinson</u> rule should be fashioned for attorneys employed by or retained by the union. The court noted that a union may choose to have its members' labor grievances handled by a union representative with no legal training, or by an attorney. <u>Id.</u> at 1258. If the union chooses to make use of an attorney, <u>that attorney has not "entered into an 'attorney-client' relationship in the ordinary sense with the particular union member who is asserting the underlying grievance"</u>, but merely "assume[s] a function that often is performed by a union's business agents or representatives." <u>Id.</u> (emphasis added) When it is the union which provides the services, albeit

RED BANK • TRENTON • NEW YORK CITY

GIORDANO, HALLERAN & CIESLA
A Professional Corporation
ATTORNEYS-AT-LAW

Patrick Trainor, Esq.
September 30, 2020
Page 6

through assigned counsel, it is the union, rather than the individual business agent or attorney, that represents and is ultimately responsible to the member.  Id.

In Carino the Third Circuit cited several policy considerations weighing against the imposition of malpractice liability on union attorneys representing union members in labor grievances under a collective bargaining agreement.  The court noted that it would be "anomalous" if the union attorney could be liable for mere negligence where the union would be liable only if a higher standard were met, namely arbitrariness or bad faith.  Id. at 161.

Second, because state statutes of limitation for malpractice are generally longer than the time limit for filing suit by union members against the union, if union attorneys were subject to such malpractice suits, litigants would be able to proceed against the attorney long after the expiration of the statutory period for suits against the union and the employer.  Id., citing Peterson, 771 F.2d at 1259.[1]

Finally, the Third Circuit recognized that if union members were permitted to sue union attorneys, the attorneys could be held liable for damages "flowing from the union's political or tactical choices" which "could, in turn, severely hamper unions in enlisting quality representation."  Id., citing Montplasier, 875 F.2d at 7.

The Third Circuit concluded, "accordingly, guided by Atkinson and Reise and the logic of the opinions of our sister court of appeals, we join these courts in holding that § 301 of the LMRA immunizes attorneys employed by or fired by unions to perform services related to a collective bargaining agreement from suit for malpractice.  Thus, for all of the reasons above, we will affirm."  Id. at 162.

The clear and unequivocal holding in the binding precedential decision by the Third Circuit in Carino that attorneys hired by unions to perform services related to a collective bargaining

---

[1] Any claim against the Teamsters Union is time-barred by the six-month statute of limitations.

RED BANK  •  TRENTON  •  NEW YORK CITY

GIORDANO, HALLERAN & CIESLA
A Professional Corporation
ATTORNEYS-AT-LAW

Patrick Trainor, Esq.
September 30, 2020
Page 7

agreement are immune from suits for legal malpractice by union members bars Plaintiff's claim as pleaded in the Complaint against CWS.  Accordingly, demand is made that the Complaint be dismissed with prejudice as to CWS.  The failure to do so will result in CWS being compelled to file a motion to dismiss the Complaint in which event it will seek sanctions under Fed.R.Civ. P. 11.

Very truly yours,

*Michael J Canning*

MICHAEL J. CANNING

MJC/cmt

RED BANK  •  TRENTON  •  NEW YORK CITY

# EXHIBIT "D"

# THE LAW OFFICE OF PATRICK TRAINOR

848 Paterson Avenue | East Rutherford, New Jersey 07073
Telephone: (201) 777-3327 | eFax: (201) 896-7815 | help@ptesq.com

October 1, 2020

**Via email mcanning@ghclaw.com and regular mail**
Michael J. Canning, Esq.
Giordano, Halleran & Ciesla, P.C.
125 Half Mile Road,
Suite 300
Red Bank, New Jersey 07701

      Re:    <u>Daniel D'Ambly v. Exoo et al.</u>
               Civil Case No.: 2:20-cv-12880-JMV-JAD

Dear Mr. Canning,

As you are aware this office represents Daniel D'Ambly (Hereinafter "Plaintiff") in the above-reference action. I am replying to your letter dated September 30, 2020, wherein you demanded Plaintiff dismiss with prejudice his complaint against your client Cohen, Weiss and Simon, LLP ("CWS"). Your demand letter cited New Jersey and Third Circuit precedential case history, and interpretations of Section 301(b) of the Labor Management Relations Act that you argue favor immediate withdrawal of the Complaint. Additionally, your letter threatened this office with sanctions under Fed.R.Civ. P. 11 if we do not immediately obey your demand and withdraw the Complaint with prejudice.

