**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DANIEL D'AMBLY, AARON WOLKIND, STEVE HARTLEY, RICHARD SCHWETZ, JOBEL BARBOSA, MATTHEW REIDINGER, JOHN HUGO, SEAN-MICHAEL DAVID SCOTT, THOMAS LOUDEN, ZACHARY REHL, AMANDA REHL, K.R., a minor, by and through her father ZACHARY REHL, and her mother AMANDA REHL, MARK ANTHONY TUCCI,<br><br>    Plaintiffs,<br><br>  vs.<br><br>CHRISTIAN EXOO a/k/a ANTIFASH GORDON, ST. LAWRENCE UNIVERSITY, TRIBUNE PUBLISHING COMPANY, NEW YORK DAILY NEWS, VIJAYA GADDE, TWITTER, INC., COHEN, WEISS AND SIMON, LLP, NICK STRICKLAND, TORCH ANTIFA NETWORK, UNNAMED ASSOCIATES 1-100,<br><br>    Defendants. | CIVIL ACTION NO.: 2:20-cv-12880-JMV-JAD<br><br>Hon. John M. Vazquez, U.S.D.J.<br><br>Oral Argument Requested<br><br>Motion Date: February 22, 2022 |

## DECLARATION OF CHRISTOPHER MARLBOROUGH

CHRISTOPHER MARLBOROUGH, an attorney admitted to practice in the State of New Jersey and the United States District Court for the District of New Jersey, hereby affirms under penalty of perjury that:

1.    I am the Principal Attorney of the Marlborough Law Firm, P.C. I represent Defendant Christian Exoo in the above-referenced action.

2.    I have personal knowledge of the matters stated herein and, if called upon I could and would competently testify thereto.

3.    Annexed hereto as Exhibit A is a true and correct copy of the

Court's November 1, 2021, Opinion concerning Defendant Exoo's Motion to Dismiss Plaintiffs' First Amended Complaint (ECF No. 99).

4.      Anexxed hereto as Exhibit B is a true and correct copy of the Court's November 1, 2021, Order granting Defendant Exoo's Motion to Dismiss Plaintiffs' First Amended Complaint (ECF No. 100).

5.      Anexxed hereto as Exhibit C is a true and correct copy of Plaintiffs' Second Amended Complaint (ECF No. 101).

6.      Annexed hereto as Exhibit D is a true and correct copy of a Rule 11 safe harbor letter which will be served by e-mail and regular mail to Defendants' counsel along with the Notice of Motion and Motion, Memorandum of Law, [Proposed] Order, and this Declaration on December 15, 2021 (the " Motion Papers").

7.      In the event that Plaintiffs do not dismiss the new defendants and withdraw the new claim as set forth in the motion papers, the Motion Papers will be filed on the ECF docket on January 6, 2021.

8.      I submit this declaration regarding the attached exhibits. Executed this 15th day of December 2021, at Lynbrook, New York.

_____
Christopher Marlborough

# EXHIBIT A

Not for Publication

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

DANIEL D'AMBLY, et al.,

        *Plaintiffs*,

    v.

CHRISTIAN EXOO a/k/a ANTIFASH
GORDON, et al.,

        *Defendants*.

Civil Action No. 20-12880

### OPINION

**John Michael Vazquez, U.S.D.J.**

      In this case, Plaintiffs—purported far right activists—take aim at Defendant Christian Exoo—a purported far left activist—and others. It seems as though Plaintiffs want to express their views without a negative impact on other aspects of their lives. Similarly, it seems like Exoo wants to criticize Plaintiffs because of their views and try to get Plaintiffs fired from their jobs. The general question raised here is whether Exoo's communications about Plaintiffs crossed a legal line into unlawful action.

      Presently before the Court are motions to dismiss from the following Defendants: (1) St. Lawrence University ("SLU"), D.E. 75; (2) Vijaya Gadde and Twitter, Inc. ("Twitter" and collectively, the "Twitter Defendants"), D.E. 78; and (3) Christian Exoo (collectively, the "Moving Defendants"), D.E. 79. Plaintiffs filed briefs in opposition, D.E. 83, 84, 85, to which the Moving Defendants replied, D.E. 88, 89, 90.[1] The Court reviewed the parties' submissions and decided

---

[1] SLU's brief in support of its motion (D.E. 75-1) will be referred to as "SLU Br.", the Twitter Defendants' brief in support of their motion (D.E. 78-1) will be referred to as "Twitter Br.", and Exoo's brief in support of his motion (D.E. 79-1) will be referred to as "Exoo Br.". Plaintiffs'

the motions without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b).  For

the reasons set forth below, the Moving Defendants' motions are **GRANTED**.

## I.  FACTUAL[2] AND PROCEDURAL BACKGROUND

Plaintiffs brought suit after Defendant Christian Exoo identified Plaintiffs as fascists or

white supremacists, and "doxed" them on Twitter.  Doxing refers to "publicly disclos[ing] a

person's identity, employer, school, home address, etc., for the purpose of causing harm to that

person."  Am. Compl., Statement of the Case, ¶ 27.  Plaintiffs allege that when doxing individuals,

Exoo does not act alone.  Rather, Plaintiffs allege that Exoo directs a group, which includes Exoo's

employer, SLU; Twitter; Gadde, Twitter's Head of Legal, Public Policy, and Trust and Safety

Lead; and multiple unidentified individuals, who presumably are at least some of Exoo's Twitter

followers.  *Id.* ¶ 16, 20, 22.  Plaintiffs allege that Exoo and his associates work to identify neo-

Nazis, fascists, and white supremacists.  *Id.* ¶ 32.  After learning their personal identities, Exoo

doxes the individual using the Twitter handle @AntiFashGordon.  Exoo also directs his associates

to call, email, and send Tweets to the individual's employers, co-workers, and school

administrators to get the individual fired or expelled from school.  *Id.* ¶ 33.  Plaintiffs allege that

after being identified and doxed by Exoo and his associates, they received violent threats, their

homes or personal items were vandalized, and they were terminated from their jobs.  *Id.* ¶ 37.  The

Court discusses more specific allegations in the analysis section below.

---

opposition to SLU's motion (D.E. 84) will be referred to as "SLU Opp.", their opposition to the
Twitter Defendants' motion (D.E.  85) will be referred to as "Twitter Opp.", and their opposition
to Exoo's motion (D.E. 83) will be referred to "Exoo Opp.".  SLU's reply brief (D.E. 88) will be
referred to as "SLU Reply", the Twitter Defendants' reply brief (D.E. 90) will be referred to as
"Twitter Reply", and Exoo's reply brief (D.E. 89) will be referred to as "Exoo Reply".

[2] The factual background is taken from Plaintiffs' Amended Complaint ("Am. Compl.").  D.E. 66.
When reviewing a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts
in the complaint.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

D'Ambly filed suit on September 21, 2020, after he was doxed by Exoo and terminated from his job at the New York Daily News (the "Daily News"). His thirteen-count Complaint largely addressed the alleged doxing campaign through federal and state RICO claims, tort claims, and claims alleging violations of federal and New Jersey criminal statutes. D'Ambly also asserted an employment discrimination claim against his employer, in addition to a malpractice claim against Cohen, Weiss, and Simon, LLP ("CWS"). D'Ambly's union hired CWS to represent it, on D'Ambly's behalf, with respect to an employment grievance that was filed after D'Ambly's termination. D.E. 1-1. On March 25, 2021, Plaintiffs filed the Amended Complaint, which includes allegations about additional Plaintiffs who were also allegedly doxed by Exoo and his associates. The factual allegations as to D'Ambly remain the same in the Amended Complaint. D.E. 66. Further, Plaintiffs assert the same claims that D'Ambly asserted in his initial pleading.

The Moving Defendants subsequently filed motions to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). D.E. 75, 78, 79. CWS also filed a motion to dismiss, D.E. 74, which is addressed in a separate opinion. Finally, Defendants New York Daily News and Tribune Publishing Company, LLC, D'Ambly's former employer, answered the Amended Complaint. D.E. 76.

## II.     STANDARD OF REVIEW

The Moving Defendants seek to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). Rule 12(b)(2) permits a party to move to dismiss a case for lack of personal jurisdiction. In such a motion, the plaintiff bears the burden of demonstrating "sufficient facts to establish that jurisdiction is proper." *Mellon Bank PSFS Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992). In reviewing a motion to dismiss for lack of personal jurisdiction, a court "must accept all of the plaintiff's allegations as true and construe disputed

facts in favor of the plaintiff." *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 142 n.1 (3d Cir. 1992). But when a defendant raises a jurisdictional defense, "a plaintiff bears the burden of proving by affidavits or other competent evidence that jurisdiction is proper." *Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1302 (3d Cir. 1996).

Thus, to withstand a Rule 12(b)(2) motion, a plaintiff may not rely on the pleadings alone, as it "is inherently a matter which requires resolution of factual issues *outside the pleadings*." *Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 66 n.9 (3d Cir. 1984) (emphasis added). In conducting this jurisdictional analysis, district courts may rely upon the parties' declarations for relevant factual support. *See, e.g.*, *Pausch LLC v. Ti-Ba Enters.*, No. 13-6933, 2014 WL 5092649, at *6-7 (D.N.J. Oct. 8, 2014) (using declarations from both parties to conclude that contacts with the forum were insufficient for personal jurisdiction); *Shnayderman v. Cell-U-More, Inc.*, No. 18-5103, 2018 WL 6069167, at *11 (D.N.J. Nov. 20, 2018) (using information from the plaintiff's complaint and declaration to determine that the defendant did not travel to the forum state or solicit a loan from the plaintiff in the forum state). Therefore, in determining whether personal jurisdiction exists, the Court looks beyond the pleadings to all relevant evidence and construes all disputed facts in favor of the plaintiff.

Rule 12(b)(6) permits a court to dismiss a complaint that fails "to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). For a complaint to survive dismissal under Rule 12(b)(6), it must contain sufficient factual matter to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Further, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery

will uncover proof of her claims." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016). In evaluating the sufficiency of a complaint, district courts must separate the factual and legal elements. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-211 (3d Cir. 2009). Restatements of the elements of a claim are legal conclusions, and therefore, are not entitled to a presumption of truth. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011). The Court, however, "must accept all of the complaint's well-pleaded facts as true." *Fowler*, 578 F.3d at 210.

### III. ANALYSIS

At the outset, the Court reviews the scope of the First Amendment. Plaintiffs indicate that their political speech is protected under the First Amendment. *See, e.g.*, Am. Compl. ¶ 1. Similarly, Exoo maintains that that Counts II and III must be dismissed because he was engaged in constitutionally protected political speech. Exoo Br. at 18-21. The First Amendment "guarantees freedom of expressions by prohibiting Congress from restricting . . . the rights of individuals to speak freely." U.S. Const. amend. I. But the speech at issue seemingly only involved private actors. "[T]he First Amendment protections for freedom of speech are directed only to state action, not private action." *Pietrylo v. Hillstone Rest. Grp.*, No. 06-5754, 2008 WL 6085437, at *5 (D.N.J. July 25, 2008). Consequently, without sufficient allegations demonstrating that a governmental actor somehow attempted to improperly restrict Plaintiffs or Exoo's free speech rights, the First Amendment is not implicated.

### A. RICO Claims (Counts VIII through X)

In Counts IX and X, Plaintiffs assert federal RICO claims, for racketeering and a civil RICO conspiracy, respectively, under the federal RICO statute, 18 U.S.C. § 1961 *et seq*. In Count VIII, Plaintiffs assert a claim for racketeering under the New Jersey RICO statute, N.J. Stat. Ann. § 2C:41-1 *et seq*. *See* Am. Compl. ¶¶ 186-217. "The civil RICO statute allows '[a]ny person

injured in his business or property by reason of a violation of section 1962 of this chapter [to] sue

therefor in any appropriate United States district court.'" *Anderson v. Ayling*, 396 F.3d 265, 268-

69 (3d Cir. 2005) (quoting 18 U.S.C. § 1964(c)). To bring a federal civil RICO claim in accordance

with 18 U.S.C. § 1962, a plaintiff must allege: "(1) the conducting of, (2) an enterprise, (3) through

a pattern, (4) of racketeering activity." *Gunter v. Ridgewood Energy Corp.*, 32 F. Supp. 2d 166,

173 (D.N.J. 1998). To establish a pattern of racketeering activity, a plaintiff must allege "at least

two predicate acts of racketeering that occurred within ten years of each other." *Slimm v. Bank of

Am. Corp.*, No. 12-5846, 2013 WL 1867035, at *20 (D.N.J. May 2, 2013). Racketeering activity

is defined in Section 1961(1)(B) as "any act which is indictable under" a number of enumerated

federal laws; these federal offenses are called "predicate acts." *See* 18 U.S.C. § 1341; 18 U.S.C.

§ 1962(1)(B).

The Moving Defendants seek to dismiss Plaintiffs' RICO claims on numerous grounds,

including a failure to allege a pattern of racketeering activity. *See, e.g.*, Exoo Br. at 29-34. The

Amended Complaint alleges that the pattern involves an "attempt to extort employment

terminations and compel school expulsions, by directing waves of threatening phone calls, emails,

Twitter messages, social media comments at the target's employers, co-workers, and school

administrators." Am. Compl. ¶ 33. Plaintiffs further allege that the purported Exoo Enterprise's

pattern of racketeering activity includes "multiple indictable acts" under 18 U.S.C. §§ 1951 and

1952. *Id.* ¶ 205.

The Hobbs Act, 18 U.S.C. § 1951, states that

> [w]hoever in any way or degree obstructs, delays, or affects
> commerce or the movement of any article or commodity in
> commerce, by robbery or extortion or attempts or conspires so to do,
> or commits or threatens physical violence to any person or property
> in furtherance of a plan or purpose to do anything in violation of this

6

> section shall be fined under this title or imprisoned not more than
> twenty years, or both.

18 U.S.C. § 1951. Plaintiffs repeatedly allege that they were extorted by Defendants. But, as pled,

no Plaintiff was the victim of extortion because extortion requires "the obtaining of property from

another." 18 U.S.C. § 1951(b)(2); *see United States v. Hedaithy*, 392 F.3d 580, 602 n.21 (3d Cir.

2004) (explaining that "the Hobbs Act expressly requires the Government to prove that the

defendant 'obtain[ed] property from another'" (quoting 18 U.S.C. § 1951(b)(2))). Plaintiffs' focus

their RICO claims on allegations that they lost their jobs because of Exoo's doxing, but the loss of

a job alone does not constitute a Hobbs Act violation because no one obtains another person's

property.[3] *See Carson v. Vernon Township*, No. 09-6126, 2010 WL 2985849, at *12 (D.N.J. July

21, 2010) ("Plaintiff's loss or threatened loss of his council positions is not the surrender of

property," therefore "they are not predicate acts of racketeering activity under the [Hobbs Act]").