In preparation of filing the Complaint, I researched and analyzed the cases and statutes referenced in your letter. In general, I agree with your argument that an attorney-client relationship is not formed between a union attorney, such as CWS, and a union member grievant, such as Plaintiff, and, therefore, the union attorney is immune from suit in cases such as these. I also agree that CWS represented Plaintiff's labor Union, the Amalgamated Lithographers of America, GCC/IBT Local One-L ("Teamsters") in arbitration case 01-19-0000-7178 that was scheduled before the American Arbitration Association. However, in light of the facts in this case, this office reached a different conclusion relative to CWS's liability.

Based on the detail in your exquisitely researched and written letter you obviously know that when the interests of the grievant (Plaintiff) and the organization (Teamsters) are adverse, the union attorney, in this case your client CWS, is required to disclose the nature of their attorney-client relationship, and recuse when there is a conflict of interest or potential conflict of interest. Although your letter does not address the issue of disclosure requirements and recusal,

of which you are aware, the rules of professional conduct dictated CWS was required to explain the true nature of their attorney-client relationship to Plaintiff and recuse, due to the conflicted interests of the Teamsters and Plaintiff.

American Bar Association ("ABA") Rules of Professional Conduct, rule 1.13(f) states:

> In dealing with an organization's directors, officers, employees, members, shareholders or other constituents, a lawyer shall explain the identity of the client when the lawyer knows or reasonably should know that the organization's interests are adverse to the those of the constituents with whom the lawyer is dealing.

Similarly, the New Jersey Rules of Professional Conduct, rule 1.13(2)(d) states:

> In dealing with an organization's directors, officers, employees, members, shareholders or other constituents, a lawyer shall explain the identity of the client when the lawyer believes that such an explanation is necessary to avoid misunderstanding on their part.

The Teamsters public statements prior to Plaintiff's termination illustrate the adverse interests of the Teamsters and Plaintiff, an alleged white supremacist.  The Teamsters publicly stated "Unions: We Must Lead the Opposition to White Supremacy," "White Supremacy and low wages go hand-in-hand," "Worker injustice and white supremacy are linked…," "We can't win against economic inequality w/o addressing racism & white supremacy," "This article puts down white supremacists, and we won't apologize for that. *Our members are not white supremacists*" (emphasis is mine).  The Teamsters' public statements of opposition to racism, anti-Semitism, and white supremacy, made Plaintiff's description as an alleged "white supremacist" clearly adverse to the interests of the Teamsters, particularly at a time when the Teamsters were being publicly pressured by outside agitators to cut ties with Plaintiff.

Based on the Teamsters own statements, your client clearly knew that their client, the Teamsters, did not want white supremacist members, therefore, their interests were not aligned with Plaintiffs, an alleged white supremacist, who sought employment reinstatement.  Your client had more than enough information to determine they were required to immediately recuse, and recommend Plaintiff seek independent counsel.  I argue your client was under an affirmative duty to immediately recuse given the overt conflict of interests.

Plaintiff is a fastidious record keeper, who has provided this office all documents in his possession relative to his employment and termination, including his Union contract dated

September 12, 1992, all subsequent contract extension agreements, his "Last and Final Warning" letter, and "Termination of Employment" letter, but he does not possess an attorney-client disclosure or an acknowledgement waiver from CWS.

Unless you put forth evidence that demonstrates the Teamsters interests were not opposed to the interests of a white supremacist, such as Plaintiff was alleged to be, we dispute your analysis that concluded your client is immune from liability in this matter, therefore, the Complaint will not be withdrawn.

Sincerely,

Patrick Trainor, Esq.