Moreover, nothing in the Amended Complaint suggests that Defendants obtained any other

property or property right from any Plaintiff. Consequently, Plaintiffs fail to sufficiently allege a

violation of the Hobbs Act.

The Travel Act, 18 U.S.C. § 1952, applies to certain "unlawful acts." 18 U.S.C. § 1952(a).

Broadly speaking, an unlawful act involves (1) a business enterprise involving gambling, liquor,

narcotics, or controlled substances as well as unlawful prostitution offenses; (2) extortion, bribery,

or arson; or (3) indictable offenses involving money laundering. 18 U.S.C. § 1952(b). Again,

---

[3] In their opposition brief, Plaintiffs maintain that union membership is a protectable property interest, and the Exoo Enterprise deprived D'Ambly of his rights as a union member. Plfs. Opp. at 20-22. Because Plaintiffs fail to allege how D'Ambly's union membership was affected in the Amended Complaint, the Court will not address this argument. *See Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984)). Even if the Court were to consider this argument, Plaintiffs have not indicated how another obtained this protectable property interest.

Plaintiffs' allegations involve Exoo's directions to place threatening phone calls, emails, Twitter messages, social media comments to Plaintiffs' employers to get Plaintiffs fired. *See* Am. Compl. ¶ 33. Nothing in Amended Complaint suggests that any member of the purported Exoo Enterprise engaged in unlawful activity as defined by the Travel Act. Therefore, Plaintiffs fail to adequately plead a predicate act under the Travel Act.

Without sufficient predicate acts, Plaintiffs cannot plausibly allege that there was a pattern of racketeering activity. Plaintiffs' substantive federal RICO claim therefore fails. In addition, because Plaintiffs fail to establish a substantive RICO claim, their RICO conspiracy claim must also be dismissed. *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993) ("Any claim under section 1962(d) based on conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient.").

To state a claim under the New Jersey RICO statute, a plaintiff must also plead facts establishing a RICO enterprise and a pattern of racketeering activity. *State v. Ball*, 661 A.2d 251, 261 (N.J. 1995). A RICO enterprise must "have an 'organization'" meaning that it consists of "interactions that become necessary when a group, to accomplish its goal, divides among its members the tasks that are necessary to achieve a common purpose." *Id.* In addition, a plaintiff should provide evidence as to the following:

> [T]he number of people involved and their knowledge of the objectives of their association, how the participants associated with each other, whether the participants each performed discrete roles in carrying out the scheme, the level of planning involved, how decisions were made, the coordination involved in implementing decisions, and how frequently the group engaged in incidents or committed acts of racketeering activity, and the length of time between them.

*Id.* Finally, a member of an enterprise must "act purposefully and knowingly in the affairs of the enterprise in the sense of engaging in activities that seek to further, assist, or help effectuate the goals of the enterprise." *Id.* at 268.

Here, Plaintiffs plead that the Exoo Enterprise is directed by Exoo and includes "associates of St. Lawrence University, the Twitter Defendants, and other unknown associates." Am. Compl. ¶ 187. But outside of the allegation that Exoo directs the Enterprise, Plaintiffs provide no further details about the Enterprise's organization. For example, the Amended Complaint does not address the other alleged members' roles within the Enterprise, what planning occurred, or even if there were any interactions between the members to further the Enterprise's goal. Without sufficient allegations, the Court cannot reasonably infer that any Defendant operated within a group. *See Demodulation, Inc. v. Applied DNA Sciences, Inc.*, No. 11-296, 2012 WL 6204172, at *5 (D.N.J. Dec. 12, 2012) (dismissing New Jersey RICO claim because "Plaintiff did not even allege facts suggesting that Defendants worked together as a group, let alone that the group had a structure or made plans or coordinated any activities."). In fact, Plaintiffs fail to indicate that any of the alleged members of the Exoo Enterprise were even aware of the Enterprise or its goals. Plaintiffs, therefore, do not adequately plead that a RICO enterprise existed under the New Jersey RICO statute.

Plaintiffs counter that Exoo has admitted that a RICO enterprise exists. In making this argument, however, Plaintiffs rely on facts in multiple news articles from, for example, *Rolling Stone* magazine and *Medium.com*, rather than on allegations in the Amended Complaint. *See* SLU Opp. at 7-10. In deciding a Rule 12(b)(6) motion, a court ordinarily considers only the factual

allegations, exhibits attached to the complaint, and matters of public record.[4]  *Lum v. Bank of Am.*, 361 F.3d 217, 221 n.3 (3d Cir. 2004).  A court may also rely on "a document *integral to or explicitly relied* upon in the complaint" to decide a Rule 12(b)(6) motion.  *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002) (emphasis in original) (citation omitted).  A document is integral if a "claim would not exist but-for the existence of the document."  *Dix v. Total Petrochemicals USA, Inc.*, No. 10-3196, 2011 WL 2474215, at *1 (D.N.J. June 20, 2011).  Here, the articles that Plaintiffs cite are not integral to Plaintiffs' claims or public records, nor did Plaintiffs include them as exhibits to the Amended Complaint.  Although Plaintiff references some of the articles in a footnote in the Amended Complaint, *see* Am. Compl. ¶ 16 n.1, Plaintiffs appear to reference the articles to establish Exoo's infamy.  Plaintiffs do not cite the articles or any facts contained therein when discussing the purported RICO enterprise.   Accordingly, the Court does not consider these articles for the reasons that Plaintiffs use them in their opposition briefs.[5]  Plaintiffs do not otherwise challenge Defendants' arguments regarding the existence of a RICO enterprise.  As a result, Plaintiffs fail to plausibly plead that a RICO enterprise existed.

---

[4] If matters outside the pleading are presented on a motion to dismiss and are considered by the court, the motion must be treated as a motion for summary judgment under Rule 56, and all parties must be given an opportunity to present all pertinent material. Fed. R. Civ. P. 12(d).  Although Plaintiffs recognize that the Court may convert a motion to dismiss into one for summary judgment pursuant to Rule 12(d), Plaintiffs expressly asks that this Court *not* convert the instant motions.  *See* Exoo Opp. at 5.  Because the Court does not consider any matters outside the pleadings in deciding the current motions, there is no need to convert the motions into ones for summary judgment.

[5] In addition to relying on information outside the pleadings, Plaintiffs also appear to assert various new claims against Defendants in their opposition briefs. *See, e.g.*, SLU Opp. at 12-14 (seemingly asserting a tort claim by contending that SLU had a duty to ensure that Exoo did not harm others); Twitter Opp. at 17-18 (arguing that Twitter aided and abetted a RICO enterprise). Again, Plaintiffs cannot amend their Amended Complaint through a brief. *Zimmerman*, 836 F.2d at 181 ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (quoting *Car Carriers, Inc.*, 745 F.2d at 1107). Consequently, any new allegation or claim that appears in Plaintiffs' opposition briefs is disregarded.

As a result, Plaintiffs' three RICO claims are dismissed pursuant to Rule 12(b)(6).

## B. Personal Jurisdiction

Next, Exoo maintains that if Plaintiffs' RICO claims are dismissed, the claims asserted by every Plaintiff except for D'Ambly must be dismissed for lack of personal jurisdiction as to Exoo, SLU, and the Twitter Defendants. Exoo Br. at 38-39. Plaintiffs do not address this argument. SLU separately contends that Plaintiffs fail to establish personal jurisdiction as to it. SLU Br. at 17-21. Plaintiffs, however, only assert RICO claims against SLU. Because the RICO claims are dismissed, the Court does not reach SLU's personal jurisdiction arguments. Exoo also fails to explain his authority to assert a defense on behalf of the Twitter Defendants. Consequently, the Court will only consider Exoo's arguments for lack of personal jurisdiction as to him.

Section 1965(b) authorizes nationwide service of process for a plaintiff asserting a RICO claim. 18 U.S.C. § 1965. "Where Congress has statutorily authorized nationwide service of process, such service establishes personal jurisdiction, provided that the federal court's exercise of jurisdiction comports with Fifth Amendment due process." *Laurel Gardens, LLC v. Mckenna*, 948 F.3d 105, 122 (3d Cir. 2020) (quoting *Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1229 (10th Cir. 2006)). But because Plaintiffs' RICO claims are dismissed for failure to state a claim, Plaintiffs cannot rely on the RICO statute to establish personal jurisdiction. *See Pop Test Cortisol, LLC v. Univ. of Chic.*, No. 14-7174, 2015 WL 3822237, at *5 (D.N.J. June 18, 2015) (stating that because the plaintiff did not allege a plausible RICO claim "18 U.S.C. § 1965(d) cannot rightly form a basis for asserting personal jurisdiction over defendants"). As a result, Plaintiffs must each establish that personal jurisdiction exists over Exoo. *See Bristol-Myers Squibb Co. v. Super. Ct. of Ca., S.F. Cty.*, 137 S. Ct. 1773, 1781-82 (2017) (explaining that the requirements for personal jurisdiction must be satisfied for each defendant and a defendant's relationship with a third party

is an insufficient basis to confer personal jurisdiction); *see also Weirbach v. Cellular Connection, LLC*, 478 F. Supp. 3d 544, 550 (E.D. Pa. 2020) (concluding that the court could not exercise personal jurisdiction over out-of-state plaintiffs' claims even though they suffered the same harms as in-state plaintiffs).

Personal jurisdiction can be established in a number of ways: general personal jurisdiction, specific personal jurisdiction, waiver, consent, and in-state service of an individual. Here, the focus is on specific personal jurisdiction. A federal court must have both statutory and constitutional authority to assert personal jurisdiction over an out-of-state defendant. *IMO Indus. Inc. v. Kiekert*, 155 F.3d 254, 259 (3d Cir. 1998). This two-step inquiry first looks to the forum state's long-arm statute then to the Due Process Clause of the Fourteenth Amendment to determine if the exercise of jurisdiction is permitted. *Id.* In New Jersey, however, the two steps are collapsed into a single inquiry because the New Jersey long-arm statute allows for the "exercise [of] jurisdiction over a non-resident defendant to the uttermost limits permitted by the United States Constitution." *Nicastro v. J. McIntyre Mach. Am., Ltd.*, 987 A.2d 575, 589 (N.J. 2010) (internal quotation marks omitted); *rev'd on other grounds*, 564 U.S. 873 (2011). Therefore, for a court to exercise personal jurisdiction, the Due Process Clause requires (1) minimum contacts between the defendant and the forum; and (2) that jurisdiction over the defendant comports with "fair play and substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945)).

Minimum contacts may be established by means of general or specific jurisdiction. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). General jurisdiction exists if a defendant's "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Id.* "With respect to a corporation, the place of

incorporation and principal place of business are paradigm bases for general jurisdiction." *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). Here, Plaintiffs allege that Exoo is domiciled in New York. Am. Compl. ¶ 16. As a result, general personal jurisdiction does not exist as to Exoo.

Specific jurisdiction may exist "if the defendant has purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King*, 471 U.S. at 473. In light of Supreme Court precedent, the Third Circuit developed a three-part test to determine whether specific personal jurisdiction exists. First, the defendant must have "purposefully directed [its] activities at the forum." *O'Connor v. Sandy Lane Hotel Co.,* 496 F.3d 312, 317 (3d Cir. 2007) (internal quotation marks omitted). The first requirement of this test is also known as "purposeful availment," and seeks to ensure "that a defendant will not be haled into a jurisdiction solely as a result of 'random, fortuitous, or attenuated contacts" or based on the "unilateral activity of another party or third person." *Burger King*, 471 U.S. at 475 (internal quotation marks omitted) (citing *Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 417 (1984); *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 299 (1980)). Second, the litigation must "arise out of or relate to at least one of those activities." *Id*. (internal quotation marks omitted). Third, if the first two requirements are met, the exercise of jurisdiction must "otherwise comport with fair play and substantial justice." *Id*. (internal quotation marks omitted).

Here, except for D'Ambly, none of the Plaintiffs live or work in New Jersey. Because the alleged wrongful conduct here involves interference with their home life and employment, these Plaintiffs do not establish that the Court has specific personal jurisdiction over Exoo. Consequently, all Plaintiffs except for D'Ambly fail to demonstrate a sufficient connection

between New Jersey, their claims, and Exoo.  These Plaintiffs, therefore, fail to allege that Exoo

purposefully availed itself of the New Jersey forum.  Without purposeful availment, this Court

cannot conclude that specific personal jurisdiction exists over Exoo.[6]  Consequently, the claims

asserted by all Plaintiffs except for D'Ambly are dismissed as to Exoo for lack of personal

jurisdiction.[7]

### C.  Tortious Interference (Count II)

In Count Two, D'Ambly alleges that Exoo intentionally interfered with his prospective

economic benefit.  D'Ambly indicates that Exoo's interference caused D'Ambly's employer to

terminate his employment.  Am. Compl. ¶¶ 148-55.  Exoo seeks to dismiss the tortious interference

claim on numerous grounds.  First, Exoo argues that providing truthful information to an employer

does not constitute improper interference with an economic opportunity.  Exoo Br. at 21-23.  Under

New Jersey law, a plaintiff must plead the following elements to establish a claim:

> (1) a plaintiff's reasonable expectation of economic benefit or
> advantage, (2) the defendant's knowledge of that expectancy, (3) the
> *defendant's wrongful, intentional interference* with that expectancy,
> (4) in the absence of interference, the reasonable probability that the
> plaintiff would have received the anticipated economic benefit, and
> (5) damages resulting from the defendant's interference.

*Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 186 (3d Cir.1992) (emphasis added)

(citing *Printing Mart–Morristown v. Sharp Elec. Corp.*, 563 A.2d 31, 37 (N.J. 1989)).  However,

"it is generally recognized that a party may not be liable for tortious interference for merely

providing truthful information to one of the contracting parties."  *E. Penn Sanitation, Inc. v.*

---

[6] Because these Plaintiffs fail to allege purposeful availment, the Court will not address the
remaining two requirements to establish specific personal jurisdiction over Exoo.

[7] Due to this conclusion, as to Exoo, the remainder of this Opinion only addresses D'Ambly's
claims against him.

*Grinnell Haulers, Inc.*, 682 A.2d 1207, 1218 (N.J. App. Div. 1996); *see also Snitken v. Franklin Sussex Auto Mall*, No. A-2125-06T12125-06T1, 2008 WL 539024, at \*4 (N.J. App. Div. Feb. 29, 2008) ("[T]he *Restatement (Second) of Torts § 727* comment B provides [that] [t]here is of course no liability for interference with a contract or a prospective contractual relation on the part of one who merely gives truthful information to another.").

The Court determines that D'Ambly's allegations as to wrongful and intentional interference are insufficient to survive a motion to dismiss. There appears to be no dispute that Exoo's conduct was intentional. Accordingly, the Court focuses on the wrongful requirement vis-à-vis D'Ambly's employment. Through the Tweets, Exoo allegedly publicized that D'Ambly is a fascist and a white supremacist. *See, e.g.*, Am. Compl. ¶ 39. D'Ambly does not outright deny either allegation. Instead, D'Ambly avers that he is a member of the New Jersey European Heritage Association ("EHA"). *Id.* ¶ 1. Other than indicating that the association is a "non-violent, pro-domestic policy organization," *id.*, Plaintiffs fail to indicate any specifics about the EHA. Exoo, however, provides relevant Twitter threads as exhibits to his motion to dismiss, which demonstrate that the EHA adheres to white supremacist views.[8] *See* Torres Decl., Ex. B-II. For example, the Twitter thread points out that EHA's website includes the "14 words" slogan, which is a phrase used frequently amongst white supremacists, *see 14 Words*, ANTI-DEFAMATION LEAGUE, https://adl.org/education/references/hate-symbols/14-words, and that its YouTube page contains antisemitic images, including the Swastika. Torres Decl., Ex. B-II at 4, 13. Moreover, in the Amended Complaint, D'Ambly admits that there are videos of him "using imprudent

---

[8] The Court considers these exhibits as the doxing Twitter threads are integral to Plaintiffs' claims. *See U.S. Express Lines Ltd.*, 281 F.3d at 388.

15

language during political rallies." *Id.* ¶ 46. In short, it does not appear that D'Ambly is claiming that Exoo defamed him or otherwise spread false information about D'Ambly.

D'Ambly also indicates that Exoo retweeted information about D'Ambly and an "It's okay to be white" march. *Id.* ¶¶ 48, 51. This information appears to focus on D'Ambly's activities outside of work. The information is also not alleged to be false. Similarly, D'Ambly asserts that his employer conducted its own investigation into D'Ambly's activities, and its investigatory report included videos of D'Ambly "using imprudent language during political rallies." *Id.* ¶ 46. As pled, the Amended Complaint appears to indicate that the information came from his employer's investigation rather than from Exoo. Critically, D'Ambly often uses conclusory terms as to alleged improper conduct, such as "threatening Tweets[,]" "death threats[,]" and "threats of physical violence[.]" *Id.* ¶¶ 46d, 52, 59. Likewise, D'Ambly alleges that Exoo directed his associates to send "harassing, intimidating, and threatening phone calls and Tweets" to the Daily News to get D'Ambly fired. *Id.* ¶ 45. But these conclusory allegations and labels are not entitled to the presumption of truth. The doxing thread itself does not include such instructions. *See* Torres Decl., Ex. B-II. Thus, as pled, Plaintiffs fail to sufficiently allege any wrongful conduct.

D'Ambly makes two allegations that demand closer scrutiny. First, D'Ambly indicates that on January 11, 2019, Exoo tweeted "Regardless, I'm gonna spend the next week wrecking your f-----g life, Dan D'Ambly" in response to an EHA Tweet. *Id.* ¶ 58. Exoo's statement certainly reflects an intent to take imminent action against D'Ambly. D'Ambly adds that the same night, his car was vandalized; his vehicle was "keyed," and its tires were slashed. *Id.* ¶ 59. As a result, D'Ambly demonstrates a strong temporal connection between Exoo's statements and unlawful activity. But the activity is not related to D'Ambly's employment, and D'Ambly's termination forms the basis for Count II.

Second, D'Ambly asserts that on January 11, 2019, a Tribune executive "delivered recordings of the death threats to the Daily News. The callers threatened D'Ambly and stated the Daily News was responsible for 'any violence or blood spilled is also on your hands.'" *Id.* ¶ 52. As to the alleged "death threat," the Court has already found that the conclusory term is not entitled to the presumption of truth. D'Ambly also does not indicate when the calls were actually made. The reference to any violence or blood spilled could support a finding of wrongful and intentional interference, but more factual support is needed. It is not clear to the Court whether the callers were referring to *D'Ambly's* blood being spilled or violence as to him, to D'Ambly engaging in violence, or to some other activity or persons. Consequently, this allegation does not sufficiently allege wrongful conduct.

In sum, D'Ambly's tortious interference claim is not plausibly pled. Presumably, D'Ambly has, or knows the content of, the threats and other allegedly improper activity. D'Ambly will have to provide more factual support in his amended pleading. Because the Court finds that Count II is insufficiently alleged, it does not reach the remainder of Exoo's arguments.

### D. Intrusion Upon Seclusion (Count III)

In Count III, D'Ambly pleads a claim for intrusion upon seclusion because Exoo directed and carried out efforts to publicize private information about D'Ambly. Am. Compl. ¶¶ 156-60. Amongst other things, Exoo argues that this claim must be dismissed because Plaintiffs do not allege that Exoo entered into D'Ambly's "private" space when doxing him. Exoo Br. at 25.

"To establish a prima facie claim for an invasion of privacy by an unreasonable intrusion upon the seclusion of another, a plaintiff must demonstrate: (1) an intentional intrusion; (2) into the solitude, seclusion, or private affairs of another; (3) that is highly offensive to a reasonable person." *Swift v. United Food Commercial Workers Union Local 56*, No. A-2612-06T12612-

17

06T1, 2008 WL 2696174, at *3 (N.J. App. Div. July 11, 2008) (quoting *Kinsella v. Welch*, 827 A.2d 325, 333 (N.J. App. Div. 2003)); *see also Rumbauskas v. Cantor*; 649 A.2d 853, 856 (N.J. 1994) . As the New Jersey Appellate Division has observed: "The thrust of this aspect of the tort is, in other words, that a person's private, personal affairs should not be pried into. The converse of this principle is, however, of course, that there is no wrong where defendant did not actually delve into plaintiff's concerns, or where plaintiff's activities are already public or known." *Bisbee v. John C. Conover Agency, Inc.*, 452 A.2d 689, 691 (N.J. Sup. Ct. App. Div. 1982) (citing *Prosser, Law of Torts* (4 ed. 1971), § 117 at 807–809).

In *Brisbee*, for example, a homeowner sued his real estate broker over a press release. 452 A.2d at 690. The release included a picture of the house, taken without the plaintiff's consent; the purchase price, the property address, the name of the plaintiff, and the plaintiff's job, among other things. *Id.* The Appellate Division found that the plaintiff's intrusion upon seclusion claim failed as a matter of law:

> It can accordingly be seen that plaintiff's first count must fail, both because reasonable men could not find any highly offensive intrusion upon the Bisbees here, and because all of the matters at issue herein were otherwise known and public. The photograph which the *Press* printed was taken from the street, a public thoroughfare, and merely represented a view which is available to any bystander. Most of the facts in the article are matters of public record, readily available to anyone who would wish to ascertain them. For instance, the deed and the acknowledgment thereto must contain the true consideration as required for recording by [N.J. Stat. Ann. §] 46:15–6. The realty transfer fee imposed by [N.J. Stat. Ann. §] 46:15–7 is endorsed on the deed by the recording officer and that amount also reflects the consideration paid for the purchase. Defendants did nothing wrongful in obtaining or compiling this information.

*Id.* at 691 (footnote omitted).

18

D'Ambly insufficiently alleges a claim in Count III. Like Count II, D'Ambly relies on conclusory statements and labels instead of plausible facts. D'Ambly alleges that "Defendant Exoo publishes Tweets and doxes other persons private and undisclosed information." Am. Compl. ¶ 27. D'Ambly further claims "enterprise associates stalked D'Ambly to uncover his true identity." *Id.* ¶ 39. With the exception of the pejorative and conclusory word "stalked," D'Ambly fails to assert any facts indicating that Exoo (or his associates) used anything other than public and permissible means to identify him. D'Ambly indicates that on October 29, 2018, Exoo "publicly disclosed for the first time D'Ambly's name, hometown, photograph, employer, occupation, employer's location, multiple telephone numbers for his employer, a labor union Referendum Board he chaired, and the names of the other Referendum Board members." *Id.* ¶ 44. But D'Ambly fails to adequately allege that the information was acquired by wrongful means. For example, D'Ambly does not indicate that such information was not publicly available or that he took steps to ensure that some or all of the information remained private. *See Stengart v. Loving Care Agency, Inc.*, 990 A.2d 650, 663-54 (N.J. 2010) (explaining that the plaintiff subjectively had a reasonable expectation of privacy to personal emails that she exchanged with her attorney on her work laptop with a password protected, personal email account); *Ehling v. Monmouth-Ocean Hosp. Serv. Corp.*, 872 F. Supp. 2d 369, 374 (D.N.J. 2012) (denying intrusion upon seclusion claim involving allegation that the plaintiff's supervisor accessed postings on her Facebook "wall" that could be viewed only by her Facebook friends). Indeed, it appears that not only was D'Ambly an admitted member of EHA, but that he also "actively participates with other EHA member in political rallies, peaceful political protests, pamphleteering, and speech[.]" Am. Compl. ¶ 1. Such public activity by definition does not reflect D'Ambly's solitude, seclusion, or private affairs.

For the foregoing reasons, Count III is dismissed.

### E.  Violations of Criminal Statutes (Counts IV, V, and VI)

In Counts IV, V, and VI, D'Ambly alleges that Exoo violated provisions of the New Jersey Criminal Code and federal criminal statutes.  Am. Compl. ¶¶ 161-77.  Exoo maintains that all three claims must be dismissed because there is no private right of action for any of the cited criminal statutes.  Exoo Br. at 26-29.

Ordinarily, federal criminal statutes do not provide individuals with a private right of action in a civil case.  *See Weeks v. Bowman*, No. 16-9050, 2017 WL 557332, at *2 (D.N.J. Feb. 10, 2017) (dismissing civil matter for lack of subject matter jurisdiction because criminal statutes cited by the plaintiff did not create a private right of action).  If a statute provides a private right of action, however, an individual may "bring suit to remedy or prevent an injury that results from another party's actual or threatened violation of a legal requirement."  *Wisniewski v. Rodale, Inc.*, 510 F.3d 294, 296 (3d Cir. 2007).  In Count V, D'Ambly alleges that Exoo violated 18 U.S.C. § 875(c), and in Count IV, that Exoo violated 18 U.S.C. § 2261A(2).  There is no private right of action for either statute.  *Chadda v. Mullins*, No. 10-4029, 2010 WL 4484622, at *2 (E.D. Pa. Nov. 9, 2010) (dismissing claim because "18 U.S.C. § 875 does not authorize a private cause of action"); *Humphrey v. Pa. Court of Common Pleas of Phila.*, 462 F. Supp. 3d 532, 534 n.2 (E.D. Pa. 2020) (dismissing claims premised on 18 U.S.C. § 2261-2262 and noting that "[n]umerous federal courts held that no private right of action exists under this specific statute).  As a result, Counts V and VI are dismissed.

In Count IV, D'Ambly alleges that Exoo violated N.J. Stat. Ann. §§ 2C:33-4.1 and 2C:30-31(a).  Am. Compl. ¶¶ 161-66.  Neither section of the New Jersey Criminal Code contains a private right of action.  Courts in New Jersey are "reluctant to infer a statutory private right of action where the Legislature has not expressly provided for such action."  *R.J. Gaydos Ins. Agency, Inc. v. Nat'l*

*Consumer Ins. Co.*, 773 A.2d 1132, 1142 (N.J. 2001). D'Ambly does not identify any authority suggesting the Court should infer that a statutory private right of action exists for either statute. Therefore, the Court will not infer a private right of action. As a result, Count IV is also dismissed.

### F.  Negligent Entrustment (Count XI)

Next, in Count XI, Plaintiffs assert a negligent entrustment claim against the Twitter Defendants. Am. Compl. ¶¶ 218-26. A claim for negligent entrustment may arise by

> permit[ing] a third person to use a thing or to engage in an activity which is under the control of the actor, if the actor knows or should know that such person intends or is likely to use the thing or to conduct himself in the activity in such a manner as to create an unreasonable risk of harm to others.

*N.J. Citizens United v. Hernandez*, No. A-4060-04T54060-04T5, 2006 WL 686571, at *4 (N.J. App. Div. Mar. 20, 2006) (quoting *Restatement (Second) of Torts* § 308 (1965)). To state a claim for negligent entrustment, a plaintiff must plead there was an "entrustment of [a] dangerous instrumentality." *Id.* (quoting 57A *Am. Jur.2d Negligence* § 318 (2005)). The Twitter Defendants argue that Twitter does not constitute a dangerous instrumentality. Twitter Br. at 20. The Court agrees.

Negligent entrustment claims involve activities or items that are inherently dangerous, such as firearms, automobiles, or furnishing alcohol to minors. *See Stelting v. Hauck*, 159 A.2d 395, 389 (N.J. 1960) (explaining that firearms, "poisons, knives, and the like" are "instrumentalities of potential harm to children); *Quigley v. Arthur*, No. 10-4308, 2011 WL 5519839, at *2 (D.N.J. Nov. 10, 2011) (denying summary judgment for negligent entrustment claim involving use of an automobile that was involved in an accident); *Gaines v. Krawczyk*, 354 F. Supp. 2d 573, (W.D. Pa. 2004) ("It is sufficiently alleged that the institutional defendants were aware of Krawczyk's propensity to furnish alcohol to minors in his position as a priest, and knew or should have known

that an unreasonable risk of harm to individuals under the age of twenty-one would be created by permitting Krawczyk to retain his position as pastor[.]"); *see also Restatement (Second) of Torts* § 308, Illustrations (1965) (solely using car accidents as basis for negligent entrustment claim). Twitter, an online communications platform, is materially different. Simply stated, there is nothing inherently dangerous about a technology that facilitates communication, and the Court is unaware of any authority that suggests the opposite.

As a result, Plaintiffs' negligent entrustment claim is dismissed.

### G. Breach of the Implied Covenant of Good Faith and Fair Dealing (Count XII)

Finally, Plaintiffs assert a claim for breach of the implied covenant of good faith and fair dealing against the Twitter Defendants. Am. Compl. ¶ 227-37. The Twitter Defendants contend that this claim must be dismissed because Plaintiffs fail to allege that there was a contract between any Plaintiffs and either of the Twitter Defendants. Twitter Br. at 36. The implied covenant of good faith and fair dealing is a "component of every contract" that requires both parties to a contract act in "good faith[,]" that is, they must "adher[e] to community standards of decency, fairness, or reasonableness." *Iliadis v. Wal-Mart Stores, Inc.*, 922 A.2d 710, 722 (N.J. 2007) (internal citations omitted). But "in the absence of a contract, there can be no breach of an implied covenant of good faith and fair dealing." *Noye v. Hoffman-La Roche Inc.*, 570 A.2d 12, 14 (N.J. App. Div. 1990); *see also FDIC v. Bathgate*, 27 F.3d 850, 876 (3d Cir. 1994) (stating that the circuit did not believe that the New Jersey Supreme Court would support "the proposition that *non-parties* to a contract can be held liable for a breach of a contractual duty of good faith and fair dealing") (emphasis in original). Here, Plaintiffs fail to assert that any contract existed. Without a contract, Plaintiffs' implied covenant of good faith and fair dealing claim fails.

Count XI, therefore, is dismissed.[9]

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are **GRANTED in part** and **DENIED in** part.  Dismissal is without prejudice.  Plaintiffs shall have thirty (30) days to file an amended complaint that cures the deficiencies noted herein.  If Plaintiffs do not file an amended pleading within that time, the claims dismissed herein will be dismissed with prejudice.  An appropriate Order accompanies this Opinion.

Dated: November 1, 2021

John Michael Vazquez, U.S.D.J.

---

[9] Because the Court concludes that Plaintiffs fail to state any claims against the Twitter Defendants, the Court does not reach the Twitter Defendants' argument that they are immune from Plaintiffs' claims under 47 U.S.C. § 230, which is an affirmative defense.  *See Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014) ("Preemption under the Communications Decency Act[, 47 U.S.C. § 230] is an affirmative defense.").  The Court notes, however, that a district court "may grant a Rule 12(b)(6) motion on the basis of an affirmative defense '*if* the predicate establishing the defense is apparent *from the face of the complaint*.'"  *Brody v. Hankin*, 145 F. App'x 768, 771 (3d Cir. 2005) (quoting *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 n.10 (3d Cir. 1978)).

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

DANIEL D'AMBLY, et al.,

     *Plaintiffs*,

    v.

CHRISTIAN EXOO a/k/a ANTIFASH
GORDON, et al.,

     *Defendants*.

Civil Action No. 20-12880

**ORDER**

__John Michael Vazquez, U.S.D.J.__

For the reasons set forth in the accompanying Opinion, and for good cause shown,

IT IS on this 1st day of November, 2021,

**ORDERED** that the motions to dismiss from (1) St. Lawrence University, D.E. 75, (2) Vijaya Gadde and Twitter, Inc., D.E. 78, and (3) Christian Exoo, D.E. 79, are **GRANTED**; and it is further

**ORDERED** that Counts II through VI and XIII through XII of the Amended Complaint are **DISMISSED** for failure to state a claim; and it is further

**ORDERED** that except for Plaintiff Daniel D'Ambly, Plaintiffs' claims are **DISMISSED** as to Christian Exoo for lack of personal jurisdiction; and it is further

**ORDERED** that Plaintiffs are provided leave to file an amended pleading that remedies the identified deficiencies. Plaintiffs' amended pleading must be filed within thirty (30) days of the date of this Order. If Plaintiffs fail to file an appropriate amended pleading within this time, the dismissed claims and parties will be **DISMISSED with prejudice**.

John Michael Vazquez, U.S.D.J.

# EXHIBIT C

Patrick Trainor, Esquire (Attorney ID 242682019)
**LAW OFFICE OF PATRICK TRAINOR**
19 Union Avenue, Suite 201
Rutherford, New Jersey 07070
P: (201) 777-3327
F: (201) 896-7815
pt@ptesq.com
*Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DANIEL D'AMBLY; AARON WOLKIND; STEVE HARTLEY; RICHARD SCHWETZ; JOBEL BARBOSA; MATTHEW REIDINGER; JOHN HUGO; SEAN-MICHAEL DAVID SCOTT; THOMAS LOUDEN; ZACHARY REHL; AMANDA REHL; K.R., a minor, by and through her father ZACHARY REHL and her mother AMANDA REHL, MARK ANTHONY TUCCI, | CIVIL ACTION NO.: 2:20-cv-12880-JMV-JSA <br><br> **SECOND AMENDED COMPLAINT** <br><br> **JURY TRIAL DEMAND** |
| Plaintiffs, | |
| vs. | |
| CHRISTIAN EXOO a/k/a ANTIFASH GORDON; ST. LAWRENCE UNIVERSITY; TRIBUNE PUBLISHING COMPANY, LLC; NEW YORK DAILY NEWS; VIJAYA GADDE; TWITTER, INC; COHEN, WEISS AND SIMON, LLP; NICK STRICKLAND; TORCH ANTIFA NETWORK; UNNAMED ASSOCIATES 1 – 100, | |
| Defendants. | |

Plaintiffs, Daniel D'Ambly, Aaron Wolkind; Steven Hartley; Richard Schwetz; Jobel

Barbosa; Matthew Reidinger; John Hugo; Sean-Michael David Scott; Jr.*;* Thomas Louden;

Zachary Rehl; Amanda Rehl; K.R., a minor, by and through her father Zachary Rehl and her

mother Amanda Rehl (hereinafter collectively referred to as "Plaintiffs") by and through their

attorney the Law Office of Patrick Trainor, as and for their Complaint against defendants Christian Exoo a/k/a @AntifashGordon, St. Lawrence University, Tribune Publishing Company, LLC, New York Daily News, Vijaya Gadde, Twitter, Inc., Torch Antifa Network, Nick Strickland, and Cohen, Weiss, and Simon, LLP, hereby alleges as follows:

## **STATEMENT OF THE CASE**

This action arises out of the conduct of defendant Christian Exoo (hereinafter "Exoo"), under the Twitter username "@AntiFashGordon." Defendant Exoo is a habitual doxer, who leads, associates, and conspires with likeminded associates to dox[1] people ("targets") that they claim are "fascists" and "white supremacists," in order to cause those targets to suffer employment terminations, school expulsions, and to financially devastate them. Exoo and associates coupled doxing with direct action[2] against Plaintiffs.

Inserted throughout this Complaint are Tweets, blog posts, and statements made by Exoo and associates with "calls to action," mocking results of direct action, concern for legal ramifications, the promotion of the use of *67 to mask their phone numbers. Exoo and associates believe doxes are warnings against trespass against them and all doxes and dogpiling are imbued with threats against their target. Exoo often reminds his associates "we don't cry to the cops or the court. who protects us? we protect us."



---

[1] *Dox Definition*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/dox, "to publicly identify or publish private information about (someone) especially as a form of punishment or revenge." (last visited Nov. 14, 2021).

[2] *Direct Action Definition*, OxfordLearnersDictionaries.com, *The use of strikes, protests, etc. instead of discussion in order to get what you want*, https://www.oxfordlearnersdictionaries.com/us/definition/english/direct-action?q=direct+action (last visited Nov. 27, 2021).

Moreover, by Defendants' definition of what constitutes actual violence, doxes and their inherent threats, are actual violence. As evidenced in the images below of a Twitter conversation, involving Exoo, his key Exoo associate, Twitter user @emilygorcenski, who is a verified blue check Twitter account, and Mark Pitcavage, Senior Research Fellow, Center on Extremism, Anti-Defamation League, Exoo and @emilygorcenski dispute Mr. Pitcavage's point that threats are not actual violence, and cite to the World Health Organization definition, which includes threats as actual violence to support his position.



Exoo admits leading, associating with, and conspiring with others in an enterprise that doxes and conducts direct action against alleged fascists and white supremacists. In *Rolling Stone* magazine[3], Exoo was described as the "closest thing to a leader," and in a September

---

[3] Andy Kroll, *Meet the Undercover Anti-Fascists*, https://www.rollingstone.com/politics/politics-features/antifa-proud-boys-militia-trump-insurrection-1121933/ (last accessed Nov. 27, 2021).

2019, Medium.com interview as "@AntiFashGordon" (or "AFG"), Exoo is described as "just about the closest thing Antifa…has to a celebrity." In the Medium.com interview, Exoo described that[4]

> himself is exactly what we don't need," he explained. "I have a whole affinity group of people sharing intel with me. And I would be a lonely guy just screaming onto social media without communities to actually mobilize around this stuff."

Exoo's associates seconded Exoo's admission that an association of people engaged in doxing and direct action exists. On or about April 9, 2021, in the blog post titled "*Antifash Gordon's Abuse, Abusers not welcome here: A statement of separation from AntiFash Gordon*," associates announced they will no longer work with Exoo, because of his abusive behavior, which included using doxing and direct action for his own financial gain.[5]

> and presents himself as an exemplar of anarchistic values. The reality is that AFG is a selfish, self-interested, reckless, and harmful individual who has cynically used a movement working for a better world as a vehicle for his own financial and social gain, at the expense of others, with no indication

Another former associate recently described Exoo's @AntiFashGordon Twitter account as the public face of a "vast underground network." Moreover, associates admitted in the *Statement of Separation* blog post that for doxing and direct action Exoo compensated them with


wetland waifu 🌱
@endeveryting

"security culture" against disabled, trans, poc to keep their spaces insular that were easily infiltrated.

This isn't about one person. AFG is the public face of a vast underground network whose labor he takes credit. AFG isn't just Ex_o, it started as a Boston DSA project

10:52 PM · Nov 6, 2021 · Twitter Web App

---

[4] Aaron Gell, *Anti-Fascists Are Waging a Cyber War – And They're Winning*, Medium.com, September 9, 2019, https://gen.medium.com/antifas-keyboard-warriors-254f62be2a95 (last accessed Nov. 27, 2021). *See also* Ex. A.
[5] *Antifash Gordon's Abuse, Abusers not welcome here: A statement of separation from AntiFash Gordon,* (Apr. 9, 2021) *formerly available* at https://antifashgordon.noblogs.org (last accessed May 12, 2021) has since been taken offline but a copy is *available at* https://web.archive.org/web/20210409230402/https://antifashgordon.noblogs.org/ (last accessed Nov. 27, 2012). *See also* Ex. B.

cash and other valuable consideration, such as money, connections to jobs, and opportunities for media appearances with his friends in the press.[6]

The *Statement of Separation from AntiFash Gordon* is signed by members of Defendant Torch Antifa, who published their own statement of solidarity and separation Exoo that similarly described the existence of an organization.[7] Torch Antifa described Exoo as someone who holds a "position of power and influence" that enables him to serve has the "arbiter and distributor of research information, media opportunities, and financial resources to other antifascists," but who failed to acknowledge the "collective labor" behind *@AntiFashGordon* Twitter account.[8]

The association obtains private and confidential information of their targets, who use online aliases. Publication of the dox is the first step. Once the dox is published Exoo and associates dogpile a target's employers, co-workers, schools, acquaintances. Dogpiling is when an individual uses Twitter to incite their followers to say or do a specific thing, such as reply to another person with abusive messaging,[9] or as Exoo himself put it:

> The next step, Gordon continued, was to "find some point of vulnerability: employer, landlord, school, church, anywhere where they would lose some kind of social status or take a hit." Often, a single phone call alerting an employer to the presence of a white nationalist on the payroll was enough to get someone fired; other times, an online publicity campaign is launched to apply community pressure. "This is not a thing we take joy in — the personal suffering of white supremacists," David said. "But it is a good

---

[6] *Id.*

[7] *Concerning Antifash Gordon: A Torch Statement in Solidarity with the Victims of Abuse*, (Apr. 9, 2021) *formerly available at* https://torchantifa.org/concerning-antifash-gordon-a-torch-statement-solidarity-with-victims-of-abuse (last accessed May 12, 2021), however, on or about November 7, 2021, Torch's statement in the above link was taken down and it now links to a statement explaining that Torch removed the original statement in solidarity, because they received a "Cease and Desist" notice from Christian Exoo's attorneys. (last accessed Nov. 27, 2021). A copy of both statements is attached hereto as Exhibit C.

[8] *Concerning Antifash Gordon: A Torch Statement in Solidarity with the Victims of Abuse*, (Apr. 9, 2021) *formerly available at* https://torchantifa.org/concerning-antifash-gordon-a-torch-statement-solidarity-with-victims-of-abuse (last accessed May 12, 2021). *See also* Ex. CC.

[9] *https://help.twitter.com/en/rules-and-policies/coordinated-harmful-activity* (last accessed Nov. 14, 2021).

**THE PARTIES**

1.     Daniel D'Ambly (hereinafter "D'Ambly"), was a twenty-seven (27) year member of Local One-L, Graphic Communications Conference of the International Brotherhood of Teamsters, who was employed as a was a plate maker for the New York Daily News in Jersey City, New Jersey until January 18, 2019.  D'Ambly was doxed by Exoo on October 29, 2018.  In the dox D'Ambly was labeled a 'fascist' and/or a 'white supremacist.'  D'Ambly is a member of the New Jersey European Heritage Association ("EHA"), a non-violent, pro-domestic policy organization that the Exoo and associates have labeled a white supremacist hate group, which D'Ambly leads.  D'Ambly and the EHA, actively participate in political rallies, peaceful political protests, pamphleteering, and speech that is protected by U.S. Const. amend. I and N.J. Const. art. I, ¶ 6.  D'Ambly is an individual domiciled in the State of New Jersey and a "person" as defined under 18 U.S.C. § 1961(3).

2.     Zachary Rehl ("Rehl") was employed by New York Life Insurance Company in Philadelphia when he was doxed by Exoo in or about August 2017, and labeled a fascist and white supremacist.  Rehl is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

3.     Amanda Rehl ("AmRehl") is the spouse of Zachary Rehl.  AmRehl is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

4.     K.R. ("K.R."), is the minor child of Zachary Rehl and Amanda Rehl.  K.R. is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

5.      Aaron Wolkind ("Wolkind") was a Technical Support Specialist for Aerzen USA Corporation ("Aerzen") when he was doxed by Exoo on or about June 2019, and labeled a fascist, white supremacist, and a neo-Nazi.  Wolkind is an individual domiciled in the State of Delaware and a "person" as defined under 18 U.S.C. § 1961(3).

6.      Steven Hartley ("Hartley"), is a logistics manager for American Expediting located in Folcroft, Pa.  On November 29, 2018, he was doxed by Exoo and labeled a Nazi, racist and white supremacist who was a threat to women and minorities.  Hartley is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

7.      Mark Anthony Tucci ("Tucci") was employed at Aldo's Pizzarama in Philadelphia when he was doxed by Exoo on December 10, 2018, and labeled a fascist, racist, and white supremacist.  Tucci is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

8.      Richard Schwetz ("Schwetz") was employed at Inova Payroll in Lancaster, Pa., when he was doxed by Exoo in or about June 2020, and labeled a fascist, racist, and white supremacist.  Schwetz is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

9.      Jobel Barbosa ("Barbosa") is Puerto Rican and a permanently disabled veteran, who was employed as a Detail Department Manager at Jaguar Land Rover Willow Grove, in Willow Grove, Pa., when he was doxed by Exoo on June 22, 2019, and labeled a fascist, racist, and white supremacist.  Barbosa is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

10.     Matthew Reidinger ("Reidinger") was employed in Coal Township, Pa.  On

November 27, 2018, he was doxed by Exoo and labeled a fascist and white supremacist.

Reidinger is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as

defined under 18 U.S.C. § 1961(3).

11.     John Hugo ("Hugo") was employed as a dispatch manager for Green and Yellow

Cab in Somerville, Massachusetts when he was doxed by Exoo on January 2, 2020, and labeled a

fascist and white supremacist.   Hugo is an individual domiciled in the Commonwealth of

Massachusetts and a "person" as defined under 18 U.S.C. § 1961(3).

12.     Sean-Michael David Scott ("Scott") was employed in Seattle, Washington when

he was doxed by Exoo on September 16, 2019, and labeled a fascist, white supremacist, and anti-

Semite.  Scott is an individual domiciled in the State of Florida and a "person" as defined under

18 U.S.C. § 1961(3).

13.     Thomas Louden ("Louden") is a 30-year volunteer firefighter and the appointed

Deputy Emergency Management Coordinator for Hilltown Township, Pennsylvania and was

employed as the Director of Managed Care at Thomas Jefferson University Hospital in

Philadelphia for twenty-three (23) years when he was doxed by Exoo on November 2, 2020.

Louden is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as

defined under 18 U.S.C. § 1961(3).

14.     Plaintiffs Wolkind, Hartley, Schwetz, Rehl, Barbosa, and Tucci are members of

the Philadelphia chapter of the Proud Boys (hereinafter "PPB" or "Proud Boys").  Plaintiff

Reidinger is a member of the Harrisburg chapter of the Proud Boys ("HPB").  The Proud Boys

are a diverse, multi-racial, multi-ethnic, fraternal, males-only drinking club, who consider

themselves "western chauvinists."

15.     Hugo is the President of Super Happy Fun America, a right of center civil rights organization focusing on defending the American Constitution, opposing gender madness, and defeating cultural Marxism.  Super Happy Fun America is best known for organizing the 2019 Boston Straight Pride Parade.  Hugo was the 2018 Republican Candidate for Massachusetts' 5th Congressional District.

16.     Defendant Christian Exoo ("Exoo" or "@AntiFashGordon") is a library building supervisor and lecturer at St. Lawrence University.  Exoo is a self-described anti-fascist, notorious doxer, and leader of Antifa, who by doxing others has acquired a great deal of notoriety and infamy.[10]  Exoo currently publishes Tweets under Twitter username "@AntiFashGordon."  Exoo is an individual domiciled in the State of New York and a "person" as defined under 18 U.S.C. § 1961(3).

17.     St, Lawrence University ("St. Lawrence" or "STL") is a private four-year university with its principal place of business located at 116 Vilas Hall, 23 Romoda Drive, Canton, New York 13617, and a "person" as defined under 18 U.S.C. § 1961(3).

18.     Tribune Publishing Company ("Tribune") is a media company organized under the laws of the State of Delaware with its principal place of business located at 160 N. Stetson

---

[10] *Anti-Fascists Are Waging A Cyber War – And They're Winning*, Medium.com (Sep. 9, 2019) https://gen.medium.com/antifas-keyboard-warriors-254f62be2a95 (last accessed Sep. 15, 2020); *Comcast fires employee with alleged ties to Proud Boys, We the People Rally*, PhillyVoice.com (November 15, 2018) https://www.phillyvoice.com/comcast-fires-employee-proud-boys-alt-right-philadelphia-rally/ (last accessed Sep. 15, 2020); *The Right Wing Is Trying to Make It a Crime to Oppose Fascism*, Truthout.org (Aug. 9, 2019) https://truthout.org/articles/the-right-wing-is-trying-to-make-it-a-crime-to-oppose-fascism/ (last accessed Sep. 15, 2020); *How to Spot An Abuser, Featuring Antifash Gordon, In His Own Words: A Step By Step Guide, and Also F\*\*\* That Guy,* Medium.com (Jun. 25, 2020) https://medium.com/@abuse_isnt_revolutionary/how-to-spot-an-abuser-featuring-antifash-gordon-in-his-own-abuser-words-7b39f4657b19 (last accessed Sep. 15, 2020).

Avenue, Chicago, Illinois 60601 that conducts its business throughout the United States and is a "person" as defined under 18 U.S.C. § 1961(3).

19.    New York Daily News Company ("Daily News") is owned by the Tribune Publishing Company (Tribune and Daily News are sometimes hereinafter referred to collectively as "Daily News") with a place of business located at 125 Theodore Conrad Drive, Jersey City, New Jersey 07305, and 4 New York Plaza, New York, NY 10004.  The Daily News is a "person" as defined under 18 U.S.C. § 1961(3).  At all times relevant, the Tribune Publishing Company had the right and did exercise control over the actions of the New York Daily News.

20.    Vijaya Gadde ("Gadde") is the Head of Legal, Public Policy, and Trust and Safety Lead at Twitter, Inc.  At all times relevant, Vijaya Gadde was the sole decision maker and person authorized to permanently ban Twitter users who violated Twitter's Terms of Service and Rules. She is a "person" as defined under 18 U.S.C. § 1961(3).  Gadde is believed to be domiciled in the State of California.

21.    Twitter, Inc. ("Twitter"), is a company organized under the laws of the State of Delaware with its principal place of business located at 1355 Market Street, San Francisco, CA 94103, that conducts its business globally and a "person" as defined under 18 U.S.C. § 1961(3).

22.    Exoo and associates are a criminal enterprise as defined under 18 U.S.C. § 1961(4).

23.    Cohen, Weiss, and Simon, LLP ("CWS") is a law firm with its principal place of business located at 900 3rd Avenue, #2100, New York, New York 10022 and a "person" as defined under 18 U.S.C. § 1961(3).

24.    Nick Strickland is an individual domiciled in the State of New Jersey and a "person" as defined under 18 U.S.C. § 1961(3), he controls and publishes Twitter username "@NStricklanded."

25.    Torch Network a/k/a Torch Antifa Network describes itself as "*a network of Militant antifascists across (but not limited to) the United States.  We are born out of, and pay our respects to, the Anti-Racist Action Network.  We are dedicated to confronting fascism and other element of oppression.  We believe in direct action.*"[11]





Torch Antifa controls and publishes Twitter account "@TorchAntifa" and internet website *https://torchantifa.org*.  Torch Antifa has no known address but its internet domain *torchantifa.org* is registered to Pennsylvania non-profit organization One People's Project, whose principal address is in New Brunswick, New Jersey.

## JURISDICTION AND VENUE

---

[11] Torch Network, https://torchantifa.org/about/, (last accessed Nov. 14, 2021).

26. Jurisdiction of this Court is proper because this litigation arises under federal law, namely 18 U.S.C. §§ 1961 to 1968. This Court has jurisdiction over this matter under 28 U.S.C. § 1331.

27. The Court has supplemental jurisdiction over the state law claims asserted in this case under 28 U.S.C. § 1367(a).

28. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and the threatened and actual harm occurred in this District by reason of Defendants' conduct as alleged below.

## FACTS PERTINENT TO ALL PLAINTIFFS

29. Exoo and associates use the terms fascists and/or white supremacists interchangeably.

30. Defendant Exoo publishes Tweets and doxes under Twitter username *"@AntiFashGordon"* a leading Antifa Twitter account that as of November 14, 2021, has 53,534 Twitter followers. The headline of @AntiFashGordon's public profile as seen below states "I expose fascists via #OSINT, get them fired, de-homed, kicked out of school, etc."



12

31.     Doxing is prohibited by Twitter's Private Information Policy within their Terms
of Service and Rules ("TOS").[12]

32.     Twitter's TOS also prohibit Coordinated harmful activity, specifically Twitter
prohibits *Social Coordination*, which Twitter defines as "on or off-Twitter coordination among a
group of people to amplify or propagate a specific message…an individual using Twitter to
incite their followers to say or do a specific thing, such as reply to another person with abusive
messaging – a practice referred to as "dogpiling."[13]

33.     Upon information and belief, Exoo is a habitual doxer and ban evader, who has
been permanently banned at least twice before Exoo he began to publish and control
*@AntiFashGordon*, is known to Twitter's Trust & Safety Council ("TSC").  A ban evader is a
person who creates a new Twitter account after receiving a permanent ban, which is a lifetime
ban.  The ban evader's new account is called a "ban evasion account," and is prohibited by
Twitter rules.[14]  Twitter has previously permanently banned *@ChrisExoo*,[15] *@ChristianExoo*.[16]



---

[12] *https://help.twitter.com/en/rules-and-policies/personal-information* "You may not publish or post other people's
private information without their express authorization and permission.  We also prohibit threatening to expose
private information or incentivizing others to do so." (last accessed Nov. 14, 2021).
[13] *https://help.twitter.com/en/rules-and-policies/coordinated-harmful-activity* (last accessed Nov. 14, 2021).
[14] *https://help.twitter.com/en/rules-and-policies/enforcement-options* "Permanent suspension: This is our most
severe enforcement action.  Permanently suspending an account will remove it from global view, and the violator
will not be allowed to create new accounts." (last accessed Nov. 14, 2021).
[15] *https://twitter.com/ChrisExoo* (last accessed Nov. 14, 2021).
[16] *https://twitter.com/ChristianExoo* (last accessed Nov. 14, 2021).

34.     Upon information and belief, Twitter agreed to allow Exoo, a known ban evader change his username @DoxSavage to @AntiFashGordon, in lieu of third permanent ban.



35.     Exoo described his associates as "our entire crew," and acknowledged monthly IT costs for the entire crew of about $50.[17]

> others in the movement. And he outlined the expenses. "We fight fascism on a budget,"
> he said. "For our entire crew — and this includes database subscriptions, VPNs, burner
> phones, and encrypted data storage — it comes to about $50 a month."

36.     As seen below Exoo insists associates continue dogpiling until the target's employer publicly announces the target's termination.



37.     Exoo and associates conspire with well-known doxer who publishes Twitter account @emilygorcenski, which is a blue check Twitter verified account, who Exoo has cited as a mentor.

---

[17] Aaron Gell, *Anti-Fascists Are Waging a Cyber War – And They're Winning*, Medium.com, September 9, 2019, https://gen.medium.com/antifas-keyboard-warriors-254f62be2a95 (last accessed Nov. 27, 2021).



38.    Verified blue check Twitter account @emilygorcenski is followed by Twitter

CEO Jack Dorsey, accordingly @*emilygorcenski* can send private direct messages to @*jack*, and

@*jack* sees @emilygorcenski's Tweets in his home timeline when he logs on to his account.[18]

---

[18] Following FAQ's, Twitter.com *available at* https://help.twitter.com/en/using-twitter/following-faqs#:~:text=Followers%20are%20people%20who%20receive,they%20log%20in%20to%20Twitter (last accessed Nov. 30, 2021).



39.     Twitter account *@emilygorcenski* has exhibited sliding into *@jack* direct

messages to get a Twitter account banned for "deadnaming" when Twitter Support did not ban

the account, and also boasted about surviving @jack's follower purge in 2019.



40.     As a result of Exoo and associates conduct described herein, every doxed Plaintiff was threatened, had their families threatened, and sustained property damage.

## **DANIEL D'AMBLY**

41.     D'Ambly repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 40 with the same force and effect as if set forth in detail herein again.

42.     Upon information and belief, the Exoo Enterprise targeted D'Ambly as a fascist and white supremacist at some point in or about January 2018.

43.     Upon information and belief, in and before September 2018, Twitter received and investigated complaints that Exoo's former Twitter account *@DoxSavage* was doxing and engaging in abusive behavior.

44.     Upon information and belief, on or about October 1, 2018, Gadde and Twitter agreed to allow *@DoxSavage* to undergo a username change in lieu of a third permanent ban.

45.     On October 11, 2018, *@DoxSavage* Tweeted a farewell announcement to his followers: "Hey folks—I just underwent a name change from *@DoxSavage* to *@AntiFash Gordon*.  I'll be back tomorrow to expose more violent fascists who were on the ground in Providence on 10/6."





46.     Exoo's change for his evasion account @*DoxSavage* to @*AntiFashGordon*
prevented him from losing approximately 15,000 @*DoxSavage* followers.

47.     On October 29, 2018, at 11:49 a.m., @*AntiFashGordon* doxed D'Ambly in a
massive twenty-two count Tweet thread that included D'Ambly's name, hometown, photograph,
employer, occupation, employer's location, multiple telephone numbers for his employer, labor
union Referendum Board he chaired, and the names of the other Referendum Board members.



**AntiFash Gordon**
@AntiFashGordon

8.) And until now, no one knew who was behind it.

It's Daniel D'Ambly, of Dayton, New Jersey, a
newspaper printer for @NYDailyNews in Jersey City.

11:49 AM · Oct 29, 2018

48.     In the dox, @AntiFashGordon labeled D'Ambly a "Nazi" and directed associates
to send harassing, intimidating, and threatening phone calls, and Tweets to the Daily News's
Twitter username @*NYDailyNews*, to extort D'Ambly's termination.  *See* Exhibit C, Exoo's First
Dox of D'Ambly October 29, 2018.

49.     Exoo's dox directed:

a.   In the 19th Tweet, @*AntiFashGordon* directed his associates "stay on top of this,
     too.  If you don't hear back from @NYDailyNews, keep tweeting at them."  Call
     their printing facilities in Jersey City at (201) ***-**** (number provided in
     original Tweet) and warn them about Daniel D'Ambly…"



b. A follow up Tweet included a second telephone number for the Daily News and a

subsequent Tweet included the direct telephone number to D'Ambly's print shop.



c. Exoo associates dogpiled *@NYDailyNews* and *@Teamsters*.







d. Upon information and belief, from October 29, 2018, to January 11, 2019, the Exoo Enterprise directed no less than one-hundred and ninety-one (191) Tweets to @DailyNews plus an unknown number of phone calls.

e. D'Ambly was never told of the threats or warned to take safety precautions.

50. On October 30, 2018, without warning D'Ambly of the threats, Tribune engaged Insite Risk Management ("Insite") to investigate D'Ambly. Insite submitted its "Private

Investigation Report" ("Report") to the Tribune on December 4, 2018.  The Report

acknowledged @AntiFashGordon's doxing was the impetus for the investigation.  The Report

included videos of D'Ambly and others using imprudent language during political rallies.

51.     On or before January 8, 2019, EHA posted flyers on public bulletin boards in

Princeton, New Jersey that announced an "It's okay to be white" protest march purportedly

scheduled for January 12, 2019.

52.     On January 9, 2019, *@AntiFashGordon* re-Tweeted the "It's okay to be white"

march to his associates and doxed D'Ambly again by Tweeting, "If anyone wants their leaders

name, it's Dan D'Ambly."

53.     On January 10, 2019, *@AntiFashGordon* published a Tweet that referenced

EHA's purported march and directed his associates to "show up and shut down" the purported

march "And please say hi to their leader, Dan D'Ambly for me."



54.     On January 10, 2019, D'Ambly was called to an interview with Jean Nechvatal

("Nechvatal), Tribune's Vice President, Talent Management & Learning and James R. Brill

("Brill"), Daily News's Sr. Vice President of Operations. D'Ambly was accompanied at the meeting by Union Steward Pete Cairnie. During the meeting, D'Ambly was confronted with content of the Report, but not informed of the report's existence. D'Ambly acknowledged using imprudent language in a private conversation during a protest.

55. On January 11, 2019, at 10:14 a.m., Exoo reiterated "show up and show these pricks that we don't tolerate hate in our streets" to stop D'Ambly's purported march. Exoo also stated that he had not gotten official word of that D'Ambly was terminated.



56. Exoo reminded his associates to prepare for conflict, "Remember that the police won't protect us here."



57. The morning of January 11, 2019, after Exoo's Tweet, Edward Bushey, Sr. Vice President, General Manager, Manufacturing and Distribution at Tribune delivered recordings of threats to the Daily News. The callers stated if they continued to employ D'Ambly the Daily

22

News was responsible for "any violence or blood spilled is also on your hands."  Upon information and belief, the call was received from phone number (732) 744-4937.[19]

```
--------- Forwarded message ----------
From: ██████ George" <██████@nydailynews.com>
To: ██████ Ed" <██████@tribpub.com>
Cc:
Bcc:
Date: Mon, 14 Jan 2019 19:33:44 +0000
Subject: FW: Voicemail from 7327444937

Ed,

This is the second message looks like the phone number is there.

George

From: Cisco Unity Connection Messaging System [mailto:██████@relay-int.tribune.com]
Sent: Friday, January 11, 2019 10:21 AM
To: ██████@relay-int.tribune.com
Subject: Voicemail from 7327444937
```

58.     On January 11, 2019, at 3:30 p.m., D'Ambly was called to a second meeting with Brill, wherein Brill issued D'Ambly a "Last and Final Warning" that stated the "*ONLY reason that you are not being terminated immediately is because, thus far, we have not determined that your activities with NJEHA has occurred at work and/or derogatory comments were made about any co-workers.*"  The warning continued "should we learn that you engaged in any inappropriate speech or behavior in the workplace or with regard to any other employee, or if the Company or any of its employees suffer any backlash as a result of your association with the NJEHA, your conduct will be considered "work-related" and you will be terminated immediately."

59.     The meeting occurred five (5) hours after threats were received, but Brill did not inform or warn D'Ambly of the threats.

60.     At 4:34 p.m. on January 11, 2019, *@AntiFashGordon* threatened D'Ambly by stating "Regardless, I'm gonna spend the next week wrecking your fucking life, Dan D'Ambly."

---

[19] Electronic media copies of the threats will be submitted to the Court and all defendants on a USB thumb drive.



61.     On or about the evening of January 11, 2019, D'Ambly's vehicle was "keyed" (scratched) and tires slashed while it was parked outside of his home on private property. After his vehicle was damaged, D'Ambly received a text message from unknown phone number (732) 744-4937, that stated "So your thing went well today? Did you guys get there ok?" A police report for a bias incident, criminal mischief, and harassment was filed with the South Brunswick Police Department. The phone number (732) 744-4937 is cited in South Brunswick Police Department incident report image below. *See also* Exhibit E, South Brunswick Police Department Incident Report, Case No.: I-2019-002817.

```
DAMBLY STATED THAT HE MAY HAVE BEEN TARGETED BY "ANTIFA" DUE TO HIS AFFILIATION WITH THE "EUROPEAN
HERITAGE ASSOCIATION." HE STATED THAT A PRINCETON SCHOOL TEACHER, MARTHA FRIEND, HAD POSTED A PICTURE
OF HIS VEHICLE ON TWITTER THIS PAST NOVEMBER. HE ALSO STATED THAT ANOTHER TWITTER USER, KNOWN AS
"ANTIFASHGORDON", DOXXED HIM A FEW MONTHS AGO BY RELEASING HIS HOME ADDRESS, EMPLOYMENT DETAILS,
PICTURES OF HIS VEHICLE, AND A SATELLITE IMAGE OF HIS HOUSE TO TWITTER. HE BELIEVES THAT THE ACTOR USED
THIS INFORMATION TO FIND HIS VEHICLE AND SLASH HIS TIRES TO PREVENT HIM FROM DRIVING TO A SCHEDULED
PROTEST IN PRINCETON ON SATURDAY.

HE ALSO STATED THAT HE RECEIVED A TEXT THIS WEEKEND FROM AN UNKNOWN SUBJECT (732-744-4937) ASKING HIM,
"SO YOUR THING WENT WELL TODAY? DID YOU GUYS GET THERE OK?" HE BELIEVES THIS SUBJECT MAY HAVE BEEN
INVOLVED WITH DAMAGING HIS TIRES.
```

62.     Upon information and belief, on January 11, 2019, cellular phone number (732) 744-4937) described above in ¶ 63 left the message "any violence or blood spilled is also on your hands," that was captured by the New York Daily News as described in ¶ 58 above.

63.     Upon information and belief, cellular phone number (732) 744-4937 belongs to the person who controls and publishes Twitter account *@Nstricklanded*, who sent the below message to Exoo after the message described in ¶ 58 above was captured and sent D'Ambly the text message described at ¶ 63 above.



64.     On Sunday, January 13, 2019, Exoo, who had no connection to D'Ambly or Daily

News, announced D'Ambly's termination to his associates twenty-four (24) hours before the

Daily News claimed they learned of the threats that caused D'Ambly's termination.



65.     On January 16, 2019, during a phone conference with Brill, Nechvatal, and a

Union representative, D'Ambly was played the recorded death threats and asked to identify the

caller.  D'Ambly was unable to identify the caller, but said it was the behavior of "Antifa types."

D'Ambly was terminated during this phone conference.

66.     On January 23, 2019, Patrick LoPresti, President of Local One-L informed the

Daily News that they were appealing D'Ambly's termination pursuant to terms of the Contract.

67.     On or about January 25, 2019, D'Ambly received his "Termination of

Employment" letter, signed by Brill, and dated January 22, 2019.  The letter informed D'Ambly

his termination was effective January 18, 2019.  In the letter, Brill stated you "are being targeted

by this group…" and "now our workplace and employees [are] at risk of counter attacks by

Antifa."  *See* Exhibit D, Termination of Employment letter dated January 22, 2019.

> You  are being targeted by this group
> has now put our workplace and employees at
> risk of counter attacks by Antifa.

68.     The termination letter falsely stated the Daily News learned of the death threats

on January 14, 2019, contrary to emails that confirm the Daily News learned of the threats on

January 11, 2019.

> On Monday, January 14, 2019, we learned that two threatening voice-mails had been left
> on a Company voice-mail box on Friday, January 11, 2019, which caused our company
> to have serious concern for the safety of our employees.

---------- Forwarded message ----------
From: ▮▮▮▮▮ George" <▮▮▮▮▮@nydailynews.com>
To: ▮▮▮▮▮ Ed" <▮▮▮▮▮@tribpub.com>
Cc:
Bcc:
Date: Mon, 14 Jan 2019 19:33:44 +0000
Subject: FW: Voicemail from 7327444937

Ed.

This is the second message looks like the phone number is there.

George

From: Cisco Unity Connection Messaging System [mailto: ▮▮▮▮▮@relay-int.tribune.com]
Sent: Friday, January 11, 2019 10:21 AM
To: ▮▮▮▮▮@relay-int.tribune.com
Subject: Voicemail from 7327444937

69.     In the termination letter, Brill claimed the death threats received on January 11,

2019, were the "cause" of D'Ambly's termination, because the death threats meant D'Ambly

"brought his activities" into the workplace, therefore, "we deem your actions to be work related and are terminating your employment for cause."

70.    At some point after January 23, 2019, the Union on behalf of D'Ambly filed a grievance with the American Arbitration Association, case number 01-19-0000-7178.  The Union retained attorneys Thomas Kennedy ("Kennedy") and Kate M. Swearengen ("Swearengen") of Cohen, Weiss, and Simon, LLP (collectively Kennedy, Swearengen and Cohen, Weiss and Simon, LLP shall be referred to as "CWS") to represent D'Ambly.

71.    Thereafter, D'Ambly had a phone conference with Kennedy to discuss the case. D'Ambly was acquainted with Kennedy for approximately twenty years due to his Union activities.  D'Ambly explained the threats he received, property damage, and that his tires were slashed.  D'Ambly stated "Tom, this Antifa are terrorists…"  Kennedy angrily responded, "I do not consider Antifa to be terrorists and if you are going to continue referring to them (Antifa) as terrorists we are going to end this call."  Kennedy scoffed at D'Ambly's desire to have his employment reinstated at the Daily News.

72.    At some point thereafter, D'Ambly had his first case discussion phone conference with Kate Swearengen, who assumed representation.  Without prompting, Swearengen explicitly informed D'Ambly that "she doesn't agree with his politics, and she doesn't want to discuss them any further."  Like Kennedy, Swearengen dismissed D'Ambly's wish to have his employment reinstated.

73.    Kennedy and Swearengen's revulsion of D'Ambly directed their representation and they failed to adequately research basic facts favorable to D'Ambly's wish to be reinstated. CWS ignored Brill's misrepresentation and veracity of the claimed "cause" of their client's termination.

74.     CWS failed to adequately investigate the sources of the doxing campaign. Had CWS engaged in reasonable investigation of the source of the dox they would have discovered @AntiFashGordon's January 13, 2019, announcement that D'Ambly was terminated, which was one day before the Daily News claimed they learned of the "cause" of D'Ambly's termination.

75.     On or about July 15, 2019, D'Ambly executed the "Separation Agreement and Mutual General Release" negotiated by CWS that paid D'Ambly a lump sum payment in exchange the Union would withdraw the pending arbitration case with prejudice.

76.     As a result of Defendants' misconduct D'Ambly has suffered substantial personal and property damage and been severely financially harmed.

## ZACHARY REHL

77.     Rehl repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 76 with the same force and effect as if set forth in detail herein again.

78.     Exoo worked with Torch Antifa members to acquire Rehl's true personal identity and doxed him on or about August 2, 2017. Rehl was labeled a fascist and white supremacist, because he organized a "Back the Blue" rally to support Philadelphia police officers.

79.     As in all cases, associates dogpiled Rehl's employer with calls, emails, and Tweets, and Rehl was terminated in or about September 2017.

80.     On or about October 1, 2018, Rehl was doxed a second time when he organized the "We the People" rally that occurred in Philadelphia on November 17, 2018.



AntiFash Gordon
@AntiFashGordon                                    ...

THREAD: Far-right groups are organizing a "We the People" rally in Philadelphia for Saturday, 11/17.

81.     On November 14, 2018, Exoo followed up Rehl's dox and incited his associates to disrupt the We the People rally, because "fascism is coming and only we can stop it."



82.     On November 16, 2018, Exoo further incited his followers against the We the People rally, by stating "the city granted rally permits to fascists, and the cops will be there to protect them" and reminded "Who protects us? We protect us."



83.     As a result of Exoo's incitement, November 17, 2018, at 12:41 a.m., the night before the rally, Torch Antifa took "direct action" against Rehl and threw a brick through the front window of Rehl's home and spray painted the word "Nazi" on his home as seen below.



84.     Exoo acknowledged media reports of the brick being thrown through Rehl's window.



85.     The day of the We the People rally Torch Antifa attacked two Marine Reservists that Torch Antifa they participated in the rally.



CITY

# Marines Were Attacked, Robbed Near "We the People" Rally in Philly

Police say these guys maced, punched, kicked, and robbed a group of Marine Corps reservists after calling them "Nazis" and "white supremacists."

*by VICTOR FIORILLO • 11/20/2018, 2:34 p.m.*

The Philadelphia Police Department is asking for the public's help to identify a group of people accused of attacking multiple Marine Corps reservists last Saturday afternoon down the street from the "We the People" rally.

It happened around 3:20 p.m. on November 17th on the 100 block of South Front Street. According to police, the reservists were approached by a group of males and females, who called the reservists "Nazis" and "white supremacists."

US NEWS

### Antifa Member Charged in Assault of US Marines Near 'We the People' Rally in Philly: Reports

November 28, 2018 15:51, Last Updated: November 28, 2018 16:45

By Jack Phillips

Police arrested and charged a man believed to be the leader of an Antifa group in Philadelphia after a group of U.S. Marine reservists were assaulted on Nov. 17.

CITY

## Philly Antifa Activist Tom Keenan Charged in Assault on Marines

The alleged attack occurred on November 17th near the "We the People" rally.

by VICTOR FIORILLO · 11/26/2018, 1:44 p.m.

Tom Keenan, 33, of Mount Airy, turned himself into the police department several days ago after investigators released a video that appeared to show him and two others yelling at a group following a rally in Philadelphia, Fox News reported.

86.     Three members of Torch Antifa were arrested and have been charged with various felonies, including aggravated assault, ethnic intimidation, and conspiracy related to the attack.

CITY

## D.C. "Antifa Leader" Is Third Man Charged in Marine Attack in Philadelphia

Joseph Alcoff has been charged with aggravated assault, ethnic intimidation, and conspiracy, among other offenses.

by VICTOR FIORILLO · 1/29/2019, 9:55 a.m. 

The Philadelphia District Attorney's Office has charged 37-year-old Washington, D.C., resident Joseph Alcoff with aggravated assault, ethnic intimidation, and conspiracy — all felonies — among other charges. He has pleaded not guilty and is currently out on bail.

Alcoff joins codefendants Tom Keenan and Thomas Massey in the case. Both Keenan and Massey were arrested at the end of November and are also out on bail awaiting trial.

### AMANDA REHL

87.     AmRehl repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 86 with the same force and effect as if set forth in detail herein again.

88.     On or about August 2, 2017, Exoo conspired with Torch Antifa to dox AmRehl's home address when he doxed her husband, Zachary Rehl.

89.     On or about October 1, 2018, AmRehl's home address was doxed a second time when Exoo doxed her husband Zachary Rehl, because he organized the "We the People" march in Philadelphia that occurred on November 17, 2018.

90.     On November 14, 2018, Exoo directed his associates to counter protest and disrupt the We the People the event, because "fascism is coming and only we can stop it."

91.     At 12:41 a.m. on November 17, 2018, AmRehl's safety was endangered when she was assaulted by Torch Antifa who threw a brick through the front window of AmRehl's home and spray painted the word "Nazi" on the front of her home as seen below with a copy of the Philadelphia Police Incident Report.



**K.R., a minor, by and through her father ZACHARY REHL and mother AMANDA REHL**

92.     K.R. repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 92 with the same force and effect as if set forth in detail herein again.

93.     On or about August 2, 2017, Exoo and Torch Antifa doxed K.R.'s home address when he doxed her father, Zachary Rehl.

94.     On or about October 1, 2018, K.R.'s home address was doxed a second time when Exoo doxed K.R.'s father Zachary Rehl, because he organized the "We the People" march in Philadelphia that occurred on November 17, 2018.

95.     On November 14, 2018, Exoo directed his associates to counter protest and disrupt the We the People event, because "fascism is coming and only we can stop it."

96.     At 12:41 a.m. on November 17, 2018, K.R.'s safety was endangered when she was assaulted by Torch Antifa who threw a brick through the front window of her home and spray painted the word Nazi on the front of her home.



## **AARON WOLKIND**

97.     Aaron Wolkind repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 96 with the same force and effect as if set forth in detail herein again.

98.     Exoo conspired with members of Torch Antifa to obtain Wolkind's true personal identity and doxed him on or about June 21, 2019.  Wolkind was called a fascist, white supremacist, and Nazi, which is an idiotic assertion, because Aaron's a Jew.

 AntiFash Gordon @AntiFashGordon · Jun 21, 2019    ...
Philly Proud Boy Sgt-at-arms Aaron **Wolkind** is employed as a Technical Support Specialist at @AerzenUSA, in Coatesville, PA.

99.     On July 3, 2019, Exoo re-posted Wolkind's dox and associates dogpiled

Wolkind's employer Aerzen USA ("Aerzen") social media accounts and internet profiles and

dogpiled his employer and co-workers with phone calls and emails.

100.     To their credit, Aerzen did not immediately terminate Wolkind, but when

enterprise associates discovered Wolkind was not terminated, Exoo and associates dogpiled

Aerzen's clients demanding they stop doing business Aerzen and dogpiled Aerzen's subsidiaries

101.     On or about November 17, 2019, Torch Antifa became angered that a tavern in

Philadelphia allegedly owned by a family member of Zach Rehl allegedly allowed Wolkind to

distribute literature inside the tavern, so they encouraged dogpiling on Wolkind's employer.



102.     On November 18, 2019, Exoo published Wolkind's dox and reminded associates

to "Use *67 to block your number."



34

103.    Torch Antifa dogpiled a tavern, because they believed Wolkind distributed

literature at the tavern.



104.    On or about November 19, 2018, based on Torch Antifa's belief that Wolkind

was affiliated with the tavern, the tavern "got the smash," which meant its windows were broken.



105.    Torch Antifa vandalized the tavern a second time on January 1, 2021, based on

their belief that Wolkind was affiliated with the tavern and their damage derogatorily referenced

the Proud Boys.



106.    As a result, Wolkind's November 18, 2019, dox and subsequent dogpiling, his

employer blocked Twitter users and temporarily shut down their social media and internet

profiles, and closes a Coatesville, Pa. facility for one day.



107.    Wolkind continues to receive threatening and harassing phone calls due to the

dox, which identifies him as a white supremacist and a Nazi, but as stated above Aaron's a Jew.

## STEVE HARTLEY

108. Hartley repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 107 with the same force and effect as if set forth in detail herein again.



109. Hartley's employer information and home address were doxed and dogpiled on November 29, 2018, and labeled a Nazi, racist, terrorist and a threat to women and minorities.



110. Exoo partnered with Torch Antifa to dox Hartley, who dogpiled Hartley'employer and co-workers with negative posts and reviews.



111.    Following his dox Torch Antifa members caused damage to Hartley's home, which is what they consider to be self-protection.

## **MARK ANTONY TUCCI**

112.    Tucci repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 112 with the same force and effect as if set forth in detail herein again.

113.    Exoo worked with Torch Antifa members to dox Tucci on December 10, 2018. Associates called Tucci's employer more than 600 times and shut it down.

114.    In real time you can see the enterprise's conspiracy play out in their Tweets, Exoo picked up when his Torch Antifa partner got temporarily banned.



a.   Enterprise associates who called Tucci's employer, Tweeted confirmation.



115.    Exoo would not let his associates relent until Tucci's employer publicly

announced his termination.



116.    The following day Exoo directed associates to continue dogpiling.



## RICHARD SCHWETZ

117.    Schwetz repeats and realleges the facts pertinent to all plaintiffs as alleged above

in paragraphs 1 through 116 with the same force and effect as if set forth in detail herein again.

118. The enterprise targeted Schwetz after he volunteered to clean up debris and litter at a Clean Up America event that occurred in Philadelphia on May 23, 2020.

119. Schwetz was doxed in June 2020 by an Exoo associate, but it failed to deliver as intended.



120. Exoo doxed Schwetz on September 21, 2020, with detailed information and a statement that we do not cry to cops or the courts.



## MATTHEW REIDINGER

121. Reidinger repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 120 with the same force and effect as if set forth in detail herein again.

122. Exoo and Torch Antifa conspired to dox Reidinger.



123.    As is the case with all victims, Exoo and associates dogpiled Reidinger's employer.



124.    In his instructions Exoo instructed associates to dogpile Reidinger's employer in order to cause his termination as they successfully had done to a Comcast employee.



## JOBEL BARBOSA

125.    Barbosa repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 124 with the same force and effect as if set forth in detail herein again.

126.    Exoo conspired with Torch Antifa to dox Barbosa's identity and employer's information on June 22, 2019, which dox was promoted by comedienne Kathy Griffin.



127.     Barbosa is an olive-skinned Puerto Rican, who was immediately called into a meeting with a company executive and a human resource's representative and interrogated about being a white supremacist.

128.     Exoo and associates did not know Barbosa was terminated on June 27, 2019, so they reposted his information on July 1, 2019, with his employer's corporate office contacts.



129.     As is the custom, associates Tweeted confirmation of contacts with Barbosa's employer to Exoo.



130.     Associates' confirmation to Exoo included implied violence against Barbosa.



131.    Barbosa's home address and cell phone numbers for him and his wife were

posted to phonezapp.noblog.org (no longer available) and Barbosa's wife received threatening

calls on her personal cell phone.

## SEAN-MICHAEL DAVID SCOTT

132.    Scott repeats and realleges the facts pertinent to all plaintiffs as alleged above in

paragraphs 1 through 131 with the same force and effect as if set forth in detail herein again.



134.     On the same day as the dox was published, Torch Antifa posted flyers near

Scott's home and caused property damage and painted it with graffiti.  As a result of the property

damage, Scott's property manager forced him to break his lease and immediately vacate in order

to avoid further property damage that was threatened by Torch Antifa dogpilers.



135.     Exoo and Torch Antifa caused Scott's termination from a second employer.



136.   On or before April 15, 2020, Torch Antifa identified Scott's car and his tires were slashed, and although not seen in photo below, his passenger windows were broken.  Torch Antifa mocked Scott's damaged car as seen in photos below.



### JOHN HUGO

137.   Hugo repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 136 with the same force and effect as if set forth in detail herein again.

138.   Hugo was doxed by Exoo on January 2, 2020, and Exoo has admitted he threatens Boston area "fash" like Hugo.



139.    A second dox occurred in February 2020 that led to Hugo being terminated in

March 2020.



140.    Hugo continues to receive harassing phone calls from enterprise associates on a

near daily basis.[20]

## SUPPLEMENTAL PLEADING TO ADD PLAINTIFF THOMAS LOUDEN WHO WAS INJURED BY THE ENTERPRISE AFTER THE COMPLAINT WAS FILED

141.    Louden repeats and realleges the facts pertinent to all plaintiffs as alleged above

in paragraphs 1 through 140 with the same force and effect as if set forth in detail herein again.

142.    The original Complaint in this action was filed on September 21, 2020, and

Louden was injured after the Complaint was filed in the same series of occurrences or

transactions.

143.    Louden was employed as the Director of Managed Care at Thomas Jefferson

University Hospital in Philadelphia.

---

[20] Voicemail recordings are provided on thumb drive that was submitted to the Court and defendants.

144.    During a global health emergency and pandemic Exoo doxed and dogpiled Louden's hospital employer on November 2, 2020, because of the employer's decision concerning an illegal alien's immigration status.



145.    Louden does not have a Twitter account was unaware of Exoo's dox until he was called to a Zoom meeting with his employer's Vice-President and a human resources representative on November 2, 2020.  Louden was quizzed about his membership in a right-wing extremist group.  Louden is a 30-year volunteer firefighter and the appointed Deputy Emergency Management Coordinator for Hilltown Township, Pa.

146.    On November 3, 2020, Louden learned that Exoo posted photos of his home.

147.    On November 10, 2020, Exoo re-posted Louden's personal information with explicit directions, including photographs of his home and local street signs, the name of the city, and longitude and latitude coordinates.



## CLAIMS FOR RELIEF

## COUNT I

### Violation of New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to – 49
### (as to D'Ambly against Tribune Publishing Company and the New York Daily News)

148. D'Ambly realleges and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 147 with the same force and effect as if set forth in detail herein again.

149. Defendants Tribune and Daily News are employers as defined in N.J.S.A. 10:5-5.

150. D'Ambly is older than forty years (40) old and was an employee as defined in N.J.S.A. 10:5-5.

151. Defendants Tribune and Daily News discharged D'Ambly due to their enmity towards D'Ambly's racially identifiable associations, whereas, non-white Tribune and Daily News employees who participate in racially identifiable associations, are not punished, or terminated, violated N.J.S.A. 10:5-12.

152. Defendants Tribune and Daily News undertook several pre-textual steps to mask D'Ambly's discriminatory termination:

a. Tribune hired a private investigation firm to invade D'Ambly's privacy in an unsuccessful effort to catch D'Ambly engaged in unlawful activity.

b. In the morning of January 11, 2019, the Daily News received death threats intended to extort D'Ambly's termination that they did not immediately disclose, because they intended to use the threats pre-textually as the "cause" of D'Ambly's termination.

c. In the afternoon of January 11, 2019, the Daily News issued D'Ambly a "Last and Final Warning," that warned D'Ambly he would be immediately terminated if it

49

were discovered he brought his political activities into the workplace, but they did not inform or warn D'Ambly of the death threats earlier received.

d.  D'Ambly was informed he was terminated on January 16, 2019.

e.  Subsequently, D'Ambly received a "Termination of Employment" letter dated January 22, 2019, whereby, the Daily News falsely stated they discovered the death threats on January 14, 2019, contrary to indisputable evidence they received the death threats on January 11, 2019, which meant he "brought his activities into the workplace" after he was warned. Daily News cited this fabrication as the "cause" of D'Ambly's termination.

153.    As a direct and proximate result of defendants Tribune Publishing Company and the New York Daily News racially discriminatory termination, D'Ambly has suffered adverse consequences and continues to be damaged. D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT II

**Tortious Interference with Prospective Economic Benefit**
**(as to all Plaintiffs except K.R. against defendant Christian Exoo a/k/a "AntiFashGordon")**

154.    Plaintiffs reallege and incorporate herein by reference each and every one of the allegations contained in paragraphs 1 through 153 with the same force and effect as if set forth in detail herein again.

155.    Plaintiffs were rightfully entitled to pursue lawful employment.

156.    Plaintiffs reasonably expected their employment to continue into the future and to benefit economically from his employment.

157.     Defendant Exoo knew Plaintiffs were employed and intentionally interfered with their prospective economic benefits to be gained from continued employment.

158.     Defendant Exoo intentionally and unjustifiably interfered with Plaintiffs rights to pursue lawful business.

159.     Defendant Exoo's interference caused Plaintiffs' employers to terminate their employment.

160.     Plaintiffs have suffered and will continue to suffer irreparable harm in the form of damage to his reputation, loss of income and financial hardship as a result of Exoo's interference.

161.     As a direct and proximate result of defendant Exoo's interference with Plaintiffs prospective economic benefits, Plaintiffs have suffered adverse consequences and continue to be damaged.  Plaintiffs are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT III

### Employer's Breach of its Duty to Warn
### (as to D'Ambly against defendants Tribune Publishing Company and the New York Daily News)

162.     D'Ambly realleges and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 161 with the same force and effect as if set forth in detail herein again.

163.     Defendants Tribune and Daily News received a stream of death threats directed at D'Ambly over a two and one-half month period, but they never warned D'Ambly.

164. Defendants Tribune and Daily News never warned D'Ambly to take precautionary measures as he entered or exited the workplace.

165. Defendants Tribune and Daily News did not take steps to increase the safety of D'Ambly and other employees as they entered and exited the workplace.

166. Defendants Tribune and Daily News did not secure the workplace in order to protect D'Ambly and others.

167. As he was not aware of the threats, D'Ambly could not take steps to protect himself and his property and as a result his property was damaged on January 11, 2019.

168. Defendants Tribune and Daily News had a duty to warn their employee he was the direct target of the death threats they received.

169. As a direct and proximate result of defendants Tribune and Daily News' failure to warn D'Ambly has suffered adverse consequences and continues to be damaged. D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT IV

**Violations of 18 U.S.C. §§ 1962(c) – Racketeering
Multiple violations of RICO predicates 18 U.S.C. §§ 1951 and 1952
(as to all Plaintiffs against defendants Christian Exoo a/k/a "AntiFashGordon," St. Lawrence University, Vijaya Gadde, and Twitter, Inc., the "Exoo Enterprise")**

170. Plaintiffs reallege and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 169 with the same force and effect as if set forth in detail herein again.

52

171. Each of the individuals and entities is a "person" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

172. Defendant Christian Exoo leads and conspires with associates, including Defendant Torch Antifa Network in an enterprise as defined by 18 U.S.C. 1961(4).

173. At all times relevant, Gadde was the only Twitter employee authorized to permanently ban Twitter users.[21]

174. Upon information and belief, Exoo's activities are well known to his employer St. Lawrence University, who have not taken steps to prevent their employee from harming others from his place of employment, because their share his goals.

We are witnessing a resurgence of the most dangerous and hateful legacy of our nation's history—white nationalism. The Southern Poverty Law Center, New York State, and because of the diversity our students, staff, and faculty bring to the table. White nationalism seeks to erode this through a discourse of fear, hatred, and xenophobia. It seeks to create a concept of America that is built on white supremacy and the dismantling of the work of social justice and equality that have been the hall-mark of this country for the last forty years. We will stand up for the rights of our students, faculty, and staff.

175. Exoo uses his employment and lecturing at St. Lawrence to recruit.

---

[21] *Meet Vijaya Gadde, an Indian-born Twitter head who decides on blocking tweets, users*, The Economic Times, (Jan. 16, 2020) https://economictimes.indiatimes.com/tech/internet/meet-vijaya-gadde-an-indian-born-twitter-head-who-decides-on-blocking-tweets/articleshow/73281445.cms, (last accessed September 12, 2020). See also, *Twitter's Top Lawyer Is Final Word On Blocking Tweets – Even Donald Trump's,* Bloomberg.com,(Jan. 15, 2020) https://www.bloomberg.com/news/articles/2020-01-15/twitter-s-gadde-is-final-word-on-blocking-tweets-even-trump-s, last accessed September 12, 2020; *Meet Twitter's top lawyer, who has the final word on blocking tweets – including Donald Trump's,* Fortune.com, (Jan. 15, 2020) https://fortune.com/2020/01/15/twitter-top-lawyer-vijaya-gadde-blocks-tweets-donald-trump/, (last accessed September 12, 2020).



176.    Exoo is and was well known to Gadde and Twitter as a ban evader before and

during the time of Plaintiffs' dox.



177.    Upon information and belief Gadde and Twitter Support have received complaints

regarding @AntiFashGordon's doxing and social coordination, examples below.



178. In or about September 2019, Exoo was suspended for posting confidential information of others, otherwise known as doxing, but reinstated weeks later.



179. Twitter has complete control over who is allowed an account, and as a permanently banned user Exoo could not possess an account without Twitter's consent or agreement when he was allowed to change his ban evasion account username from @DoxSavage to @AntiFashGordon.[22]



180. Exoo is connected to Twitter through his association with the account holder of @emilygorcenski, who has leveraged a connection to Jack Dorsey to have accounts that use "deadnames" banned, as seen in the image below.

---

[22] Video recording of Twitter executives confirming permanent Twitter bans are lifetime bans submitted to the Court on a thumb drive.



181.    Gadde and Twitter have classified alleged white supremacists as a greater threat than drug cartels or Islamic terrorists, and Exoo and associates doxing benefits her publicly stated opposition to white supremacists, which she is "very, very focused on that...the KKK, the American Nazi Party," because that "was what my parents had to deal with" where she grew up on the Texas-Louisiana border.[23]

182.    Exoo and associates conduct activities that affects interstate commerce by threatening violence to persons and property and causing actual violence to persons and property.

183.    Defendants directed and participated in patterns of racketeering activity, including multiple acts indictable under 18 U.S.C. §§ 1951 (Interference with commerce by threats or violence) and 1952 (use of interstate facilities to conduct unlawful activity), including using

---

[23] *Twitter's Kayvon Beykpour and Vijaya Gadde: the Code Conference interview (transcript)*, Vox.com (June 27, 2019) https://www.vox.com/recode/2019/6/27/18760444/twitter-kayvon-beykpour-vijaya-gadde-kara-swisher-peter-kafka-code-conference-interview-transcript, last accessed September 12, 2020.

interstate communications to order violent acts against all plaintiffs, specifically, D'Ambly, Rehl, Wolkind, and Scott.

184.    The conduct of the Exoo and associates described above constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).  Defendants' decisions and activity routinely conduct its transactions in such a manner constitutes "patterns of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

185.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiffs for three times the damages sustained, plus the costs of this suit, including reasonable attorneys' fees.

186.    As a direct and proximate result of Defendants patterns of racketeering activity Plaintiffs have suffered adverse consequences and continue to suffer adverse consequences in an amount to be determined at trial, but which is in excess of $75,000.00.  Plaintiffs are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT V

**Violation of 18 U.S.C. § 1962(d) (Conspiracy)**
**(as to all Plaintiffs against defendants Christian Exoo a/k/a "AntiFashGordon," St. Lawrence University, Vijaya Gadde, and Twitter, Inc., the "Exoo Enterprise")**

187.    Plaintiffs reallege and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 186 with the same force and effect as if set forth in detail herein again.

188.    Section 1962(d) of RICO provides "shall be unlawful for any person to conspire to violate any provisions of subsection (a), (b), or (c) of this section."

189.     Defendants have violated 18 U.S.C. § 1962(d) by conspiring to associate and participate in the Exoo Enterprise's patterns of racketeering activities as defined in 18 U.S.C. 1962(c).

190.     Defendants' have engaged in overt and predicate racketeering acts in furtherance of the conspiracy, including using interstate communications to threaten, intimidate and commit violent acts against their targets.

191.     The nature of the above-described acts of Defendants in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. 1962(d) violation, but they were aware that their ongoing acts have been, and are part of an overall pattern through related and continuous acts.

192.     Defendants sought to and have engaged in the commission of, and continue to commit overt acts, including the following unlawful racketeering predicate acts:

    a.  Multiple instances of interference with commerce by threats of violence in violation of 18 U.S.C. § 1951; and

    b.  Multiple instances of use of interstate facilities to conduct unlawful activity violations of 18 U.S.C. § 1952.

193.     As a direct and proximate result of Defendants' multiple overt acts and predicate acts in furtherance of an enterprise in violation of 18 U.S.C. § 1962(d), by conspiring to violate 18 U.S.C. 1962(c), D'Ambly has been and continues to be injured by Defendants' conduct.

194.     By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are liable to D'Ambly for three times the damages sustained, plus the costs of this suit, including reasonable attorneys' fees.

195.     As a direct and proximate result of Defendants patterns of racketeering activity Plaintiffs have suffered adverse consequences and continue to suffer adverse consequences in an amount to be determined at trial, but which is in excess of $75,000.00.  Plaintiffs are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT VI
## Legal Malpractice

### (as to D'Ambly against defendant Cohen, Weiss, and Simon, L.L.P.)

196.     D'Ambly repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 195 with the same force and effect as if set forth in detail herein again.

197.     As a result of their personal revulsion of D'Ambly and his political beliefs CWS failed to adequately represent and protect D'Ambly's rights.

198.     Defendant CWS neglected to perform necessary case research, legal research, and investigation of the accusations against D'Ambly.

199.     As a result of CWS's inadequate legal research and investigation they failed to protect D'Ambly from the extortionate and criminal conduct of others.

200.     As a result of CWS's failure to adequately investigate D'Ambly's doxing they failed to learn that @AntiFashGordon publicly announced D'Ambly's termination on January 13, 2019, which occurred five days before his official termination date, and one day before the purported "cause" of his termination was discovered.

201.     CWS failed to challenge Brill's blatant misrepresentations regarding the timing of the alleged 'cause' of D'Ambly's termination.

202.    CWS's revulsion of D'Ambly and his political beliefs caused them to ignore an obvious racially discriminatory pre-textual termination spotlighted by the private investigation, last and final warning, and falsely claimed cause of D'Ambly's termination.

203.    As a direct and proximate result of CWS's legal malpractice that flowed from their firmwide enmity of D'Ambly's political beliefs D'Ambly has suffered adverse consequences and continues to be damaged. D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT VII

### Deprivation of Rights under *Section 610* of the Labor-Management Relationship Disclosure Act (LMRDA), 18 U.S.C. § 530

### (as to D'Ambly against defendants Christian Exoo a/k/a "AntiFashGordon," St. Lawrence University, Vijaya Gadde, Twitter, Inc., "Exoo Enterprise")

204.    D'Ambly repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 203 with the same force and effect as if set forth in detail herein.

205.    Under *Section 610* of the *Labor-Management Relationship Disclosure Act* ("*LMRDA*"), *18 U.S.C. §530:*

> It shall be unlawful for any person through the use of force or violence, or threat of the use of force or violence, to restrain, coerce, or intimidate, or attempt to restrain, coerce, or intimidate any member of a labor organization for the purpose of interfering with or preventing the exercise of any right to which he is entitled under the provisions of this Act [LMRDA].

206.    As a result of the acts described herein, D'Ambly was forced into early unexpected retirement. He was a printing press platemaker, and his union does not have a Union

Hall where he can go shape to obtain new union printing jobs, moreover, his trade has been significantly depressed by technology.

207.   D'Ambly's job has deprived him of his intangible property rights as a union member, and the economic benefits that flow therefrom, for the reason that his job loss has had the impact of an expulsion from the Teamsters.

208.   On or about October 29, 2018, Exoo and associates dogpiled Daily News and the Teamsters intending to prevent D'Ambly from exercising his rights provided by the LMRDA.



209.   Exoo and associates, such as those who caused property damage at D'Ambly's home, intentionally intimidated others with threats, such the phrase any "blood spilled" to deprive D'Ambly his union member rights.



210.    On January 13, 2019, when Exoo announced D'Ambly's termination the Teamsters were the only party capable of telling Exoo that D'Ambly was terminated, because the Daily News did not learn of the cause of D'Ambly's termination until January 14, 2019.

211.    As a direct and proximate result of Exoo and associates' dogpiling that threatened violence, use of force, and "any blood spilled" D'Ambly has been deprived of his intangible property rights provided to him under the LMRDA. D'Ambly has suffered adverse consequences and continues to be damaged. D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

1.      Demands judgment against Defendants, jointly and severally, in an amount to be determined at trial plus interest, including, but not limited to, all emotional distress, back pay,

punitive damages, liquidated damages, statutory damages, attorneys' fees, costs, and disbursements, and for such relief as the Court deems just and proper.

2.     On Plaintiffs' RICO claims: compensatory damages and enhancement of damages Plaintiffs have sustained as a result of Defendants' conduct as may be permitted under the relevant statutes, such amount to be determined at trial, plus Plaintiffs costs in this suit, including reasonable attorneys' fees.

3.     On Plaintiffs' tortious interference, intrusion upon seclusion, stalking and harassment claims: compensatory and punitive damages in an amount to be determined at trial.

4.     On D'Ambly's State claims against the Tribune and Daily News: compensatory damages and enhancement of damages he sustained as a result of the Tribune and Daily News' conduct as may be permitted under the relevant statutes, such amount to be determined at trial, plus Plaintiffs costs in this suit, including reasonable attorneys' fees.

5.     On D'Ambly's legal malpractice claim: compensatory damages to be determined at trial.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury on all issues so triable.

Respectfully Submitted,
**LAW OFFICE OF PATRICK TRAINOR**
*Attorney for Plaintiffs*

_____

Dated: November 30, 2021     Patrick Trainor
19 Union Avenue, Suite 201
Rutherford, New Jersey 07070
(201) 777-3327
pt@ptesq.com

# EXHIBIT D

# THE MARLBOROUGH LAW FIRM, P.C.

445 Broad Hollow Road, Suite 400     (212) 991-8960
Melville, New York 11747     (212) 991-8952 fax
chris@marlboroughlawfirm.com

December 15, 2021

*VIA EMAIL AND U.S. MAIL*
THE LAW OFFICE OF PATRICK TRAINOR, ESQ., LLC
19 Union Avenue, Suite 201
Rutherford, New Jersey 07070
Email: pt@ptesq.com

Re:    *D'ambly, et al. v. Exoo, et al.*,
       No. 20-cv-12880-JMV-JSA (D.N.J.)


Dear Mr. Trainor:

On behalf of Defendant Exoo, I request under Fed. R. Civ. P. 11(b) and (c)(2) that you withdraw Plaintiffs' newly asserted claim (Count VII for Deprivation of Rights under Section 610 of the Labor-Management Relationship Disclosure Act ("LMRDA")) and voluntarily dismiss the two new parties that were added to the case in the Second Amended Complaint ("SAC") that Plaintiffs filed on November 30, 2021. Should Plaintiffs fail to do so within 21 days, Defendant Exoo will move for Rule 11 sanctions against you. Copies of the motion papers we intend to file are enclosed herewith.

Plaintiffs' SAC violates Rule 11 for several reasons. First, the amendments go far beyond the scope of amendments permitted in the Court's November 1, 2021 Opinion and Order (ECF Nos. 99 and 100, respectively). As the Court explained in *U.F.C.W. Local 56 Health & Welfare Fund v. J.D.'s Market*, 204 F.R.D. 149 (D.N.J. 2007), when a complaint exceeds the scope of the leave to amend granted by a court, the court may, *inter alia*, appropriately treat an unapproved amendment as a violation of Rules 11 and 15(a), and award sanctions. *See U.F.C.W. Local 56*, 204 F.R.D. at 154. *See also Sciore v. Phung*, 2021 U.S. Dist. LEXIS 190120, at *25 (D.N.J. Sep. 30, 2021) (granting defendant's motion for sanctions and requiring the payment of

defendant's attorneys' fees where Plaintiffs' amendment to include an unauthorized breach of contract claim "went far beyond the limited scope of amendment granted by" the court.)(internal quotations omitted); *Dover Steel Co. v. Hartford Accident & Indem. Co*., 151 F.R.D. 570, 575 (E.D. Pa. 1993) (awarding monetary sanctions in the form of defendants' attorneys' fees where plaintiffs counsel added unauthorized parties and asserted new legal theories in an amended complaint).

Second, in asserting Count VII, Plaintiffs seek relief under a fifth criminal statute with no private right of action immediately after claims under four other criminal statutes against Defendant Exoo were dismissed on the same basis. *See* Opinion at 20. This conduct provides a separate basis for sanctions against you.

It is well-settled that there is no private of action for violations of Section 610 of the LMRDA (29 U.S.C. § 530). *See Martin v. Local 556, Transp. Workers Union of Am.*, AFL-CIO, Civil Action No. 3:14-CV-0500-D, 2014 U.S. Dist. LEXIS 122755, at *12 (N.D. Tex. Sep. 3, 2014) ("Section 530 does not contain any language suggesting that Congress intended to authorize a private cause of action."); *Rodriguez v. Serv. Emples. Int'l*, 755 F. Supp. 2d 1033, 1048 (N.D. Cal. 2010) ("Section 530 does not give rise to a private cause of action."); *Schonfeld v. Raftery*, 335 F. Supp. 846, 851 (S.D.N.Y. 1971) ("Plaintiff has no standing to enforce these criminal provisions"). *Grant v. Communs. Workers of Am., Local 1101* ("*Grant I*"), No. 13-CV-7917 (JMF), 2014 U.S. Dist. LEXIS 96585, at *6 n.3 (S.D.N.Y. July 15, 2014) ("is a criminal provision with no private civil right of action.") *citing Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67, 93 n.17 (1989); *Grant v. Commc'ns Workers, Local 1101* ("*Grant II*"), 2017 U.S. Dist. LEXIS 198188, at *19 (S.D.N.Y. Dec. 1, 2017) (dismissing plaintiffs' claim under Section 530).

Federal Rule of Civil Procedure 11 requires that all allegations and other factual contentions have factual and legal support. If no such support exists, Rule 11 allows for sanctions against attorneys, law firms, and parties. Further, 28 U.S.C. § 1927 allows for sanctions against any attorney who unreasonably and vexatiously multiplies the

Page 3

proceedings in any litigation in Federal Court. We believe that you and your law firm are subject to sanctions under one or both of these provisions for the reasons discussed above.

We have spoken with counsel for Defendants Tribune Publishing Company, LLC and the New York Daily News and they have indicated that they will join us in filing a motion to strike with respect to the addition of new parties, new claims, and new legal theories which exceed the scope of the leave to amend granted by Judge Vazquez.

Sincerely,

Christopher Marlborough

Cc:     Richard Torres, Esq. (via email)
        Lawrence S. Lustberg, Esq.
        Lauren James-Weir, Esq.
        Monica C. Barrett, Esq.
        Adam Mastroleo, Esq.
        Lindsay F. Ditlow, Esq.
        Michael Canning, Esq.
        Richard Scharlat, Esq.