Michael J. Canning, Esq. (MJC3060)
**GIORDANO, HALLERAN & CIESLA, P.C.**
125 Half Mile Road, Suite 300
Red Bank, N.J. 07701-6777
(732) 741-3900
Attorneys for Defendant, Cohen, Weiss and Simon LLP

<div align="center">

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| DANIEL D'AMBLY, AARON WOLKIND, STEVE HARTLEY, RICHARD SCHWETZ, JOBEL BARBOSA, MATTHEW REIDINGER, JOHN HUGO, SEAN-MICHAEL DAVID SCOTT, THOMAS LOUDEN, ZACHARY REHL, AMANDA REHL, K.R., a minor, by and through her father ZACHARY REHL, and her mother AMANDA REHL, MARK ANTHONY TUCCI, <br><br> Plaintiffs, <br><br> v. <br><br> CHRISTIAN EXOO a/k/a ANTIFASH GORDON; ST. LAWRENCE UNIVERSITY; TRIBUNE PUBLISHING COMPANY; NEW YORK DAILY NEWS; VIJAY GADDE; TWITTER, INC.; COHEN, WEISS AND SIMON LLP, <br><br> Defendants. | Case No. 2:20-cv-12880-JMV-JAD <br><br><br> <u>Civil Action</u> <br><br> **CERTIFICATION OF MICHAEL J. CANNING, ESQ.** |

MICHAEL J. CANNING, ESQ., by way of certification in lieu of affidavit, hereby states as follows:

1.    I am an attorney at law of the State of New Jersey and an officer and shareholder in the law firm of Giordano, Halleran & Ciesla, P.C. ("*GH&C*"), attorneys for Cohen, Weiss and Simon LLP

("*CWS*").   I make this Certification in support of CWS' motion to dismiss with prejudice Plaintiffs' Second Amended Complaint.

2.   On November 1, 2021, the Honorable Michael Vazquez, U.S.D.J. entered an Order dismissing Count XIII of the First Amended Complaint as to CWS, which is the sole allegation in the First Amended Complaint as to CWS.   On the same date the Court entered its Opinion stating the reasons for the dismissal of Count XIII of the Amended Complaint.

3.   The dismissal Order was without prejudice and Plaintiff was given leave to file an amended pleading within 30 days of the Order that remedied the deficiencies identified in the Opinion.

4.   On November 30, 2021, Plaintiff filed a Second Amended Complaint.   There are no new facts or new allegations asserted in the Second Amended Complaint against CWS.   Rather, Count VI of the Second Amended Complaint contains the identical allegation of legal malpractice, based on the identical facts, as set forth in Count XIII of the First Amended Complaint which was dismissed by the Court's November 1, 2021 Order.

5.   As Plaintiff has elected not to attempt to identify any of the deficiencies in the First Amended Complaint as it relates to CWS, and rather has simply reiterated the identical facts and claim of legal malpractice already rejected by the Court as a matter of law, CWS respectfully requests that the Second Amended Complaint be dismissed with prejudice.

2

6.    Attached hereto as **Exhibit "A"** is a true and accurate copy of the Supplemental Certification of Michael J. Canning, Esq. which has been submitted in support of the pending motion by CWS to recover sanctions under Fed.R.Civ.P. 11 as a result of Plaintiff's failure to withdraw the Amended Complaint after having received notice that the First Amended Complaint was filed in violation of Rule 11.   The Supplemental Certification details the procedural history of the matter as it relates to CWS and is adopted and incorporated as if set forth at length herein.

7.    Attached as **Exhibit "B"** is a true and accurate copy of reply brief of CWS submitted in further support of its motion to dismiss the First Amended Complaint.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

_____
MICHAEL J. CANNING, ESQ.

DATED:   JANUARY 17, 2022

Docs #5484999-v1

# EXHIBIT "A"

Michael J. Canning, Esq. (MJC3060)
**GIORDANO, HALLERAN & CIESLA, P.C.**
125 Half Mile Road, Suite 300
Red Bank, N.J. 07701-6777
(732) 741-3900
Attorneys for Defendant, Cohen, Weiss and Simon LLP

<div align="center">

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| DANIEL D'AMBLY, | Case No. 2:20-cv-12880-JMV-JSA |
| Plaintiff, | |
| v. | Civil Action |
| CHRISTIAN EXOO a/k/a ANTIFASH GORDON; ST. LAWRENCE UNIVERSITY; TRIBUNE PUBLISHING COMPANY; NEW YORK DAILY NEWS; VIJAY GADDE; TWITTER, INC.; COHEN, WEISS AND SIMON LLP, | **SUPPLEMENTAL CERTIFICATION OF MICHAEL CANNING, ESQ.** |
| | **Motion Date:** |
| Defendants. | |

MICHAEL J. CANNING, ESQ., by way of certification in lieu of affidavit, hereby states as follows:

1.    I am an attorney at law of the State of New Jersey and an officer and shareholder in the law firm of Giordano, Halleran & Ciesla, P.C. ("*GH&C*"), attorneys for Cohen, Weiss and Simon LLP ("*CWS*"). I make this supplemental certification in further support of CWS' motion for sanctions against Plaintiff's counsel pursuant to Fed.R.Civ. P. 11.

2.    On November 17, 2020 our office served Patrick Trainor, Esq., counsel for Plaintiff Daniel D'Ambly with a Notice of Motion by CWS for sanctions under Rule 11, Certification of Michael J. Canning, Esq. dated November 17, 2020 (the "*Original Canning Cert.*"), a brief in

support of the Motion for Rule 11 sanctions and a proposed Order.  A copy of the November 17, 2020 letter to Mr. Trainor with attachments is attached hereto as **Exhibit "A"**.

3.      Prior to serving Mr. Trainor with the Rule 11 motion on November 17, 2020, our office had previously served Mr. Trainor with a letter dated September 30, 2020 providing notice that there was no legal basis for the legal malpractice action pleaded against CWS in Count XIII of the Complaint and that the Complaint was filed in violation of Rule 11 (the *"Notice Letter"*). Demand was made upon Mr. Trainor to dismiss the Complaint with prejudice as to CWS.  Mr. Trainor was advised that the failure to do so would result in CWS being compelled to file a Motion to Dismiss the Complaint in which event it would seek sanctions under Rule 11.  See Exhibit "C" to the Original Canning Certification.

4.      In the Notice Letter, Mr. Trainor was advised that the decision by the Third Circuit Court of Appeals in Carino v. Stefan, 76 F.3d 156 (2004) was directly on point and was dispositive of Plaintiff's claim for legal malpractice.  Plaintiff's counsel was advised that in Carino the Third Circuit unequivocally ruled that Section 301(b) of the Labor Management Relations Act (*"LMRA"*), as broadly interpreted by the United States Supreme Court in Atkinson v. Sinclair Refinancing Co., 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed. 2d 462 (1962) immunizes attorneys hired by unions to perform services related to a collective bargaining agreement from suit for legal malpractice.  Plaintiff's claim for legal malpractice is predicated upon CWS' representation of the Teamsters Union in a grievance filed against his employer.  Under the binding precedent of Carino, and the other cases cited in the Notice Letter, CWS was immune from liability for the legal malpractice claim asserted in the Complaint.

5.      In response to the Notice Letter, Mr. Trainor did not dismiss the Complaint with prejudice.  Instead, he sent a letter to me dated October 1, 2020 advising that the Complaint would

not be withdrawn. A copy of the October 1, 2020 letter is attached as Exhibit "D" to the original Canning Certification. In the October 1, 2020 letter Mr. Trainor stated, "In general, I agree with your argument that an attorney-client relationship is not formed between a union attorney, such as CWS, and a union member grievant, such as plaintiff, and, therefore, the union attorney is immune from suit in cases such as these." See page 1 of the October 1, 2020 letter attached as Exhibit "D" to the Original Canning Certification. Despite acknowledging the controlling precedent of Carino and the other cases cited by CWS in their Notice Letter, Plaintiff nonetheless refused to withdraw the Complaint.

6.      Accordingly, on November 17, 2020 Mr. Trainor was served with the Rule 11 Motion for Sanctions by CWS. See **Exhibit "A"**. The pleadings were served upon Mr. Trainor in accordance with the 21-day safe harbor period under Fed.R.Civ. P. 11(c)(4). CWS agreed to carry its pending Motion to Dismiss the Complaint, which was scheduled for December 7, 2020, until the next motion date of December 21, 2020 in order to give Plaintiff the full 21-day safe harbor period in which to dismiss the Complaint with prejudice before the Court ruled on the Motion to Dismiss.

7.      In response to the service of the Rule 11 Motion, Plaintiff did not withdraw the Complaint. Rather, Plaintiff sought to amend the Complaint.

8.      Upon receipt of Plaintiff's Motion to Amend the Complaint, on January 15, 2021 I wrote a letter to Judge Vazquez requesting that the pending Motion to Dismiss by CWS remain on the Court's docket since the Motion to Amend the Complaint did not relate to CWS as it asserted no new causes of action and no new facts against CWS. A copy of the January 15, 2021 letter is attached hereto as **Exhibit "B"**. Judge Vazquez denied the request and the pending Motion to Dismiss was administratively terminated. See Judge Vazquez Order attached as **Exhibit "C"**.

3

9.     On March 25, 2021, the Honorable Jessica S. Allen, U.S.M.J., entered an Order allowing Plaintiff to file the First Amended Complaint in the form submitted with the Motion. A copy of Judge Allen's Order is attached hereto as **Exhibit "D"**. A copy of the First Amended Complaint is attached hereto as **Exhibit "E"**.

10.     As set forth in the January 15, 2021 letter to Judge Vazquez, the Amended Complaint contains no new causes of action against CWS and states no new facts relating to the claim against CWS. The single claim against CWS in the First Amended Complaint remained the single identical claim for legal malpractice set forth in Count XIII of the original Complaint.

11.     After the issuance of Judge Allen's Order, Mr. Trainor served our office with a copy of the Amended Complaint. Upon receipt of the Amended Complaint, I sent an email to Mr. Trainor on April 6, 2021. A copy of the email is attached hereto as **Exhibit "F"**.

12.     In the email Mr. Trainor was notified that since the allegations in the Amended Complaint remained identical as to CWS, the Amended Complaint was filed in violation of Rule 11 for the same reasons the original Complaint was, as set forth in the Notice Letter and in the Motion for Rule 11 Sanctions delivered to Mr. Trainor on November 17, 2020. Mr. Trainor was advised that CWS adopted and incorporated as if set forth at length therein, the September 11, 2020 Notice Letter and Motion for Rule 11 Sanctions served on November 17, 2020. Id.

13.     Mr. Trainor was further provided notice that the letter was sent to him as a demand under Rule 11 that the Amended Complaint be dismissed within the 21-day safe harbor provision of Rule 11 and that the failure to do so would result in the refiling of the Motion to Dismiss and the filing of the Motion for Rule 11 Sanctions which had previously been served upon him.

14.     Plaintiff did not withdraw the Amended Complaint in response to the demand set forth in the April 6, 2021 email.

15.     Accordingly, on April 22, 2021 CWS filed a Notice of Motion to Dismiss the Amended Complaint with the supporting Certification and Memorandum of Law. A copy of the Motion, Certification and Memorandum of Law are attached hereto as **Exhibit "G"**.

16.     The gravamen of the Motion to Dismiss was, as set forth in the Notice Letter and the Motion for Rule 11 Sanctions previously served on Plaintiff's counsel, that under controlling legal precedent, including binding precedent from the Third Circuit Court of Appeals in <u>Carino</u>, there was no attorney-client relationship between Plaintiff and CWS as CWS represented the union in the grievance and arbitration, which was fatal to Plaintiff's legal malpractice claim.

17.     On November 1, 2021, the Honorable John Michael Vazquez, U.S.D.J. entered an Order and accompanying Opinion granting CWS' Motion to Dismiss the Complaint. A copy of the Order and Opinion are attached hereto as **Exhibit "H"**.

18.     In the Opinion Judge Vazquez found that <u>Carino</u> "is directly on point." <u>See</u> page 6 of Opinion at **Exhibit "H"**. Judge Vazquez further found:

> Plaintiff's allegations fit squarely into the parameters discussed in <u>Carino</u>. Namely, plaintiff seeks to hold defendant liable because of the actions (or inactions) of two attorneys in representing the grievance related to plaintiff's termination. Because the union retained defendant to represent plaintiff as to the grievance, Section 301(b) bars plaintiff from asserting malpractice claims against defendant.

[<u>See</u> page 7 of Opinion at **Exhibit "H"**.]

19.     The reasons for the dismissal of the Amended Complaint, that <u>Carino</u> is directly on point and Section 301(b) of the LMRA immunized CWS from any legal malpractice claim since it was representing the union in the grievance process, were the identical reasons upon which CWS based its demand that Plaintiff dismiss the Complaint and Amended Complaint as set forth in the Notice Letter, April 6, 2021 email and Rule 11 Motion previously served on Plaintiff's counsel.

5

20.     In an article which appeared in the New Jersey Law Journal on November 2, 2021 with regard to the dismissal of Plaintiff's Amended Complaint, Plaintiff's counsel was quoted as saying, "We were expecting this." A copy of the Law Journal article is attached as **Exhibit "I"**.

21.     In his Order and Opinion, Judge Vazquez ruled that the Order of Dismissal was without prejudice. In his Opinion Judge Vazquez found:

> Although it appears that any amendment would be futile in light of the Section 301(b) bar, the court recognizes that D'Ambly raised potential new allegations in his opposition brief. As a result, the court will provide plaintiff with leave to file an amended pleading that remedies the identified deficiencies. Plaintiff's amended pleading must be filed within thirty (30) days of the date of this Opinion and the accompanying Order. If plaintiffs fail to file an appropriate amended pleading within this time, the claim against Cohen, Weiss and Simon LLP and Cohen, Weiss and Simon LLP as a defendant will be dismissed with prejudice."

[See page 10 of Opinion.]

The accompanying Order likewise provided Plaintiffs with leave to file an amended pleading that remedies the identified deficiencies within 30 days and that the failure to do so will result in the claim against CWS being dismissed with prejudice.

22.     On November 30, 2021, Plaintiff's counsel filed a Second Amended Complaint, a copy of which is attached hereto as **Exhibit "J"**.

23.     The sole cause of action in the Second Amended Complaint against CWS is set forth in Count VI. The claim of legal malpractice set forth in Count VI of the Second Amended Complaint is identical to the claim of legal malpractice set forth in Count XIII of the original Complaint and First Amended Complaint.

24.     Although Plaintiff was granted leave of court to remedy the deficiencies identified by the Court in its Order and Opinion, Plaintiff did not elect to do so. Instead, he filed the identical claim of legal malpractice which the Court has already ruled fails as a matter of law.

25.     CWS respectfully requests that the Court enter an Order under Rule 11 issuing sanctions against Plaintiff's counsel and awarding it the reasonable attorney's fees incurred in seeking to dismiss the original and First Amended Complaints.  CWS relies upon the Motion for Rule 11 Sanctions which was served upon Plaintiff's counsel on November 17, 2020 and which is filed herewith, and which was incorporated into its demand for dismissal as to the Amended Complaint as set forth in its April 6, 2021 email to Plaintiff's counsel.  CWS further relies upon the additional facts set forth in this Supplemental Certification which supplements the record from the time of the service of the Rule 11 Motion upon Plaintiff's counsel on November 17, 2020 as to the original Complaint and on April 6, 2021 as to the Amended Complaint.

26.     On December 3, 2021, I sent another letter to Mr. Trainor demanding that the Second Amended Complaint be dismissed with prejudice as it does not cure any of the identified deficiencies set forth in the Court's Opinion and Order and simply restates the identical claim that the Court has ruled fails as a matter of law.  If the Second Amended Complaint is not dismissed with prejudice, then CWS will be compelled to file another Motion to Dismiss the Second Amended Complaint for which it will separately seek Rule 11 sanctions relating to the Second Amended Complaint.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

_____
MICHAEL J. CANNING, ESQ.

DATED:  December 3, 2021

Docs #5426356-v1

7

**EXHIBIT "A"**

# GIORDANO, HALLERAN & CIESLA, P.C.
### A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
WWW.GHCLAW.COM

**MICHAEL J. CANNING, ESQ.**
SHAREHOLDER
CERTIFIED CIVIL TRIAL ATTORNEY
MCANNING@GHCLAW.COM
DIRECT DIAL: (732) 219-5482

*Please Reply To:*
125 HALF MILE ROAD
SUITE 300
RED BANK, NJ 07701
(732) 741-3900
FAX: (732) 224-6599

November 17, 2020

Client/Matter No. 22826/1

***Via email pt@ptesq.com, Fedex and Regular Mail***
Patrick Trainor, Esq.
Law Office of Patrick Trainor, Esq., LLC
848 Paterson Avenue
East Rutherford, New Jersey 07073

Re:   Daniel D'Ambly v. Christian Exoo a/k/a Antifash Gordon, *et als.*
      Civil Action No. 2:20-cv-12880-JMV-JAD

Dear Mr. Trainor:

    This office represents Cohen, Weiss and Simon LLP ("*CWS*"). Enclosed for service upon you and Plaintiff is the notice of motion by CWS for sanctions under Rule 11, Certification of Michael J. Canning, Esq., brief in support of the motion and proposed Order. These pleadings are served upon you and Plaintiff in accordance with the 21-day safe harbor period under Fed.R.Civ.P. 11 (c)(4). The pleadings will not be filed with the Court until after the expiration of the 21-day safe harbor period.

    As the pending motion to dismiss the Complaint is scheduled for December 7, 2020, we shall request that the Court carry the motion to dismiss until the next motion date of December 21, 2020 so that you and Plaintiff will have the full 21-day safe harbor period in which to dismiss the Complaint with prejudice before the Court rules on the motion to dismiss.

                            Very truly yours,

                            MICHAEL J. CANNING

MJC/cmt
Enclosures

---

RED BANK • TRENTON • NEW YORK CITY

# EXHIBIT "B"

# GIORDANO, HALLERAN & CIESLA, P.C.

A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
WWW.GHCLAW.COM

**MICHAEL J. CANNING, ESQ.**
SHAREHOLDER
CERTIFIED CIVIL TRIAL ATTORNEY
MCANNING@GHCLAW.COM
DIRECT DIAL: (732) 219-5482

*Please Reply To:*
125 HALF MILE ROAD
SUITE 300
RED BANK, NJ 07701
(732) 741-3900
FAX: (732) 224-6599

January 15, 2021

Client/Matter No. 22826/1

*Via eCourts*
Honorable John Michael Vazquez
United States District Court
District of New Jersey
Frank R. Lautenberg U.S.P.O and Courthouse
2 Federal Square, Room 417
Newark, New Jersey 07102

> Re:   Daniel D'Ambly v. Christian Exoo a/k/a Antifash Gordon, *et als.*
> Civil Action No. 2:20-cv-12880-JMV-JAD

Dear Judge Vazquez:

This office represents Defendant, Cohen, Weiss and Simon LLP ("*CWS*"). We have received the Court's Text Order administratively terminating the pending motions to dismiss due to the filing of the motion to amend the Complaint filed by Plaintiff. Plaintiff's motion to amend the Complaint does not relate to CWS and the proposed Amended Complaint asserts no new causes of action against CWS and adds no new facts relating to the claim against CWS. The proposed additional Plaintiffs do not assert any causes of action against CWS. The sole cause of action in the proposed Amended Complaint against CWS remains Count XIII, which is unchanged from the original Complaint.

The proposed Amended Complaint does not in any way impact the legal and factual arguments which have already been fully briefed and submitted to the Court. We respectfully

---

RED BANK • TRENTON • NEW YORK CITY

GIORDANO, HALLERAN & CIESLA
A Professional Corporation
ATTORNEYS-AT-LAW

Honorable John Michael Vazquez
January 15, 2021
Page 2

request that the motion to dismiss filed by CWS remain on the Court's docket for decision.  We

thank Your Honor for your consideration of this request.

Respectfully yours,

MICHAEL J. CANNING

MJC/cmt

cc:     Patrick Trainor, Esq. *(via eCourts)*
        Lauren James-Weir, Esq. *(via eCourts)*
        Richard Scharlat, Esq. *(via eCourts)*
        Christopher Marlborough, Esq. *(via eCourts)*

Docs #4850195-v1

RED BANK  •  TRENTON  •  NEW YORK CITY

**EXHIBIT "C"**

# GIORDANO, HALLERAN & CIESLA, P.C.

A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
WWW.GHCLAW.COM

**MICHAEL J. CANNING, ESQ.**
SHAREHOLDER
CERTIFIED CIVIL TRIAL ATTORNEY
MCANNING@GHCLAW.COM
DIRECT DIAL: (732) 219-5482

*Please Reply To:*
125 HALF MILE ROAD
SUITE 300
RED BANK, NJ 07701
(732) 741-3900
FAX: (732) 224-6599

January 15, 2021

Client/Matter No. 22826/1

*Via eCourts*
Honorable John Michael Vazquez
United States District Court
District of New Jersey
Frank R. Lautenberg U.S.P.O and Courthouse
2 Federal Square, Room 417
Newark, New Jersey  07102

Re:   Daniel D'Ambly v. Christian Exoo a/k/a Antifash Gordon, *et als.*
       Civil Action No. 2:20-cv-12880-JMV-JAD

Dear Judge Vazquez:

This office represents Defendant, Cohen, Weiss and Simon LLP ("*CWS*").  We have received the Court's Text Order administratively terminating the pending motions to dismiss due to the filing of the motion to amend the Complaint filed by Plaintiff.  Plaintiff's motion to amend the Complaint does not relate to CWS and the proposed Amended Complaint asserts no new causes of action against CWS and adds no new facts relating to the claim against CWS.  The proposed additional Plaintiffs do not assert any causes of action against CWS.  The sole cause of action in the proposed Amended Complaint against CWS remains Count XIII, which is unchanged from the original Complaint.

The proposed Amended Complaint does not in any way impact the legal and factual arguments which have already been fully briefed and submitted to the Court.  We respectfully

---

RED BANK  •  TRENTON  •  NEW YORK CITY

GIORDANO, HALLERAN & CIESLA
A Professional Corporation
ATTORNEYS-AT-LAW

Honorable John Michael Vazquez
January 15, 2021
Page 2

request that the motion to dismiss filed by CWS remain on the Court's docket for decision.  We

thank Your Honor for your consideration of this request.

Respectfully yours,

*(signature)* Michael J Canning

MJC/cmt                                                MICHAEL J. CANNING

cc:     Patrick Trainor, Esq. *(via eCourts)*
        Lauren James-Weir, Esq. *(via eCourts)*
        Richard Scharlat, Esq. *(via eCourts)*
        Christopher Marlborough, Esq. *(via eCourts)*

Docs #4850195-v1

Request DENIED.

SO ORDERED.

s/ John Michael Vazquez
John Michael Vazquez, U.S.D.J.

Date: 1/19/2021

RED BANK  •  TRENTON  •  NEW YORK CITY

**EXHIBIT "D"**

Patrick Trainor, Esquire (Attorney ID 242682019)
**LAW OFFICE OF PATRICK TRAINOR**
848 Paterson Avenue
East Rutherford, New Jersey 07073
P: (201) 777-3327
pt@ptesq.com
*Attorney for Plaintiffs*

<div align="center">

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| DANIEL D'AMBLY; AARON WOLKIND; STEVEN HARTLEY; RICHARD SCHWETZ; JOBEL BARBOSA; MATTHEW REIDINGER; JOHN HUGO; SEAN-MICHAEL DAVID SCOTT; THOMAS LOUDEN; ZACHARY REHL; AMANDA REHL; K.R., a minor, by and through her father ZACHARY REHL and her mother AMANDA REHL, MARK ANTHONY TUCCI,<br><br>        Plaintiffs,<br><br>vs.<br><br>CHRISTIAN EXOO a/k/a @ANTIFASH GORDON; ST. LAWRENCE UNIVERSITY; TRIBUNE PUBLISHING COMPANY, LLC; NEW YORK DAILY NEWS; VIJAYA GADDE; TWITTER, INC; COHEN, WEISS AND SIMON, LLP; UNNAMED ASSOCIATES 1 – 100,<br><br>        Defendants. | CIVIL ACTION NO.: 2:20-cv-12880-JMV-JSA<br><br>*(Filed Electronically)*<br><br>**ORDER GRANTING PLAINTIFF LEAVE TO FILE FIRST AMENDED COMPLAINT** |

<div align="center">

**ORDER GRANTING PLAINTIFF LEAVE TO FILE FIRST AMENDED COMPLAINT**

</div>

THIS MATTER having been opened to the Court by the Law Office of Patrick Trainor,
attorney for Plaintiff(s), seeking leave to file an amended complaint pursuant to Fed. R. Civ. P.
15(a); and the Court having considered the moving papers; and no opposition having been filed;
and for good cause shown,

**IT IS**, on this <u>25th</u> day of <u>March</u>, 2021, ORDERED as follows:

1.   Plaintiff's motion to file a First Amended Complaint (ECF 47) is **GRANTED**.

2.   Plaintiff shall file the First Amended Complaint consistent with the red-lined version of the proposed First Amended Complaint filed by Plaintiff on the Court docket on January 13, 2021 (ECF 49-1), pursuant to Local Civil Rule 15.1(a)(2).

3.   Plaintiff shall file the First Amended Complaint with this Court within three (3) days from the date hereof.

*s/Jessica S. Allen*
**Honorable Jessica S. Allen, U.S.M.J.**

EXHIBIT "E"

Patrick Trainor, Esquire (Attorney ID 242682019)
**LAW OFFICE OF PATRICK TRAINOR**
848 Paterson Avenue
East Rutherford, New Jersey 07073
P: (201) 777-3327
pt@ptesq.com
*Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| DANIEL D'AMBLY; AARON WOLKIND; STEVE HARTLEY; RICHARD SCHWETZ; JOBEL BARBOSA; MATTHEW REIDINGER; JOHN HUGO; SEAN-MICHAEL DAVID SCOTT; THOMAS LOUDEN; ZACHARY REHL; AMANDA REHL; K.R., a minor, by and through her father ZACHARY REHL and her mother AMANDA REHL, MARK ANTHONY TUCCI, | CIVIL ACTION NO.: 2:20-cv-12880-JMV-JSA |
| Plaintiffs, | **FIRST AMENDED COMPLAINT TO ADD PLAINTIFFS INJURED BEFORE COMPLAINT WAS FILED ON SEPTEMBER 21, 2020, AND SUPPLMENTED COMPLAINT TO ADD PLAINTIFF INJURED AFTER THE COMPLAINT WAS FILED** |
| vs. |  |
| CHRISTIAN EXOO a/k/a ANTIFASH GORDON; ST. LAWRENCE UNIVERSITY; TRIBUNE PUBLISHING COMPANY, LLC; NEW YORK DAILY NEWS; VIJAYA GADDE; TWITTER, INC; COHEN, WEISS AND SIMON, LLP; UNNAMED ASSOCIATES 1 – 100, | **JURY TRIAL DEMAND** |
| Defendants. |  |

Plaintiffs, Daniel D'Ambly, Aaron Wolkind; Steven Hartley; Richard Schwetz; Jobel

Barbosa; Matthew Reidinger; John Hugo; Sean-Michael David Scott; *Dean David Van Zandt,*

*Jr.;* Thomas Louden; *Steven Rosati*; Zachary Rehl; Amanda Rehl; K.R. a minor, by and through

her father Zachary Rehl and her mother Amanda Rehl (hereinafter collectively referred to as

"Plaintiffs") by and through their attorney the Law Office of Patrick Trainor, as and for their

Complaint against defendants Christian Exoo a/k/a @AntifashGordon, St. Lawrence University, Tribune Publishing Company, LLC, New York Daily News, Vijaya Gadde, Twitter, Inc., and Cohen, Weiss, and Simon, LLP, hereby alleges as follows:

## STATEMENT OF THE CASE

This action arises out of the repugnant conduct of defendant Christian Exoo (Hereinafter "Exoo"), an extortionist, known habitual doxer, and member of Antifa, who associates with others to conduct patterns of racketeering activities. Exoo under the Twitter username "@AntiFashGordon" directs his associates in the "Exoo Enterprise" to conduct violent and extortionate patterns of racketeering activities devoted to "doxing" complete strangers that the Exoo Enterprise has labeled "fascists" and/or "white supremacists." To "dox" someone means to publicly disclose a person's identity, employer, school, home address, etc., for the purpose of causing harm to that person. Once the target has been doxed, Exoo directs enterprise associates to commence a pattern of violent and threatening emails, Tweets, and phone calls to the target's employers, professional clients, schools, prospective employers, or schools to extort the target's termination from employment, expulsion from school, and compel the targets exit from society.

To execute their plan, enterprise associates engage in a practice referred to as "dogpiling," which is to conduct an all-out attack on both their target's employer and co-workers by flooding them with emails and phone calls and plastering negative messages and comments throughout their entire online footprint, including Google reviews, Facebook posts, LinkedIn posts, Twitter, etc., to label the employer a fascist, white supremacist company and the target's co-workers as the same. Associates conspire to ruin the target's employer's existing business relationships and/or shame prospective clients from conducting business with them until their target is terminated.

2

Exoo is aware of the potential illegality of his directives, because he instructs his associates to use telephone *67 feature to block their phone numbers when making threatening calls.

On varied dates and times beginning in 2017, Exoo identified Plaintiffs as fascists and white supremacists.  Thereafter, Exoo directed enterprise associates to stalk Plaintiffs in order to learn their true identity.   Upon discovering Plaintiffs identity, Exoo directed associates to deluge Plaintiffs' employers with violent Tweets, phone calls, emails that threatened personal and physical harm to the employer's property and co-workers, in order to extort Plaintiffs' terminations.  Exoo unmistakably directs the enterprise's patterns of racketeering activities through interstate communications.

One-person hellbent on destroying the lives of other persons, conspires with, participates in, and directs an enterprise that engages in patterns of racketeering activities every day by using interstate communications to threaten physical violence to extort and cause harm to their target. The enterprise's associates and co-conspirators include, a major religious university, top lawyer of a publicly traded corporation and the publicly traded corporation.  Enterprise associates are motivated by a shared disdain of people labeled fascists and white supremacists.

## THE PARTIES

1.      Daniel D'Ambly (Hereinafter "D'Ambly"), is a twenty-seven (27) year member of Local One-L, Graphic Communications Conference of the International Brotherhood of Teamsters, who was employed as a was a plate maker for the New York Daily News in Jersey City, New Jersey until January 18, 2019.  D'Ambly was doxed by Exoo on October 29, 2018.  In the dox D'Ambly was labeled a 'fascist' and/or a 'white supremacist.'  D'Ambly is a member of the New Jersey European Heritage Association ("EHA"), a non-violent, pro-domestic policy

organization that the Exoo Enterprise labeled a white supremacist hate group. D'Ambly, who the Exoo Enterprise identifies as the leader of EHA, actively participates with other EHA members in political rallies, peaceful political protests, pamphleteering, and speech that is protected by U.S. Const. amend. I and N.J. Const. art. I, ¶ 6. D'Ambly is an individual domiciled in the State of New Jersey and a "person" as defined under 18 U.S.C. § 1961(3).

2.      Zachary Rehl ("Rehl") was employed by New York Life Insurance Company in Philadelphia when he was doxed by Exoo in or about August 2017, and labeled a fascist and white supremacist. Rehl is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

3.      Amanda Rehl ("AmRehl") is the spouse of Zachary Rehl. AmRehl is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

4.      K.R. ("K.R."), is the minor child of Zachary Rehl and Amanda Rehl. K.R. is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

5.      Aaron Wolkind ("Wolkind") was a Technical Support Specialist for Aerzen USA Corporation ("Aerzen") when he was doxed by Exoo on or about June 2019, and labeled a fascist, white supremacist, and a neo-Nazi. Wolkind is an individual domiciled in the State of Delaware and a "person" as defined under 18 U.S.C. § 1961(3).

6.      Steven Hartley ("Hartley"), is a logistics manager for American Expediting located in Folcroft, Pa. On November 29, 2018, he was doxed by Exoo and labeled a Nazi, racist and white supremacist who was a threat to women and minorities. Hartley is an individual

4

domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

7.      Mark Anthony Tucci ("Tucci") was employed at Aldo's Pizzarama in Philadelphia when he was doxed by Exoo on December 10, 2018, and labeled a fascist, racist, and white supremacist.  Tucci is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

8.      Richard Schwetz ("Schwetz") was employed at Inova Payroll in Lancaster, Pa., when he was doxed by Exoo in or about June 2020, and labeled a fascist, racist, and white supremacist.  Schwetz is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

9.      Jobel Barbosa ("Barbosa") is Puerto Rican and a permanently disabled veteran, who was employed as a Detail Department Manager at Jaguar Land Rover Willow Grove, in Willow Grove, Pa., when he was doxed by Exoo on June 22, 2019, and labeled a fascist, racist, and white supremacist.  Barbosa is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

10.     Matthew Reidinger ("Reidinger") was employed in Coal Township, Pa.  On November 27, 2018, he was doxed by Exoo and labeled a fascist and white supremacist. Reidinger is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

11.     John Hugo ("Hugo") was employed as a dispatch manager for Green and Yellow Cab in Somerville, Massachusetts when he was doxed by Exoo on January 2, 2020, and labeled a fascist and white supremacist.   Hugo is an individual domiciled in the Commonwealth of Massachusetts and a "person" as defined under 18 U.S.C. § 1961(3).

12.     Sean-Michael David Scott ("Scott") was employed in Seattle, Washington when he was doxed by Exoo on September 16, 2019, and labeled a fascist, white supremacist, and anti-Semite.  Scott is an individual domiciled in the State of Florida and a "person" as defined under 18 U.S.C. § 1961(3).

13.     Thomas Louden ("Louden") is a 30-year volunteer firefighter and the appointed Deputy Emergency Management Coordinator for Hilltown Township, Pennsylvania and was employed as the Director of Managed Care at Thomas Jefferson University Hospital in Philadelphia for twenty-three (23) years when he was doxed by Exoo on November 2, 2020. Louden is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

14.     Plaintiffs Wolkind, Hartley, Schwetz, Rehl, Barbosa, and Tucci are members of the Philadelphia chapter of the Proud Boys (hereinafter "PPB" or "Proud Boys").  Plaintiff Reidinger is a member of the Harrisburg chapter of the Proud Boys ("HPB").  The Proud Boys are a diverse, multi-racial, multi-ethnic, fraternal, males-only drinking club, who consider themselves "western chauvinists."

15.     Hugo is the President of Super Happy Fun America, a right of center civil rights organization focusing on defending the American Constitution, opposing gender madness, and defeating cultural Marxism.  Super Happy Fun America is best known for organizing the 2019 Boston Straight Pride Parade.  Hugo was the 2018 Republican Candidate for Massachusetts' 5th Congressional District.

16.     Defendant Christian Exoo ("Exoo" or "@AntiFashGordon") is a library building supervisor and lecturer at St. Lawrence University.  Exoo is a self-described anti-fascist, notorious doxer, and leader of Antifa, who by doxing others has acquired a great deal of

6

notoriety and infamy.[1]  Exoo currently publishes Tweets under Twitter username

"@AntiFashGordon."  Exoo is an individual domiciled in the State of New York and a "person"

as defined under 18 U.S.C. § 1961(3).

      17.     St, Lawrence University ("St. Lawrence" or "STL") is a private four-year

university with its principal place of business located at 116 Vilas Hall, 23 Romoda Drive,

Canton, New York 13617, and a "person" as defined under 18 U.S.C. § 1961(3).

      18.     Tribune Publishing Company ("Tribune") is a media company organized under

the laws of the State of Delaware with its principal place of business located at 160 N. Stetson

Avenue, Chicago, Illinois 60601 that conducts its business throughout the United States, and is a

"person" as defined under 18 U.S.C. § 1961(3).

      19.     New York Daily News Company ("Daily News") is owned by the Tribune

Publishing Company (Tribune and Daily News are sometimes hereinafter referred to collectively

as "Daily News") with a place of business located at 125 Theodore Conrad Drive, Jersey City,

New Jersey 07305, and 4 New York Plaza, New York, NY 10004.  The Daily News is a

"person" as defined under 18 U.S.C. § 1961(3).  At all times relevant, the Tribune Publishing

Company had the right and did exercise control over the actions of the New York Daily News.

---

[1] *Anti-Fascists Are Waging A Cyber War – And They're Winning*, Medium.com (Sep. 9, 2019)
https://gen.medium.com/antifas-keyboard-warriors-254f62be2a95 (last accessed Sep. 15, 2020);
*Comcast fires employee with alleged ties to Proud Boys, We the People Rally*, PhillyVoice.com
(November 15, 2018) https://www.phillyvoice.com/comcast-fires-employee-proud-boys-alt-right-philadelphia-rally/ (last accessed Sep. 15, 2020); *The Right Wing Is Trying to Make It a Crime to Oppose Fascism*, Truthout.org (Aug. 9, 2019) https://truthout.org/articles/the-right-wing-is-trying-to-make-it-a-crime-to-oppose-fascism/ (last accessed Sep. 15, 2020); *How to Spot An Abuser, Featuring Antifash Gordon, In His Own Words: A Step By Step Guide, and Also F\*\*\* That Guy,* Medium.com (Jun. 25, 2020)
https://medium.com/@abuse_isnt_revolutionary/how-to-spot-an-abuser-featuring-antifash-gordon-in-his-own-abuser-words-7b39f4657b19 (last accessed Sep. 15, 2020).

20.     Vijaya Gadde ("Gadde") is the Head of Legal, Public Policy, and Trust and Safety Lead at Twitter, Inc.  At all times relevant, Vijaya Gadde was the sole decision maker and person authorized to permanently ban Twitter users who violated Twitter's Terms of Service and Rules. She is a "person" as defined under 18 U.S.C. § 1961(3).  Gadde is believed to be domiciled in the State of California.

21.     Twitter, Inc. ("Twitter"), is a company organized under the laws of the State of Delaware with its principal place of business located at 1355 Market Street, San Francisco, CA 94103, that conducts its business globally and a "person" as defined under 18 U.S.C. § 1961(3).

22.     The Exoo Enterprise is a criminal enterprise as defined under 18 U.S.C. § 1961(4), consisting of Defendant Christian Exoo a/k/a "AntiFashGordon," who directs the Exoo Enterprise, St. Lawrence University, Vijaya Gadde, Twitter, Inc., and unidentified associates.

23.     Cohen, Weiss, and Simon, LLP ("CWS") is a law firm with its principal place of business located at 900 3rd Avenue, #2100, New York, New York 10022 and a "person" as defined under 18 U.S.C. § 1961(3).

## JURISDICTION AND VENUE

24.     Jurisdiction of this Court is proper because this litigation arises under federal law, namely 18 U.S.C. §§ 1961 to 1968.  This Court has jurisdiction over this matter under 28 U.S.C. § 1331.

25.     The Court has supplemental jurisdiction over the state law claims asserted in this case under 28 U.S.C. § 1367(a).

26.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and

the threatened and actual harm occurred in this District by reason of Defendants' conduct as

alleged below.

## FACTS PERTINENT TO ALL PLAINTIFFS

27.     Defendant Exoo publishes Tweets and doxes other persons private and

undisclosed information under Twitter username "@AntiFashGordon" the leading Antifa Twitter

account that as of December 30, 2020, has 46,140 followers.  The headline of

@AntiFashGordon's public profile states "I expose fascists via #OSINT, get them fired, de-

homed, kicked out of school, etc."  Exoo's definition of fascists and white supremacists is

indiscernible, because he uses the terms broadly and interchangeably.  Based on the substance of

@AntiFashGordon's Tweets he broadly identifies all persons who do not share his radical far left

political ideology as fascists and/or white supremacists.

28.     Upon information and belief, Exoo is known to Twitter's Trust & Safety Council

("TSC") as a habitual doxer and ban evader.  A ban evader is a person who creates a new Twitter

account after receiving a permanent ban.  The ban evader's new account is called a "ban evasion

account," and is prohibited by Twitter rules.[2]  A permanent ban means a lifetime ban.

29.     Doxing is prohibited by Twitter's Private Information Policy within their Terms

of Service and Rules ("TOS").[3]

30.     Upon information and belief, in addition to Twitter's agreement to allow Exoo to

change username @DoxSavage to @AntiFashGordon, Exoo has had two Twitter accounts

---

[2] https://help.twitter.com/en/rules-and-policies/enforcement-options "Permanent suspension: This
is our most severe enforcement action.  Permanently suspending an account will remove it from
global view, and the violator will not be allowed to create new accounts."
[3] https://help.twitter.com/en/rules-and-policies/personal-information "You may not publish or
post other people's private information without their express authorization and permission.  We
also prohibit threatening to expose private information or incentivizing others to do so."

permanently banned for doxing.  Twitter has previously permanently banned @ChrisExoo,[4] @ChristianExoo.[5]

31.    Exoo directs associates in an enterprise that uses interstate communications to conduct patterns of racketeering activities.

32.    Of their own volition, Exoo and associates identify persons as Nazis, fascists, and white supremacists, which also includes any person Exoo and/or associates label homophobic, transphobic, etc.  Once a target has been identified Exoo and associates set about to learn the personal identity of their unknown targets.

33.    Once their targets' identity is discovered, Exoo and associates commence patterns of racketeering activities to extort employment terminations and compel school expulsions, by directing waves of threatening phone calls, emails, Twitter messages, social media comments at the target's employers, co-workers, and school administrators.

34.    Enterprise associates "dogpile" their target's employers and co-workers with calls to their direct work phone number and email address with continual calls and emails to every employee and co-worker to extort the target's termination.  The practice eliminates a company's ability to conduct business.

35.    To extort their target's termination, enterprise associates harm his employer's existing and prospective business relationships by posting a flood of negative comments and reviews to the employer's social media and internet sites to use as leverage to extort their target's termination.

---

[4] https://twitter.com/ChrisExoo (last accessed Sep. 15, 2020)
[5] https://twitter.com/ChristianExoo (last accessed Sep. 15, 2020)

36.     When an employer does not immediately terminate their target, Enterprise associates directly contact and threaten their target's employers' customers to shame them from continuing to do business with the target's employer.

37.     As a result of Exoo's dox and direction of an enterprise engaged in threatening patterns of racketeering activities as described above, every Plaintiff has received explicitly violent threats against their life and the lives of their family, several Plaintiffs were physically attacked about their person, sustained damage to their homes and property, and all Plaintiffs were terminated from employment due to the enterprise's patterns of racketeering activities.

## DANIEL D'AMBLY

38.     D'Ambly repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 37 with the same force and effect as if set forth in detail herein again.

39.     Upon information and belief, the Exoo Enterprise targeted D'Ambly as a fascist and white supremacist at some point in or about January 2018.  Thereafter, enterprise associates stalked D'Ambly to uncover his true identity, for the sole purpose of doxing him.

40.     Upon information and belief, by September 2018, Twitter received dozens of complaints directly Tweeted to Twitter Support and Twitter Trust and Safety informing them that Exoo's former Twitter account @DoxSavage was aggressively doxing, which forced Twitter to investigate the accounts activities.  Under Twitter's normal protocol, accounts being investigated for violating the TOS are prevented from Tweeting during the investigation.[6]

41.     Twitter ignored their TOS and allowed @DoxSavage to continue Tweeting during their investigation.

---

[6] https://help.twitter.com/en/rules-and-policies/enforcement-options (last accessed Sep. 15, 2020)

42.     Upon information and belief, at some point on or about October 1, 2018, Gadde and Twitter agreed to allow @DoxSavage to undergo a name change in lieu of a third permanent. The unprecedented agreement to allow Exoo's username change to @AntiFashGordon under these circumstances was done to ensure he kept his approximate 15,000 @DoxSavage followers.

43.     On October 11, 2018, @DoxSavage Tweeted a farewell announcement to his followers: "Hey folks—I just underwent a name change from @DoxSavage to @AntiFash Gordon.  I'll be back tomorrow to expose more violent fascists who were on the ground in Providence on 10/6."  The name change kept the Exoo Enterprise intact, and their ability to effectively conduct its patterns of racketeering activities was not harmed.

44.     On October 29, 2018, at 11:49 a.m., @AntiFashGordon published a massive twenty-two count Tweet thread (a thread is a series of related Tweets) that doxed D'Ambly to his estimated 20,000 followers.  The dox publicly disclosed for the first time D'Ambly's name, hometown, photograph, employer, occupation, employer's location, multiple telephone numbers for his employer, a labor union Referendum Board he chaired, and the names of the other Referendum Board members.

45.     In the dox, @AntiFashGordon labeled D'Ambly a "Nazi" and directed the Exoo Enterprise associates to send harassing, intimidating, and threatening phone calls, and Tweets to the Daily News's Twitter username @NYDailyNews, to extort D'Ambly's termination.  Exoo's dox directed:

      a.   In the 19th Tweet, @AntiFashGordon directed his associates "stay on top of this, too.  If you don't hear back from @NYDailyNews, keep tweeting at them."  Call their printing facilities in Jersey City at (201) \*\*\*-\*\*\*\* (number provided in original Tweet) and warn them about Daniel D'Ambly…"

12

b. A follow up Tweet included a second telephone number for the New York Daily News and a subsequent Tweet included the direct telephone number to D'Ambly's print shop.

c. Within minutes the Exoo Enterprise obeyed Exoo's directive and flooded @NYDailyNews and @Teamsters with Tweets and phone calls that threatened the Daily News with violent attacks if D'Ambly was not terminated.

d. Upon information and belief, from October 29, 2018, to January 11, 2019, the Exoo Enterprise directed no less than fifty-four (54) threatening Tweets to @Daily News plus an unknown number of threatening phone calls.

e. D'Ambly was never told of the threats or warned to take safety precautions by anyone from the Daily News or Tribune.

46.     On October 30, 2018, without warning D'Ambly of the dangerous threats, Tribune engaged Insite Risk Management ("Insite") to investigate D'Ambly.  At the conclusion of their investigation, Insite produced the "Private Investigation Report" ("Report") and provided it to the Tribune on December 4, 2018.  The Report acknowledged @AntiFashGordon's doxing was the impetus for the investigation and confirmed D'Ambly's association with EHA.  The Report included videos of D'Ambly and others using imprudent language during political rallies.

47.     On or before January 8, 2019, EHA posted flyers on public bulletin boards in Princeton, New Jersey that announced an "It's okay to be white" protest march purportedly scheduled for January 12, 2019.

48.     On January 9, 2019, @AntiFashGordon re-Tweeted the "It's okay to be white" march to his associates and again doxed D'Ambly by Tweeting, "If anyone wants their leaders name, it's Dan D'Ambly."

13

49.     On January 10, 2019, @AntiFashGordon published a second Tweet that referenced EHA's purported march and directed his associates to "show up and shut down" the purported march "And please say hi to their leader, Dan D'Ambly for me."

50.     On January 10, 2019, D'Ambly was called to an interview with Jean Nechvatal ("Nechvatal), Tribune's Vice President, Talent Management & Learning and James R. Brill ("Brill"), Daily News's Sr. Vice President of Operations.  D'Ambly was accompanied at the meeting by Union Steward Pete Cairnie.  During the meeting, D'Ambly was confronted with content of the Report, but not informed of the report's existence.  D'Ambly acknowledged using imprudent language in a private conversation during a protest.

51.     On January 11, 2019, at 10:14 a.m., @AntiFashGordon again directed his associates to shut down EHA's purported January 12, 2019 "It's okay to be white" march and exhorted his associates "if you can, show up and show these pricks that we don't tolerate hate in our streets."  The Tweet included @NYDailyNews and doxed D'Ambly's hometown again.  Exoo encouraged violence to shut down the purported protest, but warned "Remember that the police won't protect us here."

52.     Upon information and belief, at some point before 10:21 a.m. on January 11, 2019, Edward Bushey, Sr. Vice President, General Manager, Manufacturing and Distribution at Tribune delivered recordings of the death threats to the Daily News.  The callers threatened D'Ambly and stated the Daily News was responsible for "any violence or blood spilled is also on your hands."  One threatening caller's phone number was captured.

53.     On January 11, 2019, from 9:30 a.m. to 10:14 a.m., Twitter usernames @hubcityantifa, @NYCAntifa, and @Nstricklanded replied via Tweet to @AntiFashGordon's instructions with coded messages that confirmed they followed his instructions and made threats.

14

54.     Upon reason and belief, one of the death threat phone numbers is owned by a person who Tweeted mission confirmation to @AntiFashGordon on January 11, 2019.

55.     On January 11, 2019, at 2:20 p.m., EHA Tweeted that the "It's okay to be white" protest was a prank.

56.     On January 11, 2019, at 3:30 p.m., D'Ambly was called to a second meeting with James Brill, Sr. Vice President of Operations for the Daily News to recap the previous days meeting.  In the meeting, Brill issued D'Ambly a "Last and Final Warning" that stated the "ONLY reason that you are not being terminated immediately is because, thus far, we have not determined that your activities with NJEHA has occurred at work and/or derogatory comments were made about any co-workers."  The warning continued "should we learn that you engaged in any inappropriate speech or behavior in the workplace or with regard to any other employee, or if the Company or any of its employees suffer any backlash as a result of your association with the NJEHA, your conduct will be considered "work-related" and you will be terminated immediately."

57.     This meeting with Brill was a pre-text for D'Ambly's termination.  The meeting occurred five (5) hours after death threats were received, but Brill did not inform D'Ambly, because the Daily News intended to use the threats as evidence the company received "backlash" from D'Ambly's conduct and was the "cause" of D'Ambly's termination.

58.     At 4:34 p.m. on January 11, 2019, @AntiFashGordon replied to EHA's Tweet by threatening D'Ambly whereby @AntiFashGordon threatened "Regardless, I'm gonna spend the next week wrecking your fucking life, Dan D'Ambly."

59.     In the evening of January 11, 2019, the Exoo Enterprise's extended campaign of violent Tweets and threats of physical violence to D'Ambly came to fruition and D'Ambly's

15

vehicle was "keyed" (scratched) and tires slashed while parked outside of his home on private property. An investigation report for a bias incident, criminal mischief, and harassment was filed with the South Brunswick Police Department.

60.     D'Ambly reported to work the following day on January 12, 2019, but was not informed of the death threats received the day before.

61.     On Sunday, January 13, 2019, at 10:16 a.m., five (5) days before D'Ambly's official termination date @AntiFashGordon Tweeted to four of his associates that he "got a pretty reliable tip this morning that he's not at the @NYDailyNews anymore…" in reference to D'Ambly.

62.     On Monday, January 14, 2019, the Daily News called D'Ambly and told him not to report to work until informed otherwise.

63.     On January 16, 2019, during a phone conference with Brill, Nechvatal, and a Union representative, D'Ambly was played the recorded death threats and asked to identify the caller. D'Ambly was unable to identify the caller, but said it was the behavior of "Antifa types." Brill was scornful of D'Ambly's inability to identify the caller and blamed him for the threats. D'Ambly was terminated during this phone conference.

64.     On January 23, 2019, Patrick LoPresti, President of Local One-L informed the Daily News that they were appealing D'Ambly's termination pursuant to terms of the Contract.

65.     On or about January 25, 2019, D'Ambly received his "Termination of Employment" letter, signed by Brill, and dated January 22, 2019. The letter informed D'Ambly his termination was effective January 18, 2019. The termination letter is imbued with Brill's animus for D'Ambly. In the letter, Brill stated "your choice to take these repulsive actions has now put our workplace and employees at risk of counter attacks by Antifa."

66.     The termination letter falsely stated the Daily News learned of the death threats

on January 14, 2019, contrary to emails that confirm the Daily News learned of the threats on

January 11, 2019.

67.     In the termination letter, Brill claimed the death threats received on January 11,

2019, were the "cause" of D'Ambly's termination, because the death threats meant D'Ambly

"brought his activities" into the workplace, therefore, "we deem your actions to be work related

and are terminating your employment for cause."

68.     At some point after January 23, 2019, the Union on behalf of D'Ambly filed a

grievance with the American Arbitration Association, case number 01-19-0000-7178.  The

Union retained attorneys Thomas Kennedy ("Kennedy") and Kate M. Swearengen

("Swearengen") of Cohen, Weiss, and Simon, LLP (collectively Kennedy, Swearengen and

Cohen. Weiss and Simon, LLP shall be referred to as "CWS") to represent D'Ambly.

69.     Thereafter, D'Ambly had a phone conference with Kennedy to discuss the case.

D'Ambly was acquainted with Kennedy for approximately twenty years due to his Union

activities.  D'Ambly explained the threats he received, property damage, and that his tires were

slashed.  D'Ambly stated "Tom, this Antifa are terrorists…"  Kennedy angrily responded, "I do

not consider Antifa to be terrorists and if you are going to continue referring to them (Antifa) as

terrorists we are going to end this call."  Kennedy scoffed at D'Ambly's desire to have his

employment reinstated at the Daily News.

70.     At some point thereafter, D'Ambly had his first case discussion phone

conference with Kate Swearengen, who assumed representation.  Without prompting,

Swearengen explicitly informed D'Ambly that "she doesn't agree with his politics and she

17

doesn't want to discuss them any further." Like Kennedy, Swearengen dismissed D'Ambly's wish to have his employment reinstated.

71.     Kennedy and Swearengen's revulsion of D'Ambly directed their representation and they failed to adequately research basic facts favorable to D'Ambly's wish to be reinstated. CWS ignored Brill's misrepresentation and veracity of the claimed "cause" of their client's termination.

72.     CWS failed to adequately investigate the sources of the doxing campaign. Had CWS engaged in reasonable investigation of the source of the dox they would have discovered @AntiFashGordon's January 13, 2019, announcement that D'Ambly was terminated, which was one day before the Daily News claimed they learned of the "cause" of D'Ambly's termination.

73.     On or about July 15, 2019, D'Ambly dejectedly executed the "Separation Agreement and Mutual General Release" negotiated by CWS that paid D'Ambly a lump sum payment in exchange the Union would withdraw the pending arbitration case with prejudice.

74.     As a result of Defendants' misconduct D'Ambly has suffered substantial personal and property damage and been severely financially harmed.

## ZACHARY REHL

75.     Rehl repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 37 with the same force and effect as if set forth in detail herein again.

76.     Exoo doxed Rehl for the first time on or about August 2, 2017, and labeled him a fascist and a white supremacist because Rehl organized a "Back the Blue" march to support police officers and first responders in Philadelphia.

77.     Exoo directed enterprise associates to contact Rehl's former employer New York Life Insurance Company to extort Rehl's termination. As in all cases, enterprise associates

complied with Exoo's directions and placed threatening calls, emails, and Tweets to New York Life Insurance Company.

78.　　Rehl was terminated from New York Life Insurance Company in September 2017.

79.　　On or about October 1, 2018, Rehl was doxed a second time, when he organized the "We the People" event that occurred in Philadelphia on November 17, 2018.

80.　　On November 14, 2018, Exoo followed up his October 1, 2018 dox with directions to his associates to counter protest the We the People event. Exoo directed enterprise associates to disrupt the event because "fascism is coming and only we can stop it."

81.　　On November 16, 2018, Exoo decided his community was being attacked, because "the city granted rally permits to fascists, and the cops will be there to protect them." Exoo then Tweeted the phrase "Who protects us? We protect us" a battle cry to get his associates to attack "We the People" event organizers.

82.　　At 12:41 a.m. on November 17, 2018, Rehl's safety was endangered when he was attacked by an Exoo associate who threw a brick through the front window of Rehl's home and spray painted the word "Nazi" on the front of his home.

**AMANDA REHL**

83.　　AmRehl repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 37 with the same force and effect as if set forth in detail herein again.

84.　　On or about August 2, 2017, Exoo doxed AmRehl's home address when he doxed her husband Zachary Rehl.

85.     On or about October 1, 2018, AmRehl's home address was doxed a second time when Exoo doxed her husband Zachary Rehl, because he organized the "We the People" march in Philadelphia that occurred on November 17, 2018.

86.     On November 14, 2018, Exoo directed his associates to counter protest and disrupt the We the People the event, because "fascism is coming and only we can stop it."

87.     On November 16, 2018, Exoo decided his community was being attacked, because "the city granted rally permits to fascists, and the cops will be there to protect them." Exoo then Tweeted the phrase "Who protects us? We protect us" as a battle cry to get his associates to attack "We the People" event organizers.

88.     At 12:41 a.m. on November 17, 2018, AmRehl's safety was endangered when she was assaulted by an Exoo associate who threw a brick through the front window of AmRehl's home and spray painted the word "Nazi" on the front of her home.

### K.R., a minor, by and through her father ZACHARY REHL and mother AMANDA REHL

89.     K.R. repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 37 with the same force and effect as if set forth in detail herein again.

90.     On or about August 2, 2017, Exoo doxed K.R.'s home address when he doxed her father Zachary Rehl.

91.     On or about October 1, 2018, K.R.'s home address was doxed a second time when Exoo doxed K.R.'s father Zachary Rehl, because he organized the "We the People" march in Philadelphia that occurred on November 17, 2018.

92.     On November 14, 2018, Exoo directed his associates to counter protest and disrupt the We the People event, because "fascism is coming and only we can stop it."

93.     On November 16, 2018, Exoo decided his community was being attacked, because "the city granted rally permits to fascists, and the cops will be there to protect them." Exoo then Tweeted the phrase "Who protects us? We protect us" as a battle cry to get his associates to attack "We the People" event organizers.

94.     At 12:41 a.m. on November 17, 2018, K.R.'s safety was endangered when she was assaulted by an Exoo associate who threw a brick through the front window of her home and spray painted the word Nazi on the front of her home.

**AARON WOLKIND**

95.     Wolkind repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 37 with the same force and effect as if set forth in detail herein again.

96.     Wolkind was doxed in or about June 2019 and called a fascist, white supremacist, and Nazi, which is an idiotic assertion, because Aaron's a Jew.

97.     On July 3, 2019, Exoo re-posted Exoo's dox and directed his associates to contact Wolkind's employer Aerzen USA ("Aerzen") to extort his termination.  Immediately enterprise associates directed hundreds of phone calls and emails to Wolkind's employer and his co-workers.  Aerzen's social media accounts and internet profiles were flooded with messages demanding his termination.

98.     On November 28, 2019, Exoo re-doxed Wolkind with Aerzen's direct phone number and the reminder to associates to "Use *67 to block your number."

99.     The November 28, 2019, dox dramatically increased the volume of messages posted to Aerzen's social media and internet profiles so much so that it created a network security concern and caused Aerzen to temporarily shut down their social media and internet profiles.

21

100.    The enterprise's threatening and harassing messages also caused Aerzen's management to close the Coatesville, Pa. building out of fear for employee safety.

101.    To their credit, Aerzen did not immediately terminate Wolkind, but when enterprise associates discovered Wolkind was not terminated, they directed threats at Aerzen's clients demanding they stop doing business Aerzen or face consequences, and harassed and intimidated Aerzen's foreign subsidiaries.

102.    Wolkind continues to receive threatening and harassing phone calls and the dox has prohibited Wolkind from obtaining new employment in his field.  Prospective employers have cancelled scheduled interviews and pulled job offers when they perform an internet background search for Wolkind's name, because the first listing is Exoo's dox, which identifies him as a fascist, white supremacist, and a Nazi, but as stated above Aaron's a Jew.

## STEVE HARTLEY

103.    Hartley repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 37 with the same force and effect as if set forth in detail herein again.

104.    Hartley was doxed on November 29, 2018, and labeled a Nazi, racist, terrorist and a threat to women and minorities.  The dox included directives to dogpile Hartley's employer with calls, emails, and Tweets to demand his termination.  In the dox, Hartley was identified as the president of the Philadelphia Proud Boys.

105.    As is the pattern, enterprise associates complied with Exoo's directives and in December 2018, associates inundated Hartley's employer and co-workers with hundreds of phone calls and emails and flooded their social media and internet profiles with negative posts and reviews.  Enterprise associates still contact Hartley's employer and co-workers with threatening and harassing phone calls and emails.

22

106.    Hartley's home address and personal cell phone were also doxed, and he has received hundreds of threatening and harassing phone calls from enterprise associates, including direct threats on his life. The threatening and harassing communications continue to this day.

## MARK ANTONY TUCCI

107.    Tucci repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 37 with the same force and effect as if set forth in detail herein again.

108.    Exoo doxed Tucci on December 10, 2018, and associates directed harassing and threatening phone calls, emails, and Twitter messages to his employer. Enterprise associates called his employer more than 600 times on that first night, which effectively shut down the restaurant. Tucci's employer realized what was happening and told callers he was terminated.

109.    In real time you can see the enterprise's conspiracy play out in their Tweets.

    a.   Exoo doxed Tucci with directions to harass, threaten and intimidate his employer.

    b.   Enterprise associates who called Tucci's employer, Tweeted confirmation to Exoo.

    c.   When Tucci's employer stated Tucci was terminated, enterprise associates relayed that information to Exoo.

110.    Exoo replied "Thanks for calling in the meantime it's very likely they're just hoping this blows over, so keep calling, folks!"

111.    The following day Exoo directed his associates to "keep calling folks" and the enterprise continued the assault.

## RICHARD SCHWETZ

112.    Schwetz repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 37 with the same force and effect as if set forth in detail herein again.

113.    The enterprise targeted Schwetz after he volunteered to clean up debris and litter at a Scott Presler Clean Up America event that occurred in Philadelphia on May 23, 2020.

114.    As a result of participating in the cleanup event and being photographed with other Proud Boys that participated in the cleanup event, Schwetz was doxed in June 2020.

115.    Enterprise associates directed harassing and threatening phone calls, emails, Twitter messages, and social media posts to Schwetz's co-workers located at the varied locations of his then employer Inova Payroll.

116.    Amidst the initial wave of incoming harassing and threatening phone calls, emails, and Twitter messages, an enterprise associate threatened one specific Inova Payroll employee by posting a photograph of the employee with her young son.

117.    The employee had no relationship with Schwetz whatsoever, caused Inova Payroll to reasonably fear for its employees' safety.

118.    Exoo doxed Schwetz a second time on September 21, 2020, with further instructions to enterprise associates to conduct a second round of harassing and threatening messages. The threats are still visible on Twitter.

## MATTHEW REIDINGER

119.    Reidinger repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 37 with the same force and effect as if set forth in detail herein again.

120.    Exoo doxed Reidinger on November 27, 2018, and instructed his associates to direct threatening, harassing, and intimidating phone calls, Tweets, to his employer to demand his termination.

24

121.     As is the case with all victims, Exoo directed associates to dogpile Reidinger's employer's social media sites with negative reviews.  In his instructions Exoo admits that they recently successfully dogpiled Comcast to extort a termination.

## JOBEL BARBOSA

122.     Barbosa repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 37 with the same force and effect as if set forth in detail herein again.

123.     Exoo doxed Barbosa on June 22, 2019, as trans-phobic, because he was photographed at Philadelphia's gay pride parade.  As always, Exoo's directed enterprise associates to contact Barbosa's employer to demand his termination.  Associates immediately followed Exoo's directions, including one enterprise associate who left her name and telephone number.

124.     Barbosa's home address and cell phone numbers for him and his wife were posted to a webpage phonezapp.noblog.org (no longer available) and Barbosa's wife received threatening calls on her personal cell phone.

125.     The number of contacts his former employer received is unknown at this point, but the volume was substantial, and Barbosa was immediately called into a meeting with a company executive and a human resources representative.

126.     Barbosa was terminated on June 27, 2019.

## SEAN-MICHAEL DAVID SCOTT

127.     Scott repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 37 with the same force and effect as if set forth in detail herein again.

128.     Exoo doxed Scott on September 16, 2019 and his employer publicly confirmed his employment termination on September 17, 2019.

25

129.    Exoo associates threatened and intimidated the property manager for Scott's apartment.  The property manager was fearful of repercussions and demanded Scott vacate the premises.

130.    On September 17, 2019, Scott's home was attacked with graffiti and vandalized.

131.    On April 16, 2020, Scott was attacked at his home for the second time and his car's tires were slashed and windows broken.

## JOHN HUGO

132.    Hugo repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 37 with the same force and effect as if set forth in detail herein again.

133.    Hugo was doxed by Exoo on January 2, 2020, and as with all of his doxes, Exoo labeled Hugo a fascist and white supremacist.  Exoo's dox and call to action to his associates was re-Tweeted over 100,000 times.

134.    Enterprise associates immediately followed Exoo's directives and made hundreds of threatening and harassing phone calls and over 1,000 harassing emails to Hugo's employer demanding Hugo's termination.  As in all cases, the volume of phone calls prevented Hugo and his co-workers from performing their jobs.  Hugo was terminated in March 2020.

135.    Hugo continues to receive threatening and harassing phone calls from enterprise associates who threaten Hugo that they will never let him work again and will force him to live in a box.

## SUPPLEMENTAL PLEADING TO ADD PLAINTIFF THOMAS LOUDEN WHO WAS INJURED BY THE ENTERPRISE AFTER THE COMPLAINT WAS FILED

136.    Louden repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 37 with the same force and effect as if set forth in detail herein again.

26

137.    The original Complaint in this action was filed on September 21, 2020, and Louden was injured after the Complaint was filed in the same series of occurrences or transactions after the Complaint was filed.  Louden was employed as the Director of Managed Care at Thomas Jefferson University Hospital in Philadelphia.

138.    During a global health emergency and pandemic Exoo doxed Louden's hospital employer on November 2, 2020, and as in all cases associates immediately flooded Louden's employer and co-workers with harassing and threatening phone calls, emails, social media posts.

139.    Louden who does not have a Twitter account was unaware of Exoo's dox until he was called to a Zoom meeting with his hospital's Vice-President and a human resources representative on November 2, 2020.  Louden was quizzed about his membership in a right-wing extremist group.  Louden is not a member of a right-wing extremist group, he is a 30-year volunteer firefighter and the appointed Deputy Emergency Management Coordinator for Hilltown Township, Pa.

140.    On November 3, 2020, Louden learned that Exoo posted photos of his home with his car parked in his driveway.

141.    On November 10, 2020, Exoo re-posted Louden's personal information with explicit directions, including photographs of his home and local street signs, the name of the city, and even the longitude and latitude coordinates.  Louden, obviously remains fearful for his family's safety.  Louden was terminated on December 7, 2020.

## CLAIMS FOR RELIEF

### COUNT I

**Violation of New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to – 49**
**(as to D'Ambly against Tribune Publishing Company and the New York Daily News)**

27

142.    D'Ambly realleges and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 141 with the same force and effect as if set forth in detail herein again.

143.    Defendants Tribune and Daily News are employers as defined in N.J.S.A. 10:5-5.

144.    D'Ambly is older than forty years (40) old and was an employee as defined in N.J.S.A. 10:5-5.

145.    Defendants Tribune and Daily News discharged D'Ambly due to their enmity towards D'Ambly's racially identifiable associations, whereas, non-white Tribune and Daily News employees who participate in racially identifiable associations, are not punished, or terminated, violated N.J.S.A. 10:5-12.

146.    Defendants Tribune and Daily News undertook several pre-textual steps to mask D'Ambly's discriminatory termination:

a.    Tribune hired a private investigation firm to invade D'Ambly's privacy in an unsuccessful effort to catch D'Ambly engaged in unlawful activity.

b.    In the morning of January 11, 2019, the Daily News received death threats intended to extort D'Ambly's termination that they did not immediately disclose, because they intended to use the threats pre-textually as the "cause" of D'Ambly's termination.

c.    In the afternoon of January 11, 2019, the Daily News issued D'Ambly a "Last and Final Warning," that warned D'Ambly he would be immediately terminated if it were discovered he brought his political activities into the workplace, but they did not inform or warn D'Ambly of the death threats earlier received.

d.    D'Ambly was informed he was terminated on January 16, 2019.

e. Subsequently, D'Ambly received a "Termination of Employment" letter dated January 22, 2019, whereby, the Daily News falsely stated they discovered the death threats on January 14, 2019, contrary to indisputable evidence they received the death threats on January 11, 2019, which meant he "brought his activities into the workplace" after he was warned. Daily News cited this fabrication as the "cause" of D'Ambly's termination.

147. As a direct and proximate result of defendants Tribune Publishing Company and the New York Daily News racially discriminatory termination, D'Ambly has suffered adverse consequences and continues to be damaged. D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT II

### Tortious Interference with Prospective Economic Benefit
### (as to all Plaintiffs except K.R. against defendant Christian Exoo a/k/a "AntiFashGordon")

148. Plaintiffs reallege and incorporate herein by reference each and every one of the allegations contained in paragraphs 1 through 147 with the same force and effect as if set forth in detail herein again.

149. Plaintiffs were rightfully entitled to pursue lawful employment.

150. Plaintiffs reasonably expected their employment to continue into the future and to benefit economically from his employment.

151. Defendant Exoo knew Plaintiffs were employed and intentionally interfered with their prospective economic benefits to be gained from continued employment.

152. Defendant Exoo intentionally and unjustifiably interfered with Plaintiffs rights to pursue lawful business.

29

153.   Defendant Exoo's interference caused Plaintiffs employer to terminate their employment.

154.   Plaintiffs have suffered and will continue to suffer irreparable harm in the form of damage to his reputation, loss of income and financial hardship as a result of Exoo's interference.

155.   As a direct and proximate result of defendant Exoo's interference with Plaintiffs prospective economic benefits, Plaintiffs have suffered adverse consequences and continue to be damaged.  Plaintiffs are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT III

**Intrusion Upon Seclusion – Public Disclosure of Private Personal Information**
**(as to all Plaintiffs except for K.R. against Christian Exoo a/k/a "AntiFashGordon")**

156.   Plaintiffs reallege and incorporate herein by reference each and every one of the allegations contained in paragraphs 1 through 155 with the same force and effect as if set forth in detail herein again.

157.   In directing and carrying out a sustained effort to embarrass, defame and publicize private facts, including Plaintiffs' home address and familial relations without their consent, Exoo intentionally intruded upon Plaintiffs' solitude and seclusion.

158.   By conducting a sustained effort to embarrass, defame and publicize private facts including D'Ambly's home address and familial relations without Plaintiffs' consent, Exoo intentionally intruded upon Plaintiffs' solitude and seclusion.

159.   Defendant intentionally intruded on Plaintiffs' solitude and seclusion in a manner that is highly offensive to a reasonable person.

30

160. As a direct and proximate result of Exoo's intrusion upon his seclusion, Plaintiffs have suffered adverse consequences and continue to be damaged. Plaintiffs are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT IV

### Violation of N.J.S.A. 2C:33-4.1 and N.J.S.A. 2C:30-31(a) Cyber-Harassment and Stalking (as to D'Ambly against defendant Christian Exoo a/k/a "AntiFashGordon")

161. D'Ambly realleges and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 160 with the same force and effect as if set forth in detail herein again.

162. Defendant Exoo encouraged and incited others to violence against D'Ambly and conducted an ongoing campaign that intruded D'Ambly's life.

163. Defendant Exoo intentionally and knowingly sent, commented, and posted D'Ambly's private and involuntarily disclosed personal information to social media networking sites to purposely harass, intimidate, and threaten D'Ambly.

164. By encouraging others to inflict physical harm to D'Ambly's person and property.

165. By encouraging others to commit crimes against D'Ambly that resulted in D'Ambly receiving death threats and sustaining physical damage to his personal property

166. As a direct and proximate result of Defendant Exoo's cyber-harassment and stalking D'Ambly has suffered adverse consequences and continues to be damaged. D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT V

**Violation of 18 U.S.C. § 875(c) – Interstate Communications**
**(as to all Plaintiffs against defendant Christian Exoo a/k/a "AntiFashGordon")**

167.    Plaintiffs reallege and incorporate herein by reference each and every one of the allegations contained in paragraphs 1 through 166 with the same force and effect as if set forth in detail herein again.

168.    By using an interactive computer service to intentionally transmit threats of physical violence at Plaintiffs via interstate communications.

169.    By directing an enterprise is engaged in an interstate campaign of violent threats against Plaintiffs for the purpose of injuring and endangering Plaintiffs' personal safety.

170.    By explicitly threatening Plaintiffs via an interactive computer service Exoo transmitted threats in interstate commerce.

171.    As a direct and proximate result of defendant Exoo's use of interstate communications to threaten and harm Plaintiffs they have suffered adverse consequences and continue to suffer adverse consequences.  Plaintiffs are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT VI

**Violation of 18 U.S.C. 2261A(2) –Stalking**
**(as to all Plaintiffs against defendant Christian Exoo a/k/a "AntiFashGordon")**

172.    Plaintiffs reallege and incorporate herein by reference each and every one of the allegations contained in paragraphs 1 through 171 with the same force and effect as if set forth in detail herein again.

173.    Exoo used an interactive computer service to surveil and stalk Plaintiffs with the intent to harass, intimidate, threaten, and harm Plaintiffs.

32

174. Exoo stalked Plaintiffs to discover their personal identity and then disseminated the information using an interactive computer service with instructions to enterprise associates with directions to harass, intimidate, and endanger Plaintiffs personal safety.

175. Exoo used an interactive computer service to direct an enterprise to harass, intimidate, and threaten others in order to extort Plaintiffs termination from lawful employment.

176. Exoo's conduct caused Plaintiffs to reasonably fear for the safety of themselves and their family and caused Plaintiffs to suffer severe emotional and financial distress.

177. As a direct and proximate result of defendant Exoo's stalking in violation of 18 U.S.C. § 2261A(2) Plaintiffs have has suffered adverse consequences and continue to suffer adverse consequences. Plaintiffs are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT VII

### Employer's Breach of its Duty to Warn
### (as to D'Ambly against defendants Tribune Publishing Company and the New York Daily News)

178. D'Ambly realleges and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 177 with the same force and effect as if set forth in detail herein again.

179. Defendants Tribune and Daily News received a stream of death threats directed at D'Ambly over a two and one-half month period, but they never warned D'Ambly.

180. Defendants Tribune and Daily News never warned D'Ambly to take precautionary measures as he entered or exited the workplace.

181.    Defendants Tribune and Daily News did not take steps to increase the safety of D'Ambly and other employees as they entered and exited the workplace.

182.    Defendants Tribune and Daily News did not secure the workplace in order to protect D'Ambly and others.

183.    As he was not aware of the threats, D'Ambly could not take steps to protect himself and his property and as a result his property was damaged on January 11, 2019.

184.    Defendants Tribune and Daily News had a duty to warn their employee he was the direct target of the death threats they received.

185.    As a direct and proximate result of defendants Tribune and Daily News' failure to warn D'Ambly has suffered adverse consequences and continues to be damaged.  D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT VIII

### Violations of N.J.S.A 2C:41-1 to – 2C:41-6.2 (Racketeering)
### (as to D'Ambly against defendants Christian Exoo a/k/a "AntiFashGordon," St. Lawrence University, Vijaya Gadde, and Twitter, Inc., the "Exoo Enterprise")

186.    D'Ambly realleges and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 185 with the same force and effect as if set forth in detail herein again.

187.    The "Exoo Enterprise" is directed by defendant Christian Exoo a/k/a "@AntiFashGordon," and consists of associates St. Lawrence University, including their employees and agents, Vijaya Gadde, and Twitter, Inc., including their employees and agents, and unknown associates.

34

188.     Defendant Exoo used an interactive computer service to direct the Exoo

Enterprise's patterns of racketeering activities as defined by N.J.S.A. 2C:41(a)(1) to extort

D'Ambly's termination from the Daily News.

     a.     The Exoo Enterprise threatened the Daily News via Tweets and phone calls and

        related activities prohibited by N.J.S.A. 2C:41-2.

     b.     Exoo Enterprise committed multiple prohibited by N.J.S.A. 2C:41(a)(1)(h).

     c.     Exoo Enterprise committed multiple prohibited by N.J.S.A. 2C:41(a)(1)(bb)

189.     As a direct result of the Exoo Enterprises patterns of racketeering activities,

D'Ambly was terminated from his employment.

190.     As a direct and proximate result of Defendants' patterns of racketeering activities

D'Ambly has suffered adverse consequences and continues to be damaged.  D'Ambly is entitled

to compensatory damages, equitable and declaratory relief, punitive damages, costs, and

reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of

$75,000.00.

### COUNT IX

**Violations of 18 U.S.C. §§ 1962(c) – Racketeering**
**Multiple violations of RICO predicates 18 U.S.C. §§ 1951 and 1952**
**(as to all Plaintiffs against defendants Christian Exoo a/k/a "AntiFashGordon," St.**
**Lawrence University, Vijaya Gadde, and Twitter, Inc., the "Exoo Enterprise")**

191.     Plaintiffs reallege and incorporates herein by reference each and every one of the

allegations contained in paragraphs 1 through 190 with the same force and effect as if set forth in

detail herein again.

192.     Each of the individuals and entities is a "person" within the meaning of 18 U.S.C.

§ 1961(3) who conducted the affairs of the enterprise, through a pattern of racketeering activity

in violation of 18 U.S.C. § 1962(c).

193.    The Exoo Enterprise is an enterprise within the meaning of 18 U.S.C. 1961(4),

directed by defendant Christian Exoo a/k/a "@AntiFashGordon," and consisting of St. Lawrence

University, including their employees and agents, Vijaya Gadde, and Twitter, Inc., including

their employees and agents, and unknown associates.  The Exoo Enterprise was created to dox

fascists and white supremacists in order to use the doxed information to conduct patterns of

racketeering activities to threaten violence, intimidate, harass, and extort others to achieve the

enterprises mission of causing employment terminations, educational expulsions, physical injury,

and personal harm to the persons doxed.  The Exoo Enterprise functions as an organization and

continuing unit to effectuate patterns of racketeering activity.

194.    Upon information and belief, multiple generations of Exoo's family are or were

employed by St. Lawrence University and Exoo's activities are well known to St. Lawrence

faculty and administrators, who allow Exoo to direct the enterprise from St. Lawrence property,

from his place of employment, during his normal work hours using St. Lawrence equipment and

information technology.  St. Lawrence consents to Exoo's use of St. Lawrence property to direct

the enterprise, and participates in the Exoo Enterprise, because they believe the patterns of

racketeering activities helps St. Lawrence's achieve their global mission.

195.    Exoo uses his employment, teaching, and lecturing at St. Lawrence with the

consent and approval of St. Lawrence to recruit students to join the Exoo Enterprise as

associates.  In concert with other associates, the Exoo Enterprise, directed by Exoo created and

maintained systematic links for the common purpose of doxing targeted fascists and white

supremacists, and then threaten, harass, and extort others to cause harm to their targets.

196.    At all times relevant, Gadde was the only Twitter employee authorized to

permanently ban Twitter users.[7]

197.    Exoo is and was well known to Gadde and Twitter, because Gadde and Twitter

have twice before permanently banned Exoo due to habitual doxing.

198.    Gadde and Twitter agreed to associate with the Exoo Enterprise when they

breached their own TOS to conspire with a recidivist ban evader, and permitted the enterprise

leader to create ban evasion account "@AntiFashGordon," which Gadde and Twitter knew was

purposely created to dox unsuspecting persons, in order to direct associates in patterns of

racketeering activities.

199.    Gadde and Twitter associate and participate in the Exoo Enterprise's patterns of

racketeering, by virtue of their affirmative decision to allow Exoo, a three-time ban evader and

known habitual doxer, create a ban evasion account in direct contradiction of their TOS and

enforcement rules, through which, the Exoo Enterprise conducts its patterns of racketeering.

200.    Upon information and belief Gadde and Twitter have received hundreds and

likely thousands of complaints directly to their individual Twitter accounts and through Twitter's

TSC regarding the Exoo Enterprise's doxing.  But Gadde and Twitter choose to ignore the

avalanche of doxing and abusive behavior complaints and refuse to enforce their own policies in

---

[7] *Meet Vijaya Gadde, an Indian-born Twitter head who decides on blocking tweets, users*, The
Economic Times, (Jan. 16, 2020) https://economictimes.indiatimes.com/tech/internet/meet-
vijaya-gadde-an-indian-born-twitter-head-who-decides-on-blocking-
tweets/articleshow/73281445.cms, last accessed September 12, 2020.  See also, *Twitter's Top
Lawyer Is Final Word On Blocking Tweets – Even Donald Trump's*, Bloomberg.com, (Jan. 15,
2020)  https://www.bloomberg.com/news/articles/2020-01-15/twitter-s-gadde-is-final-word-on-
blocking-tweets-even-trump-s, last accessed September 12, 2020; *Meet Twitter's top lawyer,
who has the final word on blocking tweets – including Donald Trump's*, Fortune.com, (Jan. 15,
2020) https://fortune.com/2020/01/15/twitter-top-lawyer-vijaya-gadde-blocks-tweets-donald-
trump/, last accessed September 12, 2020.

order to facilitate the patterns of racketeering activities directed by known ban evasion account, @AntiFashGordon.

201.    Gadde personally participates in, and benefits from the Exoo Enterprise's patterns of racketeering activities, because she has publicly stated her personal disdain for fascists and white supremacists, and she is "very, very focused on that...the KKK, the American Nazi Party," because that "was what my parents had to deal with" where she grew up on the Texas-Louisiana border.[8]  Gadde participates in the Exoo Enterprise, because of an Oresteian desire to avenge her parents perceived mistreatment.  Gadde and Twitter are the lynchpin of the Exoo Enterprise. Without Gadde and Twitter's consent and participation, the Exoo Enterprise could not conduct its patterns of racketeering activities.

202.    Twitter benefits economically from the Exoo Enterprise's patterns of racketeering activities, because @AntiFashGordon has an extremely large Twitter following, one of the largest follower bases of all Twitter users, and the account drives a tremendous amount of internet traffic to Twitter.  Greater traffic to their site increases Twitter's ad revenue.

203.    Twitter benefits socially from the Exoo Enterprise's patterns of racketeering activities because the Exoo Enterprise's doxing of fascists and white supremacists imparts a social benefit on Twitter as it is seen as a defender of "marginalized communities" and provides cover for their stated business goal of creating what Twitter describes as "safer" conversations.

204.    The Exoo Enterprise engages in and affects interstate commerce, because, *inter alia,* it threatens violence to persons and property of others throughout the United States in

---

[8] *Twitter's Kayvon Beykpour and Vijaya Gadde: the Code Conference interview (transcript),* Vox.com (June 27, 2019) https://www.vox.com/recode/2019/6/27/18760444/twitter-kayvon-beykpour-vijaya-gadde-kara-swisher-peter-kafka-code-conference-interview-transcript, last accessed September 12, 2020.

furtherance of a plan that reaches into the several states to disrupt economic activity. The Exoo Enterprise has caused severe economic hardship to Plaintiffs and negatively impacted local economies throughout the United States.

205.    Pursuant to and in furtherance of their violent doxing campaign, Defendants directed and participated in the affairs of the Exoo Enterprise through patterns of racketeering activity, including multiple acts indictable under 18 U.S.C. §§ 1951 (Interference with commerce by threats or violence) and 1952 (use of interstate facilities to conduct unlawful activity).

206.    The conduct of the Exoo Enterprise described above constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).  Defendants' decisions and activity in connection with the Exoo Enterprise to routinely conduct its transactions in such a manner constitutes "patterns of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

207.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiffs for three times the damages sustained, plus the costs of this suit, including reasonable attorneys' fees.

208.    As a direct and proximate result of Defendants patterns of racketeering activity Plaintiffs have suffered adverse consequences and continue to suffer adverse consequences in an amount to be determined at trial, but which is in excess of $75,000.00.  Plaintiffs are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT X

**Violation of 18 U.S.C. § 1962(d) (Conspiracy)**
**(as to all Plaintiffs against defendants Christian Exoo a/k/a "AntiFashGordon," St. Lawrence University, Vijaya Gadde, and Twitter, Inc., the "Exoo Enterprise")**

209.    Plaintiffs reallege and incorporates herein by reference each and every one of the

allegations contained in paragraphs 1 through 208 with the same force and effect as if set forth in

detail herein again.

210.    Section 1962(d) of RICO provides "shall be unlawful for any person to conspire

to violate any provisions of subsection (a), (b), or (c) of this section."

211.    Defendants have violated 18 U.S.C. § 1962(d) by conspiring to associate and

participate in the Exoo Enterprise's patterns of racketeering activities as defined in 18 U.S.C.

1962(c).  The object of this conspiracy is to conduct, direct and participate in, directly or

indirectly, the Exoo Enterprise's patterns of racketeering activity.

212.    Defendants' have engaged in numerous overt and predicate racketeering acts in

furtherance of the conspiracy, including threatening, intimidating, and extorting others to cause

harm to their targets.

213.    The nature of the above-described acts of Defendants' and co-conspirators acts in

furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective

of an 18 U.S.C. 1962(d) violation, but they were aware that their ongoing extortionate acts have

been, and are part of an overall pattern of racketeering activity demonstrated through related and

continuous acts.

214.    Defendants sought to and have engaged in the commission of, and continue to

commit overt acts, including the following unlawful racketeering predicate acts:

   a.  Multiple instances of interference with commerce by threats of violence in

       violation of 18 U.S.C. § 1951; and

   b.  Multiple instances of use of interstate facilities to conduct unlawful activity

       violations of 18 U.S.C. § 1952.

40

215.     As a direct and proximate result of Defendants' multiple overt acts and predicate acts in furtherance of the Exoo Enterprise, in violation of 18 U.S.C. § 1962(d), by conspiring to violate 18 U.S.C. 1962(c), D'Ambly has been and continues to be injured by Defendants' conduct.

216.     By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are liable to D'Ambly for three times the damages sustained, plus the costs of this suit, including reasonable attorneys' fees.

217.     As a direct and proximate result of Defendants patterns of racketeering activity Plaintiffs have suffered adverse consequences and continue to suffer adverse consequences in an amount to be determined at trial, but which is in excess of $75,000.00.  Plaintiffs are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT XI

### Negligent Entrustment

### (as to all Plaintiffs against defendants Vijaya Gadde and Twitter, Inc.)

218.     Plaintiffs reallege and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 217 with the same force and effect as if set forth in detail herein again.

219.     Exoo is a notorious and infamous doxer, who relies on Twitter to dox unsuspecting people and direct his enterprise.

220.     Due to habitual doxing and abusive behavior, Twitter has previously permanently banned two accounts controlled by Exoo, @ChrisExoo and @ChristianExoo.

41

221.    Upon information and belief, Twitter received hundreds of complaints that Exoo was habitually doxing under Twitter username @DoxSavage.

222.    In lieu of a third permanent ban Twitter agreed to allow Exoo to undergo a username change from @DoxSavage to @AntifashGordon, contrary to Twitter's TOS.

223.    Subsequent to Twitter's agreement to allow Exoo to change his Twitter username to @AntiFashGordon, Vijaya Gadde and Twitter's Safety Council have received numerous doxing complaints.

224.    Gadde was the only person at Twitter with authority to decide permanent bans and she knew Exoo is a habitual doxer, but she ignored that knowledge and agreed to allow him to change his username and continue doxing.

225.    Gadde recklessly ignored Twitter's TOS against ban evasion accounts and allowed Exoo to change his name from @DoxSavage to @AntiFashGordon, thereby, entrusting Exoo with the instrumentality to direct the Exoo Enterprise's patterns of racketeering activities.

226.    As a direct and proximate result of defendant Gadde and Twitter's negligent entrustment Plaintiffs have suffered adverse consequences and continue to suffer adverse consequences. Plaintiffs are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT XII

### Breach of Implied Covenant of Good Faith – Promissory Estoppel
### (as to all Plaintiffs against defendants Vijaya Gadde and Twitter, Inc.)

227.    Plaintiffs reallege and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 226 with the same force and effect as if set forth in detail herein again.

228.   Defendant Twitter's TOS prohibit doxing and ban evasion accounts.

229.   Defendant Twitter created a Trust and Safety Council department to investigate TOS violations to remove abusive content and protect others from abusive behaviors of others.

230.   Twitter created the Trust and Safety Council to prohibit abusive behavior by Twitter users and promised victims of abusive behavior would be protected.

231.   Gadde is the executive in charge of Twitter's Trust and Safety council, and the only person at Twitter with authority to allow Exoo to create a ban evasion account.

232.   Twitter allowed Exoo to create a ban evasion account fully aware he was a habitual doxer, who used Twitter to harm others.

233.   Exoo as @AntiFashGordon doxed Plaintiffs and violently threatened others with violence, including employers and former co-workers in order to extort Plaintiffs' termination.

234.   Gadde, Twitter Support and Twitter Trust and Safety received contemporaneous complaints that @AntiFashGordon doxed Plaintiffs, but took no action.

235.   Twitter refused to protect Plaintiffs the Exoo Enterprise's abusive behavior and have not removed Plaintiffs doxed information or banned the Exoo Enterprise, who continue to abuse and dox.

236.   Twitter assumed liability for the harm that flows from defendant Exoo's doxing when they neglected to remove Plaintiffs' doxed information in violation of their TOS.

237.   As a direct and proximate result of defendant Gadde and Twitter's breach of their assumed duty to remove Plaintiffs doxed private information Plaintiffs have suffered adverse consequences and continue to suffer adverse consequences.  Plaintiffs are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT XIII
## Legal Malpractice

### (as to D'Ambly against defendant Cohen, Weiss, and Simon, L.L.P.)

238.    D'Ambly repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 237 with the same force and effect as if set forth in detail herein again.

239.    As a result of their personal revulsion of D'Ambly and his political beliefs CWS failed to adequately represent and protect D'Ambly's rights.

240.    Defendant CWS neglected to perform necessary case research, legal research, and investigation of the accusations against D'Ambly.

241.    As a result of CWS's inadequate legal research and investigation they failed to protect D'Ambly from the extortionate and criminal conduct of others.

242.    As a result of CWS's failure to adequately investigate D'Ambly's doxing they failed to learn that @AntiFashGordon publicly announced D'Ambly's termination on January 13, 2019, which occurred five days before his official termination date, and one day before the purported "cause" of his termination was discovered.

243.    CWS failed to challenge Brill's blatant misrepresentations regarding the timing of the alleged 'cause' of D'Ambly's termination.

244.    CWS's revulsion of D'Ambly and his political beliefs caused them to ignore an obvious racially discriminatory pre-textual termination spotlighted by the private investigation, last and final warning, and falsely claimed cause of D'Ambly's termination.

245.    As a direct and proximate result of CWS's legal malpractice that flowed from their firmwide enmity of D'Ambly's political beliefs D'Ambly has suffered adverse consequences and continues to be damaged.  D'Ambly is entitled to compensatory damages,

equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1.  Demands judgment against Defendants, jointly and severally, in an amount to be determined at trial plus interest, including, but not limited to, all emotional distress, back pay, punitive damages, liquidated damages, statutory damages, attorneys' fees, costs, and disbursements, and for such relief as the Court deems just and proper.

2.  On Plaintiffs' RICO claims: compensatory damages and enhancement of damages Plaintiffs have sustained as a result of Defendants' conduct as may be permitted under the relevant statutes, such amount to be determined at trial, plus Plaintiffs costs in this suit, including reasonable attorneys' fees.

3.  On Plaintiffs' tortious interference, intrusion upon seclusion, stalking and harassment claims: compensatory and punitive damages in an amount to be determined at trial.

4.  On D'Ambly's State claims against the Tribune and Daily News: compensatory damages and enhancement of damages he sustained as a result of the Tribune and Daily News' conduct as may be permitted under the relevant statutes, such amount to be determined at trial, plus Plaintiffs costs in this suit, including reasonable attorneys' fees.

5.  On D'Ambly's legal malpractice claim: compensatory damages to be determined at trial.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury on all issues so triable.

45

Respectfully Submitted,
**LAW OFFICE OF PATRICK TRAINOR**
*Attorney for D'Ambly*

Dated: March 25, 2021

_____
Patrick Trainor
848 Paterson Avenue
East Rutherford, New Jersey 07073
(201) 777-3327
pt@ptesq.com

46

# EXHIBIT "F"

## Clare Thompson

**From:** Michael J. Canning

**Subject:** FW: D'Ambly v Exoo, et.al., Civil Action No. 2:20-cv-12880-JMV-JAD,

---

**Giordano Halleran & Ciesla**
Attorneys at Law

Clare Thompson
Legal Assistant
www.ghclaw.com
Direct Dial: (732) 219-5482 · F: (732) 224-6599
125 Half Mile Road · Suite 300 · Red Bank, NJ 07701-6777

website

---

**From:** Michael J. Canning
**Sent:** Tuesday, April 06, 2021 2:33 PM
**To:** 'Patrick Trainor, Esq.' <pt@PTESQ.COM>
**Subject:** D'Ambly v Exoo, et.al., Civil Action No. 2:20-cv-12880-JMV-JAD,

Dear Mr Trainor,
As you know, this office represents defendant Cohen, Weiss and Simon L.L.P. (CWS). We have received a copy of the Amended Complaint you have filed on behalf of plaintiff Daniel D'Ambly. The Amended Complaint contains no new or different allegations against CWS from the original Complaint. On September 11,2020, we sent you a notice letter advising that the original complaint violated Fed. R.Civ.P. 11. On November 17, 2020 we sent you a letter enclosing a motion for sanctions under Rule 11 on behalf of CWS, and provided you with a 21 day safe harbor period in which to dismiss the complaint as to CWS. We filed a motion to dismiss the Complaint which was returnable on December 7,2020.
You did not dismiss the Complaint but rather filed a motion to amend the Complaint. The court advised that in light of the motion to amend the Complaint, the motion to dismiss would not be heard and would have to be refiled. The motion to amend the Complaint was granted.
The allegations in the Amended Complaint remain identical as to CWS and the Amended Complaint has been filed in violation of Rule 11 for the same reasons the original Complaint was, as set forth in our notice letter to you on September 11,2020 and in the motion for sanctions delivered to you on November 17,2020. We adopt, and incorporate as if set forth at length herein, the September 11,2020 notice letter and motion for sanctions served on November 17, 2020. This letter is sent to you as a demand under Rule 11 that the Amended Complaint be dismissed within the 21 safe harbor provision of Rule 11. The failure to do so will result in the refiling of the motions to dismiss and for sanctions which have previously been served upon you.

---

**Giordano Halleran & Ciesla**
Attorneys at Law

Michael J. Canning, Esq.    **website | biography | vcard**
Shareholder
Co-Chair of the Litigation Department
Certified Civil Trial Attorney
www.ghclaw.com
Direct Dial: (732) 219-5482 · F: (732) 224-6599
125 Half Mile Road · Suite 300 · Red Bank, NJ 07701-6777

---

1

**EXHIBIT "G"**

Michael J. Canning, Esq. (MJC3060)
**GIORDANO, HALLERAN & CIESLA, P.C.**
125 Half Mile Road, Suite 300
Red Bank, N.J. 07701-6777
(732) 741-3900
Attorneys for Defendant, Cohen, Weiss and Simon LLP

<div align="center">

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| DANIEL D'AMBLY,<br><br>             Plaintiff,<br><br>    v.<br><br>CHRISTIAN EXOO a/k/a ANTIFASH GORDON; ST. LAWRENCE UNIVERSITY; TRIBUNE PUBLISHING COMPANY; NEW YORK DAILY NEWS.; VIJAY GADDE; TWITTER, INC.; COHEN, WEISS AND SIMON LLP,<br><br>          Defendants. | Case No. 2:20-cv-12880-JMV-JSA<br><br><br>Civil Action<br><br>**COHEN, WEISS AND SIMON LLP'S NOTICE OF MOTION TO DISMISS COUNT XIII OF PLAINTIFF'S AMENDED COMPLAINT**<br><br><br>**MOTION DATE: July 6, 2021** |

**PLEASE TAKE NOTICE** that Giordano, Halleran & Ciesla, P.C., counsel for Defendant, Cohen, Weiss and Simon LLP ("*CWS*"), shall move before the United States District Court for the District of New Jersey, located at Clarkson S. Fisher Building & U.S. Courthouse, 402 East State Street, Trenton, New Jersey, on July 6, 2021 at 9:00 a.m. or as soon thereafter as counsel may be heard, for the entry of an Order dismissing Count XIII of the Plaintiff, Daniel D'Ambly's Amended Complaint with prejudice pursuant to Federal Rule of Civil Procedure 12(c).

**PLEASE TAKE FURTHER NOTICE** that in support of the application, CWS shall rely upon the Certification of Michael J. Canning, Esq. and Memorandum of Law.

**PLEASE TAKE FURTHER NOTICE** that a proposed form of Order is submitted herewith.

> **GIORDANO, HALLERAN & CIESLA, P.C.**
> Attorneys for Defendant, Cohen,
> Weiss and Simon LLP
>
> By: _Michael J. Canning_
> _____
> Michael J. Canning, Esq.

Dated:  April 22, 2021

Docs #5037122-v1

2

Michael J. Canning, Esq. (MJC3060)
**GIORDANO, HALLERAN & CIESLA, P.C.**
125 Half Mile Road, Suite 300
Red Bank, N.J. 07701-6777
(732) 741-3900
Attorneys for Defendant, Cohen, Weiss and Simon LLP

<div align="center">

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| DANIEL D'AMBLY,<br><br>                        Plaintiff,<br><br>            v.<br><br>CHRISTIAN EXOO a/k/a ANTIFASH GORDON; ST. LAWRENCE UNIVERSITY; TRIBUNE PUBLISHING COMPANY; NEW YORK DAILY NEWS; VIJAY GADDE; TWITTER, INC.; COHEN, WEISS AND SIMON LLP,<br><br>                    Defendants. | Case No. 2:20-cv-12880-JMV-JSA<br><br>Civil Action<br><br>**CERTIFICATION OF MICHAEL CANNING, ESQ.**<br><br>**Motion Date:  July 6, 2021** |

      MICHAEL J. CANNING, ESQ., by way of certification in lieu of affidavit, hereby states as follows:

      1.      I am an attorney at law of the State of New Jersey and an officer and shareholder in the law firm of Giordano, Halleran & Ciesla, P.C., attorneys for Cohen, Weiss and Simon LLP. In this capacity I am familiar with the facts set forth herein.

      2.      Attached hereto as **Exhibit "A"** is a true and accurate copy of the September 21, 2020 Complaint and Jury Trial Demand filed by Plaintiff.

      3.      Attached hereto as **Exhibit "B"** is a true and accurate copy of the October 22, 2020 Answer to Plaintiff's Complaint filed by Cohen, Weiss and Simon LLP.

4.      Attached hereto as **Exhibit "C"** is a true and accurate copy of the March 25, 2021

First Amended Complaint filed by Plaintiff.

I certify that the foregoing statements made by me are true.  I am aware that if any of the

foregoing statements are willfully false, I am subject to punishment.

_Michael J Canning_

_____

MICHAEL J. CANNING, ESQ.

DATED:  APRIL 22, 2021

Docs #5035709-v1

2

# EXHIBIT "A"

Patrick Trainor, Esquire (Attorney ID 242682019)
LAW OFFICE OF PATRICK TRAINOR, ESQ., LLC
848 Paterson Avenue
East Rutherford, New Jersey 07073
P: (201) 777-3327
pt@ptesq.com
*Attorney for Plaintiff Daniel D'Ambly*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DANIEL D'AMBLY, | |
| Plaintiff, | CIVIL ACTION NO.: |
| vs. | COMPLAINT |
| CHRISTIAN EXOO a/k/a ANTIFASH GORDON; ST. LAWRENCE UNIVERSITY; TRIBUNE PUBLISHING COMPANY; NEW YORK DAILY NEWS; VIJAYA GADDE; TWITTER, INC; COHEN, WEISS AND SIMON, LLP; | JURY TRIAL DEMAND |
| Defendants. | |

Plaintiff, Daniel D'Ambly by and through his attorney the Law Office of Patrick Trainor,

Esq., LLC, as and for its Complaint against defendants Christian Exoo a/k/a @AntifashGordon,

St. Lawrence University, Tribune Publishing Company, LLC, New York Daily News, Vijaya

Gadde, Twitter, Inc., and Cohen, Weiss, and Simon, LLP, hereby alleges as follows:

<u>STATEMENT OF THE CASE</u>

1.    This action arises out of the repugnant conduct of defendant Christian Exoo, an

extortionist, known habitual doxer, and member of Antifa, associates with others to conduct

patterns of racketeering activities.  Defendant Exoo under the Twitter username

"AntiFashGordon" directs his associates in the "Exoo Enterprise" to conduct violent and

extortionate patterns of racketeering activities devoted to "doxing" complete strangers that the Exoo Enterprise has labeled "fascists" and/or "white supremacists." To "dox" someone means to publicly disclose a person's identity, employer, school, home address, etc., for the purpose of causing harm to that person. Once the target has been doxed, Exoo directs the Enterprise to commence a pattern of violent and threatening emails, Tweets, and phone calls to the target's employers, professional clients, schools, prospective employers or schools to extort the target's termination from employment, expulsion from school, and compel the targets exit from society. Exoo is aware of the potential illegality of his directives, because he instructs his associates to use the telephone *67 feature to block their phone numbers when making threatening calls.

Defendant Exoo identified D'Ambly as a white supremacist and thereafter, directed the Exoo Enterprise to stalk him in order to learn his true identity. Upon discovering D'Ambly's identity, Exoo directed the enterprise to deluge D'Ambly's employer, the New York Daily News their parent Tribune Publishing Company and D'Ambly's labor union the Teamsters, with violent and threatening Tweets, and phone calls threatening death and personal and physical harm to their employees and property, in order to extort D'Ambly's termination. Defendant Exoo unmistakably directs the Exoo Enterprise's patterns of racketeering activities through interstate communications.

One-person hellbent on destroying the lives of other persons, conspires with, participates in, and directs an enterprise that engages in patterns of racketeering activities every day by using interstate communications to threaten physical violence to extort and cause harm to their target. The enterprise's associates and co-conspirators include, a major religious university, top lawyer of a publicly traded corporation and the publicly traded corporation. The Exoo Enterprise's associates are motivated by a shared disdain of people labeled fascists and white supremacists.

2

## THE PARTIES

2.      Plaintiff Daniel D'Ambly (Hereinafter "Plaintiff" or "D'Ambly"), is a twenty-seven (27) year member of Local One-L, Graphic Communications Conference of the International Brotherhood of Teamsters, who was employed as a was a plate maker for the New York Daily News in Jersey City, New Jersey until January 18, 2019.  D'Ambly was labeled a 'fascist' and/or a 'white supremacist.'  Plaintiff is an individual domiciled in the State of New Jersey and a "person" as defined under 18 U.S.C. § 1961(3).

3.      Defendant Christian Exoo ("Exoo" or "@AntiFashGordon") is a library building supervisor and lecturer at St. Lawrence University.  Exoo is a self-described anti-fascist, notorious doxer, and leader of Antifa, who by doxing others has acquired a great deal of notoriety and infamy.[1]  Exoo currently publishes Tweets under Twitter username "@AntiFashGordon."  Exoo is an individual domiciled in the State of New York and a "person" as defined under 18 U.S.C. § 1961(3).

4.      St, Lawrence University ("St. Lawrence" or "STL") is a private four-year university with its principal place of business located at 116 Vilas Hall, 23 Romoda Drive, Canton, New York 13617, and a "person" as defined under 18 U.S.C. § 1961(3).

---

[1] *Anti-Fascists Are Waging A Cyber War – And They're Winning*, Medium.com (Sep. 9, 2019) https://gen.medium.com/antifas-keyboard-warriors-254f62be2a95 (last accessed Sep. 15, 2020); *Comcast fires employee with alleged ties to Proud Boys, We the People Rally*, PhillyVoice.com (November 15, 2018) https://www.phillyvoice.com/comcast-fires-employee-proud-boys-alt-right-philadelphia-rally/ (last accessed Sep. 15, 2020); *The Right Wing Is Trying to Make It a Crime to Oppose Fascism*, Truthout.org (Aug. 9, 2019) https://truthout.org/articles/the-right-wing-is-trying-to-make-it-a-crime-to-oppose-fascism/ (last accessed Sep. 15, 2020); *How to Spot An Abuser, Featuring Antifash Gordon, In His Own Words: A Step By Step Guide, and Also F\*\*\* That Guy,* Medium.com (Jun. 25, 2020) https://medium.com/@abuse_isnt_revolutionary/how-to-spot-an-abuser-featuring-antifash-gordon-in-his-own-abuser-words-7b39f4657b19 (last accessed Sep. 15, 2020).

3

5.      Tribune Publishing Company ("Tribune") is a media company organized under
the laws of the State of Delaware with its principal place of business located at 160 N. Stetson
Avenue, Chicago, Illinois 60601 that conducts its business throughout the United States, and is a
"person" as defined under 18 U.S.C. § 1961(3).

6.      New York Daily News Company ("Daily News") is owned by the Tribune
Publishing Company (Tribune and Daily News are sometimes hereinafter referred to collectively
00000as Daily News) with a place of business located at 125 Theodore Conrad Drive, Jersey
City, New Jersey 07305, and 4 New York Plaza, New York, NY 10004.  The Daily News is a
"person" as defined under 18 U.S.C. § 1961(3).  At all times relevant, the Tribune Publishing
Company had the right and did exercise control over the actions of the New York Daily News.

7.      Vijaya Gadde ("Gadde") is the Head of Legal, Public Policy, and Trust and Safety
Lead at Twitter, Inc.  At all times relevant, Vijaya Gadde was the sole decision maker and person
authorized to permanently ban Twitter users 0who violated Twitter's Terms of Service and
Rules.  She is a "person" as defined under 18 U.S.C. § 1961(3).  Gadde is believed to be
domiciled in the State of California.

8.      Twitter, Inc. ("Twitter"), is a company organized under the laws of the State of
Delaware with its principal place of business located at 1355 Market Street, San Francisco, CA
94103, that conducts its business globally and a "person" as defined under 18 U.S.C. § 1961(3).

9.      The Exoo Enterprise is a criminal enterprise as defined under 18 U.S.C. §
1961(4), consisting of Defendant Christian Exoo a/k/a "AntiFashGordon," who directs the Exoo
Enterprise, St. Lawrence University, Vijaya Gadde, Twitter, Inc., and unidentified associates.

4

10.     Cohen, Weiss, and Simon, LLP ("CWS") is a law firm with its principal place of business located at 900 3rd Avenue, #2100, New York, New York 10022 and a "person" as defined under 18 U.S.C. § 1961(3).

<u>JURISDICTION AND VENUE</u>

11.     Jurisdiction of this Court is proper because this litigation arises under federal law, namely 18 U.S.C. §§ 1961 to 1968.  This Court has jurisdiction over this matter under 28 U.S.C. § 1331.

12.     The Court has supplemental jurisdiction over the state law claims asserted in this case under 28 U.S.C. § 1367(a).

13.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and the threatened and actual harm to Plaintiff occurred in this District by reason of Defendants' conduct as alleged below.

<u>FACTUAL ALLEGATIONS</u>

14.     In addition to being a Teamster, D'Ambly is a member of the New Jersey European Heritage Association ("EHA"), a non-violent, pro-domestic policy organization that the Exoo Enterprise has labeled a white supremacist hate group.  D'Ambly, who the Exoo Enterprise identifies as the leader of EHA, actively participates with other EHA members in political rallies, peaceful political protests, pamphleteering, and speech that is protected by <u>U.S. Const.</u> amend. I and <u>N.J. Const.</u> art. I, ¶ 6.

15.     Defendant Exoo publishes Tweets and doxes others using Twitter username "@AntiFashGordon" the leading Antifa Twitter account that as of September 16, 2020, has 37,518 followers.  The headline of @AntiFashGordon's public profile states "I expose fascists

5

via #OSINT, get them fired, de-homed, kicked out of school, etc." Based on the substance of

@AntiFashGordon's Tweets he broadly identifies persons who do not share his radical far left

political ideology as fascists and/or white supremacists. Exoo's definition of fascists and white

supremacists is indiscernible, because he uses the terms broadly and interchangeably.

16.     Upon information and belief, Exoo is known to Twitter's Trust & Safety Council

("TSC") as a habitual doxer and ban evader. A ban evader is a person who creates a new Twitter

account after receiving a permanent ban. The ban evader's new account is called a "ban evasion

account."

17.     Doxing is prohibited by Twitter's Private Information Policy within their Terms

of Service and Rules ("TOS").[2] Twitter's TOS do not permit permanently banned persons to

create new accounts,[3] a permanent ban means a lifetime ban.

18.     Upon information and belief, Exoo has had two Twitter accounts permanently

banned for doxing. Twitter has previously permanently banned @ChrisExoo,[4]

@ChristianExoo,[5] in addition, Twitter allowed @DoxSavage to change its name

@AntiFashGordon.

19.     Upon information and belief, the Exoo Enterprise targeted D'Ambly as a white

supremacist at some point in or about January 2018. Thereafter, Exoo directed his associates via

Twitter to uncover D'Ambly's true identity, for the sole purpose of doxing him.

---

[2] https://help.twitter.com/en/rules-and-policies/personal-information "You may not publish or
post other people's private information without their express authorization and permission. We
also prohibit threatening to expose private information or incentivizing others to do so."
[3] https://help.twitter.com/en/rules-and-policies/enforcement-options "Permanent suspension:
This is our most severe enforcement action. Permanently suspending an account will remove it
from global view, and the violator will not be allowed to create new accounts."
[4] https://twitter.com/ChrisExoo (last accessed Sep. 15, 2020)
[5] https://twitter.com/ChristianExoo (last accessed Sep. 15, 2020)

20.     Upon information and belief, by September 2018, Twitter received dozens of complaints directly Tweeted to Twitter Support and Twitter Trust and Safety informing them that Exoo's previous Twitter account @DoxSavage was aggressively doxing, which forced Twitter to investigate the accounts activities.  Under Twitter's normal protocol, accounts being investigated for violating the TOS are prevented from Tweeting during the investigation. [6]

21.     Twitter ignored their TOS and allowed @DoxSavage to continue Tweeting during their investigation.

22.     Upon information and belief, at some point on or about October 1, 2018, Gadde and Twitter agreed to allow @DoxSavage to undergo a name change in lieu of a permanent ban. Instead of receiving his third permanent ban, Twitter agreed to change Exoo's username to @AntiFashGordon.  The unprecedented agreement to allow the name change under these circumstances was done to ensure the approximate 20,000 @DoxSavage followers were not lost.

23.     On October 11, 2018, @DoxSavage Tweeted a farewell announcement to his followers: "Hey folks—I just underwent a name change from @DoxSavage to @AntiFash Gordon.  I'll be back tomorrow to expose more violent fascists who were on the ground in Providence on 10/6."  The name change kept the Exoo Enterprise intact, and their ability to effectively conduct its patterns of racketeering activities was not harmed.

24.     On October 29, 2018, at 11:49 a.m., @AntiFashGordon published a massive twenty-two count Tweet thread (a thread is a series of related Tweets) that doxed D'Ambly to his estimated 20,000 followers.  The dox publicly disclosed for the first time D'Ambly's name, hometown, photograph, employer, occupation, employer's location, multiple telephone numbers

---

[6] https://help.twitter.com/en/rules-and-policies/enforcement-options (last accessed Sep. 15, 2020)

for his employer, a labor union Referendum Board he chaired, and the names of the other Referendum Board members.

25.     In the dox, @AntiFashGordon labeled D'Ambly a "Nazi" and directed the Exoo Enterprise associates to send harassing, intimidating, and threatening phone calls and Tweets to the Daily News's Twitter username @NYDailyNews, to extort D'Ambly's termination. Exoo's dox directed:

a.  In the 19th Tweet, @AntiFashGordon directed his associates "stay on top of this, too. If you don't hear back from @NYDailyNews, keep tweeting at them." Call their printing facilities in Jersey City at (201) ***-**** (number provided in original Tweet) and warn them about Daniel D'Ambly…"

b.  A follow up Tweet included a second telephone number for the New York Daily News and a subsequent Tweet included the direct telephone number to D'Ambly's print shop.

c.  Within minutes the Exoo Enterprise obeyed Exoo's directive and flooded @NYDailyNews and @Teamsters with Tweets and phone calls that threatened the Daily News with violent attacks if D'Ambly was not terminated.

d.  Upon information and belief, from October 29, 2018, to January 11, 2019, the Exoo Enterprise directed no less than fifty-four (54) threatening Tweets to @Daily News plus an unknown number of threatening phone calls.

e.  D'Ambly was never told of the threats or warned to take safety precautions by anyone from the Daily News or Tribune.

26.     On October 30, 2018, without warning D'Ambly of the dangerous threats, Tribune engaged Insite Risk Management ("Insite") to investigate D'Ambly. At the conclusion

8

of their investigation, Insite produced the "Private Investigation Report" ("Report") and provided it to the Tribune on December 4, 2018. The Report acknowledged @AntiFashGordon's doxing was the impetus for the investigation and confirmed D'Ambly's association with EHA. The Report included videos of D'Ambly and others using imprudent language during political rallies.

27.    On or before January 8, 2019, EHA posted flyers on public bulletin boards in Princeton, New Jersey that announced an "It's okay to be white" protest march purportedly scheduled for January 12, 2019.

28.    On January 9, 2019, @AntiFashGordon re-Tweeted the "It's okay to be white" march to his associates and again doxed D'Ambly by Tweeting, "If anyone wants their leaders name, it's Dan D'Ambly."

29.    On January 10, 2019, @AntiFashGordon published a second Tweet that referenced EHA's purported march and directed his associates to "show up and shut down" the purported march "And please say hi to their leader, Dan D'Ambly for me."

30.    On January 10, 2019, D'Ambly was called to an interview with Jean Nechvatal ("Nechvatal), Tribune's Vice President, Talent Management & Learning and James R. Brill ("Brill"), Daily News's Sr. Vice President of Operations. D'Ambly was accompanied at the meeting by Union Steward Pete Cairnie. During the meeting, D'Ambly was confronted with content of the Report, but not informed of the report's existence. D'Ambly acknowledged using imprudent language in a private conversation during a protest.

31.    On January 11, 2019, at 10:14 a.m., @AntiFashGordon again directed his associates to shut down EHA's purported January 12, 2019 "It's okay to be white" march and exhorted his associates "if you can, show up and show these pricks that we don't tolerate hate in our streets." The Tweet included @NYDailyNews and doxed D'Ambly's hometown again.

9

Exoo encouraged violence to shut down the purported protest, but warned "Remember that the police won't protect us here."

32.    Upon information and belief, at some point before 10:21 a.m. on January 11, 2019, Edward Bushey, Sr. Vice President, General Manager, Manufacturing and Distribution at Tribune delivered recordings of the death threats to the Daily News. The callers threatened D'Ambly and stated the Daily News was responsible for "any violence or blood spilled is also on your hands." One threatening caller's phone number was captured.

33.    On January 11, 2019, from 9:30 a.m. to 10:14 a.m., Twitter usernames @hubcityantifa, @NYCAntifa, and @Nstricklanded replied via Tweet to @AntiFashGordon's instructions with coded messages that confirmed they followed his instructions and made threats.

34.    Upon reason and belief, one of the death threat phone numbers is owned by a person who Tweeted mission confirmation to @AntiFashGordon on January 11, 2019.

35.    On January 11, 2019, at 2:20 p.m., EHA Tweeted that the "It's okay to be white" protest was a prank.

36.    On January 11, 2019, at 3:30 p.m., D'Ambly was called to a second meeting with James Brill, Sr. Vice President of Operations for the Daily News to recap the previous days meeting. In the meeting, Brill issued D'Ambly a "Last and Final Warning" that stated the "ONLY reason that you are not being terminated immediately is because, thus far, we have not determined that your activities with NJEHA has occurred at work and/or derogatory comments were made about any co-workers." The warning continued "should we learn that you engaged in any inappropriate speech or behavior in the workplace or with regard to any other employee, or if the Company or any of its employees suffer any backlash as a result of your association with

10

the NJEHA, your conduct will be considered "work-related" and you will be terminated immediately."

37.    This meeting with Brill was a pre-text for D'Ambly's termination.  The meeting occurred five (5) hours after death threats were received, but Brill did not inform Plaintiff, because the Daily News intended to use the threats as evidence the company received "backlash" from D'Ambly's conduct and was the "cause" of his termination.

38.    At 4:34 p.m. on January 11, 2019, @AntiFashGordon replied to EHA's Tweet by threatening D'Ambly whereby @AntiFashGordon threatened "Regardless, I'm gonna spend the next week wrecking your fucking life, Dan D'Ambly."

39.    In the evening of January 11, 2019, the Exoo Enterprise's extended campaign of violent Tweets and threats of physical violence to D'Ambly came to fruition and his vehicle was "keyed" (scratched) and tires slashed while parked outside of his home on private property.  An investigation report for a bias incident, criminal mischief, and harassment was filed with the South Brunswick Police Department.

40.    Plaintiff reported to work the following day on January 12, 2019, but was not informed of the death threats received the day before.

41.    On Sunday, January 13, 2019, at 10:16 a.m., five (5) days before D'Ambly's official termination date @AntiFashGordon Tweeted to four of his associates that he "got a pretty reliable tip this morning that he's not at the @NYDailyNews anymore…" in reference to Plaintiff.

42.    On Monday, January 14, 2019, the Daily News called D'Ambly and told him not to report to work until informed otherwise.

11

43. On January 16, 2019, during a phone conference with Brill, Nechvatal, and a Union representative, D'Ambly was played the recorded death threats and asked to identify the caller. D'Ambly was unable to identify the caller, but said it was the behavior of "Antifa types." Brill was scornful of D'Ambly's inability to identify the caller and blamed him for the threats. D'Ambly was terminated during this phone conference.

44. On January 23, 2019, Patrick LoPresti, President of Local One-L informed the Daily News that they were appealing D'Ambly's termination pursuant to terms of the Contract.

45. On or about January 25, 2019, D'Ambly received his "Termination of Employment" letter, , signed by Brill and dated January 22, 2019. The letter informed Plaintiff his termination was effective January 18, 2019. The termination letter is imbued with Brill's animus for D'Ambly. In the letter, Brill stated "your choice to take these repulsive actions has now put our workplace and employees at risk of counter attacks by Antifa."

46. The termination letter falsely stated the Daily News learned of the death threats on January 14, 2019, contrary to emails that confirm the Daily News learned of the threats on January 11, 2019.

47. In the termination letter, Brill claimed the death threats received on January 11, 2019, were the "cause" of D'Ambly's termination, because the death threats meant D'Ambly "brought his activities" into the workplace, therefore, "we deem your actions to be work related and are terminating your employment for cause."

48. At some point after January 23, 2019, the Union on behalf of D'Ambly filed a grievance with the American Arbitration Association, case number 01-19-0000-7178. The Union retained attorneys Thomas Kennedy ("Kennedy") and Kate M. Swearengen

12

("Swearengen") of Cohen, Weiss, and Simon, LLP (collectively Kennedy, Swearengen and Cohen. Weiss and Simon, LLP shall be referred to as "CWS") to represent Plaintiff.

49.     Thereafter, D'Ambly had a phone conference with Kennedy to discuss the case. D'Ambly was acquainted with Kennedy for approximately twenty years due to his Union activities. D'Ambly explained the threats he received, property damage, and that his tires were slashed. D'Ambly stated "Tom, this Antifa are terrorists…" Kennedy angrily responded, "I do not consider Antifa to be terrorists and if you are going to continue referring to them (Antifa) as terrorists we are going to end this call." Kennedy scoffed at D'Ambly's desire to have his employment reinstated at the Daily News.

50.     At some point thereafter, D'Ambly had his first case discussion phone conference with Kate Swearengen, who assumed representation. Without prompting, Swearengen explicitly informed D'Ambly that "she doesn't agree with his politics and she doesn't want to discuss them any further." Like Kennedy, Swearengen dismissed D'Ambly's wish to have his employment reinstated.

51.     Kennedy and Swearengen's revulsion of D'Ambly directed their representation and they failed to adequately research basic facts favorable to D'Ambly's wish to be reinstated. CWS ignored Brill's misrepresentation and veracity of the claimed "cause" of their client's termination.

52.     CWS failed to adequately investigate the sources of the doxing campaign. Had CWS engaged in reasonable investigation of the source of the dox they would have discovered @AntiFashGordon's January 13, 2019, announcement that D'Ambly was terminated, which was one day before the Daily News claimed they learned of the "cause" of D'Ambly's termination.

13

53.     On or about July 15, 2019, D'Ambly dejectedly executed the "Separation Agreement and Mutual General Release" negotiated by CWS that paid him a lump sum payment in exchange the Union would withdraw the pending arbitration case with prejudice.

54.     As a result of Defendants' misconduct D'Ambly has suffered substantial personal and property damage and been severely financially harmed.

<u>CLAIMS FOR RELIEF</u>

<u>COUNT I</u>

Violation of New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to – 49
(as to Defendants Tribune Publishing Company and the New York Daily News)

55.     Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 54 with the same force and effect as if set forth in detail herein again.

56.     Defendants Tribune and Daily News are employers as defined in N.J.S.A. 10:5-5.

57.     Plaintiff is older than forty years (40) old and was an employee as defined in N.J.S.A. 10:5-5.

58.     Defendants Tribune and Daily News discharged D'Ambly due to their enmity towards his racially identifiable associations, whereas non-white Tribune and Daily News employees who participate in racially identifiable associations are not punished or terminated, violated N.J.S.A. 10:5-12.

59.     Defendants Tribune and Daily News undertook several pre-textual steps to mask D'Ambly's discriminatory termination:

   a.   Tribune hired a private investigation firm to invade D'Ambly's privacy in an unsuccessful effort to catch D'Ambly engaged in unlawful activity.

14

Case 2:20-cv-12880-JMV-JSA   Document 126   Filed 01/07/22   Page 93 of 299 PageID: 2404
Case 2:20-cv-12880-JMV-JSA   Document 1-1   Filed 09/10/20   Page 16 of 105 PageID:
Case 2:20-cv-12880-JMV-JSA   Document 74-2   Filed 04/22/21   Page 18 of 105 PageID: 1021

b. In the morning of January 11, 2019, the Daily News received death threats intended to extort D'Ambly's termination that they did not immediately disclose, because they intended to use the threats pre-textually as the "cause" of Plaintiff's termination.

c. In the afternoon of January 11, 2019, the Daily News issued D'Ambly a "Last and Final Warning," that warned him he would be immediately terminated if it were discovered he brought his political activities into the workplace, but they did not inform or warn D'Ambly of the death threats earlier received.

d. D'Ambly was informed he was terminated on January 16, 2019.

e. Subsequently, D'Ambly received a "Termination of Employment" letter dated January 22, 2019, whereby, the Daily News falsely stated they discovered the death threats on January 14, 2019, contrary to indisputable evidence they received the death threats on January 11, 2019, which meant he "brought his activities into the workplace" after he was warned. Daily News cited this fabrication as the "cause" of D'Ambly's termination.

60. As a direct and proximate result of defendants Tribune Publishing Company and the New York Daily News racially discriminatory termination, D'Ambly has suffered adverse consequences and continues to be damaged. D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

<u>COUNT II</u>

Tortious Interference with Prospective Economic Benefit

(as to defendant Christian Exoo a/k/a "AntiFashGordon")

15

61.     Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 60 with the same force and effect as if set forth in detail herein again.

62.     D'Ambly was rightfully entitled to pursue lawful employment with the Daily News as a plate maker and dues paying member of the Union.

63.     D'Ambly reasonably expected his employment to continue into the future and to benefit economically from his employment.

64.     Defendant Exoo knew D'Ambly was employed by the Daily News and intentionally interfered with D'Ambly's prospective economic benefits to be gained from continued employment.

65.     Defendant Exoo intentionally and unjustifiably interfered with D'Ambly's rights to pursue a lawful business.

66.     Defendant Exoo's interference caused D'Ambly's employer to terminate his employment.

67.     D'Ambly has suffered and will continue to suffer irreparable harm in the form of damage to his reputation, loss of income and financial hardship as a result of Exoo's interference.

68.     As a direct and proximate result of defendant Exoo's interference with D'Ambly's prospective economic benefits, D'Ambly has suffered adverse consequences and continues to be damaged.  D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

<u>COUNT III</u>

16

**Intrusion Upon Seclusion – Public Disclosure of Private Personal Information**

**(as to defendant Christian Exoo a/k/a "AntiFashGordon")**

69.     Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 68 with the same force and effect as if set forth in detail herein again.

70.     In directing and carrying out a sustained effort to embarrass, defame and publicize private facts, including D'Ambly's home address and familial relations without his consent, Defendant Exoo intentionally intruded upon the D'Ambly's solitude and seclusion.

71.     By conducting a sustained effort to embarrass, defame and publicize private facts without the consent of the D'Ambly, including D'Ambly's home address and familial relations, defendants intentionally intruded upon the D'Ambly's solitude and seclusion.

72.     Defendant Exoo intentionally intruded on D'Ambly's solitude and seclusion in a manner that is highly offensive to a reasonable person.

73.     D'Ambly did not consent to Defendants intrusion.

74.     As a direct and proximate result of defendant Exoo's intrusion upon his seclusion, D'Ambly has suffered adverse consequences and continues to be damaged. D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

<u>COUNT IV</u>

Violation of N.J.S.A. 2C:33-4.1 and N.J.S.A. 2C:30-31(a) Cyber-Harassment and Stalking

(as to defendant Christian Exoo a/k/a "AntiFashGordon")

75.    Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 74 with the same force and effect as if set forth in detail herein again.

76.    Defendant Exoo encouraged and incited others to violence against D'Ambly and conducted an ongoing campaign that intruded D'Ambly's life.

77.    Defendant Exoo intentionally and knowingly sent, commented, and posted D'Ambly's private and involuntarily disclosed personal information to social media networking sites to purposely harass, intimidate, and threaten D'Ambly.

78.    By encouraging others to inflict physical harm to D'Ambly's person and property.

79.    By encouraging others to commit crimes against D'Ambly that resulted in D'Ambly receiving death threats and sustaining physical damage to his personal property

80.    As a direct and proximate result of Defendant Exoo's cyber-harassment and stalking D'Ambly has suffered adverse consequences and continues to be damaged.  D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

<u>COUNT V</u>

Violation of 18 U.S.C. § 875(c) – Interstate Communications

(as to defendant Christian Exoo a/k/a "AntiFashGordon")

81.    Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 80 with the same force and effect as if set forth in detail herein again.

18

82.     By using an interactive computer service to intentionally transmit threats of physical violence to Plaintiff via interstate communications.

83.     By directing an enterprise that is engaged in an interstate campaign of violent threats to Plaintiff for the purpose of injuring and endangering D'Ambly's personal safety.

84.     By directing associates to "stay on top of this, too.  If you don't hear back from @NYDailyNews, keep tweeting at them" Exoo transmitted threats in interstate commerce.

85.     By explicitly threatening D'Ambly via an interactive computer service, by Tweeting "Regardless, I'm gonna spend the next week wrecking your fucking life, Dan D'Ambly" Exoo transmitted threats in interstate commerce.

86.     As a direct and proximate result of defendant Exoo's use of interstate communications to threaten and harm D'Ambly he suffered adverse consequences and continues to be damaged.  D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

<u>COUNT VI</u>

Violation of 18 U.S.C. 2261A(2) – Stalking

(as to defendant Christian Exoo a/k/a "AntiFashGordon")

87.     Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 86 with the same force and effect as if set forth in detail herein again.

88.     Beginning in or about January 2018, Defendant Exoo used an interactive computer service to surveil and stalk D'Ambly with the intent to harass, intimidate, threaten, and injure D'Ambly.

19

89.     As a result of stalking D'Ambly, Defendant discovered D'Ambly's true personal identity and then disseminated the information using an interactive computer service with instructions to associates to harass, intimidate, and endanger D'Ambly's personal safety.

90.     Defendant Exoo used an interactive computer service to direct others to harass, intimidate, and threaten others in order to extort D'Ambly's termination from lawful employment.

91.     Defendant Exoo's conduct caused D'Ambly to reasonably fear for the safety of himself and his family, and caused him to suffer severe emotional and financial distress.

92.     As a direct and proximate result of defendant Exoo's stalking in violation of 18 U.S.C. § 2261A(2) D'Ambly has suffered adverse consequences and continues to be damaged. D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT VII

### Employer's Breach of its Duty to Warn

#### (as to Defendants Tribune Publishing Company and the New York Daily News)

93.     Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 92 with the same force and effect as if set forth in detail herein again.

94.     Defendants Tribune and Daily News received a stream of death threats directed at Plaintiff over a two and one-half month period, but they never warned D'Ambly.

95.     Defendants Tribune and Daily News never warned D'Ambly to take precautionary measures as he entered or exited the workplace.

20

96.     Defendants Tribune and Daily News did not take steps to increase the safety of D'Ambly and other employees as they entered and exited the workplace.

97.     Defendants Tribune and Daily News did not secure the workplace in order to protect D'Ambly and others.

98.     As he was not aware of the threats, D'Ambly could not take steps to protect himself and his property and as a result his property was damaged on January 11, 2019.

99.     Defendants Tribune and Daily News had a duty to warn their employee he was the direct target of the death threats they received.

100.    As a direct and proximate result of defendants Tribune and Daily News' failure to warn D'Ambly has suffered adverse consequences and continues to be damaged.  D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT VIII

### Violations of N.J.S.A 2C:41-1 to – 2C:41-6.2 (Racketeering)

#### (as to defendant Christian Exoo a/k/a "AntiFashGordon," St. Lawrence University, Vijaya Gadde, and Twitter, Inc., the "Exoo Enterprise")

101.    Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 100 with the same force and effect as if set forth in detail herein again.

102.    The "Exoo Enterprise" is directed by defendant Christian Exoo a/k/a "AntiFashGordon," and consists of associates St. Lawrence University, including their employees and agents, Vijaya Gadde, and Twitter, Inc., including their employees and agents, and unknown associates.

21

103.    Defendant Exoo used an interactive computer service to direct the Exoo

Enterprise's patterns of racketeering activities as defined by N.J.S.A. 2C:41(a)(1) to extort

D'Ambly's termination from the Daily News.

      a.   The Exoo Enterprise threatened the Daily News via Tweets and phone calls and

           related activities prohibited by N.J.S.A. 2C:41-2.

      b.   Exoo Enterprise committed multiple prohibited by N.J.S.A. 2C:41(a)(1)(h).

      c.   Exoo Enterprise committed multiple prohibited by N.J.S.A. 2C:41(a)(1)(bb)

104.    As a direct result of the Exoo Enterprises patterns of racketeering activities,

D'Ambly was terminated from his employment.

105.    As a direct and proximate result of Defendants' patterns of racketeering activities

D'Ambly has suffered adverse consequences and continues to be damaged.  D'Ambly is entitled

to compensatory damages, equitable and declaratory relief, punitive damages, costs, and

reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of

$75,000.00.

## COUNT IX

### Violations of 18 U.S.C. §§ 1962(c) – Racketeering

### Multiple violations of RICO predicates 18 U.S.C. §§ 1951 and 1952

**(as to defendant Christian Exoo a/k/a "AntiFashGordon," St. Lawrence University, Vijaya Gadde, and Twitter, Inc., the "Exoo Enterprise")**

106.    Plaintiff repeats and incorporates herein by reference each and every one of the

allegations contained in paragraphs 1 through 105 with the same force and effect as if set forth in

detail herein again.

22

107.    Each of the individuals and entities is a "person" within the meaning of 18 U.S.C.

§ 1961(3) who conducted the affairs of the enterprise, through a pattern of racketeering activity

in violation of 18 U.S.C. § 1962(c).

108.    The Exoo Enterprise is an enterprise within the meaning of 18 U.S.C. 1961(4),

directed by defendant Christian Exoo a/k/a "AntiFashGordon," and consisting of St. Lawrence

University, including their employees and agents, Vijaya Gadde, and Twitter, Inc., including

their employees and agents, and unknown associates.  The Exoo Enterprise was created to dox

fascists and white supremacists in order to use the doxed information to conduct patterns of

racketeering activities to threaten violence, intimidate, harass, and extort others to achieve the

enterprises mission of causing employment terminations, educational expulsions, physical injury,

and personal harm to the persons doxed.  The Exoo Enterprise functions as an organization and

continuing unit to effectuate patterns of racketeering activity.

109.    Upon information and belief, multiple generations of Exoo's family are or were

employed by St. Lawrence University.  Exoo's activities are well known to St. Lawrence faculty

and administrators, who allow Exoo to direct the enterprise from St. Lawrence property, from his

place of employment, during his normal work hours using St. Lawrence equipment and

information technology.  St. Lawrence consents to Exoo's use of St. Lawrence property to direct

the enterprise, and participates in the Exoo Enterprise, because they believe the patterns of

racketeering activities helps St. Lawrence's achieve their global mission.

110.    Defendant Exoo uses his employment, teaching, and lecturing at St. Lawrence

with the consent and approval of St. Lawrence to recruit students to join the Exoo Enterprise as

associates.  In concert with other associates, the Exoo Enterprise, directed by defendant Exoo

created and maintained systematic links for the common purpose of doxing targeted fascists and white supremacists, and then threaten, harass, and extort others to cause harm to their targets.

111. At all times relevant, Gadde was the only Twitter employee authorized to permanently ban Twitter users.[7]

112. Defendant Exoo is and was well known to Gadde and Twitter, because Gadde and Twitter have twice before permanently banned Exoo due to habitual doxing.

113. Gadde and Twitter agreed to associate with the Exoo Enterprise when they breached their own TOS to conspire with a recidivist ban evader, and permitted the enterprise leader to create ban evasion account "@AntiFashGordon," which Gadde and Twitter knew was purposely created to dox unsuspecting persons, in order to direct associates in patterns of racketeering activities.

114. Gadde and Twitter associate and participate in the Exoo Enterprise's patterns of racketeering, by virtue of their affirmative decision to allow Exoo, a three-time ban evader and known habitual doxer, create a ban evasion account in direct contradiction of their TOS and enforcement rules, through which, the Exoo Enterprise conducts its patterns of racketeering.

115. Upon information and belief Gadde and Twitter have received hundreds and likely thousands of complaints directly to their individual Twitter accounts and through Twitter's

---

[7] *Meet Vijaya Gadde, an Indian-born Twitter head who decides on blocking tweets, users*, The Economic Times, (Jan. 16, 2020) https://economictimes.indiatimes.com/tech/internet/meet-vijaya-gadde-an-indian-born-twitter-head-who-decides-on-blocking-tweets/articleshow/73281445.cms, last accessed September 12, 2020. See also, *Twitter's Top Lawyer Is Final Word On Blocking Tweets – Even Donald Trump's*, Bloomberg.com,(Jan. 15, 2020) https://www.bloomberg.com/news/articles/2020-01-15/twitter-s-gadde-is-final-word-on-blocking-tweets-even-trump-s, last accessed September 12, 2020; *Meet Twitter's top lawyer, who has the final word on blocking tweets – including Donald Trump's*, Fortune.com, (Jan. 15, 2020) https://fortune.com/2020/01/15/twitter-top-lawyer-vijaya-gadde-blocks-tweets-donald-trump/, last accessed September 12, 2020.

24

TSC regarding the Exoo Enterprise's doxing. But Gadde and Twitter choose to ignore the avalanche of doxing and abusive behavior complaints and refuse to enforce their own policies in order to facilitate the patterns of racketeering activities directed by known ban evasion account, @AntiFashGordon.

116. Gadde personally participates in, and benefits from the Exoo Enterprise's patterns of racketeering activities, because she has publicly stated her personal disdain for fascists and white supremacists, and she is "very, very focused on that…the KKK, the American Nazi Party," because that "was what my parents had to deal with" where she grew up on the Texas-Louisiana border.[8] Gadde participates in the Exoo Enterprise, because of an Oresteian desire to avenge her parents perceived mistreatment. Gadde and Twitter are the lynchpin of the Exoo Enterprise. Without Gadde and Twitter's consent and participation, the Exoo Enterprise could not conduct its patterns of racketeering activities.

117. Twitter benefits economically from the Exoo Enterprise's patterns of racketeering activities, because @AntiFashGordon has an extremely large Twitter following, one of the largest follower bases of all Twitter users, and the account drives a tremendous amount of internet traffic to Twitter, which potentially increases Twitter's ad revenue.

118. Twitter benefits socially from the Exoo Enterprise's patterns of racketeering activities because the Exoo Enterprise's doxing of fascists and white supremacists imparts a social benefit on Twitter as it is seen as a defender of "marginalized communities" and provides cover for their stated business goal of creating what Twitter describes as "safer" conversations.

---

[8] *Twitter's Kayvon Beykpour and Vijaya Gadde: the Code Conference interview (transcript)*, Vox.com (June 27, 2019) https://www.vox.com/recode/2019/6/27/18760444/twitter-kayvon-beykpour-vijaya-gadde-kara-swisher-peter-kafka-code-conference-interview-transcript, last accessed September 12, 2020.

119.    The Exoo Enterprise engages in and affects interstate commerce, because, *inter alia,* it threatens violence to persons and property of others throughout the United States in furtherance of a plan that reaches into the several states to disrupt economic activity. The Exoo Enterprise has caused severe economic hardship to targeted persons, such as D'Ambly and negatively impacted local economies throughout the United States.

120.    Pursuant to and in furtherance of their violent doxing campaign, Defendants directed and participated in the affairs of the Exoo Enterprise through patterns of racketeering activity, including multiple acts indictable under 18 U.S.C. §§ 1951 (Interference with commerce by threats or violence) and 1952 (use of interstate facilities to conduct unlawful activity).

121.    The conduct of the Exoo Enterprise described above constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Defendants' decisions and activity in connection with the Exoo Enterprise to routinely conduct its transactions in such a manner constitutes "patterns of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

122.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are liable to D'Ambly for three times the damages sustained, plus the costs of this suit, including reasonable attorneys' fees.

123.    As a direct and proximate result of Defendants patterns of racketeering activity D'Ambly has suffered adverse consequences and continues to be damaged in an amount to be determined at trial, but which is in excess of $75,000.00.

124.    As a direct and proximate result of the Exoo Enterprise's patterns of racketeering activities D'Ambly has suffered adverse consequences and continues to be damaged. D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs,

26

and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

<div align="center">

COUNT X

Violation of 18 U.S.C. § 1962(d) (Conspiracy)

</div>

(as to defendant Christian Exoo a/k/a "AntiFashGordon," St. Lawrence University, Vijaya Gadde, and Twitter, Inc., the "Exoo Enterprise")

125.    Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 124 with the same force and effect as if set forth in detail herein again.

126.    Section 1962(d) of RICO provides "shall be unlawful for any person to conspire to violate any provisions of subsection (a), (b), or (c) of this section."

127.    Defendants have violated 18 U.S.C. § 1962(d) by conspiring to associate and participate in the Exoo Enterprise's patterns of racketeering activities as defined in 18 U.S.C. 1962(c). The object of this conspiracy is to conduct, direct and participate in, directly or indirectly, the Exoo Enterprise's patterns of racketeering activity.

128.    Defendants have engaged in numerous overt and predicate racketeering acts in furtherance of the conspiracy, including threatening, intimidating, and extorting others to cause harm to their targets.

129.    The nature of the above-described acts of Defendants and co-conspirators acts in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. 1962(d) violation, but they were aware that their ongoing extortionate acts have been, and are part of an overall pattern of racketeering activity demonstrated through related and continuous acts.

130.    Defendants sought to and have engaged in the commission of, and continue to commit overt acts, including the following unlawful racketeering predicate acts:

    a.  Multiple instances of interference with commerce by threats of violence in violation of 18 U.S.C. § 1951; and

    b.  Multiple instances of use of interstate facilities to conduct unlawful activity violations of 18 U.S.C. § 1952.

131.    As a direct and proximate result of Defendants' multiple overt acts and predicate acts in furtherance of the Exoo Enterprise, in violation of 18 U.S.C. § 1962(d), by conspiring to violate 18 U.S.C. 1962(c), Plaintiff has been and continues to be injured by Defendants' conduct.

132.    By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are liable to D'Ambly for three times the damages sustained, plus the costs of this suit, including reasonable attorneys' fees.

133.    As a direct and proximate result of Defendants patterns of racketeering activity D'Ambly has suffered adverse consequences and continues to be damaged.  D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

<u>COUNT XI</u>

Negligent Entrustment

(as to defendants Vijaya Gadde and Twitter, Inc.)

134.    Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 133 with the same force and effect as if set forth in detail herein again.

28

135.     Defendant Exoo is a notorious and infamous doxer, who relies on Twitter to dox unsuspecting people and direct his enterprise.

136.     Due to habitual doxing and abusive behavior, Twitter has previously permanently banned two accounts controlled by defendant Exoo, @ChrisExoo and @ChristianExoo.

137.     Upon information and belief, Twitter received hundreds of complaints that defendant Exoo was habitually doxing under Twitter username @DoxSavage.

138.     In lieu of a third permanent ban Twitter agreed to allow defendant Exoo to undergo a name change from @DoxSavage to @AntifashGordon, contrary to Twitter's TOS.

139.     Subsequent to Twitter's agreement to allow defendant Exoo to change his Twitter username to @AntiFashGordon, Vijaya Gadde and Twitter's Safety Council have received numerous doxing complaints.

140.     Gadde was the only person at Twitter with authority to decide permanent bans and she knew Exoo is a habitual doxer, but she ignored that knowledge and agreed to allow him to change his username and continue doxing.

141.     Gadde recklessly ignored Twitter's TOS against ban evasion accounts and allowed Exoo to change his name from @DoxSavage to @AntiFashGordon, thereby, entrusting Exoo with the instrumentality to direct the Exoo Enterprise's patterns of racketeering activities.

142.     As a direct and proximate result of defendant Gadde and Twitter's negligent entrustment D'Ambly has suffered adverse consequences and continues to be damaged. D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT XII

29

### Breach of Implied Covenant of Good Faith – Promissory Estoppel

### (as to defendants Vijaya Gadde and Twitter, Inc.)

143.     Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 142 with the same force and effect as if set forth in detail herein again.

144.     Defendant Twitter's TOS prohibit doxing and ban evasion accounts.

145.     Defendant Twitter created a Trust and Safety Council department to investigate violations of their TOS to remove abusive content and protect others from abusive behaviors of others.

146.     Twitter's created the Trust and Safety Council to prohibit abusive behavior by Twitter users and promised victims of abusive behavior would be protected.

147.     Gadde is the executive in charge of Twitter's Trust and Safety council, and the only person at Twitter with authority to allow Exoo to create a ban evasion account.

148.     Defendant Twitter allowed defendant Exoo to create a ban evasion account fully aware he was a habitual doxer, who used Twitter to harm others.

149.     Defendant Exoo as @AntiFashGordon doxed D'Ambly, threatened violence to D'Ambly and his employer to extort his termination.

150.     Gadde, Twitter Support and Twitter Trust and Safety received contemporaneous complaints that @AntiFashGordon doxed D'Ambly, but took no action.

151.     Twitter refused to protect Plaintiff from the Exoo Enterprise's abusive behavior and has not removed Plaintiff's doxed information or banned the Exoo Enterprise, who continues to abuse and habitually dox.

30

152.    Twitter assumed liability for the harm that flows from defendant Exoo's doxing when they neglected to remove D'Ambly's doxed information in violation of their TOS.

153.    As a direct and proximate result of defendant Gadde and Twitter's breach of their assumed duty to remove D'Ambly's doxed private information D'Ambly has suffered adverse consequences and continues to be damaged. D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT XIII

### Legal Malpractice

#### (as to defendant Cohen, Weiss, and Simon, L.L.P.)

154.    Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 153 with the same force and effect as if set forth in detail herein again.

155.    As a result of their personal revulsion of D'Ambly and his political beliefs CWS failed to adequately represent and protect D'Ambly's rights.

156.    Defendant CWS neglected to perform necessary case research, legal research, and investigation of the accusations against D'Ambly.

157.    As a result of CWS's inadequate legal research and investigation they failed to protect D'Ambly from the extortionate and criminal conduct of others.

158.    As a result of CWS's failure to adequately investigate D'Ambly's doxing they failed to learn that @AntiFashGordon publicly announced D'Ambly's termination on January 13, 2019, which occurred five days before his official termination date, and one day before the purported "cause" of his termination was discovered.

31

159. CWS failed to challenge Brill's blatant misrepresentations regarding the timing of the alleged 'cause' of D'Ambly's termination.

160. CWS's revulsion of D'Ambly and his political beliefs caused them to ignore an obvious racially discriminatory pre-textual termination spotlighted by the private investigation, last and final warning, and falsely claimed cause of D'Ambly's termination.

161. As a direct and proximate result of CWS's legal malpractice that flowed from their firmwide enmity of D'Ambly's political beliefs D'Ambly has suffered adverse consequences and continues to be damaged. D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff pray for relief as follows:

1. Demands judgment against Defendants, jointly and severally, in an amount to be determined at trial plus interest, including, but not limited to, all emotional distress, back pay, punitive damages, liquidated damages, statutory damages, attorneys' fees, costs, and disbursements, and for such relief as the Court deems just and proper.

2. On Plaintiff's RICO claims: compensatory damages and enhancement of damages Plaintiff has sustained as a result of Defendants' conduct as may be permitted under the relevant statutes, such amount to be determined at trial, plus Plaintiff's costs in this suit, including reasonable attorneys' fees;

3. On Plaintiff's tortious interference, legal malpractice, intrusion upon seclusion, stalking and harassment claims: compensatory and punitive damages in an amount to be determined at trial.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

Dated:        September 21, 2020

Respectfully Submitted,
LAW OFFICE OF PATRICK TRAINOR, ESQ., LLC
*Attorney for Plaintiff*

Patrick Trainor
848 Paterson Avenue
East Rutherford, New Jersey 07073
(201) 777-3327
pt@ptesq.com

JS 44 (Rev. 0     )

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
DANIEL D'AMBLY

**DEFENDANTS**
CHRISTIAN EXOO a/k/a AntiFashGordon; ST. LAWRENCE UNIVERSITY; TRIBUNE PUBLISHING COMPANY, LLC; NEW YORK DAILY NEWS; VIJAYA GADDE; TWITTER, INC.; JOHN DOE 1-10

**(b)** County of Residence of First Listed Plaintiff     MIDDLESEX
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:     IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
LAW OFFICE OF PATRICK TRAINOR
848 PATERSON AVENUE
EAST RUTHERFORD, NEW JERSEY 07073

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government Plaintiff
- ☒ 3   Federal Question *(U.S. Government Not a Party)*
- ☐ 2   U.S. Government Defendant
- ☐ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application | ☒ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. § 1962, 18 U.S.C. § 1964
Brief description of cause:
Defendants committed multiple violations of 18 U.S.C. §§ 1951 and 1952

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:     ☒ Yes     ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____     DOCKET NUMBER _____

DATE
09/21/2020

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

Case 2:20-cv-12880-JMV-JSA Document 162 Filed 06/17/22 Page 109 of 275 PageID: 3523
Case 2:20-cv-12880-JMV-JSA Document 1-1 Filed 09/21/20 Page 35 of 35 PageID: 33
JS 44 Reverse Case 2:20-cv-12880-JMV-JSA Document 7-12 Filed 04/22/21 Page 38 of 105 PageID: 1041

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.(a) **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II. **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; NOTE: federal question actions take precedence over diversity cases.)

III. **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV. **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

V. **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

VI. **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

VII. **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

Case 2:20-cv-12880-JMV-JSA Document 106-2 Filed 06/17/22 Page 114 of 275 PageID: 2524
4115
Case 2:20-cv-12880-JMV-JSA Document 74-2 Filed 04/22/21 Page 39 of 105 PageID: 1042

# EXHIBIT "B"

Michael J. Canning, Esq. (032541984)
**GIORDANO, HALLERAN & CIESLA, P.C.**
125 Half Mile Road, Suite 300
Red Bank, N.J. 07701-6777
(732) 741-3900
Attorneys for Defendant, Cohen, Weiss and Simon LLP

<div align="center">

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| DANIEL D'AMBLY, <br><br> Plaintiff, <br><br> v. <br><br> CHRISTIAN EXOO a/k/a ANTIFASH GORDON; ST. LAWRENCE UNIVERSITY; TRIBUNE PUBLISHING COMPANY; NEW YORK DAILY NEWS; VIJAY GADDE; TWITTER, INC.; COHEN, WEISS AND SIMON, LLP, <br><br> Defendants. | Case No. 2:20-cv-12880-JMV-JAD <br><br> <u>Civil Action</u> <br><br> **DEFENDANT COHEN, WEISS AND SIMON LLP'S ANSWER TO PLAINTIFF'S COMPLAINT, SEPARATE DEFENSES, CROSSCLAIM FOR CONTRIBUTION, CROSSCLAIM FOR INDEMNIFICATION, ANSWER TO CROSSCLAIMS, DEMAND FOR TRIAL BY JURY, DEMAND PURSUANT TO <u>R.</u> 4:18-2, DEMAND FOR ALLOCATION, DEMAND FOR STATEMENT OF DAMAGES, DESIGNATION OF TRIAL COUNSEL, CERTIFICATIONS** |

Defendant Cohen, Weiss and Simon LLP ("CWS" or "Defendant") by way of Answer to Plaintiff's Complaint hereby says as follows:

<div align="center">

**STATEMENT OF THE CASE**

</div>

1.  CWS makes no response to Plaintiff's Statement of the Case as the Statement does not relate to CWS.

<div align="center">

**THE PARTIES**

</div>

2.  CWS admits that Plaintiff was a member of Local One-L, Graphic Communications Conference of the International Brotherhood of Teamsters and was employed as a plate maker for

Case 2:20-cv-12880-MM-JSA Document 106 Filed 06/17/22 Page 1 of 5 PageID 2526
Case 2:20-cv-12880-MM-JSA Document 7 Filed 04/22/20 Page 2 of 195 PageID 54044
4117

the New York Daily News in Jersey City, New Jersey until January 18, 2019, and otherwise is
without knowledge or information sufficient to form a belief as to the truth of the allegations
contained in paragraph 2 of Plaintiff's Complaint.

3. Defendant is without knowledge or information sufficient to form a belief as to the
truth of the allegations contained in paragraph 3 of Plaintiff's Complaint.

4. Defendant is without knowledge or information sufficient to form a belief as to the
truth of the allegations contained in paragraph 4 of Plaintiff's Complaint.

5. Defendant is without knowledge or information sufficient to form a belief as to the
truth of the allegations contained in paragraph 5 of Plaintiff's Complaint.

6. Defendant is without knowledge or information sufficient to form a belief as to the
truth of the allegations contained in paragraph 6 of Plaintiff's Complaint.

7. Defendant is without knowledge or information sufficient to form a belief as to the
truth of the allegations contained in paragraph 7 of Plaintiff's Complaint.

8. Defendant is without knowledge or information sufficient to form a belief as to the
truth of the allegations contained in paragraph 8 of Plaintiff's Complaint.

9. Defendant is without knowledge or information sufficient to form a belief as to the
truth of the allegations contained in paragraph 9 of Plaintiff's Complaint.

10. CWS admits that it is a law firm with a principal place of business located at 900
3rd Avenue, #2100, New York, New York and neither admits nor denies the remaining allegations
contained in paragraph 10 of Plaintiff's Complaint as it calls for a legal conclusion.

11.     CWS neither admits nor denies the allegations contained in paragraph 11 of Plaintiff's Complaint as it calls for a legal conclusion.

12.     CWS neither admits nor denies the allegations contained in paragraph 12 of Plaintiff's Complaint as it calls for a legal conclusion.

13.     CWS neither admits nor denies the allegations contained in paragraph 13 of Plaintiff's Complaint as it calls for a legal conclusion.

14.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 14 of Plaintiff's Complaint.

15.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 15 of Plaintiff's Complaint.

16.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 16 of Plaintiff's Complaint.

17.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 17 of Plaintiff's Complaint.

18.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 18 of Plaintiff's Complaint.

19.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 19 of Plaintiff's Complaint.

20.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 20 of Plaintiff's Complaint.

Case 2:20-cv-12880-MM-JSA Document 106 Filed 06/17/22 Page 41 of 275 PageID 2528
Case 2:20-cv-12880-MM-JSA Document 42 Filed 04/22/20 Page 43 of 195 PageID 5046
4119

21.      Defendant is without knowledge or information sufficient to form a belief as to the
truth of the allegations contained in paragraph 21 of Plaintiff's Complaint.

22.      Defendant is without knowledge or information sufficient to form a belief as to the
truth of the allegations contained in paragraph 22 of Plaintiff's Complaint.

23.      Defendant is without knowledge or information sufficient to form a belief as to the
truth of the allegations contained in paragraph 23 of Plaintiff's Complaint.

24.      Defendant is without knowledge or information sufficient to form a belief as to the
truth of the allegations contained in paragraph 24 of Plaintiff's Complaint.

25.      Defendant is without knowledge or information sufficient to form a belief as to the
truth of the allegations contained in paragraph 25 of Plaintiff's Complaint.

26.      Defendant is without knowledge or information sufficient to form a belief as to the
truth of the allegations contained in paragraph 26 of Plaintiff's Complaint.

27.      Defendant is without knowledge or information sufficient to form a belief as to the
truth of the allegations contained in paragraph 27 of Plaintiff's Complaint.

28.      Defendant is without knowledge or information sufficient to form a belief as to the
truth of the allegations contained in paragraph 28 of Plaintiff's Complaint.

29.      Defendant is without knowledge or information sufficient to form a belief as to the
truth of the allegations contained in paragraph 29 of Plaintiff's Complaint.

30.      Defendant is without knowledge or information sufficient to form a belief as to the
truth of the allegations contained in paragraph 30 of Plaintiff's Complaint.

31.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 31 of Plaintiff's Complaint.

32.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 32 of Plaintiff's Complaint.

33.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 33 of Plaintiff's Complaint.

34.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 34 of Plaintiff's Complaint.

35.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 35 of Plaintiff's Complaint.

36.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 36 of Plaintiff's Complaint.

37.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 37 of Plaintiff's Complaint.

38.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 38 of Plaintiff's Complaint.

39.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 39 of Plaintiff's Complaint.

40.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 40 of Plaintiff's Complaint.

Case 2:20-cv-12880-MM-JSAD Document 106-20 Filed 06/17/22 Page 121 of 275 Page ID 2530
4131
Case 2:20-cv-12880-MM-JSAD Document 41-2 Filed 04/22/20 Page 45 of 105 Page ID 5048

41.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 41 of Plaintiff's Complaint.

42.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 42 of Plaintiff's Complaint.

43.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 43 of Plaintiff's Complaint.

44.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 44 of Plaintiff's Complaint.

45.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 45 of Plaintiff's Complaint.

46.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 46 of Plaintiff's Complaint.

47.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 47 of Plaintiff's Complaint.

48.     Defendant admits that a grievance was filed with the American Arbitration Association, Case Number 01-19-0000-7178, but denies the remaining allegations in paragraph 48 of Plaintiff's Complaint.

49.     Defendant denies the allegations contained in paragraph 49 of Plaintiff's Complaint.

Case 2:20-cv-12880-MM-JSJSAD Document 1062 Filed 06/17/22 Page 17 of 127 PageID 2531
Case 2:20-cv-12880-VMSAJAD Document 41-27 Filed 04/22/20 Page 47 of 105 PageID 59049
4133

50.     Defendant admits that Kate Swearengen informed Plaintiff during a phone conversation that she did not agree with his politics and that she did not want to discuss them and Defendant denies the remaining allegations contained in paragraph 50 of Plaintiff's Complaint.

51.     Defendant denies the allegations contained in paragraph 51 of Plaintiff's Complaint.

52.     Defendant denies the allegations contained in paragraph 52 of Plaintiff's Complaint.

53.     CWS admits that Plaintiff executed a "Separation Agreement and Mutual General Release" the terms of which speak for itself and denies the remaining allegations contained in paragraph 53 of Plaintiff's Complaint.

54.     Defendant denies the allegations contained in paragraph 54 of Plaintiff's Complaint.

## COUNT I

55.     Defendant repeats and realleges its responses to paragraphs 1 through 54 of Plaintiff's Complaint as if fully set forth herein.

56-60. CWS makes no response to the allegations in Count I of Plaintiff's Complaint as the allegations do not pertain to CWS and CWS is without information sufficient to form a belief as to the truth of the allegations contained in Count I of Plaintiff's Complaint and leaves Plaintiff to his proofs.

WHEREFORE, Defendant demands judgment dismissing Plaintiff's Complaint and denying any request for attorney's fees and costs of suit, and such other relief as the Court deems fair, equitable and just.

Case 2:20-cv-12880-MM-VSS-AD Document 10-20 Filed 06/17/22 Page 81 of 275 Page ID 2532
Case 2:20-cv-12880-MM-VSS-AD Document 21 Filed 04/22/20 Page 3 of 105 Page ID 6050
4123

## COUNT II

61.     Defendant repeats and realleges its responses to paragraphs 1 through 60 of Plaintiff's Complaint as if fully set forth herein.

62-68. CWS makes no response to the allegations in Count II of Plaintiff's Complaint as the allegations do not pertain to CWS and CWS is without information sufficient to form a belief as to the truth of the allegations contained in Count II of Plaintiff's Complaint and leaves Plaintiff to his proofs.

WHEREFORE, Defendant demands judgment dismissing Plaintiff's Complaint and denying any request for attorney's fees and costs of suit, and such other relief as the Court deems fair, equitable and just.

## COUNT III

69.     Defendant repeats and realleges its responses to paragraphs 1 through 68 of Plaintiff's Complaint as if fully set forth herein.

70-74. CWS makes no response to the allegations in Count III of Plaintiff's Complaint as the allegations do not pertain to CWS and CWS is without information sufficient to form a belief as to the truth of the allegations contained in Count III of Plaintiff's Complaint and leaves Plaintiff to his proofs.

WHEREFORE, Defendant demands judgment dismissing Plaintiff's Complaint and denying any request for attorney's fees and costs of suit, and such other relief as the Court deems fair, equitable and just.

## COUNT IV

75.     Defendant repeats and realleges its responses to paragraphs 1 through 74 of Plaintiff's Complaint as if fully set forth herein.

76-80. CWS makes no response to the allegations in Count IV of Plaintiff's Complaint as the allegations do not pertain to CWS and CWS is without information sufficient to form a belief as to the truth of the allegations contained in Count IV of Plaintiff's Complaint and leaves Plaintiff to his proofs.

WHEREFORE, Defendant demands judgment dismissing Plaintiff's Complaint and denying any request for attorney's fees and costs of suit, and such other relief as the Court deems fair, equitable and just.

## COUNT V

81.     Defendant repeats and realleges its responses to paragraphs 1 through 80 of Plaintiff's Complaint as if fully set forth herein.

82-86. CWS makes no response to the allegations in Count V of Plaintiff's Complaint as the allegations do not pertain to CWS and CWS is without information sufficient to form a belief as to the truth of the allegations contained in Count V of Plaintiff's Complaint and leaves Plaintiff to his proofs.

WHEREFORE, Defendant demands judgment dismissing Plaintiff's Complaint and denying any request for attorney's fees and costs of suit, and such other relief as the Court deems fair, equitable and just.

## COUNT VI

87.     Defendant repeats and realleges its responses to paragraphs 1 through 86 of Plaintiff's Complaint as if fully set forth herein.

88-92. CWS makes no response to the allegations in Count VI of Plaintiff's Complaint as the allegations do not pertain to CWS and CWS is without information sufficient to form a belief as to the truth of the allegations contained in Count VI of Plaintiff's Complaint and leaves Plaintiff to his proofs.

WHEREFORE, Defendant demands judgment dismissing Plaintiff's Complaint and denying any request for attorney's fees and costs of suit, and such other relief as the Court deems fair, equitable and just.

## COUNT VII

93.     Defendant repeats and realleges its responses to paragraphs 1 through 92 of Plaintiff's Complaint as if fully set forth herein.

94-100.     CWS makes no response to the allegations in Count VII of Plaintiff's Complaint as the allegations do not pertain to CWS and CWS is without information sufficient to form a belief as to the truth of the allegations contained in Count VII of Plaintiff's Complaint and leaves Plaintiff to his proofs.

WHEREFORE, Defendant demands judgment dismissing Plaintiff's Complaint and denying any request for attorney's fees and costs of suit, and such other relief as the Court deems fair, equitable and just.

## COUNT VIII

101.    Defendant repeats and realleges its responses to paragraphs 1 through 100 of Plaintiff's Complaint as if fully set forth herein.

102-105.    CWS makes no response to the allegations in Count VIII of Plaintiff's Complaint as the allegations do not pertain to CWS and CWS is without information sufficient to form a belief as to the truth of the allegations contained in Count VIII of Plaintiff's Complaint and leaves Plaintiff to his proofs.

WHEREFORE, Defendant demands judgment dismissing Plaintiff's Complaint and denying any request for attorney's fees and costs of suit, and such other relief as the Court deems fair, equitable and just.

## COUNT IX

106.    Defendant repeats and realleges its responses to paragraphs 1 through 105 of Plaintiff's Complaint as if fully set forth herein.

107-124.    CWS makes no response to the allegations in Count IX of Plaintiff's Complaint as the allegations do not pertain to CWS and CWS is without information sufficient to form a belief as to the truth of the allegations contained in Count IX of Plaintiff's Complaint and leaves Plaintiff to his proofs.

WHEREFORE, Defendant demands judgment dismissing Plaintiff's Complaint and denying any request for attorney's fees and costs of suit, and such other relief as the Court deems fair, equitable and just.

Case 2:20-cv-12880-MM-JSS Document 106-20 Filed 06/17/22 Page 126 of 299 PageID: 2536
Case 2:20-cv-12880-JMV-SAD Document 71-12 Filed 04/22/20 Page 512 of 105 PageID: 4054
4127

## COUNT X

125.    Defendant repeats and realleges its responses to paragraphs 1 through 124 of Plaintiff's Complaint as if fully set forth herein.

126-133.    CWS makes no response to the allegations in Count X of Plaintiff's Complaint as the allegations do not pertain to CWS and CWS is without information sufficient to form a belief as to the truth of the allegations contained in Count X of Plaintiff's Complaint and leaves Plaintiff to his proofs.

WHEREFORE, Defendant demands judgment dismissing Plaintiff's Complaint and denying any request for attorney's fees and costs of suit, and such other relief as the Court deems fair, equitable and just.

## COUNT XI

134.    Defendant repeats and realleges its responses to paragraphs 1 through 133 of Plaintiff's Complaint as if fully set forth herein.

135-142.    CWS makes no response to the allegations in Count XI of Plaintiff's Complaint as the allegations do not pertain to CWS and CWS is without information sufficient to form a belief as to the truth of the allegations contained in Count XI of Plaintiff's Complaint and leaves Plaintiff to his proofs.

WHEREFORE, Defendant demands judgment dismissing Plaintiff's Complaint and denying any request for attorney's fees and costs of suit, and such other relief as the Court deems fair, equitable and just.

## COUNT XII

143.     Defendant repeats and realleges its responses to paragraphs 1 through 142 of Plaintiff's Complaint as if fully set forth herein.

144-153.     CWS makes no response to the allegations in Count XII of Plaintiff's Complaint as the allegations do not pertain to CWS and CWS is without information sufficient to form a belief as to the truth of the allegations contained in Count XII of Plaintiff's Complaint and leaves Plaintiff to his proofs.

WHEREFORE, Defendant demands judgment dismissing Plaintiff's Complaint and denying any request for attorney's fees and costs of suit, and such other relief as the Court deems fair, equitable and just.

## COUNT XIII

154.     Defendant repeats and realleges its responses to paragraphs 1 through 153 of Plaintiff's Complaint as if fully set forth herein.

155.     Defendant denies the allegations contained in paragraph 155 of Plaintiff's Complaint.

156.     Defendant denies the allegations contained in paragraph 156 of Plaintiff's Complaint.

157.     Defendant denies the allegations contained in paragraph 157 of Plaintiff's Complaint.

158.     Defendant denies the allegations contained in paragraph 158 of Plaintiff's Complaint.

159. Defendant denies the allegations contained in paragraph 159 of Plaintiff's Complaint.

160. Defendant denies the allegations contained in paragraph 160 of Plaintiff's Complaint.

161. Defendant denies the allegations contained in paragraph 161 of Plaintiff's Complaint.

WHEREFORE, Defendant demands judgment dismissing Plaintiff's Complaint and denying any request for attorney's fees and costs of suit, and such other relief as the Court deems fair, equitable and just.

## SEPARATE DEFENSES

### FIRST SEPARATE DEFENSE

Plaintiff's Complaint herein fails to state a claim upon which relief can be granted and Defendant CWS reserves the right to move at or before the time of trial to dismiss same.

### SECOND SEPARATE DEFENSE

Plaintiff is estopped from proceeding with this alleged cause of action.

### THIRD SEPARATE DEFENSE

Plaintiff has waived his right to bring this suit of action against Defendant CWS.

### FOURTH SEPARATE DEFENSE

Plaintiff's action is barred by the doctrine of unclean hands.

## FIFTH SEPARATE DEFENSE

Insofar as Plaintiff's Complaint herein seeks damages against Defendant CWS, the Complaint must be dismissed in that Plaintiff sustained no damage.

## SIXTH SEPARATE DEFENSE

Plaintiff has executed a valid and binding release by the terms, effect and operation of which Plaintiff has released Defendant CWS from liability to Plaintiff for the incident and damages complained of.

## SEVENTH SEPARATE DEFENSE

There was no privity between the Plaintiff and Defendant CWS.

## EIGHTH SEPARATE DEFENSE

Any and all injuries and damages sustained were the result of a third party over whom Defendant CWS had no control.

## NINTH SEPARATE DEFENSE

Demand and claim for contribution under the terms and conditions of the Joint Tortfeasors Contribution Act (N.J.S.A. 2A:53A-1, *et seq.*) is made against all Co-defendants in this matter.

## TENTH SEPARATE DEFENSE

Plaintiff has executed a valid and binding release by the terms, effect and operation of which Plaintiff has released Defendant CWS from liability to Plaintiff for the incident and damages complained of.

## ELEVENTH SEPARATE DEFENSE

Plaintiff's injuries are a result of his own intentional, wanton and malicious acts. Thus, Plaintiff is barred from recovery.

## TWELFTH SEPARATE DEFENSE

Defendant CWS is entitled to a determination of the percentage shares of responsibility of all tortfeasors whose fault contributed to the claimed injuries and damages, as the obligation, if any, of Defendant CWS to respond in damages should not exceed its percentage share.

## THIRTEENTH SEPARATE DEFENSE

Defendant CWS acted on reasonable grounds and without malice, and, therefore, is not responsible to Plaintiff for any alleged damages.

## FOURTEENTH SEPARATE DEFENSE

Defendant CWS acted in accordance with accepted standards of care and Plaintiff's Complaint must be dismissed.

## FIFTEENTH SEPARATE DEFENSE

Defendant CWS owed no legal duty to Plaintiff.

## SIXTEENTH SEPARATE DEFENSE

Defendant CWS breached no duty owed to Plaintiff.

## SEVENTEENTH SEPARATE DEFENSE

Any action of Defendant CWS was not the proximate cause of any harm or loss to Plaintiff.

Case 2:20-cv-12880-MM-JSAD Document 1062 Filed 06/17/22 Page 131 of 299 PageID: 541
Case 2:20-cv-12880-MMJSAD Document 74-12 Filed 04/22/20 Page 57 of 105 PageID: 6959
4132

## EIGHTEENTH SEPARATE DEFENSE

Any damage sustained by Plaintiff was as a result of the actions of Plaintiff for which Defendant CWS is not liable.

## NINETEENTHSEPARATE DEFENSE

As there was no attorney client relationship between CWS and Plaintiff, CWS owed no legal duty to Plaintiff.

## TWENTIETH SEPARATE DEFENSE

Plaintiff's Complaint is frivolous and filed in bad faith and CWS adopts and incorporates its September 30, 2020 letter and is entitled to recover its legal fees in defending this frivolous action.

## CROSSCLAIM FOR CONTRIBUTION

Defendant CWS denies liability with respect to Plaintiff's claims. However, if Defendant CWS is adjudged liable, then Defendant CWS demands contribution from all Co-Defendants, pursuant to the provisions of New Jersey Joint Tortfeasors Contribution Act, N.J.S.A. 2A:53A.

## CROSSCLAIM FOR INDEMNIFICATION

Defendant CWS denies any liability with respect to Plaintiff's claims. However, if Defendant CWS is adjudged liable to Plaintiff, Defendant CWS demands equal indemnification from the Co-Defendants.

## ANSWER TO CROSSCLAIM

Defendant CWS, by way of answer to any and all Crossclaim which may be asserted against Defendant CWS, says:

Defendant CWS denies the allegations of any Crossclaims asserted by Co-Defendants and Co-Defendants are not entitled to the relief sought.

WHEREFORE, Defendant CWS demands judgment dismissing any crossclaim plus costs.

## DEMAND FOR TRIAL BY JURY

**PLEASE TAKE NOTICE**, that Defendant CWS demands a trial of the issues by a jury of six.

## DEMAND FOR ALLOCATION PURSUANT TO R. 4:7-5(c)

If any Co-Defendant settles prior to trial, answering Defendant CWS will seek an allocation of the percentage of negligence by the fact finder against the settling Defendant. We will seek this allocation, whether or not we have formally filed a Crossclaim against the settling Defendant. We may rely upon the examination and cross-examination of expert witnesses at the time of trial, in support of this allocation. You are being apprised of this pursuant to R. 4:7-5(c) and Young v. Latta, 123 N.J. 584 (1991).

## DEMAND FOR STATEMENT OF DAMAGES

Please take notice that Defendant CWS demands that Plaintiff furnish a statement of damages claimed within the time proscribed by the Rules of Court.

## DESIGNATION OF TRIAL COUNSEL

Michael J. Canning, Esq. is hereby designated as trial counsel.

## CERTIFICATION

I hereby certify that true copies of the within pleading were timely served upon the attorneys of record in this action and who have appeared *pro se*.

Case 2:20-cv-12880-JMV-JSA Document 106 Filed 06/17/22 Page 133 of 299 PageID: 2543
Case 2:20-cv-12880-JMV-JSA Document 74-12 Filed 04/22/20 Page 59 of 105 PageID: 1061
4134

## CERTIFICATION PURSUANT TO R. 4:5-1

The undersigned herby certifies that this matter is not the subject of any other action
pending in any court or arbitration proceeding, and no other action or arbitration proceeding is
contemplated.  The undersigned hereby certifies that he knows of no other parties who should be
joined in the action at this time.

GIORDANO HALLERAN & CIESLA, P.C.
Attorneys for Defendant, Cohen, Weiss and Simon LLP

By: _____
        MICHAEL J. CANNING

Dated:  October 22, 2020

Docs #4643915-v1

# EXHIBIT "C"

Case 2:20-cv-12880-JMV-JSA Document 106-20 Filed 06/21/22 Page 135 of 299 PageID: 4545
Case 2:20-cv-12880-JMV-JSA Document 74-26 Filed 03/25/21 Page 60 of 105 PageID: 2063
4136

Patrick Trainor, Esquire (Attorney ID 242682019)
**LAW OFFICE OF PATRICK TRAINOR**
848 Paterson Avenue
East Rutherford, New Jersey 07073
P: (201) 777-3327
pt@ptesq.com
*Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DANIEL D'AMBLY; AARON WOLKIND; STEVE HARTLEY; RICHARD SCHWETZ; JOBEL BARBOSA; MATTHEW REIDINGER; JOHN HUGO; SEAN-MICHAEL DAVID SCOTT; THOMAS LOUDEN; ZACHARY REHL; AMANDA REHL; K.R., a minor, by and through her father ZACHARY REHL and her mother AMANDA REHL, MARK ANTHONY TUCCI, <br><br> Plaintiffs, <br><br> vs. <br><br> CHRISTIAN EXOO a/k/a ANTIFASH GORDON; ST. LAWRENCE UNIVERSITY; TRIBUNE PUBLISHING COMPANY, LLC; NEW YORK DAILY NEWS; VIJAYA GADDE; TWITTER, INC; COHEN, WEISS AND SIMON, LLP; UNNAMED ASSOCIATES 1 – 100, <br><br> Defendants. | CIVIL ACTION NO.: 2:20-cv-12880-JMV-JSA <br><br> **FIRST AMENDED COMPLAINT TO ADD PLAINTIFFS INJURED BEFORE COMPLAINT WAS FILED ON SEPTEMBER 21, 2020, AND SUPPLMENTED COMPLAINT TO ADD PLAINTIFF INJURED AFTER THE COMPLAINT WAS FILED** <br><br> **JURY TRIAL DEMAND** |

Plaintiffs, Daniel D'Ambly, Aaron Wolkind; Steven Hartley; Richard Schwetz; Jobel

Barbosa; Matthew Reidinger; John Hugo; Sean-Michael David Scott; *Dean David Van Zandt,*

*Jr.;* Thomas Louden; *Steven Rosati*; Zachary Rehl; Amanda Rehl; K.R. a minor, by and through

her father Zachary Rehl and her mother Amanda Rehl (hereinafter collectively referred to as

"Plaintiffs") by and through their attorney the Law Office of Patrick Trainor, as and for their

1

Complaint against defendants Christian Exoo a/k/a @AntifashGordon, St. Lawrence University,
Tribune Publishing Company, LLC, New York Daily News, Vijaya Gadde, Twitter, Inc., and
Cohen, Weiss, and Simon, LLP, hereby alleges as follows:

## STATEMENT OF THE CASE

This action arises out of the repugnant conduct of defendant Christian Exoo (Hereinafter
"Exoo"), an extortionist, known habitual doxer, and member of Antifa, who associates with
others to conduct patterns of racketeering activities. Exoo under the Twitter username
"@AntiFashGordon" directs his associates in the "Exoo Enterprise" to conduct violent and
extortionate patterns of racketeering activities devoted to "doxing" complete strangers that the
Exoo Enterprise has labeled "fascists" and/or "white supremacists." To "dox" someone means to
publicly disclose a person's identity, employer, school, home address, etc., for the purpose of
causing harm to that person. Once the target has been doxed, Exoo directs enterprise associates
to commence a pattern of violent and threatening emails, Tweets, and phone calls to the target's
employers, professional clients, schools, prospective employers, or schools to extort the target's
termination from employment, expulsion from school, and compel the targets exit from society.

To execute their plan, enterprise associates engage in a practice referred to as
"dogpiling," which is to conduct an all-out attack on both their target's employer and co-workers
by flooding them with emails and phone calls and plastering negative messages and comments
throughout their entire online footprint, including Google reviews, Facebook posts, LinkedIn
posts, Twitter, etc., to label the employer a fascist, white supremacist company and the target's
co-workers as the same. Associates conspire to ruin the target's employer's existing business
relationships and/or shame prospective clients from conducting business with them until their
target is terminated.

Case 2:20-cv-12880-JMV-JSA Document 102 Filed 06/17/22 Page 137 of 299 PageID: 2547
Case 2:20-cv-12880-JMV-JSA Document 44-36 Filed 03/25/21 Page 2 of 105 PageID: 1365
4438

Exoo is aware of the potential illegality of his directives, because he instructs his associates to use telephone *67 feature to block their phone numbers when making threatening calls.

On varied dates and times beginning in 2017, Exoo identified Plaintiffs as fascists and white supremacists.  Thereafter, Exoo directed enterprise associates to stalk Plaintiffs in order to learn their true identity.   Upon discovering Plaintiffs identity, Exoo directed associates to deluge Plaintiffs' employers with violent Tweets, phone calls, emails that threatened personal and physical harm to the employer's property and co-workers, in order to extort Plaintiffs' terminations.  Exoo unmistakably directs the enterprise's patterns of racketeering activities through interstate communications.

One-person hellbent on destroying the lives of other persons, conspires with, participates in, and directs an enterprise that engages in patterns of racketeering activities every day by using interstate communications to threaten physical violence to extort and cause harm to their target. The enterprise's associates and co-conspirators include, a major religious university, top lawyer of a publicly traded corporation and the publicly traded corporation.  Enterprise associates are motivated by a shared disdain of people labeled fascists and white supremacists.

## THE PARTIES

1.     Daniel D'Ambly (Hereinafter "D'Ambly"), is a twenty-seven (27) year member of Local One-L, Graphic Communications Conference of the International Brotherhood of Teamsters, who was employed as a was a plate maker for the New York Daily News in Jersey City, New Jersey until January 18, 2019.  D'Ambly was doxed by Exoo on October 29, 2018.  In the dox D'Ambly was labeled a 'fascist' and/or a 'white supremacist.'  D'Ambly is a member of the New Jersey European Heritage Association ("EHA"), a non-violent, pro-domestic policy

Case 2:20-cv-12880-MMV-JSA Document 102 Filed 06/17/22 Page 138 of 299 PageID 2548
Case 2:20-cv-12880-MMV-JSA Document 74-26 Filed 03/22/21 Page 63 of 105 PageID 2066
4139

organization that the Exoo Enterprise labeled a white supremacist hate group. D'Ambly, who

the Exoo Enterprise identifies as the leader of EHA, actively participates with other EHA

members in political rallies, peaceful political protests, pamphleteering, and speech that is

protected by <u>U.S. Const.</u> amend. I and <u>N.J. Const.</u> art. I, ¶ 6. D'Ambly is an individual

domiciled in the State of New Jersey and a "person" as defined under 18 U.S.C. § 1961(3).

      2.     Zachary Rehl ("Rehl") was employed by New York Life Insurance Company in

Philadelphia when he was doxed by Exoo in or about August 2017, and labeled a fascist and

white supremacist. Rehl is an individual domiciled in the Commonwealth of Pennsylvania and a

"person" as defined under 18 U.S.C. § 1961(3).

      3.     Amanda Rehl ("AmRehl") is the spouse of Zachary Rehl. AmRehl is an

individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18

U.S.C. § 1961(3).

      4.     K.R. ("K.R."), is the minor child of Zachary Rehl and Amanda Rehl. K.R. is an

individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18

U.S.C. § 1961(3).

      5.     Aaron Wolkind ("Wolkind") was a Technical Support Specialist for Aerzen USA

Corporation ("Aerzen") when he was doxed by Exoo on or about June 2019, and labeled a

fascist, white supremacist, and a neo-Nazi. Wolkind is an individual domiciled in the State of

Delaware and a "person" as defined under 18 U.S.C. § 1961(3).

      6.     Steven Hartley ("Hartley"), is a logistics manager for American Expediting

located in Folcroft, Pa. On November 29, 2018, he was doxed by Exoo and labeled a Nazi, racist

and white supremacist who was a threat to women and minorities. Hartley is an individual

Case 2:20-cv-12880-MM-JSA Document 1062 Filed 06/17/22 Page 139 of 299 PageID 2549
Case 2:20-cv-12880-MM-JSA Document 74-20 Filed 03/25/21 Page 64 of 105 PageID 2567
4140

domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

7.      Mark Anthony Tucci ("Tucci") was employed at Aldo's Pizzarama in Philadelphia when he was doxed by Exoo on December 10, 2018, and labeled a fascist, racist, and white supremacist.  Tucci is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

8.      Richard Schwetz ("Schwetz") was employed at Inova Payroll in Lancaster, Pa., when he was doxed by Exoo in or about June 2020, and labeled a fascist, racist, and white supremacist.  Schwetz is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

9.      Jobel Barbosa ("Barbosa") is Puerto Rican and a permanently disabled veteran, who was employed as a Detail Department Manager at Jaguar Land Rover Willow Grove, in Willow Grove, Pa., when he was doxed by Exoo on June 22, 2019, and labeled a fascist, racist, and white supremacist.  Barbosa is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

10.     Matthew Reidinger ("Reidinger") was employed in Coal Township, Pa.  On November 27, 2018, he was doxed by Exoo and labeled a fascist and white supremacist. Reidinger is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

11.     John Hugo ("Hugo") was employed as a dispatch manager for Green and Yellow Cab in Somerville, Massachusetts when he was doxed by Exoo on January 2, 2020, and labeled a fascist and white supremacist.   Hugo is an individual domiciled in the Commonwealth of Massachusetts and a "person" as defined under 18 U.S.C. § 1961(3).

12.     Sean-Michael David Scott ("Scott") was employed in Seattle, Washington when he was doxed by Exoo on September 16, 2019, and labeled a fascist, white supremacist, and anti-Semite.  Scott is an individual domiciled in the State of Florida and a "person" as defined under 18 U.S.C. § 1961(3).

13.     Thomas Louden ("Louden") is a 30-year volunteer firefighter and the appointed Deputy Emergency Management Coordinator for Hilltown Township, Pennsylvania and was employed as the Director of Managed Care at Thomas Jefferson University Hospital in Philadelphia for twenty-three (23) years when he was doxed by Exoo on November 2, 2020.  Louden is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

14.     Plaintiffs Wolkind, Hartley, Schwetz, Rehl, Barbosa, and Tucci are members of the Philadelphia chapter of the Proud Boys (hereinafter "PPB" or "Proud Boys").  Plaintiff Reidinger is a member of the Harrisburg chapter of the Proud Boys ("HPB").  The Proud Boys are a diverse, multi-racial, multi-ethnic, fraternal, males-only drinking club, who consider themselves "western chauvinists."

15.     Hugo is the President of Super Happy Fun America, a right of center civil rights organization focusing on defending the American Constitution, opposing gender madness, and defeating cultural Marxism.  Super Happy Fun America is best known for organizing the 2019 Boston Straight Pride Parade.  Hugo was the 2018 Republican Candidate for Massachusetts' 5th Congressional District.

16.     Defendant Christian Exoo ("Exoo" or "@AntiFashGordon") is a library building supervisor and lecturer at St. Lawrence University.  Exoo is a self-described anti-fascist, notorious doxer, and leader of Antifa, who by doxing others has acquired a great deal of

Case 2:20-cv-12880-MM-VSJSAD Document 1062 Filed 06/17/22 Page 31 of 175 Page ID 2951
Case 2:20-cv-12880-MM-VSAD Document 74-26 Filed 03/25/21 Page 65 of 405 Page ID 2069
4142

notoriety and infamy.[1]  Exoo currently publishes Tweets under Twitter username
"@AntiFashGordon."  Exoo is an individual domiciled in the State of New York and a "person"
as defined under 18 U.S.C. § 1961(3).

17.     St, Lawrence University ("St. Lawrence" or "STL") is a private four-year
university with its principal place of business located at 116 Vilas Hall, 23 Romoda Drive,
Canton, New York 13617, and a "person" as defined under 18 U.S.C. § 1961(3).

18.     Tribune Publishing Company ("Tribune") is a media company organized under
the laws of the State of Delaware with its principal place of business located at 160 N. Stetson
Avenue, Chicago, Illinois 60601 that conducts its business throughout the United States, and is a
"person" as defined under 18 U.S.C. § 1961(3).

19.     New York Daily News Company ("Daily News") is owned by the Tribune
Publishing Company (Tribune and Daily News are sometimes hereinafter referred to collectively
as "Daily News") with a place of business located at 125 Theodore Conrad Drive, Jersey City,
New Jersey 07305, and 4 New York Plaza, New York, NY 10004.  The Daily News is a
"person" as defined under 18 U.S.C. § 1961(3).  At all times relevant, the Tribune Publishing
Company had the right and did exercise control over the actions of the New York Daily News.

---

[1] *Anti-Fascists Are Waging A Cyber War – And They're Winning*, Medium.com (Sep. 9, 2019)
https://gen.medium.com/antifas-keyboard-warriors-254f62be2a95 (last accessed Sep. 15, 2020);
*Comcast fires employee with alleged ties to Proud Boys, We the People Rally*, PhillyVoice.com
(November 15, 2018) https://www.phillyvoice.com/comcast-fires-employee-proud-boys-alt-
right-philadelphia-rally/ (last accessed Sep. 15, 2020); *The Right Wing Is Trying to Make It a
Crime to Oppose Fascism*, Truthout.org (Aug. 9, 2019) https://truthout.org/articles/the-right-
wing-is-trying-to-make-it-a-crime-to-oppose-fascism/ (last accessed Sep. 15, 2020); *How to Spot
An Abuser, Featuring Antifash Gordon, In His Own Words: A Step By Step Guide, and Also
F\*\*\* That Guy,* Medium.com (Jun. 25, 2020)
https://medium.com/@abuse_isnt_revolutionary/how-to-spot-an-abuser-featuring-antifash-
gordon-in-his-own-abuser-words-7b39f4657b19 (last accessed Sep. 15, 2020).

20.     Vijaya Gadde ("Gadde") is the Head of Legal, Public Policy, and Trust and Safety Lead at Twitter, Inc.  At all times relevant, Vijaya Gadde was the sole decision maker and person authorized to permanently ban Twitter users who violated Twitter's Terms of Service and Rules. She is a "person" as defined under 18 U.S.C. § 1961(3).  Gadde is believed to be domiciled in the State of California.

21.     Twitter, Inc. ("Twitter"), is a company organized under the laws of the State of Delaware with its principal place of business located at 1355 Market Street, San Francisco, CA 94103, that conducts its business globally and a "person" as defined under 18 U.S.C. § 1961(3).

22.     The Exoo Enterprise is a criminal enterprise as defined under 18 U.S.C. § 1961(4), consisting of Defendant Christian Exoo a/k/a "AntiFashGordon," who directs the Exoo Enterprise, St. Lawrence University, Vijaya Gadde, Twitter, Inc., and unidentified associates.

23.     Cohen, Weiss, and Simon, LLP ("CWS") is a law firm with its principal place of business located at 900 3rd Avenue, #2100, New York, New York 10022 and a "person" as defined under 18 U.S.C. § 1961(3).

## JURISDICTION AND VENUE

24.     Jurisdiction of this Court is proper because this litigation arises under federal law, namely 18 U.S.C. §§ 1961 to 1968.  This Court has jurisdiction over this matter under 28 U.S.C. § 1331.

25.     The Court has supplemental jurisdiction over the state law claims asserted in this case under 28 U.S.C. § 1367(a).

26.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and

8

the threatened and actual harm occurred in this District by reason of Defendants' conduct as alleged below.

## FACTS PERTINENT TO ALL PLAINTIFFS

27.     Defendant Exoo publishes Tweets and doxes other persons private and undisclosed information under Twitter username "@AntiFashGordon" the leading Antifa Twitter account that as of December 30, 2020, has 46,140 followers.  The headline of @AntiFashGordon's public profile states "I expose fascists via #OSINT, get them fired, de-homed, kicked out of school, etc."  Exoo's definition of fascists and white supremacists is indiscernible, because he uses the terms broadly and interchangeably.  Based on the substance of @AntiFashGordon's Tweets he broadly identifies all persons who do not share his radical far left political ideology as fascists and/or white supremacists.

28.     Upon information and belief, Exoo is known to Twitter's Trust & Safety Council ("TSC") as a habitual doxer and ban evader.  A ban evader is a person who creates a new Twitter account after receiving a permanent ban.  The ban evader's new account is called a "ban evasion account," and is prohibited by Twitter rules.[2]  A permanent ban means a lifetime ban.

29.     Doxing is prohibited by Twitter's Private Information Policy within their Terms of Service and Rules ("TOS").[3]

30.     Upon information and belief, in addition to Twitter's agreement to allow Exoo to change username @DoxSavage to @AntiFashGordon, Exoo has had two Twitter accounts

---

[2] https://help.twitter.com/en/rules-and-policies/enforcement-options "Permanent suspension: This is our most severe enforcement action.  Permanently suspending an account will remove it from global view, and the violator will not be allowed to create new accounts."
[3] https://help.twitter.com/en/rules-and-policies/personal-information "You may not publish or post other people's private information without their express authorization and permission.  We also prohibit threatening to expose private information or incentivizing others to do so."

permanently banned for doxing.  Twitter has previously permanently banned @ChrisExoo,[4] @ChristianExoo.[5]

    31.     Exoo directs associates in an enterprise that uses interstate communications to conduct patterns of racketeering activities.

    32.     Of their own volition, Exoo and associates identify persons as Nazis, fascists, and white supremacists, which also includes any person Exoo and/or associates label homophobic, transphobic, etc.  Once a target has been identified Exoo and associates set about to learn the personal identity of their unknown targets.

    33.     Once their targets' identity is discovered, Exoo and associates commence patterns of racketeering activities to extort employment terminations and compel school expulsions, by directing waves of threatening phone calls, emails, Twitter messages, social media comments at the target's employers, co-workers, and school administrators.

    34.     Enterprise associates "dogpile" their target's employers and co-workers with calls to their direct work phone number and email address with continual calls and emails to every employee and co-worker to extort the target's termination.  The practice eliminates a company's ability to conduct business.

    35.     To extort their target's termination, enterprise associates harm his employer's existing and prospective business relationships by posting a flood of negative comments and reviews to the employer's social media and internet sites to use as leverage to extort their target's termination.

---

[4] https://twitter.com/ChrisExoo (last accessed Sep. 15, 2020)
[5] https://twitter.com/ChristianExoo (last accessed Sep. 15, 2020)

36.     When an employer does not immediately terminate their target, Enterprise associates directly contact and threaten their target's employers' customers to shame them from continuing to do business with the target's employer.

37.     As a result of Exoo's dox and direction of an enterprise engaged in threatening patterns of racketeering activities as described above, every Plaintiff has received explicitly violent threats against their life and the lives of their family, several Plaintiffs were physically attacked about their person, sustained damage to their homes and property, and all Plaintiffs were terminated from employment due to the enterprise's patterns of racketeering activities.

## **DANIEL D'AMBLY**

38.     D'Ambly repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 37 with the same force and effect as if set forth in detail herein again.

39.     Upon information and belief, the Exoo Enterprise targeted D'Ambly as a fascist and white supremacist at some point in or about January 2018. Thereafter, enterprise associates stalked D'Ambly to uncover his true identity, for the sole purpose of doxing him.

40.     Upon information and belief, by September 2018, Twitter received dozens of complaints directly Tweeted to Twitter Support and Twitter Trust and Safety informing them that Exoo's former Twitter account @DoxSavage was aggressively doxing, which forced Twitter to investigate the accounts activities. Under Twitter's normal protocol, accounts being investigated for violating the TOS are prevented from Tweeting during the investigation. [6]

41.     Twitter ignored their TOS and allowed @DoxSavage to continue Tweeting during their investigation.

---

[6] https://help.twitter.com/en/rules-and-policies/enforcement-options (last accessed Sep. 15, 2020)

Case 2:20-cv-12880-MM-JSA Document 1062 Filed 06/17/22 Page 146 of 275 PageID 2956
Case 2:20-cv-12880-MM-JSA Document 74-65 Filed 03/25/21 Page 72 of 465 PageID 9274
4147

42.     Upon information and belief, at some point on or about October 1, 2018, Gadde
and Twitter agreed to allow @DoxSavage to undergo a name change in lieu of a third permanent.
The unprecedented agreement to allow Exoo's username change to @AntiFashGordon under
these circumstances was done to ensure he kept his approximate 15,000 @DoxSavage followers.

43.     On October 11, 2018, @DoxSavage Tweeted a farewell announcement to his
followers: "Hey folks—I just underwent a name change from @DoxSavage to @AntiFash
Gordon.  I'll be back tomorrow to expose more violent fascists who were on the ground in
Providence on 10/6."  The name change kept the Exoo Enterprise intact, and their ability to
effectively conduct its patterns of racketeering activities was not harmed.

44.     On October 29, 2018, at 11:49 a.m., @AntiFashGordon published a massive
twenty-two count Tweet thread (a thread is a series of related Tweets) that doxed D'Ambly to his
estimated 20,000 followers.  The dox publicly disclosed for the first time D'Ambly's name,
hometown, photograph, employer, occupation, employer's location, multiple telephone numbers
for his employer, a labor union Referendum Board he chaired, and the names of the other
Referendum Board members.

45.     In the dox, @AntiFashGordon labeled D'Ambly a "Nazi" and directed the Exoo
Enterprise associates to send harassing, intimidating, and threatening phone calls, and Tweets to
the Daily News's Twitter username @NYDailyNews, to extort D'Ambly's termination.  Exoo's
dox directed:

    a.   In the 19th Tweet, @AntiFashGordon directed his associates "stay on top of this,
        too.  If you don't hear back from @NYDailyNews, keep tweeting at them."  Call
        their printing facilities in Jersey City at (201) ***-**** (number provided in
        original Tweet) and warn them about Daniel D'Ambly…"

b. A follow up Tweet included a second telephone number for the New York Daily
News and a subsequent Tweet included the direct telephone number to
D'Ambly's print shop.

c. Within minutes the Exoo Enterprise obeyed Exoo's directive and flooded
@NYDailyNews and @Teamsters with Tweets and phone calls that threatened
the Daily News with violent attacks if D'Ambly was not terminated.

d. Upon information and belief, from October 29, 2018, to January 11, 2019, the
Exoo Enterprise directed no less than fifty-four (54) threatening Tweets to
@Daily News plus an unknown number of threatening phone calls.

e. D'Ambly was never told of the threats or warned to take safety precautions by
anyone from the Daily News or Tribune.

46.     On October 30, 2018, without warning D'Ambly of the dangerous threats,
Tribune engaged Insite Risk Management ("Insite") to investigate D'Ambly. At the conclusion
of their investigation, Insite produced the "Private Investigation Report" ("Report") and provided
it to the Tribune on December 4, 2018. The Report acknowledged @AntiFashGordon's doxing
was the impetus for the investigation and confirmed D'Ambly's association with EHA. The
Report included videos of D'Ambly and others using imprudent language during political rallies.

47.     On or before January 8, 2019, EHA posted flyers on public bulletin boards in
Princeton, New Jersey that announced an "It's okay to be white" protest march purportedly
scheduled for January 12, 2019.

48.     On January 9, 2019, @AntiFashGordon re-Tweeted the "It's okay to be white"
march to his associates and again doxed D'Ambly by Tweeting, "If anyone wants their leaders
name, it's Dan D'Ambly."

13

49.    On January 10, 2019, @AntiFashGordon published a second Tweet that
referenced EHA's purported march and directed his associates to "show up and shut down" the
purported march "And please say hi to their leader, Dan D'Ambly for me."

50.    On January 10, 2019, D'Ambly was called to an interview with Jean Nechvatal
("Nechvatal"), Tribune's Vice President, Talent Management & Learning and James R. Brill
("Brill"), Daily News's Sr. Vice President of Operations.  D'Ambly was accompanied at the
meeting by Union Steward Pete Cairnie.  During the meeting, D'Ambly was confronted with
content of the Report, but not informed of the report's existence.  D'Ambly acknowledged using
imprudent language in a private conversation during a protest.

51.    On January 11, 2019, at 10:14 a.m., @AntiFashGordon again directed his
associates to shut down EHA's purported January 12, 2019 "It's okay to be white" march and
exhorted his associates "if you can, show up and show these pricks that we don't tolerate hate in
our streets."  The Tweet included @NYDailyNews and doxed D'Ambly's hometown again.
Exoo encouraged violence to shut down the purported protest, but warned "Remember that the
police won't protect us here."

52.    Upon information and belief, at some point before 10:21 a.m. on January 11,
2019, Edward Bushey, Sr. Vice President, General Manager, Manufacturing and Distribution at
Tribune delivered recordings of the death threats to the Daily News.  The callers threatened
D'Ambly and stated the Daily News was responsible for "any violence or blood spilled is also on
your hands."  One threatening caller's phone number was captured.

53.    On January 11, 2019, from 9:30 a.m. to 10:14 a.m., Twitter usernames
@hubcityantifa, @NYCAntifa, and @Nstricklanded replied via Tweet to @AntiFashGordon's
instructions with coded messages that confirmed they followed his instructions and made threats.

14

54.     Upon reason and belief, one of the death threat phone numbers is owned by a
person who Tweeted mission confirmation to @AntiFashGordon on January 11, 2019.

55.     On January 11, 2019, at 2:20 p.m., EHA Tweeted that the "It's okay to be white"
protest was a prank.

56.     On January 11, 2019, at 3:30 p.m., D'Ambly was called to a second meeting with
James Brill, Sr. Vice President of Operations for the Daily News to recap the previous days
meeting.  In the meeting, Brill issued D'Ambly a "Last and Final Warning" that stated the
"ONLY reason that you are not being terminated immediately is because, thus far, we have not
determined that your activities with NJEHA has occurred at work and/or derogatory comments
were made about any co-workers."  The warning continued "should we learn that you engaged in
any inappropriate speech or behavior in the workplace or with regard to any other employee, or
if the Company or any of its employees suffer any backlash as a result of your association with
the NJEHA, your conduct will be considered "work-related" and you will be terminated
immediately."

57.     This meeting with Brill was a pre-text for D'Ambly's termination.  The meeting
occurred five (5) hours after death threats were received, but Brill did not inform D'Ambly,
because the Daily News intended to use the threats as evidence the company received "backlash"
from D'Ambly's conduct and was the "cause" of D'Ambly's termination.

58.     At 4:34 p.m. on January 11, 2019, @AntiFashGordon replied to EHA's Tweet by
threatening D'Ambly whereby @AntiFashGordon threatened "Regardless, I'm gonna spend the
next week wrecking your fucking life, Dan D'Ambly."

59.     In the evening of January 11, 2019, the Exoo Enterprise's extended campaign of
violent Tweets and threats of physical violence to D'Ambly came to fruition and D'Ambly's

15

Case 2:20-cv-12880-MMM-VSJS AD Document 1062 Filed 06/21/22 Page 150 of 252 Page ID 2560
Case 2:20-cv-12880-MMM-VSJS AD Document 74-5 Filed 03/23/21 Page 75 of 105 PageID 93678
4151

vehicle was "keyed" (scratched) and tires slashed while parked outside of his home on private property. An investigation report for a bias incident, criminal mischief, and harassment was filed with the South Brunswick Police Department.

60.     D'Ambly reported to work the following day on January 12, 2019, but was not informed of the death threats received the day before.

61.     On Sunday, January 13, 2019, at 10:16 a.m., five (5) days before D'Ambly's official termination date @AntiFashGordon Tweeted to four of his associates that he "got a pretty reliable tip this morning that he's not at the @NYDailyNews anymore…" in reference to D'Ambly.

62.     On Monday, January 14, 2019, the Daily News called D'Ambly and told him not to report to work until informed otherwise.

63.     On January 16, 2019, during a phone conference with Brill, Nechvatal, and a Union representative, D'Ambly was played the recorded death threats and asked to identify the caller. D'Ambly was unable to identify the caller, but said it was the behavior of "Antifa types." Brill was scornful of D'Ambly's inability to identify the caller and blamed him for the threats. D'Ambly was terminated during this phone conference.

64.     On January 23, 2019, Patrick LoPresti, President of Local One-L informed the Daily News that they were appealing D'Ambly's termination pursuant to terms of the Contract.

65.     On or about January 25, 2019, D'Ambly received his "Termination of Employment" letter, signed by Brill, and dated January 22, 2019. The letter informed D'Ambly his termination was effective January 18, 2019. The termination letter is imbued with Brill's animus for D'Ambly. In the letter, Brill stated "your choice to take these repulsive actions has now put our workplace and employees at risk of counter attacks by Antifa."

Case 2:20-cv-12880-MMJ-SAD Document 102 Filed 06/21/22 Page 15 of 75 PageID 561
Case 2:20-cv-12880-MMJ-SAD Document 74-5 Filed 04/23/21 Page 17 of 105 PageID 3079
4152

66.     The termination letter falsely stated the Daily News learned of the death threats
on January 14, 2019, contrary to emails that confirm the Daily News learned of the threats on
January 11, 2019.

67.     In the termination letter, Brill claimed the death threats received on January 11,
2019, were the "cause" of D'Ambly's termination, because the death threats meant D'Ambly
"brought his activities" into the workplace, therefore, "we deem your actions to be work related
and are terminating your employment for cause."

68.     At some point after January 23, 2019, the Union on behalf of D'Ambly filed a
grievance with the American Arbitration Association, case number 01-19-0000-7178.  The
Union retained attorneys Thomas Kennedy ("Kennedy") and Kate M. Swearengen
("Swearengen") of Cohen, Weiss, and Simon, LLP (collectively Kennedy, Swearengen and
Cohen. Weiss and Simon, LLP shall be referred to as "CWS") to represent D'Ambly.

69.     Thereafter, D'Ambly had a phone conference with Kennedy to discuss the case.
D'Ambly was acquainted with Kennedy for approximately twenty years due to his Union
activities.  D'Ambly explained the threats he received, property damage, and that his tires were
slashed.  D'Ambly stated "Tom, this Antifa are terrorists…"  Kennedy angrily responded, "I do
not consider Antifa to be terrorists and if you are going to continue referring to them (Antifa) as
terrorists we are going to end this call."  Kennedy scoffed at D'Ambly's desire to have his
employment reinstated at the Daily News.

70.     At some point thereafter, D'Ambly had his first case discussion phone
conference with Kate Swearengen, who assumed representation.  Without prompting,
Swearengen explicitly informed D'Ambly that "she doesn't agree with his politics and she

17

doesn't want to discuss them any further." Like Kennedy, Swearengen dismissed D'Ambly's wish to have his employment reinstated.

71.     Kennedy and Swearengen's revulsion of D'Ambly directed their representation and they failed to adequately research basic facts favorable to D'Ambly's wish to be reinstated. CWS ignored Brill's misrepresentation and veracity of the claimed "cause" of their client's termination.

72.     CWS failed to adequately investigate the sources of the doxing campaign. Had CWS engaged in reasonable investigation of the source of the dox they would have discovered @AntiFashGordon's January 13, 2019, announcement that D'Ambly was terminated, which was one day before the Daily News claimed they learned of the "cause" of D'Ambly's termination.

73.     On or about July 15, 2019, D'Ambly dejectedly executed the "Separation Agreement and Mutual General Release" negotiated by CWS that paid D'Ambly a lump sum payment in exchange the Union would withdraw the pending arbitration case with prejudice.

74.     As a result of Defendants' misconduct D'Ambly has suffered substantial personal and property damage and been severely financially harmed.

## ZACHARY REHL

75.     Rehl repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 37 with the same force and effect as if set forth in detail herein again.

76.     Exoo doxed Rehl for the first time on or about August 2, 2017, and labeled him a fascist and a white supremacist because Rehl organized a "Back the Blue" march to support police officers and first responders in Philadelphia.

77.     Exoo directed enterprise associates to contact Rehl's former employer New York Life Insurance Company to extort Rehl's termination. As in all cases, enterprise associates

complied with Exoo's directions and placed threatening calls, emails, and Tweets to New York Life Insurance Company.

78.     Rehl was terminated from New York Life Insurance Company in September 2017.

79.     On or about October 1, 2018, Rehl was doxed a second time, when he organized the "We the People" event that occurred in Philadelphia on November 17, 2018.

80.     On November 14, 2018, Exoo followed up his October 1, 2018 dox with directions to his associates to counter protest the We the People event. Exoo directed enterprise associates to disrupt the event because "fascism is coming and only we can stop it."

81.     On November 16, 2018, Exoo decided his community was being attacked, because "the city granted rally permits to fascists, and the cops will be there to protect them." Exoo then Tweeted the phrase "Who protects us? We protect us" a battle cry to get his associates to attack "We the People" event organizers.

82.     At 12:41 a.m. on November 17, 2018, Rehl's safety was endangered when he was attacked by an Exoo associate who threw a brick through the front window of Rehl's home and spray painted the word "Nazi" on the front of his home.

## AMANDA REHL

83.     AmRehl repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 37 with the same force and effect as if set forth in detail herein again.

84.     On or about August 2, 2017, Exoo doxed AmRehl's home address when he doxed her husband Zachary Rehl.

Case 2:20-cv-12880-MM-VSJSAD Document 1062 Filed 06/17/22 Page 154 of 299 PageID 2564
Case 2:20-cv-12880-MM-VSJSAD Document 74:85 Filed 03/23/21 Page 20 of 105 PageID 94082
4155

85.    On or about October 1, 2018, AmRehl's home address was doxed a second time when Exoo doxed her husband Zachary Rehl, because he organized the "We the People" march in Philadelphia that occurred on November 17, 2018.

86.    On November 14, 2018, Exoo directed his associates to counter protest and disrupt the We the People the event, because "fascism is coming and only we can stop it."

87.    On November 16, 2018, Exoo decided his community was being attacked, because "the city granted rally permits to fascists, and the cops will be there to protect them." Exoo then Tweeted the phrase "Who protects us? We protect us" as a battle cry to get his associates to attack "We the People" event organizers.

88.    At 12:41 a.m. on November 17, 2018, AmRehl's safety was endangered when she was assaulted by an Exoo associate who threw a brick through the front window of AmRehl's home and spray painted the word "Nazi" on the front of her home.

### K.R., a minor, by and through her father ZACHARY REHL and mother AMANDA REHL

89.    K.R. repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 37 with the same force and effect as if set forth in detail herein again.

90.    On or about August 2, 2017, Exoo doxed K.R.'s home address when he doxed her father Zachary Rehl.

91.    On or about October 1, 2018, K.R.'s home address was doxed a second time when Exoo doxed K.R.'s father Zachary Rehl, because he organized the "We the People" march in Philadelphia that occurred on November 17, 2018.

92.    On November 14, 2018, Exoo directed his associates to counter protest and disrupt the We the People event, because "fascism is coming and only we can stop it."

Case 2:20-cv-12880-MMVSJSAD Document 102 Filed 06/17/22 Page 155 of 299 Page ID 2565
Case 2:20-cv-12880-MMVSJSAD Document 74 Filed 04/23/21 Page 20 of 105 Page ID 4083
4156

93.     On November 16, 2018, Exoo decided his community was being attacked, because "the city granted rally permits to fascists, and the cops will be there to protect them." Exoo then Tweeted the phrase "Who protects us? We protect us" as a battle cry to get his associates to attack "We the People" event organizers.

94.     At 12:41 a.m. on November 17, 2018, K.R.'s safety was endangered when she was assaulted by an Exoo associate who threw a brick through the front window of her home and spray painted the word Nazi on the front of her home.

**AARON WOLKIND**

95.     Wolkind repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 37 with the same force and effect as if set forth in detail herein again.

96.     Wolkind was doxed in or about June 2019 and called a fascist, white supremacist, and Nazi, which is an idiotic assertion, because Aaron's a Jew.

97.     On July 3, 2019, Exoo re-posted Exoo's dox and directed his associates to contact Wolkind's employer Aerzen USA ("Aerzen") to extort his termination. Immediately enterprise associates directed hundreds of phone calls and emails to Wolkind's employer and his co-workers. Aerzen's social media accounts and internet profiles were flooded with messages demanding his termination.

98.     On November 28, 2019, Exoo re-doxed Wolkind with Aerzen's direct phone number and the reminder to associates to "Use *67 to block your number."

99.     The November 28, 2019, dox dramatically increased the volume of messages posted to Aerzen's social media and internet profiles so much so that it created a network security concern and caused Aerzen to temporarily shut down their social media and internet profiles.

21

Case 2:20-cv-12880-MM-JS-AD Document 1620 Filed 06/17/22 Page 156 of 299 PageID 2566
Case 2:20-cv-12880-MM-JS-AD Document 74-3 Filed 04/23/21 Page 82 of 465 PageID 9128
4157

100. The enterprise's threatening and harassing messages also caused Aerzen's management to close the Coatesville, Pa. building out of fear for employee safety.

101. To their credit, Aerzen did not immediately terminate Wolkind, but when enterprise associates discovered Wolkind was not terminated, they directed threats at Aerzen's clients demanding they stop doing business Aerzen or face consequences, and harassed and intimidated Aerzen's foreign subsidiaries.

102. Wolkind continues to receive threatening and harassing phone calls and the dox has prohibited Wolkind from obtaining new employment in his field. Prospective employers have cancelled scheduled interviews and pulled job offers when they perform an internet background search for Wolkind's name, because the first listing is Exoo's dox, which identifies him as a fascist, white supremacist, and a Nazi, but as stated above Aaron's a Jew.

## STEVE HARTLEY

103. Hartley repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 37 with the same force and effect as if set forth in detail herein again.

104. Hartley was doxed on November 29, 2018, and labeled a Nazi, racist, terrorist and a threat to women and minorities. The dox included directives to dogpile Hartley's employer with calls, emails, and Tweets to demand his termination. In the dox, Hartley was identified as the president of the Philadelphia Proud Boys.

105. As is the pattern, enterprise associates complied with Exoo's directives and in December 2018, associates inundated Hartley's employer and co-workers with hundreds of phone calls and emails and flooded their social media and internet profiles with negative posts and reviews. Enterprise associates still contact Hartley's employer and co-workers with threatening and harassing phone calls and emails.

22

106.    Hartley's home address and personal cell phone were also doxed, and he has
received hundreds of threatening and harassing phone calls from enterprise associates, including
direct threats on his life. The threatening and harassing communications continue to this day.

**MARK ANTONY TUCCI**

107.    Tucci repeats and realleges the facts pertinent to all plaintiffs as alleged above in
paragraphs 1 through 37 with the same force and effect as if set forth in detail herein again.

108.    Exoo doxed Tucci on December 10, 2018, and associates directed harassing and
threatening phone calls, emails, and Twitter messages to his employer.  Enterprise associates
called his employer more than 600 times on that first night, which effectively shut down the
restaurant.  Tucci's employer realized what was happening and told callers he was terminated.

109.    In real time you can see the enterprise's conspiracy play out in their Tweets.

    a.  Exoo doxed Tucci with directions to harass, threaten and intimidate his employer.

    b.  Enterprise associates who called Tucci's employer, Tweeted confirmation to
        Exoo.

    c.  When Tucci's employer stated Tucci was terminated, enterprise associates relayed
        that information to Exoo.

110.    Exoo replied "Thanks for calling in the meantime it's very likely they're just
hoping this blows over, so keep calling, folks!"

111.    The following day Exoo directed his associates to "keep calling folks" and the
enterprise continued the assault.

**RICHARD SCHWETZ**

112.    Schwetz repeats and realleges the facts pertinent to all plaintiffs as alleged above
in paragraphs 1 through 37 with the same force and effect as if set forth in detail herein again.

23

Case 2:20-cv-12880-MM-VSJS AD Document 106 20 Filed 06/21/7 22 Page 15 of 45 57 Page ID #568
Case 2:20-cv-12880-MM-VSJS AD Document 74 155 Filed 03/23/21 Page 24 of 465 Page ID 94 486

4159

113.    The enterprise targeted Schwetz after he volunteered to clean up debris and litter at a Scott Presler Clean Up America event that occurred in Philadelphia on May 23, 2020.

114.    As a result of participating in the cleanup event and being photographed with other Proud Boys that participated in the cleanup event, Schwetz was doxed in June 2020.

115.    Enterprise associates directed harassing and threatening phone calls, emails, Twitter messages, and social media posts to Schwetz's co-workers located at the varied locations of his then employer Inova Payroll.

116.    Amidst the initial wave of incoming harassing and threatening phone calls, emails, and Twitter messages, an enterprise associate threatened one specific Inova Payroll employee by posting a photograph of the employee with her young son.

117.    The employee had no relationship with Schwetz whatsoever, caused Inova Payroll to reasonably fear for its employees' safety.

118.    Exoo doxed Schwetz a second time on September 21, 2020, with further instructions to enterprise associates to conduct a second round of harassing and threatening messages.  The threats are still visible on Twitter.

## MATTHEW REIDINGER

119.    Reidinger repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 37 with the same force and effect as if set forth in detail herein again.

120.    Exoo doxed Reidinger on November 27, 2018, and instructed his associates to direct threatening, harassing, and intimidating phone calls, Tweets, to his employer to demand his termination.

Case 2:20-cv-12880-MMV-JSAD Document 102 Filed 06/17/22 Page 159 of 299 Page ID 2569
Case 2:20-cv-12880-MMV-JSAD Document 74-3 Filed 04/23/21 Page 84 of 105 Page ID 4167
4160

121.     As is the case with all victims, Exoo directed associates to dogpile Reidinger's employer's social media sites with negative reviews.  In his instructions Exoo admits that they recently successfully dogpiled Comcast to extort a termination.

## JOBEL BARBOSA

122.     Barbosa repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 37 with the same force and effect as if set forth in detail herein again.

123.     Exoo doxed Barbosa on June 22, 2019, as trans-phobic, because he was photographed at Philadelphia's gay pride parade.  As always, Exoo's directed enterprise associates to contact Barbosa's employer to demand his termination.  Associates immediately followed Exoo's directions, including one enterprise associate who left her name and telephone number.

124.     Barbosa's home address and cell phone numbers for him and his wife were posted to a webpage phonezapp.noblog.org (no longer available) and Barbosa's wife received threatening calls on her personal cell phone.

125.     The number of contacts his former employer received is unknown at this point, but the volume was substantial, and Barbosa was immediately called into a meeting with a company executive and a human resources representative.

126.     Barbosa was terminated on June 27, 2019.

## SEAN-MICHAEL DAVID SCOTT

127.     Scott repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 37 with the same force and effect as if set forth in detail herein again.

128.     Exoo doxed Scott on September 16, 2019 and his employer publicly confirmed his employment termination on September 17, 2019.

129.    Exoo associates threatened and intimidated the property manager for Scott's apartment.  The property manager was fearful of repercussions and demanded Scott vacate the premises.

130.    On September 17, 2019, Scott's home was attacked with graffiti and vandalized.

131.    On April 16, 2020, Scott was attacked at his home for the second time and his car's tires were slashed and windows broken.

## JOHN HUGO

132.    Hugo repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 37 with the same force and effect as if set forth in detail herein again.

133.    Hugo was doxed by Exoo on January 2, 2020, and as with all of his doxes, Exoo labeled Hugo a fascist and white supremacist.  Exoo's dox and call to action to his associates was re-Tweeted over 100,000 times.

134.    Enterprise associates immediately followed Exoo's directives and made hundreds of threatening and harassing phone calls and over 1,000 harassing emails to Hugo's employer demanding Hugo's termination.  As in all cases, the volume of phone calls prevented Hugo and his co-workers from performing their jobs.  Hugo was terminated in March 2020.

135.    Hugo continues to receive threatening and harassing phone calls from enterprise associates who threaten Hugo that they will never let him work again and will force him to live in a box.

## SUPPLEMENTAL PLEADING TO ADD PLAINTIFF THOMAS LOUDEN WHO WAS INJURED BY THE ENTERPRISE AFTER THE COMPLAINT WAS FILED

136.    Louden repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 37 with the same force and effect as if set forth in detail herein again.

Case 2:20-cv-12880-JMV-JSA Document 102 Filed 06/17/22 Page 161 of 275 PageID: 5711
Case 2:20-cv-12880-JMV-JSA Document 74-5 Filed 03/23/21 Page 27 of 105 PageID: 94087
4162

137.     The original Complaint in this action was filed on September 21, 2020, and Louden was injured after the Complaint was filed in the same series of occurrences or transactions after the Complaint was filed.  Louden was employed as the Director of Managed Care at Thomas Jefferson University Hospital in Philadelphia.

138.     During a global health emergency and pandemic Exoo doxed Louden's hospital employer on November 2, 2020, and as in all cases associates immediately flooded Louden's employer and co-workers with harassing and threatening phone calls, emails, social media posts.

139.     Louden who does not have a Twitter account was unaware of Exoo's dox until he was called to a Zoom meeting with his hospital's Vice-President and a human resources representative on November 2, 2020.  Louden was quizzed about his membership in a right-wing extremist group.  Louden is not a member of a right-wing extremist group, he is a 30-year volunteer firefighter and the appointed Deputy Emergency Management Coordinator for Hilltown Township, Pa.

140.     On November 3, 2020, Louden learned that Exoo posted photos of his home with his car parked in his driveway.

141.     On November 10, 2020, Exoo re-posted Louden's personal information with explicit directions, including photographs of his home and local street signs, the name of the city, and even the longitude and latitude coordinates.  Louden, obviously remains fearful for his family's safety.  Louden was terminated on December 7, 2020.

## CLAIMS FOR RELIEF

### COUNT I

**Violation of New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to – 49
(as to D'Ambly against Tribune Publishing Company and the New York Daily News)**

27

142.    D'Ambly realleges and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 141 with the same force and effect as if set forth in detail herein again.

143.    Defendants Tribune and Daily News are employers as defined in N.J.S.A. 10:5-5.

144.    D'Ambly is older than forty years (40) old and was an employee as defined in N.J.S.A. 10:5-5.

145.    Defendants Tribune and Daily News discharged D'Ambly due to their enmity towards D'Ambly's racially identifiable associations, whereas, non-white Tribune and Daily News employees who participate in racially identifiable associations, are not punished, or terminated, violated N.J.S.A. 10:5-12.

146.    Defendants Tribune and Daily News undertook several pre-textual steps to mask D'Ambly's discriminatory termination:

   a.   Tribune hired a private investigation firm to invade D'Ambly's privacy in an unsuccessful effort to catch D'Ambly engaged in unlawful activity.

   b.   In the morning of January 11, 2019, the Daily News received death threats intended to extort D'Ambly's termination that they did not immediately disclose, because they intended to use the threats pre-textually as the "cause" of D'Ambly's termination.

   c.   In the afternoon of January 11, 2019, the Daily News issued D'Ambly a "Last and Final Warning," that warned D'Ambly he would be immediately terminated if it were discovered he brought his political activities into the workplace, but they did not inform or warn D'Ambly of the death threats earlier received.

   d.   D'Ambly was informed he was terminated on January 16, 2019.

e.  Subsequently, D'Ambly received a "Termination of Employment" letter dated January 22, 2019, whereby, the Daily News falsely stated they discovered the death threats on January 14, 2019, contrary to indisputable evidence they received the death threats on January 11, 2019, which meant he "brought his activities into the workplace" after he was warned.  Daily News cited this fabrication as the "cause" of D'Ambly's termination.

147.  As a direct and proximate result of defendants Tribune Publishing Company and the New York Daily News racially discriminatory termination, D'Ambly has suffered adverse consequences and continues to be damaged.  D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT II

**Tortious Interference with Prospective Economic Benefit**
**(as to all Plaintiffs except K.R. against defendant Christian Exoo a/k/a "AntiFashGordon")**

148.  Plaintiffs reallege and incorporate herein by reference each and every one of the allegations contained in paragraphs 1 through 147 with the same force and effect as if set forth in detail herein again.

149.  Plaintiffs were rightfully entitled to pursue lawful employment.

150.  Plaintiffs reasonably expected their employment to continue into the future and to benefit economically from his employment.

151.  Defendant Exoo knew Plaintiffs were employed and intentionally interfered with their prospective economic benefits to be gained from continued employment.

152.  Defendant Exoo intentionally and unjustifiably interfered with Plaintiffs rights to pursue lawful business.

29

153.    Defendant Exoo's interference caused Plaintiffs employer to terminate their

employment.

154.    Plaintiffs have suffered and will continue to suffer irreparable harm in the form of

damage to his reputation, loss of income and financial hardship as a result of Exoo's

interference.

155.    As a direct and proximate result of defendant Exoo's interference with Plaintiffs

prospective economic benefits, Plaintiffs have suffered adverse consequences and continue to be

damaged.  Plaintiffs are entitled to compensatory damages, equitable and declaratory relief,

punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial,

but which is in excess of $75,000.00.

## COUNT III

**Intrusion Upon Seclusion – Public Disclosure of Private Personal Information**
**(as to all Plaintiffs except for K.R. against Christian Exoo a/k/a "AntiFashGordon")**

156.    Plaintiffs reallege and incorporate herein by reference each and every one of the

allegations contained in paragraphs 1 through 155 with the same force and effect as if set forth in

detail herein again.

157.    In directing and carrying out a sustained effort to embarrass, defame and publicize

private facts, including Plaintiffs' home address and familial relations without their consent,

Exoo intentionally intruded upon Plaintiffs' solitude and seclusion.

158.    By conducting a sustained effort to embarrass, defame and publicize private facts

including D'Ambly's home address and familial relations without Plaintiffs' consent, Exoo

intentionally intruded upon Plaintiffs' solitude and seclusion.

159.    Defendant intentionally intruded on Plaintiffs' solitude and seclusion in a manner

that is highly offensive to a reasonable person.

30

Case 2:20-cv-12880-MM-VSAD Document 102 Filed 06/17/22 Page 165 of 299 PageID 5075
Case 2:20-cv-12880-MM-VSAD Document 74-66 Filed 04/23/21 Page 90 of 465 PageID 5093
4166

160.     As a direct and proximate result of Exoo's intrusion upon his seclusion, Plaintiffs have suffered adverse consequences and continue to be damaged.  Plaintiffs are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT IV

### Violation of N.J.S.A. 2C:33-4.1 and N.J.S.A. 2C:30-31(a) Cyber-Harassment and Stalking (as to D'Ambly against defendant Christian Exoo a/k/a "AntiFashGordon")

161.     D'Ambly realleges and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 160 with the same force and effect as if set forth in detail herein again.

162.     Defendant Exoo encouraged and incited others to violence against D'Ambly and conducted an ongoing campaign that intruded D'Ambly's life.

163.     Defendant Exoo intentionally and knowingly sent, commented, and posted D'Ambly's private and involuntarily disclosed personal information to social media networking sites to purposely harass, intimidate, and threaten D'Ambly.

164.     By encouraging others to inflict physical harm to D'Ambly's person and property.

165.     By encouraging others to commit crimes against D'Ambly that resulted in D'Ambly receiving death threats and sustaining physical damage to his personal property

166.     As a direct and proximate result of Defendant Exoo's cyber-harassment and stalking D'Ambly has suffered adverse consequences and continues to be damaged.  D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT V

31

Case 2:20-cv-12880-MM-VSJ-SAD Document 106-20 Filed 06/21/72 Page 166 of 275 Page ID 2576
Case 2:20-cv-12880-MM-VSJ-SAD Document 74-35 Filed 03/23/21 Page 32 of 165 Page ID 9294
4167

**Violation of 18 U.S.C. § 875(c) – Interstate Communications**
**(as to all Plaintiffs against defendant Christian Exoo a/k/a "AntiFashGordon")**

167. Plaintiffs reallege and incorporate herein by reference each and every one of the allegations contained in paragraphs 1 through 166 with the same force and effect as if set forth in detail herein again.

168. By using an interactive computer service to intentionally transmit threats of physical violence at Plaintiffs via interstate communications.

169. By directing an enterprise is engaged in an interstate campaign of violent threats against Plaintiffs for the purpose of injuring and endangering Plaintiffs' personal safety.

170. By explicitly threatening Plaintiffs via an interactive computer service Exoo transmitted threats in interstate commerce.

171. As a direct and proximate result of defendant Exoo's use of interstate communications to threaten and harm Plaintiffs they have suffered adverse consequences and continue to suffer adverse consequences. Plaintiffs are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT VI

**Violation of 18 U.S.C. 2261A(2) –Stalking**
**(as to all Plaintiffs against defendant Christian Exoo a/k/a "AntiFashGordon")**

172. Plaintiffs reallege and incorporate herein by reference each and every one of the allegations contained in paragraphs 1 through 171 with the same force and effect as if set forth in detail herein again.

173. Exoo used an interactive computer service to surveil and stalk Plaintiffs with the intent to harass, intimidate, threaten, and harm Plaintiffs.

Case 2:20-cv-12880-MM-VSJSAD Document 102 Filed 06/17/22 Page 167 of 275 Page ID 2577
Case 2:20-cv-12880-MM-VSJSAD Document 74 Filed 04/23/21 Page 33 of 105 Page ID 9395
4162

174.    Exoo stalked Plaintiffs to discover their personal identity and then disseminated the information using an interactive computer service with instructions to enterprise associates with directions to harass, intimidate, and endanger Plaintiffs personal safety.

175.    Exoo used an interactive computer service to direct an enterprise to harass, intimidate, and threaten others in order to extort Plaintiffs termination from lawful employment.

176.    Exoo's conduct caused Plaintiffs to reasonably fear for the safety of themselves and their family and caused Plaintiffs to suffer severe emotional and financial distress.

177.    As a direct and proximate result of defendant Exoo's stalking in violation of 18 U.S.C. § 2261A(2) Plaintiffs have has suffered adverse consequences and continue to suffer adverse consequences.  Plaintiffs are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT VII

### Employer's Breach of its Duty to Warn
### (as to D'Ambly against defendants Tribune Publishing Company and the New York Daily News)

178.    D'Ambly realleges and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 177 with the same force and effect as if set forth in detail herein again.

179.    Defendants Tribune and Daily News received a stream of death threats directed at D'Ambly over a two and one-half month period, but they never warned D'Ambly.

180.    Defendants Tribune and Daily News never warned D'Ambly to take precautionary measures as he entered or exited the workplace.

33

Case 2:20-cv-12880-MM-JSA Document 1062 Filed 06/21/22 Page 168 of 299 PageID: 2578
Case 2:20-cv-12880-MM-JSA Document 74-5 Filed 03/23/21 Page 34 of 45 PageID: 9496
4169

181.    Defendants Tribune and Daily News did not take steps to increase the safety of D'Ambly and other employees as they entered and exited the workplace.

182.    Defendants Tribune and Daily News did not secure the workplace in order to protect D'Ambly and others.

183.    As he was not aware of the threats, D'Ambly could not take steps to protect himself and his property and as a result his property was damaged on January 11, 2019.

184.    Defendants Tribune and Daily News had a duty to warn their employee he was the direct target of the death threats they received.

185.    As a direct and proximate result of defendants Tribune and Daily News' failure to warn D'Ambly has suffered adverse consequences and continues to be damaged. D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT VIII

**Violations of N.J.S.A 2C:41-1 to – 2C:41-6.2 (Racketeering)**
**(as to D'Ambly against defendants Christian Exoo a/k/a "AntiFashGordon," St. Lawrence University, Vijaya Gadde, and Twitter, Inc., the "Exoo Enterprise")**

186.    D'Ambly realleges and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 185 with the same force and effect as if set forth in detail herein again.

187.    The "Exoo Enterprise" is directed by defendant Christian Exoo a/k/a "@AntiFashGordon," and consists of associates St. Lawrence University, including their employees and agents, Vijaya Gadde, and Twitter, Inc., including their employees and agents, and unknown associates.

34

188.     Defendant Exoo used an interactive computer service to direct the Exoo

Enterprise's patterns of racketeering activities as defined by N.J.S.A. 2C:41(a)(1) to extort

D'Ambly's termination from the Daily News.

     a.     The Exoo Enterprise threatened the Daily News via Tweets and phone calls and

        related activities prohibited by N.J.S.A. 2C:41-2.

     b.     Exoo Enterprise committed multiple prohibited by N.J.S.A. 2C:41(a)(1)(h).

     c.     Exoo Enterprise committed multiple prohibited by N.J.S.A. 2C:41(a)(1)(bb)

189.     As a direct result of the Exoo Enterprises patterns of racketeering activities,

D'Ambly was terminated from his employment.

190.     As a direct and proximate result of Defendants' patterns of racketeering activities

D'Ambly has suffered adverse consequences and continues to be damaged.  D'Ambly is entitled

to compensatory damages, equitable and declaratory relief, punitive damages, costs, and

reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of

$75,000.00.

## COUNT IX

**Violations of 18 U.S.C. §§ 1962(c) – Racketeering**
**Multiple violations of RICO predicates 18 U.S.C. §§ 1951 and 1952**
**(as to all Plaintiffs against defendants Christian Exoo a/k/a "AntiFashGordon," St.**
**Lawrence University, Vijaya Gadde, and Twitter, Inc., the "Exoo Enterprise")**

191.     Plaintiffs reallege and incorporates herein by reference each and every one of the

allegations contained in paragraphs 1 through 190 with the same force and effect as if set forth in

detail herein again.

192.     Each of the individuals and entities is a "person" within the meaning of 18 U.S.C.

§ 1961(3) who conducted the affairs of the enterprise, through a pattern of racketeering activity

in violation of 18 U.S.C. § 1962(c).

35

193.     The Exoo Enterprise is an enterprise within the meaning of 18 U.S.C. 1961(4), directed by defendant Christian Exoo a/k/a "@AntiFashGordon," and consisting of St. Lawrence University, including their employees and agents, Vijaya Gadde, and Twitter, Inc., including their employees and agents, and unknown associates.  The Exoo Enterprise was created to dox fascists and white supremacists in order to use the doxed information to conduct patterns of racketeering activities to threaten violence, intimidate, harass, and extort others to achieve the enterprises mission of causing employment terminations, educational expulsions, physical injury, and personal harm to the persons doxed.  The Exoo Enterprise functions as an organization and continuing unit to effectuate patterns of racketeering activity.

194.     Upon information and belief, multiple generations of Exoo's family are or were employed by St. Lawrence University and Exoo's activities are well known to St. Lawrence faculty and administrators, who allow Exoo to direct the enterprise from St. Lawrence property, from his place of employment, during his normal work hours using St. Lawrence equipment and information technology.  St. Lawrence consents to Exoo's use of St. Lawrence property to direct the enterprise, and participates in the Exoo Enterprise, because they believe the patterns of racketeering activities helps St. Lawrence's achieve their global mission.

195.     Exoo uses his employment, teaching, and lecturing at St. Lawrence with the consent and approval of St. Lawrence to recruit students to join the Exoo Enterprise as associates.  In concert with other associates, the Exoo Enterprise, directed by Exoo created and maintained systematic links for the common purpose of doxing targeted fascists and white supremacists, and then threaten, harass, and extort others to cause harm to their targets.

36

Case 2:20-cv-12880-MM-JSAD Document 106-20 Filed 06/17/22 Page 17 of 12 35 Page 12 581
Case 2:20-cv-12880-MM-JSAD Document 74-15 Filed 03/23/21 Page 97 of 165 PageID 95799
4172

196.    At all times relevant, Gadde was the only Twitter employee authorized to permanently ban Twitter users.[7]

197.    Exoo is and was well known to Gadde and Twitter, because Gadde and Twitter have twice before permanently banned Exoo due to habitual doxing.

198.    Gadde and Twitter agreed to associate with the Exoo Enterprise when they breached their own TOS to conspire with a recidivist ban evader, and permitted the enterprise leader to create ban evasion account "@AntiFashGordon," which Gadde and Twitter knew was purposely created to dox unsuspecting persons, in order to direct associates in patterns of racketeering activities.

199.    Gadde and Twitter associate and participate in the Exoo Enterprise's patterns of racketeering, by virtue of their affirmative decision to allow Exoo, a three-time ban evader and known habitual doxer, create a ban evasion account in direct contradiction of their TOS and enforcement rules, through which, the Exoo Enterprise conducts its patterns of racketeering.

200.    Upon information and belief Gadde and Twitter have received hundreds and likely thousands of complaints directly to their individual Twitter accounts and through Twitter's TSC regarding the Exoo Enterprise's doxing. But Gadde and Twitter choose to ignore the avalanche of doxing and abusive behavior complaints and refuse to enforce their own policies in

---

[7] *Meet Vijaya Gadde, an Indian-born Twitter head who decides on blocking tweets, users*, The Economic Times, (Jan. 16, 2020) https://economictimes.indiatimes.com/tech/internet/meet-vijaya-gadde-an-indian-born-twitter-head-who-decides-on-blocking-tweets/articleshow/73281445.cms, last accessed September 12, 2020. See also, *Twitter's Top Lawyer Is Final Word On Blocking Tweets – Even Donald Trump's*, Bloomberg.com,(Jan. 15, 2020) https://www.bloomberg.com/news/articles/2020-01-15/twitter-s-gadde-is-final-word-on-blocking-tweets-even-trump-s, last accessed September 12, 2020; *Meet Twitter's top lawyer, who has the final word on blocking tweets – including Donald Trump's,* Fortune.com, (Jan. 15, 2020) https://fortune.com/2020/01/15/twitter-top-lawyer-vijaya-gadde-blocks-tweets-donald-trump/, last accessed September 12, 2020.

Case 2:20-cv-18880-MMJ-SAD Document 102 Filed 06/17/22 Page 81 of 275 PageID 582
Case 2:20-cv-18880-MMJ-SAD Document 74-6 Filed 04/23/21 Page 38 of 105 PageID 9580
4173

order to facilitate the patterns of racketeering activities directed by known ban evasion account, @AntiFashGordon.

201. Gadde personally participates in, and benefits from the Exoo Enterprise's patterns of racketeering activities, because she has publicly stated her personal disdain for fascists and white supremacists, and she is "very, very focused on that...the KKK, the American Nazi Party," because that "was what my parents had to deal with" where she grew up on the Texas-Louisiana border.[8] Gadde participates in the Exoo Enterprise, because of an Oresteian desire to avenge her parents perceived mistreatment. Gadde and Twitter are the lynchpin of the Exoo Enterprise. Without Gadde and Twitter's consent and participation, the Exoo Enterprise could not conduct its patterns of racketeering activities.

202. Twitter benefits economically from the Exoo Enterprise's patterns of racketeering activities, because @AntiFashGordon has an extremely large Twitter following, one of the largest follower bases of all Twitter users, and the account drives a tremendous amount of internet traffic to Twitter. Greater traffic to their site increases Twitter's ad revenue.

203. Twitter benefits socially from the Exoo Enterprise's patterns of racketeering activities because the Exoo Enterprise's doxing of fascists and white supremacists imparts a social benefit on Twitter as it is seen as a defender of "marginalized communities" and provides cover for their stated business goal of creating what Twitter describes as "safer" conversations.

204. The Exoo Enterprise engages in and affects interstate commerce, because, *inter alia,* it threatens violence to persons and property of others throughout the United States in

---

[8] *Twitter's Kayvon Beykpour and Vijaya Gadde: the Code Conference interview (transcript),* Vox.com (June 27, 2019) https://www.vox.com/recode/2019/6/27/18760444/twitter-kayvon-beykpour-vijaya-gadde-kara-swisher-peter-kafka-code-conference-interview-transcript, last accessed September 12, 2020.

Case 2:20-cv-12880-MM-VSJSAD Document 1062 Filed 06/17/22 Page 91 of 275 PageID 5983
Case 2:20-cv-12880-MM-VSJSAD Document 7465 Filed 04/23/21 Page 93 of 105 PageID 9591
4174

furtherance of a plan that reaches into the several states to disrupt economic activity. The Exoo Enterprise has caused severe economic hardship to Plaintiffs and negatively impacted local economies throughout the United States.

205.    Pursuant to and in furtherance of their violent doxing campaign, Defendants directed and participated in the affairs of the Exoo Enterprise through patterns of racketeering activity, including multiple acts indictable under 18 U.S.C. §§ 1951 (Interference with commerce by threats or violence) and 1952 (use of interstate facilities to conduct unlawful activity).

206.    The conduct of the Exoo Enterprise described above constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Defendants' decisions and activity in connection with the Exoo Enterprise to routinely conduct its transactions in such a manner constitutes "patterns of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

207.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiffs for three times the damages sustained, plus the costs of this suit, including reasonable attorneys' fees.

208.    As a direct and proximate result of Defendants patterns of racketeering activity Plaintiffs have suffered adverse consequences and continue to suffer adverse consequences in an amount to be determined at trial, but which is in excess of $75,000.00. Plaintiffs are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT X

**Violation of 18 U.S.C. § 1962(d) (Conspiracy)**
**(as to all Plaintiffs against defendants Christian Exoo a/k/a "AntiFashGordon," St. Lawrence University, Vijaya Gadde, and Twitter, Inc., the "Exoo Enterprise")**

39

209.    Plaintiffs reallege and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 208 with the same force and effect as if set forth in detail herein again.

210.    Section 1962(d) of RICO provides "shall be unlawful for any person to conspire to violate any provisions of subsection (a), (b), or (c) of this section."

211.    Defendants have violated 18 U.S.C. § 1962(d) by conspiring to associate and participate in the Exoo Enterprise's patterns of racketeering activities as defined in 18 U.S.C. 1962(c).  The object of this conspiracy is to conduct, direct and participate in, directly or indirectly, the Exoo Enterprise's patterns of racketeering activity.

212.    Defendants' have engaged in numerous overt and predicate racketeering acts in furtherance of the conspiracy, including threatening, intimidating, and extorting others to cause harm to their targets.

213.    The nature of the above-described acts of Defendants' and co-conspirators acts in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. 1962(d) violation, but they were aware that their ongoing extortionate acts have been, and are part of an overall pattern of racketeering activity demonstrated through related and continuous acts.

214.    Defendants sought to and have engaged in the commission of, and continue to commit overt acts, including the following unlawful racketeering predicate acts:

    a.   Multiple instances of interference with commerce by threats of violence in violation of 18 U.S.C. § 1951; and

    b.   Multiple instances of use of interstate facilities to conduct unlawful activity violations of 18 U.S.C. § 1952.

40

215.     As a direct and proximate result of Defendants' multiple overt acts and predicate acts in furtherance of the Exoo Enterprise, in violation of 18 U.S.C. § 1962(d), by conspiring to violate 18 U.S.C. 1962(c), D'Ambly has been and continues to be injured by Defendants' conduct.

216.     By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are liable to D'Ambly for three times the damages sustained, plus the costs of this suit, including reasonable attorneys' fees.

217.     As a direct and proximate result of Defendants patterns of racketeering activity Plaintiffs have suffered adverse consequences and continue to suffer adverse consequences in an amount to be determined at trial, but which is in excess of $75,000.00.  Plaintiffs are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT XI

### Negligent Entrustment

### (as to all Plaintiffs against defendants Vijaya Gadde and Twitter, Inc.)

218.     Plaintiffs reallege and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 217 with the same force and effect as if set forth in detail herein again.

219.     Exoo is a notorious and infamous doxer, who relies on Twitter to dox unsuspecting people and direct his enterprise.

220.     Due to habitual doxing and abusive behavior, Twitter has previously permanently banned two accounts controlled by Exoo, @ChrisExoo and @ChristianExoo.

41

221. Upon information and belief, Twitter received hundreds of complaints that Exoo was habitually doxing under Twitter username @DoxSavage.

222. In lieu of a third permanent ban Twitter agreed to allow Exoo to undergo a username change from @DoxSavage to @AntifashGordon, contrary to Twitter's TOS.

223. Subsequent to Twitter's agreement to allow Exoo to change his Twitter username to @AntiFashGordon, Vijaya Gadde and Twitter's Safety Council have received numerous doxing complaints.

224. Gadde was the only person at Twitter with authority to decide permanent bans and she knew Exoo is a habitual doxer, but she ignored that knowledge and agreed to allow him to change his username and continue doxing.

225. Gadde recklessly ignored Twitter's TOS against ban evasion accounts and allowed Exoo to change his name from @DoxSavage to @AntiFashGordon, thereby, entrusting Exoo with the instrumentality to direct the Exoo Enterprise's patterns of racketeering activities.

226. As a direct and proximate result of defendant Gadde and Twitter's negligent entrustment Plaintiffs have suffered adverse consequences and continue to suffer adverse consequences. Plaintiffs are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT XII

**Breach of Implied Covenant of Good Faith – Promissory Estoppel**
**(as to all Plaintiffs against defendants Vijaya Gadde and Twitter, Inc.)**

227. Plaintiffs reallege and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 226 with the same force and effect as if set forth in detail herein again.

42

228.     Defendant Twitter's TOS prohibit doxing and ban evasion accounts.

229.     Defendant Twitter created a Trust and Safety Council department to investigate TOS violations to remove abusive content and protect others from abusive behaviors of others.

230.     Twitter created the Trust and Safety Council to prohibit abusive behavior by Twitter users and promised victims of abusive behavior would be protected.

231.     Gadde is the executive in charge of Twitter's Trust and Safety council, and the only person at Twitter with authority to allow Exoo to create a ban evasion account.

232.     Twitter allowed Exoo to create a ban evasion account fully aware he was a habitual doxer, who used Twitter to harm others.

233.     Exoo as @AntiFashGordon doxed Plaintiffs and violently threatened others with violence, including employers and former co-workers in order to extort Plaintiffs' termination.

234.     Gadde, Twitter Support and Twitter Trust and Safety received contemporaneous complaints that @AntiFashGordon doxed Plaintiffs, but took no action.

235.     Twitter refused to protect Plaintiffs the Exoo Enterprise's abusive behavior and have not removed Plaintiffs doxed information or banned the Exoo Enterprise, who continue to abuse and dox.

236.     Twitter assumed liability for the harm that flows from defendant Exoo's doxing when they neglected to remove Plaintiffs' doxed information in violation of their TOS.

237.     As a direct and proximate result of defendant Gadde and Twitter's breach of their assumed duty to remove Plaintiffs doxed private information Plaintiffs have suffered adverse consequences and continue to suffer adverse consequences.  Plaintiffs are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

**COUNT XIII**
**Legal Malpractice**

**(as to D'Ambly against defendant Cohen, Weiss, and Simon, L.L.P.)**

238.    D'Ambly repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 237 with the same force and effect as if set forth in detail herein again.

239.    As a result of their personal revulsion of D'Ambly and his political beliefs CWS failed to adequately represent and protect D'Ambly's rights.

240.    Defendant CWS neglected to perform necessary case research, legal research, and investigation of the accusations against D'Ambly.

241.    As a result of CWS's inadequate legal research and investigation they failed to protect D'Ambly from the extortionate and criminal conduct of others.

242.    As a result of CWS's failure to adequately investigate D'Ambly's doxing they failed to learn that @AntiFashGordon publicly announced D'Ambly's termination on January 13, 2019, which occurred five days before his official termination date, and one day before the purported "cause" of his termination was discovered.

243.    CWS failed to challenge Brill's blatant misrepresentations regarding the timing of the alleged 'cause' of D'Ambly's termination.

244.    CWS's revulsion of D'Ambly and his political beliefs caused them to ignore an obvious racially discriminatory pre-textual termination spotlighted by the private investigation, last and final warning, and falsely claimed cause of D'Ambly's termination.

245.    As a direct and proximate result of CWS's legal malpractice that flowed from their firmwide enmity of D'Ambly's political beliefs D'Ambly has suffered adverse consequences and continues to be damaged.  D'Ambly is entitled to compensatory damages,

Case 2:20-cv-12880-MM-JSA Document 1620 Filed 06/17/22 Page 175 of 275 Page 2589
4180
Case 2:20-cv-12880-MM-JSA Document 74-66 Filed 07/23/21 Page 104 of 405 Page ID 96107

equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1.      Demands judgment against Defendants, jointly and severally, in an amount to be determined at trial plus interest, including, but not limited to, all emotional distress, back pay, punitive damages, liquidated damages, statutory damages, attorneys' fees, costs, and disbursements, and for such relief as the Court deems just and proper.

2.      On Plaintiffs' RICO claims: compensatory damages and enhancement of damages Plaintiffs have sustained as a result of Defendants' conduct as may be permitted under the relevant statutes, such amount to be determined at trial, plus Plaintiffs costs in this suit, including reasonable attorneys' fees.

3.      On Plaintiffs' tortious interference, intrusion upon seclusion, stalking and harassment claims: compensatory and punitive damages in an amount to be determined at trial.

4.      On D'Ambly's State claims against the Tribune and Daily News: compensatory damages and enhancement of damages he sustained as a result of the Tribune and Daily News' conduct as may be permitted under the relevant statutes, such amount to be determined at trial, plus Plaintiffs costs in this suit, including reasonable attorneys' fees.

5.      On D'Ambly's legal malpractice claim: compensatory damages to be determined at trial.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury on all issues so triable.

Respectfully Submitted,

**LAW OFFICE OF PATRICK TRAINOR**

*Attorney for D'Ambly*

Dated: March 25, 2021

Patrick Trainor
848 Paterson Avenue
East Rutherford, New Jersey 07073
(201) 777-3327
pt@ptesq.com

<div align="center">

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| DANIEL D'AMBLY, | Case No. 2:20-cv-12880-JMV-JSA |
| Plaintiff, | |
| v. | Civil Action |
| CHRISTIAN EXOO a/k/a ANTIFASH GORDON; ST. LAWRENCE UNIVERSITY; TRIBUNE PUBLISHING COMPANY; NEW YORK DAILY NEWS; VIJAY GADDE; TWITTER, INC.; COHEN, WEISS AND SIMON LLP, | Motion Date: July 6, 2021 |
| Defendants. | |

---

**MEMORANDUM OF LAW ON BEHALF OF DEFENDANT COHEN, WEISS AND SIMON LLP IN SUPPORT OF ITS MOTION TO DISMISS COUNT XIII OF PLAINTIFF'S AMENDED COMPLAINT**

---

Michael J. Canning, Esq. (MJC3060)
Afiyfa H. Ellington, Esq. (AHE4674)
**GIORDANO, HALLERAN & CIESLA**
A Professional Corporation
125 Half Mile Road, Suite 300
Red Bank, N.J. 07701-6777
(732) 741-3900


Attorneys for Defendant Cohen,
Weiss and Simon LLP

MICHAEL J. CANNING, ESQ.
  Of Counsel and on the Brief

AFIYFA H. ELLINGTON, ESQ.
  On the Brief

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES........................................ ii

PRELIMINARY STATEMENT...................................... 1

PROCEDURAL HISTORY......................................... 1

STATEMENT OF FACTS........................................ 3

STANDARD OF REVIEW........................................ 6

LEGAL ARGUMENT............................................ 8

    POINT I

       THIS COURT SHOULD DISMISS COUNT XIII OF PLAINTIFF'S
       AMENDED COMPLAINT WITH PREJUDICE UNDER RULE 12(C) AS
       THERE IS NO LEGAL BASIS FOR THE LEGAL MALPRACTICE
       CLAIM AGAINST CWS........................................ 8

          A. As a Matter of Law, There Is No Attorney-Client
            Relationship between Plaintiff and CWS, as CWS
            Represented the Union in the Grievance and
            Arbitration........................................ 8

CONCLUSION............................................... 14

## TABLE OF AUTHORITIES

**Cases**

Arnold v. Air Midwest Inc., 100 F.3d 857 (10th Cir. 1996)..... 11

Ashcroft v. Iqbal, 556 U.S. 544 (2007)......................... 7

Atkinson v. Sinclair Refinancing Co., 370 U.S. 238
   1962) ........................................ 9, 10, 11, 13

Breda v. Scott, 1 F.3d 908 (9th Cir. 1993).................... 11

Burtch v. Milberg Factors Inc., 662 F.3d 212 (3d Cir.
   2011) .................................................... 7

Carino v. Stefan, 376 F.3d 156 (3d Cir. 2004).......... 9, 12, 13

Fowler v. UPMC Shadyside, 578 F.3d 203 (3d Cir. 2009).......... 7

Glob. Naps. Inc. v. Bell Atl. N.J. Inc., 287 F.Supp. 2d
   532 (D.N.J. 2003) ........................................ 7

In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410
   (3d Cir. 1997) ........................................... 7

Jabolonski v. Pan Am. World Airways, Inc., 863 F.2d 289
   (3d Cir. 1988) ........................................... 7

Jerista v. Murray, 185 N.J. 175 (2005)........................ 8

Montplaisir v. Leighton, 875 F.2d 1, 7 (1st Cir. 1989).... 11, 13

Peterson v. Kennedy, 771 F.2d 1244, 1258 (9th Cir. 1985),
   cert. denied, 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.
   2d 187 (1986) ..................................... 11, 12, 13

Republic Steel Corp. v. United Mine Workers of America,
   570 F.2d 467 (3d Cir. 1978) ............................. 10

Rosenau v. Unifund Corp., 539 F.3d 218 (3d Cir. 2008).......... 6

Waterman v. Transport Workers Union Local 100, 176 F.3d
   150 (2d Cir. 1999) ...................................... 11

Wilkes-Barre Pub. Co. v. Newspaper Guild of Wilkes-Barre,
   Local 120, 647 F.2d 372 (3d Cir. 1981) ................. 10

**Statutes**

29 U.S.C. §185; §10(b)....................................... 13

**Rules**

Rule 12(b)(6)............................................. 7, 10

Rule 12(c)................................................... 7

**<u>Constitutional Provisions</u>**

<u>U.S. Const.</u> Amend. I and <u>N.J. Const.</u> Art. I, ¶6............... 3

## PRELIMINARY STATEMENT

Cohen, Weiss and Simon LLP ("CWS") files this motion to dismiss Count XIII of the Amended Complaint of Plaintiff, Daniel D'Ambly ("Plaintiff" or "D'Ambly") with prejudice. In this Count, the sole Count of the Amended Complaint asserted against CWS, Plaintiff alleges a claim of legal malpractice arising from CWS' representation of Local One-L, Graphic Communications Conference of the International Brotherhood of Teamsters (the "Teamsters Union") in a labor arbitration challenging D'Ambly's termination by the New York Daily News ("Daily News").

This claim of legal malpractice fails as a matter of law. Legal precedent, including binding precedent from the Third Circuit Court of Appeals, compels the dismissal of this claim because there is no attorney-client relationship between Plaintiff and CWS, which represents the Teamsters Union, not its constituent member.

## PROCEDURAL HISTORY

On September 21, 2020, D'Ambly filed a Complaint with jury demand against Defendants, Christian Exoo a/k/a Antifash Gordon ("Exoo"), St. Lawrence University, Tribute Publishing Company ("Tribute"), Daily News, Vijaya Gadde, Twitter, Inc. ("Twitter") and CWS (collectively referred to as "Defendants"). (Certification of Michael J. Canning, Esq. (the "Cert. Canning") at Exhibit A).

- 1 -

Count XIII of the Complaint alleges a claim of legal malpractice against CWS, which is the only count of the Complaint directed to CWS. (Cert. Canning, Exhibit A, pp. 31-32).

On October 22, 2020, CWS filed its Answer to Plaintiff's Complaint, denying all allegations of legal malpractice and setting forth separate defenses and cross claims against Defendants. (Cert. Canning, Exhibit B). CWS pleaded as its second affirmative defense that Plaintiff's Complaint must be dismissed as to CWS for failure to state a claim upon which relief can be granted and reserved its right to move to dismiss the Complaint. Id.

On November 9, 2020, CWS filed a motion to dismiss Plaintiff's Complaint as to CWS with prejudice. On November 23, 2020, Plaintiff filed a brief in opposition to the motion to dismiss. On December 6, 2020, CWS filed its reply brief.

After CWS' motion was fully briefed, on January 10, 2021 Plaintiff filed a motion for leave to file an Amended Complaint. On March 25, 2021 an Order was entered allowing Plaintiff to file an Amended Complaint. The Amended Complaint did not include any new or additional claims against CWS and the sole count in the Amended Complaint as to CWS is Count XIII. A copy of Plaintiff's Amended Complaint is attached to the Cert. Canning as Exhibit C.

CWS now moves to dismiss Plaintiff's Amended Complaint as to CWS with prejudice pursuant to Rule 12 (c).

- 2 -

## STATEMENT OF FACTS[1]

Plaintiff D'Ambly was a member of the Teamsters Union and worked as a plate maker for the Daily News in Jersey City, New Jersey until January 18, 2019, when the Daily News terminated him. (Cert. Canning, Exhibit C, ¶1).

Plaintiff is a member of the European Heritage Association and participates in political rallies, political protests, pamphleteering and speech, which he contends is protected by the U.S. Const. Amend. I and N.J. Const. Art. I, ¶6. (Cert. Canning, Exhibit C, ¶1).

Defendant Exoo is an alleged member of Antifa who uses the Twitter username @Antifash Gordon. D'Ambly accuses Exoo of conducting "doxing" campaigns to publicly disclose the identity, employer, school, and home addresses of white supremacists and fascists in an attempt to get them fired from their jobs. (Cert. Canning, Exhibit C, Statement of Case, ¶16).

As alleged in the Complaint, in or about January 2018, Exoo identified D'Ambly as a white supremacist, and in October 2018, revealed D'Ambly's full identity, place of employment and other information. (Cert. Canning, Exhibit C, ¶¶39, 44). D'Ambly alleges that Exoo and his associates directed harassing, intimidating and

---

[1] Although the Amended Complaint contains various misstatements of fact, CWS will accept the allegations of the Amended Complaint as true for the purposes of this motion only.

- 3 -

death-threatening phone calls and Twitter "tweets" to the Daily News in order to try to get D'Ambly fired. (Cert. Canning, Exhibit. C, ¶45).

In December 2018, the Tribune, the parent company of the Daily News, conducted an investigation resulting in a Private Investigation Report ("Report") that confirmed through videography evidence that D'Ambly and others had used racial slurs and other hate speech during political rallies. (Cert. Canning, Exhibit C, ¶46).

On January 10, 2019, D'Ambly, accompanied by a representative of the Teamsters Union, met with Tribune and Daily News representatives. During the meeting, the Report was discussed and D'Ambly acknowledged that he was a member of the European Heritage Association and had used imprudent language at protests. (Cert. Canning, Exhibit C, ¶50).

D'Ambly alleges that on January 11, 2019, in an attempt to stop a protest the following day by the European Heritage Association, Exoo and his associates sent to the Daily News death threats and threatening calls. (Cert. Canning, Exhibit C, ¶¶51, 52). Later that day, the Daily News issued D'Ambly a "Last and Final Warning." (Cert. Canning, Exhibit C, ¶56).

D'Ambly alleges that on January 16, 2019, the Daily News blamed him for death threats it had received, and terminated his employment. (Cert. Canning, Exhibit C, ¶63).

- 4 -

Thereafter, the Teamsters Union filed a grievance against the Daily News challenging D'Ambly's termination, pursuant to the terms of the collective bargaining agreement.  The Teamsters Union engaged CWS, a law firm, to handle the grievance and arbitration. (Cert. Canning, Exhibit C, ¶¶23, 68).

On or about July 15, 2019, the Daily News, the Teamsters Union, and D'Ambly executed a Separation Agreement resolving the grievance and arbitration.  The Daily News paid D'Ambly a lump sum payment and in exchange the Teamsters Union withdrew the grievance and arbitration with prejudice. (Cert. Canning, Exhibit C, ¶73).

The sole cause of action pleaded against CWS is Count XIII of the Amended Complaint, which alleges legal malpractice relating to the legal services provided by CWS relating solely to the grievance and arbitration between the Teamsters Union and the Daily News. (Cert. Canning, Exhibit C, ¶¶ 68-73, 238-245).  D'Ambly alleges that in connection with the grievance and arbitration, he spoke with CWS attorneys Thomas Kennedy and Kate Swearengen, and that both attorneys allegedly expressed their disagreement as to his political positions.  D'Ambly asserts that CWS failed to adequately represent and protect his rights as a result of its attorneys' personal revulsions to his politics.  (Cert. Canning, Exhibit C, ¶¶ 68-71, 239).  D'Ambly alleges that CWS neglected to perform necessary case research, legal research and investigation of the accusations against him and contends that this failure resulted in

- 5 -

their inability to protect him from the extortionate and criminal conduct of others. (Cert. Canning, Exhibit C, ¶¶240-241). D'Ambly alleges that an investigation would have determined that @AntiFashGordon publicly announced D'Ambly's termination on January 13, 2019, five days before his official termination date and one day before the Daily News discovered the purported "cause" for his termination. (Cert. Canning, Exhibit C, ¶242). D'Ambly alleges that CWS failed to challenge blatant misrepresentations by the Daily News regarding the timing of the alleged cause of his termination. (Cert. Canning, Exhibit C, ¶243). D'Ambly further alleges that CWS' revulsion of D'Ambly's political views caused CWS to ignore that his termination was racially discriminatory and pre-textual. (Cert. Canning, Exhibit C, ¶244). D'Ambly contends that he has suffered adverse consequences and continues to be damaged, and seeks compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees and other damages. (Cert. Canning, Exhibit C, ¶245).

## STANDARD OF REVIEW

The Third Circuit has explained that a court may grant a Rule 12(c) motion for judgment on the pleadings when "no material issue of fact remains to be resolved and [the movant] is entitled to judgment as a matter of law." Rosenau v. Unifund Corp., 539 F.3d 218, 221 (3d Cir. 2008)(quoting Jabolonski v. Pan Am. World

Airways, Inc., 863 F.2d 289, 290-91 (3d Cir. 1988)(internal quotation marks and citations omitted)).

"The difference between Rule 12(b)(6) and Rule 12(c) is purely procedural and 12(c) requests for dismissal are governed by the same standards as 12(b)(6) motions." Glob. Naps. Inc. v. Bell Atl. N.J. Inc., 287 F.Supp. 2d 532, 530 (D.N.J. 2003). For a complaint to survive dismissal under Rule 12(b)(6), or Rule 12(c), it must contain sufficient factual matter to state a claim that is plausible on its face. Ashcroft v. Iqbal, 556 U.S. 544, 570 (2007). In evaluating the sufficiency of a complaint, district courts must separate the legal and factual elements. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-211 (3d Cir. 2009). Mere restatements of the elements of a claim are legal conclusions and therefore are not entitled to an assumption of truth. Burch v. Milberg Factors Inc., 662 F.3d 212, 224 (3d Cir. 2011). The pleading must contain more than "labels and conclusions or a formulaic recitation of the elements of a cause of action." Ashcroft v. Iqbal, 556 U.S. at 678. The court "need not credit a complaint's 'bald assertions' or 'legal conclusions.'" In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429 (3d Cir. 1997).

**LEGAL ARGUMENT**

**POINT I**

**THIS COURT SHOULD DISMISS COUNT XIII OF PLAINTIFF'S AMENDED COMPLAINT WITH PREJUDICE UNDER RULE 12(C) AS THERE IS NO LEGAL BASIS FOR THE LEGAL MALPRACTICE CLAIM AGAINST CWS.**

**A.   As a Matter of Law, There Is No Attorney-Client Relationship between Plaintiff and CWS, as CWS Represented the Union in the Grievance and Arbitration.**

In order to sustain a cause of action for legal malpractice under New Jersey law, an attorney-client relationship must be established between the plaintiff and the defendant which imposes upon the defendant a duty of care to the plaintiff. Jerista v. Murray, 185 N.J. 175, 190-91 (2005).

Where, as here, an attorney represents a union in a labor grievance on behalf of a union member as part of the collective bargaining process, the attorney represents the union and no attorney client relationship is entered into between the attorney and the union member. Because Plaintiff cannot prove the *prima facie* element of a legal duty owed by CWS to him, his claim for legal malpractice against CWS is unsustainable as a matter of law.

As all of the factual allegations and the sole cause of action against CWS arise out of and relate to the grievance and arbitration which are part of the collective bargaining process, CWS is immune from suit for malpractice by Plaintiff as a member of the Teamsters Union.

- 8 -

In Carino v. Stefan, 376 F.3d 156 (3d Cir. 2004), the Third Circuit Court of Appeals unequivocally ruled that Section 301(b) of the Labor Management Relations Act ("LMRA"), as broadly interpreted by the United States Supreme Court in Atkinson v. Sinclair Refinancing Co., 370 U.S. 238 (1962), immunizes from suit for legal malpractice attorneys hired by unions to perform services related to a collective bargaining agreement.

In Carino, plaintiff was employed as an insurance agent and was a member of the union that had a collective bargaining agreement with her employer. When plaintiff's employer terminated her employment (for misconduct in selling insurance policies), the union filed a grievance under the procedures established by the collective bargaining agreement. The union thereafter engaged a law firm to handle the arbitration challenging plaintiff's termination, and the law firm appointed one of its attorneys for this purpose. Plaintiff thereafter executed a settlement agreement in which she agreed to forego arbitration because the attorney assured her that in exchange, her employer would clear her of the charges and reinstate her pension. When plaintiff realized that the documents she signed made no reference to such concessions by her employer, she brought claims of legal malpractice against the firm and the attorney. Carino, 376 F.3d at 158-59.

- 9 -

This Court dismissed the complaint with prejudice under Fed.R.Civ.P. 12(b)(6) for failure to state a claim. The Third Circuit Court of Appeals affirmed the dismissal of the complaint and made clear that the attorney enjoyed immunity:

> This appeal presents a question of first impression for our Court, namely, whether an attorney hired by a union to perform services on behalf of a union member in connection with an arbitration hearing conducted pursuant to a collective bargaining agreement is immune from suit for malpractice by that member. We conclude that the LMRA bars such a suit. [Carino, 376 F.3d at 159.]

In reaching this conclusion, the Third Circuit explained that "the law is clear that individual union officers are not personally liable to third parties for actions taken on behalf of the union in the collective bargaining process." Id. at 159-160.[2] The Carino court found that "with monotonous regularity [other courts of appeals have] cited Atkinson to foreclose state-law claims, however inventively cloaked, against individuals acting as union representatives within the ambit of the collective bargaining process." Id. at 160 (internal quotation marks and citations omitted).

_____

[2] The Third Circuit had previously recognized that Atkinson protects individual union members and officers from suit from alleged union wrongs. See e.g., Wilkes-Barre Pub. Co. v. Newspaper Guild of Wilkes-Barre, Local 120, 647 F.2d 372, 377 (3d Cir. 1981); Republic Steel Corp. v. United Mine Workers of America, 570 F.2d 467, 478 (3d Cir. 1978).

- 10 -

With respect to the specific issue of the applicability of
Atkinson to attorneys who act on behalf of a union to assist a
union member in a labor arbitration, the Third Circuit recognized
that other courts of appeals had all reached the same result:

> The only courts of appeals to have considered
> the specific question presented here, where
> attorneys acted on behalf of the union, have
> uniformly concluded that Atkinson prohibits
> claims made by a union member against
> attorneys employed by or retained by the union
> to represent the member in a labor dispute.
> See Waterman v. Transport Workers Union Local
> 100, 176 F.3d 150 (2d Cir. 1999)("[U]nder
> Atkinson, a union's attorneys may not be sued
> by an individual union member for actions
> taken pursuant to a collective bargaining
> agreement."); Arnold v. Air Midwest Inc., 100
> F.3d 857, 862 (10th Cir. 1996) ("[A]n attorney
> who performs services for and on behalf of a
> union may not be held liable in malpractice to
> individual grievant where the services
> performed constitute a part of the collective
> bargaining process."); Breda v. Scott, 1 F.3d
> 908, 909 (9th Cir. 1993) (holding that
> employees cannot sue inside or outside counsel
> for services rendered under a collective
> bargaining agreement); Montplaisir [v.
> Leighton, 875 F.2d 1, 7 (1st Cir. 1989)]
> ("[F]or purposes of the Atkinson principle,
> [attorneys] must be treated the same as other
> union agents."); Peterson v. Kennedy, 771 F.2d
> 1244, 1258 (9th Cir. 1985), cert. denied, 475
> U.S. 1122, 106 S.Ct. 1642, 90 L.Ed. 2d 187
> (1986) ("[W]here, as here, the attorney
> performs a function in the collective
> bargaining process that would otherwise be
> assumed by the union's business agents or
> representatives, the rationale behind the
> Atkinson rule is squarely applicable.")
> [Id. at 160.]

As one court has explained, a union may choose to have
grievances handled by a union representative with no legal
training, or by an attorney.  When a union chooses to make use of
an attorney, that attorney has not "entered into an 'attorney-
client' relationship in the ordinary sense with the particular
union member" at issue.  Peterson, 771 F.2d at 1258 (internal
quotations in the original).  Rather, the attorney merely
"assume[s] a function that often is performed by a union's business
agents or representatives."  Peterson, 771 F.2d at 1258.  When it
is the union which provides the services, albeit through assigned
counsel, it is the union, rather than the individual business agent
or attorney, that represents and is ultimately responsible to the
member.  Id.

In Carino, the Third Circuit cited several policy
considerations for not permitting members to bring malpractice
claims against union attorneys handling labor grievances under a
collective bargaining agreement.  First, the court noted that it
would be "anomalous" if the union attorney could be liable for
mere negligence where the union would be liable only if a higher
standard were met, namely arbitrariness or bad faith.  376 F.3d at
161.

Second, because state statutes of limitation for malpractice
are generally longer than the statutes of limitation for a union
member to file suit against the union or employer, if union

- 12 -

attorneys were subject to such malpractice suits, litigants would be able to proceed against the attorney long after their time for suing the union and the employer had expired.   Id. (citing Peterson, 771 F.2d at 1259).[3]

Finally, the Third Circuit recognized that if union members were permitted to sue union attorneys, the attorneys could be held liable for damages "flowing from the union's political or tactical choices" which "could, in turn, severely hamper unions in enlisting quality representation." Id. (citing Montplaisir, 875 F.2d at 7).

"[G]uided by Atkinson [] and the logic of the opinions" of the other courts of appeals, the Third Circuit held that "§ 301 of the LMRA immunizes attorneys employed by or hired by unions to perform services related to a collective bargaining agreement from suit for malpractice." Id. at 162.

Here, the sole allegations against CWS relate to the services it provided on behalf of the Teamsters Union in the grievance and arbitration process, which are part of the collective bargaining agreement between the Daily News and the Teamsters Union.  Under the clear and unequivocal holding in Carino, CWS is immune from D'Ambly's claim of legal malpractice.

_____

[3] Any claim against the Teamsters Union is time-barred by the applicable six-month statute of limitations. See §301 of the LMRA, 29 U.S.C. §185; §10(b) of the National Labor Relations Act, as amended, 29 U.S.C. §160(b).

<u>**CONCLUSION**</u>

Based on the foregoing arguments, Defendant Cohen, Weiss and Simon LLP respectfully requests that the Court dismiss Count XIII of the Amended Complaint with prejudice.

<div style="margin-left:40%">

GIORDANO, HALLERAN & CIESLA
A Professional Corporation
Attorneys for Defendant Cohen, Weiss and Simon LLP

By: _____
     MICHAEL J. CANNING, ESQ.

</div>

Dated:  April 22, 2021

Docs #5035498-v1

<div style="text-align:center">- 14 -</div>

EXHIBIT "H"

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

DANIEL D'AMBLY, et al.,

*Plaintiffs*,

v.

CHRISTIAN EXOO a/k/a ANTIFASH
GORDON, et al.,

*Defendants*.

Civil Action No. 20-12880

**ORDER**

**John Michael Vazquez, U.S.D.J.**

For the reasons set forth in the accompanying Opinion, and for good cause shown,

IT IS on this 1st day of November, 2021,

**ORDERED** that Defendant Cohen, Weiss, and Simon LLP's motion (D.E. 74) is **GRANTED**; and it is further

**ORDERED** that Count XIII of the Amended Complaint and Cohen, Weiss, and Simon LLP as a Defendant are **DISMISSED without prejudice** in this matter; and it is further

**ORDERED** that Plaintiffs are provided leave to file an amended pleading that remedies the identified deficiencies. Plaintiffs' amended pleading must be filed within thirty (30) days of the date of this Order. If Plaintiffs fail to file an appropriate amended pleading within this time, the claim against Cohen, Weiss, and Simon LLP and Cohen, Weiss, and Simon LLP as a Defendant will be **DISMISSED with prejudice**.

John Michael Vazquez, U.S.D.J.

<u>Not for Publication</u>

<div align="center">

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

</div>

|  |  |
|---|---|
| DANIEL D'AMBLY, et al., | |
| *Plaintiffs*, | |
| v. | Civil Action No. 20-12880 |
| | **OPINION** |
| CHRISTIAN EXOO a/k/a ANTIFASH GORDON, et al., | |
| *Defendants.* | |

<u>John Michael Vazquez, U.S.D.J.</u>

Presently before the Court is Defendant Cohen, Weiss, and Simon LLP's ("Defendant" or "CWS") motion to dismiss pursuant to Federal Rule of Civil Procedure 12(c). Defendant seeks to dismiss Count XIII of the Amended Complaint, which asserts a legal malpractice claim. D.E. 74. Plaintiff Daniel D'Ambly ("Plaintiff" or "D'Ambly") filed a brief in opposition, D.E. 81, to which Defendant replied, D.E. 82.[1] The Court reviewed the parties' submissions and decided the motion without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons set forth below, Defendant's motion is **GRANTED**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

In this matter, Plaintiffs assert numerous claims against Defendant Christian Exoo and his alleged associates because Exoo instructed associates to "dox" Plaintiffs after identifying them as

---

[1] Defendant's brief in support of its motion to dismiss (D.E. 74-1) will be referred to as "Def. Br.";
Plaintiff's opposition brief (D.E. 81) will be referred to as "Plf. Opp."; and Defendant's reply brief
(D.E. 82) will be referred to as "Def. Reply."

fascists or white supremacists.[2]  Doxing refers to "publicly disclos[ing] a person's identity, employer, school, home address, etc., for the purpose of causing harm to that person."  Am. Compl., Statement of the Case.  The instant motion involves Plaintiff D'Ambly's stand-alone malpractice claim against CWS.  Thus, the Court only discusses facts pertinent to that claim.

Briefly, D'Ambly alleges that Exoo identified D'Ambly as a white supremacist and fascist in January 2018, and beginning in October 2018, D'Ambly was doxed.  *Id.* ¶¶ 39, 44.  D'Ambly is a member of the New Jersey European Heritage Association ("EHA"), "a non-violent, pro-domestic policy organization."  *Id.* ¶ 1.  In tweets, Exoo instructed his Twitter followers to send harassing and threatening tweets and phone calls to D'Ambly's employer, the New York Daily News ("Daily News"), to get D'Ambly fired.  *Id.* ¶ 45.  Between October 29, 2018, and January 11, 2019, "the Exoo Enterprise directed no less than fifty-four (54) threatening Tweets to @DailyNews plus an unknown number of threatening phone calls."  *Id.*  Exoo doxed Plaintiff for a second time on January 11, 2019, again via Twitter.  *Id.* ¶ 51.  The same day, callers left threatening phone messages for the Daily News.  *Id.* ¶ 52.  In January 2019, D'Ambly attended two meetings with the representatives of his union, Local One-L, and the Daily News and its parent company about the doxing and D'Ambly's political associations, including with the EHA.  *Id.* ¶¶ 50, 56.  On January 14, 2019, the Daily News told D'Ambly not to report to work until informed otherwise.  *Id.* ¶ 62.  D'Ambly was terminated on January 16, 2019, during a phone call with

---

[2] The factual background is taken from Plaintiff's Amended Complaint ("Am. Compl."). D.E. 66. As discussed above, the Court construes Defendant's motion as one filed pursuant to Federal Rule of Civil Procedure 12(b)(6). When reviewing a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Yet, the standard would be the same under a Rule 12(c) motion. When deciding a motion for judgment on the pleadings pursuant to Rule 12(c), the Court accepts as true all well-pleaded facts in a complaint. *In re Lipitor Antitrust Litig.*, 336 F. Supp. 3d 395, 406 (D.N.J. 2018).

D'Ambly, two employees of the Daily News' parent company, and a representative of Local One-L. *Id.* ¶ 63.

On January 23, 2019, the president of Local One-L "informed the Daily News that they were appealing D'Ambly's termination pursuant to terms of the Contract."[3] *Id.* ¶ 64. Local One-L filed a grievance on D'Ambly's behalf, *id.* ¶ 68, and the Union retained . . . Cohen, Weiss, and Simon, LLP . . . to represent D'Ambly[,]" *id.* Thereafter, Plaintiff had phone conferences with two attorneys from CWS, who both separately expressed their disdain for D'Ambly's beliefs. *Id.* ¶¶ 69-70. In addition, both attorneys dismissed D'Ambly's desire to have his employment reinstated. *Id.* On January 15, 2019, D'Ambly executed a separation agreement (presumably with the Daily News) that CWS negotiated on D'Ambly's behalf. Through the separation agreement, D'Ambly received a lump sum payment and the Union agreed to withdraw the pending arbitration case with prejudice. *Id.* ¶ 73. Plaintiff alleges that the CWS attorneys' bias against his political views impacted their representation and that they failed to adequately investigate the conduct that led to Plaintiff's termination. *Id.* ¶¶ 71-72.

D'Ambly filed suit on September 21, 2020. His thirteen-count Complaint largely addresses Defendants' alleged doxing campaign. Count XIII, however, is asserted solely by D'Ambly, and is a claim for legal malpractice against CWS. Count XIII is related to D'Ambly's termination from the Daily News and CWS's involvement in the resulting grievance. *See* Compl, ¶¶ 154-61. D'Ambly does not allege that CWS was involved in any of the doxing efforts, and the other twelve counts are not asserted against CWS. CWS subsequently filed its Answer. D.E. 12.

---

[3] The Court presumes that the "Contract" D'Ambly refers to is Local One-L's collective bargaining agreement with the Daily News.

On March 25, 2021, Plaintiffs filed the Amended Complaint, which includes allegations about additional Plaintiffs, but the allegations and claim asserted against CWS are unchanged. D.E. 66. CWS did not file an amended Answer. Instead, Defendant filed the instant motion, pursuant to Federal Rule of Civil Procedure 12(c), on April 22, 2021. D.E. 74. Defendants Christian Exoo, St. Lawrence University, Vijaya Gadde, and Twitter, Inc. filed motions to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). D.E. 75, 78, 79. Those motions will be addressed in a separate opinion or opinions.

## II.    STANDARD OF REVIEW

Defendant brings its motion to dismiss pursuant to Rule 12(c). Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). Pleadings are "closed" after the complaint and answer are filed. *Horizon Healthcare Servs., Inc. v. Allied Nat'l Inc.*, No. 03-4098, 2007 WL 1101435, at *3 (D.N.J. Apr. 10, 2007). In a multiparty case, "pleadings are not considered closed until *every* defendant has answered the complaint." *Newton v. Greenwich Township*, No. 12-238, 2012 WL 3715947, at *1 n.1 (D.N.J. Aug. 27, 2012). Here, the other Defendants in this matter have not answered the Amended Complaint. In addition, although CWS answered the original complaint, it did not file an answer to the Amended Complaint. An amended pleading supersedes all prior pleadings. *See Sunset Fin. Res., Inc. v. Redevelopment Grp. V, LLC*, 417 F. Supp. 2d 632, 642 n.15 (D.N.J. 2006). As a result, Defendant should have answered the Amended Complaint before filing the instant motion. But more importantly, because no Defendant has answered the Amended Complaint, the pleadings are not closed. Thus, Defendant's motion is procedurally improper. But because Defendant could simply re-file the instant motion as a Rule 12(b)(6) motion and because a Rule 12(c) motion is reviewed under the same standard as a Rule 12(b)(6) motion,

4

the Court will construe Defendant's motion as having been filed pursuant to Rule 12(b)(6). *See, e.g., Rivera v. Camden Bd. of Educ.*, 634 F. Supp. 2d 486, 488 (D.N.J. 2009) (construing motion to dismiss filed after answer as a Rule 12(c) motion).

For a complaint to survive dismissal under Rule 12(b)(6), it must contain sufficient factual matter to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Further, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of her claims." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016). In evaluating the sufficiency of a complaint, district courts must separate the factual and legal elements. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-211 (3d Cir. 2009). Restatements of the elements of a claim are legal conclusions, and therefore, not entitled to a presumption of truth. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011). The Court, however, "must accept all of the complaint's well-pleaded facts as true." *Fowler*, 578 F.3d at 210.

### III.    ANALYSIS

Defendant argues that Count XIII should be dismissed because there was not an attorney-client relationship between Plaintiff and Defendant. Specifically, Defendant contends that under the Labor Management Relations Act ("LMRA"), the union was its client, not Plaintiff. Defendant continues that because the union was its client, Plaintiff's claims are barred by the LMRA. Def. Br. at 8-12. Legal malpractice is negligence relating to an attorney's representation of a client. *McGrogan v. Till*, 771 A.2d 1187, 1193 (N.J. 2001). To state a claim for attorney malpractice, a plaintiff must demonstrate "(1) the existence of an attorney-client relationship creating a duty of

care by the defendant attorney, (2) the breach of that duty by the defendant, and (3) proximate causation of the damages claimed by the plaintiff." *Id.* "The existence of an attorney-client relationship is, of course, essential to the assertion of a cause of action for legal malpractice." *Froom v. Perel*, 872 A.2d 1067, 1074 (N.J. App. Div. 2005).

*Carino v. Stefan*, 376 F.3d 156 (3d Cir. 2004) is directly on point. In *Carino*, the Third Circuit broadly construed Section 301(b) of the LMRA,[4] "holding that § 301 of the LMRA immunizes attorneys employed by or hired by unions to perform services related to a collective bargaining agreement from suit for malpractice." *Id.* at 162. Consequently, the Circuit affirmed the district court's order dismissing state law claims, including a claim for malpractice, against an attorney and law firm that the union retained to file "a grievance on [Plaintiff's] behalf, contesting her termination." *Id.* at 158, 162. The Circuit explained that "the protection of § 301(b) only applies where a union agent's liability grows out of activities performed in relation to a collective bargaining agreement." *Id.* at 162. The Circuit concluded that the attorney's alleged improper conduct grew out of the union's retention of the attorney to represent the plaintiff during arbitration of the grievance and convincing the plaintiff to withdraw the grievance "was an activity performed in relation to the collective bargaining agreement." *Id.*

Here, Plaintiff pleads that after he was terminated by the Daily News, Plaintiff's union told the newspaper that it was going to appeal D'Ambly's termination "pursuant to terms of the Contract." Am. Compl. ¶ 65. Thereafter, the union filed a grievance on Plaintiff's behalf. Plaintiff further alleges that the union hired Defendant to represent Plaintiff with respect to the grievance.

---

[4] Section 301(b) states, in part, that "[a]ny money judgment against a labor organization . . . shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against any individual member or his assets." 29 U.S.C. § 185(b). Overall, "Section 185(b) has been interpreted expansively by the courts to provide broad protection for union representatives." *Cole v. Beros*, No. 08-541, 2008 WL 2225825, at *2 (W.D. Pa. May 29, 2008).

6

*Id.* ¶ 68.  In the malpractice claim, Plaintiff alleges that Defendant conducted inadequate legal research and investigation into the accusations that led to Plaintiff's termination.  Plaintiff seems to allude that had Defendant conducted an appropriate investigation, it would have led to reinstatement.  *Id.* ¶¶ 71-72, 239-45.  Plaintiff's allegations fit squarely into the parameters discussed in *Carino*.  Namely, Plaintiff seeks to hold Defendant liable because of the actions (or inaction) of two attorneys in representing the grievance related to Plaintiff's termination.  Because the union retained Defendant to represent Plaintiff as to the grievance, Section 301(b) bars Plaintiff from asserting malpractice claims against Defendant.

Plaintiff contends that there are "several factors that preclude [Defendant] from invoking the safe harbor protections of § 301(b)."  Plf. Opp. at 3.  First, Plaintiff argues that there was an implied attorney-client relationship between him and CWS.  *Id.* at 5-6.  An implied attorney-client relationship "requires more than a subjective belief that such relationship exists."  *Oestreicher v. Rutgers*, No. 02-959, 2015 WL 6460423, at *6 (D.N.J. Oct. 26, 2015).  Rather, a court may find that an implied attorney-client relationship existed if a party shows "(1) that it submitted confidential information to a lawyer, and (2) that it did so with the reasonable belief that the lawyer was acting as the party's attorney."  *Montgomery Acad. v. Kohn*, 50 F. Supp. 2d 344, 350 (D.N.J. 1999) (quoting *Pain Prevention Lab, Inc. v. Elec. Waveform Labs, Inc.*, 657 F. Supp. 1486, 1495 (N.D. Ill. 1987)).

Plaintiff maintains that an implied attorney-client relationship was formed because he shared confidential materials with Defendant.  Plf. Opp. at 6-7.  But the allegations in the Amended Complaint involve Defendant's failure to conduct an adequate investigation and its bias against Plaintiff's political beliefs and associations.  *See* Am. Compl. ¶¶ 72, 239.  Plaintiff does not allege that he shared any confidential information with Defendant.  Plaintiff cannot amend his pleading

7

through a brief. *Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984)). Accordingly, Plaintiff fails to plead facts through which the Court could assume that an implied attorney-client relationship existed.[5]

But even if an implied attorney-client relationship existed between Plaintiff and Defendant, it does not change the fact that Plaintiff's union retained Defendant and Defendant was working on the union's behalf. In *Carino*, the Circuit acknowledged that the attorney may have owed Carino a duty of care but explained that "this does not alter the fact that he was acting on behalf of the Union." *Carino*, 376 F.3d at 162. The Third Circuit explained that this additional duty owed to the individual employee does not alter the § 301(b) bar. *Id.* Consequently, even assuming that an implied attorney-client relationship here, which it did not, Section 301(b) would likely still bar Plaintiff's claims against Defendant.

Next, Plaintiff argues that Section 301(b) does not apply because the union was a captive labor organization. Plf. Opp. at 7-10. The term "captive labor organization" appears in several cases from the 1980s where the United States brought civil RICO claims against mob families. In those cases, the court determined that a union was a captive labor organization because certain

---

[5] Plaintiff also argues that Defendant violated New Jersey Rule of Professional Conduct ("RPC") 1.13, which addresses an attorney's ethical duties in representing an organization. Plf. Opp. at 6. RPC 1.13, however, does not establish that Defendant represented Plaintiff as a member of the organization. In fact, RPC 1.13 states otherwise. Specifically, RPC 1.13(a) provides that "[a] lawyer employed or retained to represent an organization represents the organization as distinct from its directors, officers, employees, members, shareholders or other constituents." RPC 1.13(a). Plaintiff further argues that Defendant violated other subsections of RPC 1.13. While an attorney's failure to comply with an RPC "can be considered evidence of malpractice," *Baxt v. Liloia*, 714 A.2d 271, 276 (N.J. 1998) (quoting *Albright v. Burns*, 503 A.2d 386, 390 (N.J. App. Div. 1986)), the Court does reach this issue due to the absence of an attorney-client relationship between Plaintiff and Defendant.

individuals "dominated [union members] through fear and intimidation and [] exploited through fraud and corruption." *United States v. Local 560, Int'l Bhd. of Teamsters, Chauffers, Warehousemen, & Helpers of Am.*, 581 F. Supp. 279, 319 (D.N.J. 1984), *aff'd* 780 F.2d 267 (3d Cir. 1985). Although Plaintiff asserts civil RICO claims in the Amended Complaint, there are absolutely no allegations that remotely suggest that the alleged RICO enterprise controlled or influenced Plaintiff's union, let alone did so through fear and intimidation. Moreover, Plaintiff cites no legal authority demonstrating that Section 301(b) does not apply if there is a captive labor organization. This argument, therefore, is rejected.

Plaintiff also appears to argue that because he could have asserted a claim under Section 501(a) of the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA"), Section 301(b) of the LMRA does not apply. Plf. Opp. at 8. Section 501(a) of the LMRDA addresses duties that union officers owe to members of the union. 29 U.S.C. § 501(a). "Members of a labor organization may sue officers for violations of their fiduciary duties under Section 501(a)." *Fonti v. Health Prof'ls & Allied Emps.*, No. 13-4231, 2015 WL 1523834, at *3 (D.N.J. Apr. 2, 2015). But again, Plaintiff does not provide any legal authority addressing how a claim under Section 501(a) of the LMRDA impacts Section 301(b). More importantly, Plaintiff is not asserting any breach of fiduciary duty claims in this matter nor does he allege facts demonstrating that any union official breached fiduciary duties the official owed to the union. Therefore, this argument is also rejected.

Finally, in his opposition brief, Plaintiff addresses whether he committed a terminable offense under his collective bargaining agreement and contends that he was engaged in political speech. Plaintiff continues that because Defendant disagreed with his political speech, it should have informed Plaintiff that there was a conflict that required Plaintiff to seek outside counsel. Plf.

9

Opp. at 10-12. But because Section 301(b) bars Plaintiff's claim against Defendant and there was not an attorney-client relationship between Plaintiff and Defendant, the Court does not address whether CWS breached any duties.

## IV.    CONCLUSION

For the foregoing reasons, Defendant Cohen, Weiss, and Simon LLP's motion (D.E. 74) is **GRANTED**. Count XIII of the Amended Complaint and Cohen, Weiss, and Simon LLP as a Defendant are **DISMISSED without prejudice** in this matter. Although it appears that any amendment would be futile in light of the Section 301(b) bar, the Court recognizes that D'Ambly raised potential new allegations in his opposition brief. As a result, the Court will provide Plaintiffs with leave to file an amended pleading that remedies the identified deficiencies. Plaintiffs' amended pleading must be filed within thirty (30) days of the date of this Opinion and the accompanying Order. If Plaintiffs fail to file an appropriate amended pleading within this time, the claim against Cohen, Weiss, and Simon LLP and Cohen, Weiss, and Simon LLP as a Defendant will be **DISMISSED with prejudice**. An appropriate Order accompanies this Opinion.

Dated: November 1, 2021

John Michael Vazquez, U.S.D.J.

# EXHIBIT "I"

Events      My Account      United States

MENU    SEARCH                                                                    PRO ▶

## New Jersey Law Journal

Topics ⌄    Surveys & Rankings ⌄    Cases & Verdicts ⌄    People & Community ⌄    All Sections ⌄


Twitter headquarters in San Francisco, California. Photo: Jason Doiy/ALM

NEWS

# Judge Eviscerates Suit Claiming Plaintiffs Were 'Doxed' Over Right-Wing Views

"The general question raised here is whether Exoo's communications about plaintiffs crossed a legal line into unlawful action," U.S. District Judge John Michael Vazquez said.

November 02, 2021 at 05:23 PM

⏱ 4 minute read

Civil Procedure

Charles Toutant ↗

## What You Need to Know

- RICO counts against Twitter, its general counsel and St. Lawrence University were dismissed because the plaintiff failed to show they obtained his property.
- The suit dismissed claims against Exoo by 12 of the 13 plaintiffs because they live in places other than New Jersey.
- Dismissals were without prejudice, and counsel for the plaintiffs said he would refile an amended complaint to correct deficiencies.

A federal judge in Newark, New Jersey, has dismissed most counts in a suit by alleged white supremacists, who claim they were victims of a doxing campaign.

U.S. District Judge John Michael Vazquez dismissed claims against Twitter and its general counsel, Vijaya Gadde, in a suit by 13 people who say they were harassed for their right-wing views.

The judge also dismissed from the case the New York law firm of Cohen, Weiss and Simon and St. Lawrence University.

In addition, Vazquez threw out claims against Christian Exoo, who was alleged to be the leader of the doxing campaign, by 12 of the 13 plaintiffs. According to the suit, Twitter, Gadde, St. Lawrence and Exoo were part of a network that disseminated plaintiffs' addresses, phone numbers and the names of their employers for the purpose of facilitating harassment.



Still standing are complaints by plaintiff Daniel D'Ambly against Exoo, his former employer, the New York Daily News, and its parent, Tribune Publishing Co.

The dismissals were without prejudice, and the plaintiffs' lawyer, Patrick Trainor, a solo practitioner in East Rutherford, New Jersey, said he would file amended complaints with more details of the harassment experienced by his clients.

"We were expecting this," Trainor said.

The plaintiffs alleged, according to Vazquez, that after being identified and doxed by Exoo and his associates, they received violent threats, their homes and personal items were vandalized, and they were terminated from their jobs.

U.S. District Judge for the District of New Jersey John Michael Vazquez. Courtesy photo

"It seems as though plaintiffs want to express their views without a negative impact on other aspects of their lives. Similarly, it seems like Exoo wants to criticize plaintiffs because of their views and try to get plaintiffs fired from their jobs. The general question raised here is whether Exoo's communications about plaintiffs crossed a legal line into unlawful action," Vazquez said.

D'Ambly belongs to the New Jersey European Heritage Association, and some other plaintiffs say they are part of a group called the Proud Boys. D'Ambly, who worked at the Daily News printing plant in Jersey City, claimed he was fired from his job after Exoo and others targeted his workplace with numerous threatening phone calls and tweets.

The suit claimed Twitter and Gadde were liable because the alleged doxing relied on the company's platform to spread information about the plaintiffs, and that they were part of an enterprise that also included Exoo and his employer, St. Lawrence.

Vazquez said the plaintiffs alleged they were extorted by the defendants, but the suit provides no support for that claim since extortion requires "the obtaining of property from another."

"Plaintiffs' focus their RICO claims on allegations that they lost their jobs because of Exoo's doxing, but the loss of a job alone does not constitute a Hobbs Act violation because no one obtains another person's property," Vazquez wrote.

Vazquez found that none of the plaintiffs other than D'Ambly established personal jurisdiction over Exoo. Other than D'Ambly, none of the plaintiffs lives or works in New Jersey. "Consequently, all plaintiffs except for D'Ambly fail to demonstrate a sufficient connection between New Jersey, their claims, and Exoo," Vazquez said.

D'Ambly claimed that Cohen Weiss, which represented his labor union in connection with his separation from the Daily News, harbored bias against his political views that impacted their representation and that the firm failed to adequately investigate the case. But Vazquez found that Section 301b of the Labor Management Relations Act immunizes attorneys employed or hired by unions to perform services related to a collective bargaining agreement from suit for malpractice.

Judge Eviscerates Suit Claiming Plaintiffs Were 'Doxed' Over Right-Wing Views | New Jersey Law Journal

Lawrence Lustberg of Gibbons, who represented Twitter and Gadde, and Monica Barrett of Bond, Schoeneck & King in New York, who represented St. Lawrence University, said they were not authorized to comment. Michael Canning of Giordano, Halleran & Ciesla, who represented Cohen Weiss, referred a call about the case to the firm, which declined to comment.

RELATED STORIES

**Claims Multiply in Suit Alleging 'Proud Boys' Families, Employers Targeted for Harassment**

**New York Daily News Employee Fired for Being White Supremacist Faces Long Odds in Court, Lawyers Say**

**Twitter Faces Lawsuit by Man 'Doxed' as White Supremacist**

You Might Like

August 16, 2021
**Netflix, Hulu Face Battle With Local Governments Over a Share of Streaming Video Fees**
By Charles Toutant
⏱ 3 minute read

July 28, 2021
**Zoom Forced Me to Quit: Lawyer Says Technology Accelerated His Retirement**
By Robert Storace
⏱ 4 minute read

July 27, 2021
**$400K Payday for Law Firm Behind Sony's Settlement Over Devices That Became Obsolete**
By Charles Toutant
⏱ 2 minute read

September 21, 2021
**Lawyer Beats Ethics Case After Paralegal Allegedly Used Facebook to 'Friend' Adversary's Client: Here's How He Did It**
By Charles Toutant
⏱ 5 minute read

EXHIBIT "J"

Patrick Trainor, Esquire (Attorney ID 242682019)
**LAW OFFICE OF PATRICK TRAINOR**
19 Union Avenue, Suite 201
Rutherford, New Jersey 07070
P: (201) 777-3327
F: (201) 896-7815
pt@ptesq.com
*Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DANIEL D'AMBLY; AARON WOLKIND; STEVE HARTLEY; RICHARD SCHWETZ; JOBEL BARBOSA; MATTHEW REIDINGER; JOHN HUGO; SEAN-MICHAEL DAVID SCOTT; THOMAS LOUDEN; ZACHARY REHL; AMANDA REHL; K.R., a minor, by and through her father ZACHARY REHL and her mother AMANDA REHL, MARK ANTHONY TUCCI, <br><br> Plaintiffs, <br><br> vs. <br><br> CHRISTIAN EXOO a/k/a ANTIFASH GORDON; ST. LAWRENCE UNIVERSITY; TRIBUNE PUBLISHING COMPANY, LLC; NEW YORK DAILY NEWS; VIJAYA GADDE; TWITTER, INC; COHEN, WEISS AND SIMON, LLP; NICK STRICKLAND; TORCH ANTIFA NETWORK; UNNAMED ASSOCIATES 1 – 100, <br><br> Defendants. | CIVIL ACTION NO.: 2:20-cv-12880-JMV-JSA <br><br> **SECOND AMENDED COMPLAINT** <br><br> **JURY TRIAL DEMAND** |

Plaintiffs, Daniel D'Ambly, Aaron Wolkind; Steven Hartley; Richard Schwetz; Jobel

Barbosa; Matthew Reidinger; John Hugo; Sean-Michael David Scott; Jr.*;* Thomas Louden;

Zachary Rehl; Amanda Rehl; K.R., a minor, by and through her father Zachary Rehl and her

mother Amanda Rehl (hereinafter collectively referred to as "Plaintiffs") by and through their

attorney the Law Office of Patrick Trainor, as and for their Complaint against defendants

Christian Exoo a/k/a @AntifashGordon, St. Lawrence University, Tribune Publishing Company,

LLC, New York Daily News, Vijaya Gadde, Twitter, Inc., Torch Antifa Network, Nick

Strickland, and Cohen, Weiss, and Simon, LLP, hereby alleges as follows:

### STATEMENT OF THE CASE

This action arises out of the conduct of defendant Christian Exoo (hereinafter "Exoo"),

under the Twitter username "@AntiFashGordon." Defendant Exoo is a habitual doxer, who

leads, associates, and conspires with likeminded associates to dox[1] people ("targets") that they

claim are "fascists" and "white supremacists," in order to cause those targets to suffer

employment terminations, school expulsions, and to financially devastate them. Exoo and

associates coupled doxing with direct action[2] against Plaintiffs.

Inserted throughout this Complaint are Tweets, blog posts, and statements made by Exoo

and associates with "calls to action," mocking results of direct action, concern for legal

ramifications, the promotion of the use of *67 to mask their phone numbers. Exoo and

associates believe doxes are warnings against trespass against them and all doxes and dogpiling

are imbued with threats against their target. Exoo often reminds his associates "we don't cry to

the cops or the court. who protects us? we protect us."



---

[1] *Dox Definition*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/dox, "to publicly identify or publish private information about (someone) especially as a form of punishment or revenge." (last visited Nov. 14, 2021).

[2] *Direct Action Definition*, OxfordLearnersDictionaries.com, *The use of strikes, protests, etc. instead of discussion in order to get what you want*, https://www.oxfordlearnersdictionaries.com/us/definition/english/direct-action?q=direct+action (last visited Nov. 27, 2021).

Moreover, by Defendants' definition of what constitutes actual violence, doxes and their inherent threats, are actual violence. As evidenced in the images below of a Twitter conversation, involving Exoo, his key Exoo associate, Twitter user @emilygorcenski, who is a verified blue check Twitter account, and Mark Pitcavage, Senior Research Fellow, Center on Extremism, Anti-Defamation League, Exoo and @emilygorcenski dispute Mr. Pitcavage's point that threats are not actual violence, and cite to the World Health Organization definition, which includes threats as actual violence to support his position.




Exoo admits leading, associating with, and conspiring with others in an enterprise that doxes and conducts direct action against alleged fascists and white supremacists. In *Rolling Stone* magazine[3], Exoo was described as the "closest thing to a leader," and in a September

---

[3] Andy Kroll, *Meet the Undercover Anti-Fascists*, https://www.rollingstone.com/politics/politics-features/antifa-proud-boys-militia-trump-insurrection-1121933/ (last accessed Nov. 27, 2021).

2019, Medium.com interview as "@AntiFashGordon" (or "AFG"), Exoo is described as "just about the closest thing Antifa...has to a celebrity." In the Medium.com interview, Exoo described that[4]

> himself is exactly what we don't need," he explained. "I have a whole affinity group of people sharing intel with me. And I would be a lonely guy just screaming onto social media without communities to actually mobilize around this stuff."

Exoo's associates seconded Exoo's admission that an association of people engaged in doxing and direct action exists. On or about April 9, 2021, in the blog post titled "*Antifash Gordon's Abuse, Abusers not welcome here: A statement of separation from AntiFash Gordon*," associates announced they will no longer work with Exoo, because of his abusive behavior, which included using doxing and direct action for his own financial gain.[5]

> and presents himself as an exemplar of anarchistic values. The reality is that AFG is a selfish, self-interested, reckless, and harmful individual who has cynically used a movement working for a better world as a vehicle for his own financial and social gain, at the expense of others, with no indication

Another former associate recently described Exoo's @AntiFashGordon Twitter account as the public face of a "vast underground network." Moreover, associates admitted in the *Statement of Separation* blog post that for doxing and direct action Exoo compensated them with



wetland waifu 🏴
@endeveryting

"security culture" against disabled, trans, poc to keep their spaces insular that were easily infiltrated.

This isn't about one person. AFG is the public face of a vast underground network whose labor he takes credit. AFG isn't just Ex_o, it started as a Boston DSA project

10:52 PM · Nov 6, 2021 · Twitter Web App

---

[4] Aaron Gell, *Anti-Fascists Are Waging a Cyber War – And They're Winning*, Medium.com, September 9, 2019, https://gen.medium.com/antifas-keyboard-warriors-254f62be2a95 (last accessed Nov. 27, 2021). *See also* Ex. A.
[5] *Antifash Gordon's Abuse, Abusers not welcome here: A statement of separation from AntiFash Gordon,* (Apr. 9, 2021) *formerly available* at https://antifashgordon.noblogs.org (last accessed May 12, 2021) has since been taken offline but a copy is *available at* https://web.archive.org/web/20210409230402/https://antifashgordon.noblogs.org/ (last accessed Nov. 27, 2012). *See also* Ex. B.

cash and other valuable consideration, such as money, connections to jobs, and opportunities for media appearances with his friends in the press. [6]

The *Statement of Separation from AntiFash Gordon* is signed by members of Defendant Torch Antifa, who published their own statement of solidarity and separation Exoo that similarly described the existence of an organization.[7] Torch Antifa described Exoo as someone who holds a "position of power and influence" that enables him to serve has the "arbiter and distributor of research information, media opportunities, and financial resources to other antifascists," but who failed to acknowledge the "collective labor" behind @*AntiFashGordon* Twitter account.[8]

The association obtains private and confidential information of their targets, who use online aliases. Publication of the dox is the first step. Once the dox is published Exoo and associates dogpile a target's employers, co-workers, schools, acquaintances. Dogpiling is when an individual uses Twitter to incite their followers to say or do a specific thing, such as reply to another person with abusive messaging,[9] or as Exoo himself put it:

> The next step, Gordon continued, was to "find some point of vulnerability: employer, landlord, school, church, anywhere where they would lose some kind of social status or take a hit." Often, a single phone call alerting an employer to the presence of a white nationalist on the payroll was enough to get someone fired; other times, an online publicity campaign is launched to apply community pressure. "This is not a thing we take joy in — the personal suffering of white supremacists," David said. "But it is a good

---

[6] *Id.*

[7] *Concerning Antifash Gordon: A Torch Statement in Solidarity with the Victims of Abuse*, (Apr. 9, 2021) *formerly available at* https://torchantifa.org/concerning-antifash-gordon-a-atorch-statement-solidarity-with-victims-of-abuse (last accessed May 12, 2021), however, on or about November 7, 2021, Torch's statement in the above link was taken down and it now links to a statement explaining that Torch removed the original statement in solidarity, because they received a "Cease and Desist" notice from Christian Exoo's attorneys. (last accessed Nov. 27, 2021). A copy of both statements is attached hereto as Exhibit C.

[8] *Concerning Antifash Gordon: A Torch Statement in Solidarity with the Victims of Abuse*, (Apr. 9, 2021) *formerly available at* https://torchantifa.org/concerning-antifash-gordon-a-atorch-statement-solidarity-with-victims-of-abuse (last accessed May 12, 2021). *See also* Ex. CC.

[9] *https://help.twitter.com/en/rules-and-policies/coordinated-harmful-activity* (last accessed Nov. 14, 2021).

## THE PARTIES

1.      Daniel D'Ambly (hereinafter "D'Ambly"), was a twenty-seven (27) year member of Local One-L, Graphic Communications Conference of the International Brotherhood of Teamsters, who was employed as a was a plate maker for the New York Daily News in Jersey City, New Jersey until January 18, 2019. D'Ambly was doxed by Exoo on October 29, 2018. In the dox D'Ambly was labeled a 'fascist' and/or a 'white supremacist.' D'Ambly is a member of the New Jersey European Heritage Association ("EHA"), a non-violent, pro-domestic policy organization that the Exoo and associates have labeled a white supremacist hate group, which D'Ambly leads. D'Ambly and the EHA, actively participate in political rallies, peaceful political protests, pamphleteering, and speech that is protected by U.S. Const. amend. I and N.J. Const. art. I, ¶ 6. D'Ambly is an individual domiciled in the State of New Jersey and a "person" as defined under 18 U.S.C. § 1961(3).

2.      Zachary Rehl ("Rehl") was employed by New York Life Insurance Company in Philadelphia when he was doxed by Exoo in or about August 2017, and labeled a fascist and white supremacist. Rehl is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

3.      Amanda Rehl ("AmRehl") is the spouse of Zachary Rehl. AmRehl is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

4.      K.R. ("K.R."), is the minor child of Zachary Rehl and Amanda Rehl. K.R. is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

5.    Aaron Wolkind ("Wolkind") was a Technical Support Specialist for Aerzen USA Corporation ("Aerzen") when he was doxed by Exoo on or about June 2019, and labeled a fascist, white supremacist, and a neo-Nazi.  Wolkind is an individual domiciled in the State of Delaware and a "person" as defined under 18 U.S.C. § 1961(3).

6.    Steven Hartley ("Hartley"), is a logistics manager for American Expediting located in Folcroft, Pa.  On November 29, 2018, he was doxed by Exoo and labeled a Nazi, racist and white supremacist who was a threat to women and minorities.  Hartley is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

7.    Mark Anthony Tucci ("Tucci") was employed at Aldo's Pizzarama in Philadelphia when he was doxed by Exoo on December 10, 2018, and labeled a fascist, racist, and white supremacist.  Tucci is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

8.    Richard Schwetz ("Schwetz") was employed at Inova Payroll in Lancaster, Pa., when he was doxed by Exoo in or about June 2020, and labeled a fascist, racist, and white supremacist.  Schwetz is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

9.    Jobel Barbosa ("Barbosa") is Puerto Rican and a permanently disabled veteran, who was employed as a Detail Department Manager at Jaguar Land Rover Willow Grove, in Willow Grove, Pa., when he was doxed by Exoo on June 22, 2019, and labeled a fascist, racist, and white supremacist.  Barbosa is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

10.     Matthew Reidinger ("Reidinger") was employed in Coal Township, Pa.  On November 27, 2018, he was doxed by Exoo and labeled a fascist and white supremacist. Reidinger is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

11.     John Hugo ("Hugo") was employed as a dispatch manager for Green and Yellow Cab in Somerville, Massachusetts when he was doxed by Exoo on January 2, 2020, and labeled a fascist and white supremacist.   Hugo is an individual domiciled in the Commonwealth of Massachusetts and a "person" as defined under 18 U.S.C. § 1961(3).

12.     Sean-Michael David Scott ("Scott") was employed in Seattle, Washington when he was doxed by Exoo on September 16, 2019, and labeled a fascist, white supremacist, and anti-Semite.  Scott is an individual domiciled in the State of Florida and a "person" as defined under 18 U.S.C. § 1961(3).

13.     Thomas Louden ("Louden") is a 30-year volunteer firefighter and the appointed Deputy Emergency Management Coordinator for Hilltown Township, Pennsylvania and was employed as the Director of Managed Care at Thomas Jefferson University Hospital in Philadelphia for twenty-three (23) years when he was doxed by Exoo on November 2, 2020. Louden is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

14.     Plaintiffs Wolkind, Hartley, Schwetz, Rehl, Barbosa, and Tucci are members of the Philadelphia chapter of the Proud Boys (hereinafter "PPB" or "Proud Boys").  Plaintiff Reidinger is a member of the Harrisburg chapter of the Proud Boys ("HPB").  The Proud Boys are a diverse, multi-racial, multi-ethnic, fraternal, males-only drinking club, who consider themselves "western chauvinists."

15. Hugo is the President of Super Happy Fun America, a right of center civil rights organization focusing on defending the American Constitution, opposing gender madness, and defeating cultural Marxism. Super Happy Fun America is best known for organizing the 2019 Boston Straight Pride Parade. Hugo was the 2018 Republican Candidate for Massachusetts' 5th Congressional District.

16. Defendant Christian Exoo ("Exoo" or "@AntiFashGordon") is a library building supervisor and lecturer at St. Lawrence University. Exoo is a self-described anti-fascist, notorious doxer, and leader of Antifa, who by doxing others has acquired a great deal of notoriety and infamy.[10] Exoo currently publishes Tweets under Twitter username "@AntiFashGordon." Exoo is an individual domiciled in the State of New York and a "person" as defined under 18 U.S.C. § 1961(3).

17. St, Lawrence University ("St. Lawrence" or "STL") is a private four-year university with its principal place of business located at 116 Vilas Hall, 23 Romoda Drive, Canton, New York 13617, and a "person" as defined under 18 U.S.C. § 1961(3).

18. Tribune Publishing Company ("Tribune") is a media company organized under the laws of the State of Delaware with its principal place of business located at 160 N. Stetson

---

[10] *Anti-Fascists Are Waging A Cyber War – And They're Winning*, Medium.com (Sep. 9, 2019) https://gen.medium.com/antifas-keyboard-warriors-254f62be2a95 (last accessed Sep. 15, 2020); *Comcast fires employee with alleged ties to Proud Boys, We the People Rally*, PhillyVoice.com (November 15, 2018) https://www.phillyvoice.com/comcast-fires-employee-proud-boys-alt-right-philadelphia-rally/ (last accessed Sep. 15, 2020); *The Right Wing Is Trying to Make It a Crime to Oppose Fascism*, Truthout.org (Aug. 9, 2019) https://truthout.org/articles/the-right-wing-is-trying-to-make-it-a-crime-to-oppose-fascism/ (last accessed Sep. 15, 2020); *How to Spot An Abuser, Featuring Antifash Gordon, In His Own Words: A Step By Step Guide, and Also F\*\*\* That Guy*, Medium.com (Jun. 25, 2020) https://medium.com/@abuse_isnt_revolutionary/how-to-spot-an-abuser-featuring-antifash-gordon-in-his-own-abuser-words-7b39f4657b19 (last accessed Sep. 15, 2020).

Avenue, Chicago, Illinois 60601 that conducts its business throughout the United States and is a "person" as defined under 18 U.S.C. § 1961(3).

19.     New York Daily News Company ("Daily News") is owned by the Tribune Publishing Company (Tribune and Daily News are sometimes hereinafter referred to collectively as "Daily News") with a place of business located at 125 Theodore Conrad Drive, Jersey City, New Jersey 07305, and 4 New York Plaza, New York, NY 10004.  The Daily News is a "person" as defined under 18 U.S.C. § 1961(3).  At all times relevant, the Tribune Publishing Company had the right and did exercise control over the actions of the New York Daily News.

20.     Vijaya Gadde ("Gadde") is the Head of Legal, Public Policy, and Trust and Safety Lead at Twitter, Inc.  At all times relevant, Vijaya Gadde was the sole decision maker and person authorized to permanently ban Twitter users who violated Twitter's Terms of Service and Rules. She is a "person" as defined under 18 U.S.C. § 1961(3).  Gadde is believed to be domiciled in the State of California.

21.     Twitter, Inc. ("Twitter"), is a company organized under the laws of the State of Delaware with its principal place of business located at 1355 Market Street, San Francisco, CA 94103, that conducts its business globally and a "person" as defined under 18 U.S.C. § 1961(3).

22.     Exoo and associates are a criminal enterprise as defined under 18 U.S.C. § 1961(4).

23.     Cohen, Weiss, and Simon, LLP ("CWS") is a law firm with its principal place of business located at 900 3rd Avenue, #2100, New York, New York 10022 and a "person" as defined under 18 U.S.C. § 1961(3).

24.     Nick Strickland is an individual domiciled in the State of New Jersey and a "person" as defined under 18 U.S.C. § 1961(3), he controls and publishes Twitter username "@NStricklanded."

25.     Torch Network a/k/a Torch Antifa Network describes itself as "*a network of Militant antifascists across (but not limited to) the United States. We are born out of, and pay our respects to, the Anti-Racist Action Network. We are dedicated to confronting fascism and other element of oppression. We believe in direct action.*"[11]



Torch Antifa controls and publishes Twitter account "@TorchAntifa" and internet website *https://torchantifa.org*.  Torch Antifa has no known address but its internet domain *torchantifa.org* is registered to Pennsylvania non-profit organization One People's Project, whose principal address is in New Brunswick, New Jersey.

**<u>JURISDICTION AND VENUE</u>**

---

[11] Torch Network, https://torchantifa.org/about/, (last accessed Nov. 14, 2021).

26.     Jurisdiction of this Court is proper because this litigation arises under federal law, namely 18 U.S.C. §§ 1961 to 1968.  This Court has jurisdiction over this matter under 28 U.S.C. § 1331.

27.     The Court has supplemental jurisdiction over the state law claims asserted in this case under 28 U.S.C. § 1367(a).

28.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and the threatened and actual harm occurred in this District by reason of Defendants' conduct as alleged below.

## **FACTS PERTINENT TO ALL PLAINTIFFS**

29.     Exoo and associates use the terms fascists and/or white supremacists interchangeably.

30.     Defendant Exoo publishes Tweets and doxes under Twitter username "*@AntiFashGordon*" a leading Antifa Twitter account that as of November 14, 2021, has 53,534 Twitter followers.  The headline of @AntiFashGordon's public profile as seen below states "I expose fascists via #OSINT, get them fired, de-homed, kicked out of school, etc."



31.     Doxing is prohibited by Twitter's Private Information Policy within their Terms of Service and Rules ("TOS").[12]

32.     Twitter's TOS also prohibit Coordinated harmful activity, specifically Twitter prohibits *Social Coordination*, which Twitter defines as "on or off-Twitter coordination among a group of people to amplify or propagate a specific message…an individual using Twitter to incite their followers to say or do a specific thing, such as reply to another person with abusive messaging – a practice referred to as "dogpiling."[13]

33.     Upon information and belief, Exoo is a habitual doxer and ban evader, who has been permanently banned at least twice before Exoo he began to publish and control *@AntiFashGordon*, is known to Twitter's Trust & Safety Council ("TSC").  A ban evader is a person who creates a new Twitter account after receiving a permanent ban, which is a lifetime ban.  The ban evader's new account is called a "ban evasion account," and is prohibited by Twitter rules.[14]  Twitter has previously permanently banned *@ChrisExoo*,[15] *@ChristianExoo*.[16]



_____
[12] *https://help.twitter.com/en/rules-and-policies/personal-information* "You may not publish or post other people's private information without their express authorization and permission.  We also prohibit threatening to expose private information or incentivizing others to do so." (last accessed Nov. 14, 2021).
[13] *https://help.twitter.com/en/rules-and-policies/coordinated-harmful-activity* (last accessed Nov. 14, 2021).
[14] *https://help.twitter.com/en/rules-and-policies/enforcement-options* "Permanent suspension: This is our most severe enforcement action.  Permanently suspending an account will remove it from global view, and the violator will not be allowed to create new accounts." (last accessed Nov. 14, 2021).
[15] *https://twitter.com/ChrisExoo* (last accessed Nov. 14, 2021).
[16] *https://twitter.com/ChristianExoo* (last accessed Nov. 14, 2021).

Case 2:20-cv-12880-JMV-JSA Document 1062 Filed 06/21/22 Page 226 of 752 PageID: 2640
Case 2:20-cv-12880-JMV-JSA Document 103 Filed 11/30/21 Page 14 of 63 PageID: 2183
4231

34.     Upon information and belief, Twitter agreed to allow Exoo, a known ban evader

change his username @DoxSavage to @AntiFashGordon, in lieu of third permanent ban.



35.     Exoo described his associates as "our entire crew," and acknowledged monthly IT

costs for the entire crew of about $50.[17]

> others in the movement. And he outlined the expenses. "We fight fascism on a budget,"
> he said. "For our entire crew — and this includes database subscriptions, VPNs, burner
> phones, and encrypted data storage — it comes to about $50 a month."

36.     As seen below Exoo insists associates continue dogpiling until the target's

employer publicly announces the target's termination.

37.     Exoo and associates conspire with well-known doxer who publishes Twitter

account @emilygorcenski, which is a blue check Twitter verified account, who Exoo has cited as

a mentor.

---

[17] Aaron Gell, *Anti-Fascists Are Waging a Cyber War – And They're Winning*, Medium.com, September 9, 2019,
https://gen.medium.com/antifas-keyboard-warriors-254f62be2a95 (last accessed Nov. 27, 2021).



38.    Verified blue check Twitter account @emilygorcenski is followed by Twitter

CEO Jack Dorsey, accordingly *@emilygorcenski* can send private direct messages to *@jack*, and

*@jack* sees @emilygorcenski's Tweets in his home timeline when he logs on to his account.[18]

---

[18] Following FAQ's, Twitter.com *available at* https://help.twitter.com/en/using-twitter/following-faqs#:~:text=Followers%20are%20people%20who%20receive,they%20log%20in%20to%20Twitter (last accessed Nov. 30, 2021).



39.    Twitter account *@emilygorcenski* has exhibited sliding into *@jack* direct

messages to get a Twitter account banned for "deadnaming" when Twitter Support did not ban

the account, and also boasted about surviving @jack's follower purge in 2019.



40.     As a result of Exoo and associates conduct described herein, every doxed Plaintiff was threatened, had their families threatened, and sustained property damage.

### DANIEL D'AMBLY

41.     D'Ambly repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 40 with the same force and effect as if set forth in detail herein again.

42.     Upon information and belief, the Exoo Enterprise targeted D'Ambly as a fascist and white supremacist at some point in or about January 2018.

43.     Upon information and belief, in and before September 2018, Twitter received and investigated complaints that Exoo's former Twitter account *@DoxSavage* was doxing and engaging in abusive behavior.

44.     Upon information and belief, on or about October 1, 2018, Gadde and Twitter agreed to allow *@DoxSavage* to undergo a username change in lieu of a third permanent ban.

45.     On October 11, 2018, *@DoxSavage* Tweeted a farewell announcement to his followers: "Hey folks—I just underwent a name change from *@DoxSavage* to *@AntiFash Gordon.*  I'll be back tomorrow to expose more violent fascists who were on the ground in Providence on 10/6."





46.     Exoo's change for his evasion account *@DoxSavage* to *@AntiFashGordon*

prevented him from losing approximately 15,000 *@DoxSavage* followers.

47.     On October 29, 2018, at 11:49 a.m., *@AntiFashGordon* doxed D'Ambly in a

massive twenty-two count Tweet thread that included D'Ambly's name, hometown, photograph,

employer, occupation, employer's location, multiple telephone numbers for his employer, labor

union Referendum Board he chaired, and the names of the other Referendum Board members.



**AntiFash Gordon**
@AntiFashGordon

8.) And until now, no one knew who was behind it.

It's Daniel D'Ambly, of Dayton, New Jersey, a
newspaper printer for @NYDailyNews in Jersey City.

11:49 AM · Oct 29, 2018

48.     In the dox, *@AntiFashGordon* labeled D'Ambly a "Nazi" and directed associates

to send harassing, intimidating, and threatening phone calls, and Tweets to the Daily News's

Twitter username *@NYDailyNews*, to extort D'Ambly's termination. *See* Exhibit C, Exoo's First

Dox of D'Ambly October 29, 2018.

49.     Exoo's dox directed:

a.  In the 19th Tweet, *@AntiFashGordon* directed his associates "stay on top of this,

too.  If you don't hear back from @NYDailyNews, keep tweeting at them."  Call

their printing facilities in Jersey City at (201) ***-**** (number provided in

original Tweet) and warn them about Daniel D'Ambly…"



b. A follow up Tweet included a second telephone number for the Daily News and a

subsequent Tweet included the direct telephone number to D'Ambly's print shop.



c. Exoo associates dogpiled *@NYDailyNews* and *@Teamsters*.







d. Upon information and belief, from October 29, 2018, to January 11, 2019, the Exoo Enterprise directed no less than one-hundred and ninety-one (191) Tweets to @DailyNews plus an unknown number of phone calls.

e. D'Ambly was never told of the threats or warned to take safety precautions.

50. On October 30, 2018, without warning D'Ambly of the threats, Tribune engaged Insite Risk Management ("Insite") to investigate D'Ambly. Insite submitted its "Private

Investigation Report" ("Report") to the Tribune on December 4, 2018.  The Report acknowledged @AntiFashGordon's doxing was the impetus for the investigation.  The Report included videos of D'Ambly and others using imprudent language during political rallies.

51.     On or before January 8, 2019, EHA posted flyers on public bulletin boards in Princeton, New Jersey that announced an "It's okay to be white" protest march purportedly scheduled for January 12, 2019.

52.     On January 9, 2019, *@AntiFashGordon* re-Tweeted the "It's okay to be white" march to his associates and doxed D'Ambly again by Tweeting, "If anyone wants their leaders name, it's Dan D'Ambly."

53.     On January 10, 2019, *@AntiFashGordon* published a Tweet that referenced EHA's purported march and directed his associates to "show up and shut down" the purported march "And please say hi to their leader, Dan D'Ambly for me."



54.     On January 10, 2019, D'Ambly was called to an interview with Jean Nechvatal ("Nechvatal"), Tribune's Vice President, Talent Management & Learning and James R. Brill

("Brill"), Daily News's Sr. Vice President of Operations.  D'Ambly was accompanied at the

meeting by Union Steward Pete Cairnie.  During the meeting, D'Ambly was confronted with

content of the Report, but not informed of the report's existence.  D'Ambly acknowledged using

imprudent language in a private conversation during a protest.

        55.        On January 11, 2019, at 10:14 a.m., Exoo reiterated "show up and show these

pricks that we don't tolerate hate in our streets" to stop D'Ambly's purported march.  Exoo also

stated that he had not gotten official word of that D'Ambly was terminated.



        56.        Exoo reminded his associates to prepare for conflict, "Remember that the police

won't protect us here."



        57.        The morning of January 11, 2019, after Exoo's Tweet, Edward Bushey, Sr. Vice

President, General Manager, Manufacturing and Distribution at Tribune delivered recordings of

threats to the Daily News.  The callers stated if they continued to employ D'Ambly the Daily

News was responsible for "any violence or blood spilled is also on your hands." Upon

information and belief, the call was received from phone number (732) 744-4937.[19]

```
---------- Forwarded message ----------
From:        George" -          @nydailynews.com>
To:          Ed" <          @tribpub.com>
Cc:
Bcc:
Date: Mon. 14 Jan 2019 19:33:44 +0000
Subject: FW: Voicemail from 7327444937

Ed,

This is the second message looks like the phone number is there.

George

From: Cisco Unity Connection Messaging System [mailto:          @relay-int.tribune.com]
Sent: Friday, January 11, 2019 10:21 AM
To:          @relay-int.tribune.com
Subject: Voicemail from 7327444937
```

58.     On January 11, 2019, at 3:30 p.m., D'Ambly was called to a second meeting with

Brill, wherein Brill issued D'Ambly a "Last and Final Warning" that stated the "*ONLY reason*

*that you are not being terminated immediately is because, thus far, we have not determined that*

*your activities with NJEHA has occurred at work and/or derogatory comments were made about*

*any co-workers.*" The warning continued "should we learn that you engaged in any

inappropriate speech or behavior in the workplace or with regard to any other employee, or if the

Company or any of its employees suffer any backlash as a result of your association with the

NJEHA, your conduct will be considered "work-related" and you will be terminated

immediately."

59.     The meeting occurred five (5) hours after threats were received, but Brill did not

inform or warn D'Ambly of the threats.

60.     At 4:34 p.m. on January 11, 2019, *@AntiFashGordon* threatened D'Ambly by

stating "Regardless, I'm gonna spend the next week wrecking your fucking life, Dan D'Ambly."

---

[19] Electronic media copies of the threats will be submitted to the Court and all defendants on a USB thumb drive.



**AntiFash Gordon**
@AntiFashGordon

Replying to @EuropeanAssoc

Regardless, I'm gonna spend the next week wrecking your fucking life. Dan D'Ambly.

4:34 PM · Jan 11, 2019 · Twitter for iPhone

61.     On or about the evening of January 11, 2019, D'Ambly's vehicle was "keyed" (scratched) and tires slashed while it was parked outside of his home on private property.  After his vehicle was damaged, D'Ambly received a text message from unknown phone number (732) 744-4937, that stated "So your thing went well today?  Did you guys get there ok?"  A police report for a bias incident, criminal mischief, and harassment was filed with the South Brunswick Police Department.  The phone number (732) 744-4937 is cited in South Brunswick Police Department incident report image below.  *See also* Exhibit E, South Brunswick Police Department Incident Report, Case No.: I-2019-002817.

```
DAMBLY STATED THAT HE MAY HAVE BEEN TARGETED BY "ANTIFA" DUE TO HIS AFFILIATION WITH THE "EUROPEAN
HERITAGE ASSOCIATION."  HE STATED THAT A PRINCETON SCHOOL TEACHER, MARTHA FRIEND, HAD POSTED A PICTURE
OF HIS VEHICLE ON TWITTER THIS PAST NOVEMBER.  HE ALSO STATED THAT ANOTHER TWITTER USER, KNOWN AS
"ANTIFASHGORDON", DOXXED HIM A FEW MONTHS AGO BY RELEASING HIS HOME ADDRESS, EMPLOYMENT DETAILS,
PICTURES OF HIS VEHICLE, AND A SATELLITE IMAGE OF HIS HOUSE TO TWITTER.  HE BELIEVES THAT THE ACTOR USED
THIS INFORMATION TO FIND HIS VEHICLE AND SLASH HIS TIRES TO PREVENT HIM FROM DRIVING TO A SCHEDULED
PROTEST IN PRINCETON ON SATURDAY.

HE ALSO STATED THAT HE RECEIVED A TEXT THIS WEEKEND FROM AN UNKNOWN SUBJECT (732-744-4937) ASKING HIM,
 "SO YOUR THING WENT WELL TODAY? DID YOU GUYS GET THERE OK?"  HE BELIEVES THIS SUBJECT MAY HAVE BEEN
INVOLVED WITH DAMAGING HIS TIRES.
```

62.     Upon information and belief, on January 11, 2019, cellular phone number (732) 744-4937) described above in ¶ 63 left the message "any violence or blood spilled is also on your hands," that was captured by the New York Daily News as described in ¶ 58 above.

63.     Upon information and belief, cellular phone number (732) 744-4937 belongs to the person who controls and publishes Twitter account *@Nstricklanded*, who sent the below message to Exoo after the message described in ¶ 58 above was captured and sent D'Ambly the text message described at ¶ 63 above.

24



64.     On Sunday, January 13, 2019, Exoo, who had no connection to D'Ambly or Daily

News, announced D'Ambly's termination to his associates twenty-four (24) hours before the

Daily News claimed they learned of the threats that caused D'Ambly's termination.



65.     On January 16, 2019, during a phone conference with Brill, Nechvatal, and a

Union representative, D'Ambly was played the recorded death threats and asked to identify the

caller. D'Ambly was unable to identify the caller, but said it was the behavior of "Antifa types."

D'Ambly was terminated during this phone conference.

66.    On January 23, 2019, Patrick LoPresti, President of Local One-L informed the

Daily News that they were appealing D'Ambly's termination pursuant to terms of the Contract.

67.    On or about January 25, 2019, D'Ambly received his "Termination of

Employment" letter, signed by Brill, and dated January 22, 2019.  The letter informed D'Ambly

his termination was effective January 18, 2019.  In the letter, Brill stated you "are being targeted

by this group…" and "now our workplace and employees [are] at risk of counter attacks by

Antifa."  *See* Exhibit D, Termination of Employment letter dated January 22, 2019.

> You  are being targeted by this group
> has now put our workplace and employees at
> risk of counter attacks by Antifa.

68.    The termination letter falsely stated the Daily News learned of the death threats

on January 14, 2019, contrary to emails that confirm the Daily News learned of the threats on

January 11, 2019.

> On Monday, January 14, 2019, we learned that two threatening voice-mails had been left
> on a Company voice-mail box on Friday, January 11, 2019, which caused our company
> to have serious concern for the safety of our employees.
>
> ---------- Forwarded message ----------
> From:          George" -          @nydailynews.com>
> To:            Ed" <          @tribpub.com>
> Cc:
> Bcc:
> Date: Mon. 14 Jan 2019 19:33:44 +0000
> Subject: FW: Voicemail from 7327444937
>
> Ed:
>
> This is the second message looks like the phone number is there.
>
> George
>
> From: Cisco Unity Connection Messaging System [mailto:          @relay-int.tribune.com]
> Sent: Friday, January 11, 2019 10:21 AM
> To:          @relay-int.tribune.com
> Subject: Voicemail from 7327444937

69.    In the termination letter, Brill claimed the death threats received on January 11,

2019, were the "cause" of D'Ambly's termination, because the death threats meant D'Ambly

"brought his activities" into the workplace, therefore, "we deem your actions to be work related and are terminating your employment for cause."

70.     At some point after January 23, 2019, the Union on behalf of D'Ambly filed a grievance with the American Arbitration Association, case number 01-19-0000-7178.  The Union retained attorneys Thomas Kennedy ("Kennedy") and Kate M. Swearengen ("Swearengen") of Cohen, Weiss, and Simon, LLP (collectively Kennedy, Swearengen and Cohen, Weiss and Simon, LLP shall be referred to as "CWS") to represent D'Ambly.

71.     Thereafter, D'Ambly had a phone conference with Kennedy to discuss the case. D'Ambly was acquainted with Kennedy for approximately twenty years due to his Union activities.  D'Ambly explained the threats he received, property damage, and that his tires were slashed.  D'Ambly stated "Tom, this Antifa are terrorists…"  Kennedy angrily responded, "I do not consider Antifa to be terrorists and if you are going to continue referring to them (Antifa) as terrorists we are going to end this call."  Kennedy scoffed at D'Ambly's desire to have his employment reinstated at the Daily News.

72.     At some point thereafter, D'Ambly had his first case discussion phone conference with Kate Swearengen, who assumed representation.  Without prompting, Swearengen explicitly informed D'Ambly that "she doesn't agree with his politics, and she doesn't want to discuss them any further."  Like Kennedy, Swearengen dismissed D'Ambly's wish to have his employment reinstated.

73.     Kennedy and Swearengen's revulsion of D'Ambly directed their representation and they failed to adequately research basic facts favorable to D'Ambly's wish to be reinstated. CWS ignored Brill's misrepresentation and veracity of the claimed "cause" of their client's termination.

74.     CWS failed to adequately investigate the sources of the doxing campaign.  Had CWS engaged in reasonable investigation of the source of the dox they would have discovered @AntiFashGordon's January 13, 2019, announcement that D'Ambly was terminated, which was one day before the Daily News claimed they learned of the "cause" of D'Ambly's termination.

75.     On or about July 15, 2019, D'Ambly executed the "Separation Agreement and Mutual General Release" negotiated by CWS that paid D'Ambly a lump sum payment in exchange the Union would withdraw the pending arbitration case with prejudice.

76.     As a result of Defendants' misconduct D'Ambly has suffered substantial personal and property damage and been severely financially harmed.

## ZACHARY REHL

77.     Rehl repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 76 with the same force and effect as if set forth in detail herein again.

78.     Exoo worked with Torch Antifa members to acquire Rehl's true personal identity and doxed him on or about August 2, 2017.  Rehl was labeled a fascist and white supremacist, because he organized a "Back the Blue" rally to support Philadelphia police officers.

79.     As in all cases, associates dogpiled Rehl's employer with calls, emails, and Tweets, and Rehl was terminated in or about September 2017.

80.     On or about October 1, 2018, Rehl was doxed a second time when he organized the "We the People" rally that occurred in Philadelphia on November 17, 2018.



**AntiFash Gordon**
@AntiFashGordon

THREAD: Far-right groups are organizing a "We the People" rally in Philadelphia for Saturday, 11/17.

81.     On November 14, 2018, Exoo followed up Rehl's dox and incited his associates to disrupt the We the People rally, because "fascism is coming and only we can stop it."



82.     On November 16, 2018, Exoo further incited his followers against the We the People rally, by stating "the city granted rally permits to fascists, and the cops will be there to protect them" and reminded "Who protects us? We protect us."



83.     As a result of Exoo's incitement, November 17, 2018, at 12:41 a.m., the night before the rally, Torch Antifa took "direct action" against Rehl and threw a brick through the front window of Rehl's home and spray painted the word "Nazi" on his home as seen below.



29

84.    Exoo acknowledged media reports of the brick being thrown through Rehl's

window.



85.    The day of the We the People rally Torch Antifa attacked two Marine Reservists

that Torch Antifa they participated in the rally.

## CITY

# Marines Were Attacked, Robbed Near "We the People" Rally in Philly

Police say these guys maced, punched, kicked, and robbed a group of Marine Corps reservists after calling them "Nazis" and "white supremacists."

*by* VICTOR FIORILLO • *11/20/2018, 2:34 p.m.*



The Philadelphia Police Department is asking for the public's help to identify a group of people accused of attacking multiple Marine Corps reservists last Saturday afternoon down the street from the the "We the People" rally.

It happened around 3:20 p.m. on November 17th on the 100 block of South Front Street. According to police, the reservists were approached by a group of males and females, who called the reservists "Nazis" and "white supremacists."

US NEWS

**Antifa Member Charged in Assault of US Marines Near 'We the People' Rally in Philly: Reports**

November 29, 2018 15:51, Last Updated: November 29, 2018 18:45

By Jack Phillips

Police arrested and charged a man believed to be the leader of an Antifa group in Philadelphia after a group of U.S. Marine reservists were assaulted on Nov. 17.

CITY

**Philly Antifa Activist Tom Keenan Charged in Assault on Marines**

The alleged attack occurred on November 17th near the "We the People" rally.

*by VICTOR FIORILLO · 11/30/2018, 1:33 p.m.*   👁

Tom Keenan, 33, of Mount Airy, turned himself into the police department several days ago after investigators released a video that appeared to show him and two others yelling at a group following a rally in Philadelphia, Fox News reported.

86.     Three members of Torch Antifa were arrested and have been charged with various felonies, including aggravated assault, ethnic intimidation, and conspiracy related to the attack.

CITY

**D.C. "Antifa Leader" Is Third Man Charged in Marine Attack in Philadelphia**

Joseph Alcoff has been charged with aggravated assault, ethnic intimidation, and conspiracy, among other offenses.

*by VICTOR FIORILLO · 1/29/2019, 9:55 a.m.*   

The Philadelphia District Attorney's Office has charged 37-year-old Washington, D.C., resident Joseph Alcoff with aggravated assault, ethnic intimidation, and conspiracy — all felonies — among other charges. He has pleaded not guilty and is currently out on bail.

Alcoff joins codefendants Tom Keenan and Thomas Massey in the case. Both Keenan and Massey were arrested at the end of November and are also out on bail awaiting trial.

**AMANDA REHL**

87.     AmRehl repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 86 with the same force and effect as if set forth in detail herein again.

88.     On or about August 2, 2017, Exoo conspired with Torch Antifa to dox AmRehl's home address when he doxed her husband, Zachary Rehl.

89.     On or about October 1, 2018, AmRehl's home address was doxed a second time when Exoo doxed her husband Zachary Rehl, because he organized the "We the People" march in Philadelphia that occurred on November 17, 2018.

90.     On November 14, 2018, Exoo directed his associates to counter protest and disrupt the We the People the event, because "fascism is coming and only we can stop it."

91.     At 12:41 a.m. on November 17, 2018, AmRehl's safety was endangered when she was assaulted by Torch Antifs who threw a brick through the front window of AmRehl's home and spray painted the word "Nazi" on the front of her home as seen below with a copy of the Philadelphia Police Incident Report.



**K.R., a minor, by and through her father ZACHARY REHL and mother AMANDA REHL**

92.     K.R. repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 92 with the same force and effect as if set forth in detail herein again.

93.     On or about August 2, 2017, Exoo and Torch Antifa doxed K.R.'s home address when he doxed her father, Zachary Rehl.

94.     On or about October 1, 2018, K.R.'s home address was doxed a second time when Exoo doxed K.R.'s father Zachary Rehl, because he organized the "We the People" march in Philadelphia that occurred on November 17, 2018.

95.     On November 14, 2018, Exoo directed his associates to counter protest and disrupt the We the People event, because "fascism is coming and only we can stop it."

96.     At 12:41 a.m. on November 17, 2018, K.R.'s safety was endangered when she was assaulted by Torch Antifa who threw a brick through the front window of her home and spray painted the word Nazi on the front of her home.



### AARON WOLKIND

97.     Aaron Wolkind repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 96 with the same force and effect as if set forth in detail herein again.

98.     Exoo conspired with members of Torch Antifa to obtain Wolkind's true personal identity and doxed him on or about June 21, 2019.  Wolkind was called a fascist, white supremacist, and Nazi, which is an idiotic assertion, because Aaron's a Jew.


**AntiFash Gordon** @AntiFashGordon · Jun 21, 2019          ···
Philly Proud Boy Sgt-at-arms Aaron **Wolkind** is employed as a Technical
Support Specialist at @AerzenUSA, in Coatesville, PA.

33

99.     On July 3, 2019, Exoo re-posted Wolkind's dox and associates dogpiled Wolkind's employer Aerzen USA ("Aerzen") social media accounts and internet profiles and dogpiled his employer and co-workers with phone calls and emails.

100.     To their credit, Aerzen did not immediately terminate Wolkind, but when enterprise associates discovered Wolkind was not terminated, Exoo and associates dogpiled Aerzen's clients demanding they stop doing business Aerzen and dogpiled Aerzen's subsidiaries

101.     On or about November 17, 2019, Torch Antifa became angered that a tavern in Philadelphia allegedly owned by a family member of Zach Rehl allegedly allowed Wolkind to distribute literature inside the tavern, so they encouraged dogpiling on Wolkind's employer.



102.     On November 18, 2019, Exoo published Wolkind's dox and reminded associates to "Use *67 to block your number."



103. Torch Antifa dogpiled a tavern, because they believed Wolkind distributed literature at the tavern.



104. On or about November 19, 2018, based on Torch Antifa's belief that Wolkind was affiliated with the tavern, the tavern "got the smash," which meant its windows were broken.



105. Torch Antifa vandalized the tavern a second time on January 1, 2021, based on their belief that Wolkind was affiliated with the tavern and their damage derogatorily referenced the Proud Boys.

Case 2:20-cv-12880-JMV-JSA   Document 106   Filed 06/17/22   Page 252 of 299 PageID: 4253



106.    As a result, Wolkind's November 18, 2019, dox and subsequent dogpiling, his employer blocked Twitter users and temporarily shut down their social media and internet profiles, and closes a Coatesville, Pa. facility for one day.



107.    Wolkind continues to receive threatening and harassing phone calls due to the dox, which identifies him as a white supremacist and a Nazi, but as stated above Aaron's a Jew.

## STEVE HARTLEY

108.    Hartley repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 107 with the same force and effect as if set forth in detail herein again.



109.    Hartley's employer information and home address were doxed and dogpiled on November 29, 2018, and labeled a Nazi, racist, terrorist and a threat to women and minorities.



110.    Exoo partnered with Torch Antifa to dox Hartley, who dogpiled Hartley'employer and co-workers with negative posts and reviews.

Case 2:20-cv-12880-JMV-JSA Document 106 Filed 06/17/22 Page 254 of 299 PageID: 4255



111.    Following his dox Torch Antifa members caused damage to Hartley's home, which is what they consider to be self-protection.

## MARK ANTONY TUCCI

112.    Tucci repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 112 with the same force and effect as if set forth in detail herein again.

113.    Exoo worked with Torch Antifa members to dox Tucci on December 10, 2018. Associates called Tucci's employer more than 600 times and shut it down.

114.    In real time you can see the enterprise's conspiracy play out in their Tweets, Exoo picked up when his Torch Antifa partner got temporarily banned.



a.    Enterprise associates who called Tucci's employer, Tweeted confirmation.

38



115.     Exoo would not let his associates relent until Tucci's employer publicly announced his termination.



116.     The following day Exoo directed associates to continue dogpiling.



## **RICHARD SCHWETZ**

117.     Schwetz repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 116 with the same force and effect as if set forth in detail herein again.

118. The enterprise targeted Schwetz after he volunteered to clean up debris and litter at a Clean Up America event that occurred in Philadelphia on May 23, 2020.

119. Schwetz was doxed in June 2020 by an Exoo associate, but it failed to deliver as intended.



**We Will Be Ruthless** @RuthlessWe · Jun 19, 2020
Meet Richard **Schwetz** of Lancaster PA. Member of @splcenter designated hate group the "Proud Boys" and employee at @InovaPayroll

120. Exoo doxed Schwetz on September 21, 2020, with detailed information and a statement that we do not cry to cops or the courts.



### **MATTHEW REIDINGER**

121. Reidinger repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 120 with the same force and effect as if set forth in detail herein again.

122. Exoo and Torch Antifa conspired to dox Reidinger.

40



123.    As is the case with all victims, Exoo and associates dogpiled Reidinger's

employer.



124.    In his instructions Exoo instructed associates to dogpile Reidinger's employer in

order to cause his termination as they successfully had done to a Comcast employee.



## JOBEL BARBOSA

125.    Barbosa repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 124 with the same force and effect as if set forth in detail herein again.

126.    Exoo conspired with Torch Antifa to dox Barbosa's identity and employer's information on June 22, 2019, which dox was promoted by comedienne Kathy Griffin.



42

127.    Barbosa is an olive-skinned Puerto Rican, who was immediately called into a meeting with a company executive and a human resource's representative and interrogated about being a white supremacist.

128.    Exoo and associates did not know Barbosa was terminated on June 27, 2019, so they reposted his information on July 1, 2019, with his employer's corporate office contacts.



129.    As is the custom, associates Tweeted confirmation of contacts with Barbosa's employer to Exoo.



130.    Associates' confirmation to Exoo included implied violence against Barbosa.



131.    Barbosa's home address and cell phone numbers for him and his wife were posted to phonezapp.noblog.org (no longer available) and Barbosa's wife received threatening calls on her personal cell phone.

## SEAN-MICHAEL DAVID SCOTT

132.    Scott repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 131 with the same force and effect as if set forth in detail herein again.



134.    On the same day as the dox was published, Torch Antifa posted flyers near

Scott's home and caused property damage and painted it with graffiti.  As a result of the property

damage, Scott's property manager forced him to break his lease and immediately vacate in order

to avoid further property damage that was threatened by Torch Antifa dogpilers.



135.    Exoo and Torch Antifa caused Scott's termination from a second employer.



136. On or before April 15, 2020, Torch Antifa identified Scott's car and his tires were slashed, and although not seen in photo below, his passenger windows were broken. Torch Antifa mocked Scott's damaged car as seen in photos below.



### JOHN HUGO

137. Hugo repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 136 with the same force and effect as if set forth in detail herein again.

138. Hugo was doxed by Exoo on January 2, 2020, and Exoo has admitted he threatens Boston area "fash" like Hugo.



46

139.    A second dox occurred in February 2020 that led to Hugo being terminated in March 2020.



140.    Hugo continues to receive harassing phone calls from enterprise associates on a near daily basis.[20]

## SUPPLEMENTAL PLEADING TO ADD PLAINTIFF THOMAS LOUDEN WHO WAS INJURED BY THE ENTERPRISE AFTER THE COMPLAINT WAS FILED

141.    Louden repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 140 with the same force and effect as if set forth in detail herein again.

142.    The original Complaint in this action was filed on September 21, 2020, and Louden was injured after the Complaint was filed in the same series of occurrences or transactions.

143.    Louden was employed as the Director of Managed Care at Thomas Jefferson University Hospital in Philadelphia.

---

[20] Voicemail recordings are provided on thumb drive that was submitted to the Court and defendants.

144.    During a global health emergency and pandemic Exoo doxed and dogpiled Louden's hospital employer on November 2, 2020, because of the employer's decision concerning an illegal alien's immigration status.



145.    Louden does not have a Twitter account was unaware of Exoo's dox until he was called to a Zoom meeting with his employer's Vice-President and a human resources representative on November 2, 2020. Louden was quizzed about his membership in a right-wing extremist group. Louden is a 30-year volunteer firefighter and the appointed Deputy Emergency Management Coordinator for Hilltown Township, Pa.

146.    On November 3, 2020, Louden learned that Exoo posted photos of his home.

147.    On November 10, 2020, Exoo re-posted Louden's personal information with explicit directions, including photographs of his home and local street signs, the name of the city, and longitude and latitude coordinates.



## CLAIMS FOR RELIEF

## COUNT I

**Violation of New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to – 49**
**(as to D'Ambly against Tribune Publishing Company and the New York Daily News)**

148.     D'Ambly realleges and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 147 with the same force and effect as if set forth in detail herein again.

149.     Defendants Tribune and Daily News are employers as defined in N.J.S.A. 10:5-5.

150.     D'Ambly is older than forty years (40) old and was an employee as defined in N.J.S.A. 10:5-5.

151.     Defendants Tribune and Daily News discharged D'Ambly due to their enmity towards D'Ambly's racially identifiable associations, whereas, non-white Tribune and Daily News employees who participate in racially identifiable associations, are not punished, or terminated, violated N.J.S.A. 10:5-12.

152.     Defendants Tribune and Daily News undertook several pre-textual steps to mask D'Ambly's discriminatory termination:

a.   Tribune hired a private investigation firm to invade D'Ambly's privacy in an unsuccessful effort to catch D'Ambly engaged in unlawful activity.

b.   In the morning of January 11, 2019, the Daily News received death threats intended to extort D'Ambly's termination that they did not immediately disclose, because they intended to use the threats pre-textually as the "cause" of D'Ambly's termination.

c.   In the afternoon of January 11, 2019, the Daily News issued D'Ambly a "Last and Final Warning," that warned D'Ambly he would be immediately terminated if it

were discovered he brought his political activities into the workplace, but they did

not inform or warn D'Ambly of the death threats earlier received.

d.   D'Ambly was informed he was terminated on January 16, 2019.

e.   Subsequently, D'Ambly received a "Termination of Employment" letter dated

January 22, 2019, whereby, the Daily News falsely stated they discovered the

death threats on January 14, 2019, contrary to indisputable evidence they received

the death threats on January 11, 2019, which meant he "brought his activities into

the workplace" after he was warned.  Daily News cited this fabrication as the

"cause" of D'Ambly's termination.

153.    As a direct and proximate result of defendants Tribune Publishing Company and

the New York Daily News racially discriminatory termination, D'Ambly has suffered adverse

consequences and continues to be damaged.  D'Ambly is entitled to compensatory damages,

equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an

amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT II

**Tortious Interference with Prospective Economic Benefit**
**(as to all Plaintiffs except K.R. against defendant Christian Exoo a/k/a "AntiFashGordon")**

154.    Plaintiffs reallege and incorporate herein by reference each and every one of the

allegations contained in paragraphs 1 through 153 with the same force and effect as if set forth in

detail herein again.

155.    Plaintiffs were rightfully entitled to pursue lawful employment.

156.    Plaintiffs reasonably expected their employment to continue into the future and to

benefit economically from his employment.

157.    Defendant Exoo knew Plaintiffs were employed and intentionally interfered with their prospective economic benefits to be gained from continued employment.

158.    Defendant Exoo intentionally and unjustifiably interfered with Plaintiffs rights to pursue lawful business.

159.    Defendant Exoo's interference caused Plaintiffs' employers to terminate their employment.

160.    Plaintiffs have suffered and will continue to suffer irreparable harm in the form of damage to his reputation, loss of income and financial hardship as a result of Exoo's interference.

161.    As a direct and proximate result of defendant Exoo's interference with Plaintiffs prospective economic benefits, Plaintiffs have suffered adverse consequences and continue to be damaged.  Plaintiffs are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT III

### Employer's Breach of its Duty to Warn
### (as to D'Ambly against defendants Tribune Publishing Company and the New York Daily News)

162.    D'Ambly realleges and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 161 with the same force and effect as if set forth in detail herein again.

163.    Defendants Tribune and Daily News received a stream of death threats directed at D'Ambly over a two and one-half month period, but they never warned D'Ambly.

164. Defendants Tribune and Daily News never warned D'Ambly to take precautionary measures as he entered or exited the workplace.

165. Defendants Tribune and Daily News did not take steps to increase the safety of D'Ambly and other employees as they entered and exited the workplace.

166. Defendants Tribune and Daily News did not secure the workplace in order to protect D'Ambly and others.

167. As he was not aware of the threats, D'Ambly could not take steps to protect himself and his property and as a result his property was damaged on January 11, 2019.

168. Defendants Tribune and Daily News had a duty to warn their employee he was the direct target of the death threats they received.

169. As a direct and proximate result of defendants Tribune and Daily News' failure to warn D'Ambly has suffered adverse consequences and continues to be damaged. D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT IV

**Violations of 18 U.S.C. §§ 1962(c) – Racketeering**
**Multiple violations of RICO predicates 18 U.S.C. §§ 1951 and 1952**
**(as to all Plaintiffs against defendants Christian Exoo a/k/a "AntiFashGordon," St.**
**Lawrence University, Vijaya Gadde, and Twitter, Inc., the "Exoo Enterprise")**

170. Plaintiffs reallege and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 169 with the same force and effect as if set forth in detail herein again.

171.    Each of the individuals and entities is a "person" within the meaning of 18 U.S.C.

§ 1961(3) who conducted the affairs of the enterprise, through a pattern of racketeering activity

in violation of 18 U.S.C. § 1962(c).

172.    Defendant Christian Exoo leads and conspires with associates, including

Defendant Torch Antifa Network in an enterprise as defined by 18 U.S.C. 1961(4).

173.    At all times relevant, Gadde was the only Twitter employee authorized to

permanently ban Twitter users.[21]

174.    Upon information and belief, Exoo's activities are well known to his employer St.

Lawrence University, who have not taken steps to prevent their employee from harming others

from his place of employment, because their share his goals.

We are witnessing a resurgence of the most dangerous and hateful legacy of our nation's history—white nationalism. The Southern Poverty Law Center, New York State, and because of the diversity our students, staff, and faculty bring to the table. White nationalism seeks to erode this through a discourse of fear, hatred, and xenophobia. It seeks to create a concept of America that is built on white supremacy and the dismantling of the work of social justice and equality that have been the hall-mark of this country for the last forty years. We will stand up for the rights of our students, faculty, and staff.

175.    Exoo uses his employment and lecturing at St. Lawrence to recruit.

---

[21] *Meet Vijaya Gadde, an Indian-born Twitter head who decides on blocking tweets, users*, The Economic Times, (Jan. 16, 2020) https://economictimes.indiatimes.com/tech/internet/meet-vijaya-gadde-an-indian-born-twitter-head-who-decides-on-blocking-tweets/articleshow/73281445.cms, (last accessed September 12, 2020).  See also, *Twitter's Top Lawyer Is Final Word On Blocking Tweets – Even Donald Trump's,* Bloomberg.com,(Jan. 15, 2020) https://www.bloomberg.com/news/articles/2020-01-15/twitter-s-gadde-is-final-word-on-blocking-tweets-even-trump-s, last accessed September 12, 2020; *Meet Twitter's top lawyer, who has the final word on blocking tweets – including Donald Trump's,* Fortune.com, (Jan. 15, 2020) https://fortune.com/2020/01/15/twitter-top-lawyer-vijaya-gadde-blocks-tweets-donald-trump/, (last accessed September 12, 2020).



176.     Exoo is and was well known to Gadde and Twitter as a ban evader before and

during the time of Plaintiffs' dox.



177.     Upon information and belief Gadde and Twitter Support have received complaints

regarding @AntiFashGordon's doxing and social coordination, examples below.

 

**An update on your report**

Thanks again for letting us know. Our
investigation found this account
violated the Twitter Rules:

AntiFash Gordon
@AntiFashGordon

Violating our rules against posting
private information.

We appreciate your help in improving
everyone's experience on Twitter. You
can learn more about reporting
abusive behavior here.

178.     In or about September 2019, Exoo was suspended for posting confidential

information of others, otherwise known as doxing, but reinstated weeks later.



179.     Twitter has complete control over who is allowed an account, and as a

permanently banned user Exoo could not possess an account without Twitter's consent or

agreement when he was allowed to change his ban evasion account username from @DoxSavage

to @AntiFashGordon.[22]

180.     Exoo is connected to Twitter through his association with the account holder of

@emilygorcenski, who has leveraged a connection to Jack Dorsey to have accounts that use

"deadnames" banned, as seen in the image below.

---

[22] Video recording of Twitter executives confirming permanent Twitter bans are lifetime bans submitted to the Court
on a thumb drive.



181.    Gadde and Twitter have classified alleged white supremacists as a greater threat than drug cartels or Islamic terrorists, and Exoo and associates doxing benefits her publicly stated opposition to white supremacists, which she is "very, very focused on that…the KKK, the American Nazi Party," because that "was what my parents had to deal with" where she grew up on the Texas-Louisiana border.[23]

182.    Exoo and associates conduct activities that affects interstate commerce by threatening violence to persons and property and causing actual violence to persons and property.

183.    Defendants directed and participated in patterns of racketeering activity, including multiple acts indictable under 18 U.S.C. §§ 1951 (Interference with commerce by threats or violence) and 1952 (use of interstate facilities to conduct unlawful activity), including using

---

[23] *Twitter's Kayvon Beykpour and Vijaya Gadde: the Code Conference interview (transcript)*, Vox.com (June 27, 2019) https://www.vox.com/recode/2019/6/27/18760444/twitter-kayvon-beykpour-vijaya-gadde-kara-swisher-peter-kafka-code-conference-interview-transcript, last accessed September 12, 2020.

interstate communications to order violent acts against all plaintiffs, specifically, D'Ambly, Rehl, Wolkind, and Scott.

184.    The conduct of the Exoo and associates described above constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Defendants' decisions and activity routinely conduct its transactions in such a manner constitutes "patterns of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

185.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiffs for three times the damages sustained, plus the costs of this suit, including reasonable attorneys' fees.

186.    As a direct and proximate result of Defendants patterns of racketeering activity Plaintiffs have suffered adverse consequences and continue to suffer adverse consequences in an amount to be determined at trial, but which is in excess of $75,000.00. Plaintiffs are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT V

**Violation of 18 U.S.C. § 1962(d) (Conspiracy)**
**(as to all Plaintiffs against defendants Christian Exoo a/k/a "AntiFashGordon," St. Lawrence University, Vijaya Gadde, and Twitter, Inc., the "Exoo Enterprise")**

187.    Plaintiffs reallege and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 186 with the same force and effect as if set forth in detail herein again.

188.    Section 1962(d) of RICO provides "shall be unlawful for any person to conspire to violate any provisions of subsection (a), (b), or (c) of this section."

189.   Defendants have violated 18 U.S.C. § 1962(d) by conspiring to associate and participate in the Exoo Enterprise's patterns of racketeering activities as defined in 18 U.S.C. 1962(c).

190.   Defendants' have engaged in overt and predicate racketeering acts in furtherance of the conspiracy, including using interstate communications to threaten, intimidate and commit violent acts against their targets.

191.   The nature of the above-described acts of Defendants in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. 1962(d) violation, but they were aware that their ongoing acts have been, and are part of an overall pattern through related and continuous acts.

192.   Defendants sought to and have engaged in the commission of, and continue to commit overt acts, including the following unlawful racketeering predicate acts:

   a.   Multiple instances of interference with commerce by threats of violence in violation of 18 U.S.C. § 1951; and

   b.   Multiple instances of use of interstate facilities to conduct unlawful activity violations of 18 U.S.C. § 1952.

193.   As a direct and proximate result of Defendants' multiple overt acts and predicate acts in furtherance of an enterprise in violation of 18 U.S.C. § 1962(d), by conspiring to violate 18 U.S.C. 1962(c), D'Ambly has been and continues to be injured by Defendants' conduct.

194.   By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are liable to D'Ambly for three times the damages sustained, plus the costs of this suit, including reasonable attorneys' fees.

195.     As a direct and proximate result of Defendants patterns of racketeering activity Plaintiffs have suffered adverse consequences and continue to suffer adverse consequences in an amount to be determined at trial, but which is in excess of $75,000.00.  Plaintiffs are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT VI
## Legal Malpractice

### (as to D'Ambly against defendant Cohen, Weiss, and Simon, L.L.P.)

196.     D'Ambly repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 195 with the same force and effect as if set forth in detail herein again.

197.     As a result of their personal revulsion of D'Ambly and his political beliefs CWS failed to adequately represent and protect D'Ambly's rights.

198.     Defendant CWS neglected to perform necessary case research, legal research, and investigation of the accusations against D'Ambly.

199.     As a result of CWS's inadequate legal research and investigation they failed to protect D'Ambly from the extortionate and criminal conduct of others.

200.     As a result of CWS's failure to adequately investigate D'Ambly's doxing they failed to learn that @AntiFashGordon publicly announced D'Ambly's termination on January 13, 2019, which occurred five days before his official termination date, and one day before the purported "cause" of his termination was discovered.

201.     CWS failed to challenge Brill's blatant misrepresentations regarding the timing of the alleged 'cause' of D'Ambly's termination.

202.    CWS's revulsion of D'Ambly and his political beliefs caused them to ignore an

obvious racially discriminatory pre-textual termination spotlighted by the private investigation,

last and final warning, and falsely claimed cause of D'Ambly's termination.

203.    As a direct and proximate result of CWS's legal malpractice that flowed from

their firmwide enmity of D'Ambly's political beliefs D'Ambly has suffered adverse

consequences and continues to be damaged.  D'Ambly is entitled to compensatory damages,

equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an

amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT VII

**Deprivation of Rights under *Section 610* of the Labor-Management Relationship
Disclosure Act (LMRDA), 18 U.S.C. § 530**

**(as to D'Ambly against defendants Christian Exoo a/k/a "AntiFashGordon," St. Lawrence
University, Vijaya Gadde, Twitter, Inc., "Exoo Enterprise")**

204.    D'Ambly repeats and incorporates herein by reference each and every one of the

allegations contained in paragraphs 1 through 203 with the same force and effect as if set forth in

detail herein.

205.    Under *Section 610* of the *Labor-Management Relationship Disclosure Act*

(*"LMRDA"*), *18 U.S.C. §530:*

It shall be unlawful for any person through the use of force or violence, or threat
of the use of force or violence, to restrain, coerce, or intimidate, or attempt to
restrain, coerce, or intimidate any member of a labor organization for the purpose
of interfering with or preventing the exercise of any right to which he is entitled
under the provisions of this Act [LMRDA].

206.    As a result of the acts described herein, D'Ambly was forced into early

unexpected retirement.  He was a printing press platemaker, and his union does not have a Union

Hall where he can go shape to obtain new union printing jobs, moreover, his trade has been significantly depressed by technology.

207. D'Ambly's job has deprived him of his intangible property rights as a union member, and the economic benefits that flow therefrom, for the reason that his job loss has had the impact of an expulsion from the Teamsters.

208. On or about October 29, 2018, Exoo and associates dogpiled Daily News and the Teamsters intending to prevent D'Ambly from exercising his rights provided by the LMRDA.





209. Exoo and associates, such as those who caused property damage at D'Ambly's home, intentionally intimidated others with threats, such the phrase any "blood spilled" to deprive D'Ambly his union member rights.



210.    On January 13, 2019, when Exoo announced D'Ambly's termination the Teamsters were the only party capable of telling Exoo that D'Ambly was terminated, because the Daily News did not learn of the cause of D'Ambly's termination until January 14, 2019.

211.    As a direct and proximate result of Exoo and associates' dogpiling that threatened violence, use of force, and "any blood spilled" D'Ambly has been deprived of his intangible property rights provided to him under the LMRDA.  D'Ambly has suffered adverse consequences and continues to be damaged.  D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

1.    Demands judgment against Defendants, jointly and severally, in an amount to be determined at trial plus interest, including, but not limited to, all emotional distress, back pay,

punitive damages, liquidated damages, statutory damages, attorneys' fees, costs, and disbursements, and for such relief as the Court deems just and proper.

2. On Plaintiffs' RICO claims: compensatory damages and enhancement of damages Plaintiffs have sustained as a result of Defendants' conduct as may be permitted under the relevant statutes, such amount to be determined at trial, plus Plaintiffs costs in this suit, including reasonable attorneys' fees.

3. On Plaintiffs' tortious interference, intrusion upon seclusion, stalking and harassment claims: compensatory and punitive damages in an amount to be determined at trial.

4. On D'Ambly's State claims against the Tribune and Daily News: compensatory damages and enhancement of damages he sustained as a result of the Tribune and Daily News' conduct as may be permitted under the relevant statutes, such amount to be determined at trial, plus Plaintiffs costs in this suit, including reasonable attorneys' fees.

5. On D'Ambly's legal malpractice claim: compensatory damages to be determined at trial.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury on all issues so triable.

Respectfully Submitted,
**LAW OFFICE OF PATRICK TRAINOR**
*Attorney for Plaintiffs*

Dated: November 30, 2021

Patrick Trainor
19 Union Avenue, Suite 201
Rutherford, New Jersey 07070
(201) 777-3327
pt@ptesq.com

# EXHIBIT "B"

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

DANIEL D'AMBLY,

Plaintiff,

v.

CHRISTIAN EXOO a/k/a ANTIFASH
GORDON; ST. LAWRENCE
UNIVERSITY; TRIBUNE PUBLISHING
COMPANY; NEW YORK DAILY NEWS;
VIJAY GADDE; TWITTER, INC.;
COHEN, WEISS AND SIMON LLP,

Defendants.

Case No. 2:20-cv-12880-JMV-JAD

Civil Action

**REPLY MEMORANDUM OF LAW ON BEHALF OF DEFENDANT COHEN, WEISS AND SIMON LLP IN FURTHER SUPPORT OF ITS MOTION TO DISMISS COUNT XIII OF PLAINTIFF'S AMENDED COMPLAINT**

Michael J. Canning, Esq. (MJC3060)
**GIORDANO, HALLERAN & CIESLA**
A Professional Corporation
125 Half Mile Road, Suite 300
Red Bank, N.J. 07701-6777
(732) 741-3900

Attorneys for Defendant Cohen,
Weiss and Simon LLP

MICHAEL J. CANNING, ESQ.
   Of Counsel and on the Brief

Case 2:20-cv-12880-JMV-JSA   Document 120-2   Filed 01/17/22   Page 282 of 299 PageID:
4283
Case 2:20-cv-12880-JMV-JSA   Document 82-1   Filed 05/12/21   Page 2 of 19 PageID: 1808

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    POINT I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        THE ISSUE OF RULE 11 SANCTIONS IS NOT PRESENTLY
        BEFORE THE COURT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    POINT II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        NO ATTORNEY CLIENT RELATIONSHIP EXISTED BETWEEN
        D'AMBLY AND CWS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

POINT III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        PLAINTIFF'S CLAIMS RELATING TO THE LMRDA, WHICH WERE
        NOT PLEADED IN HIS AMENDED COMPLAINT, DO NOT APPLY TO
        THE FACTS OF THIS CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

POINT IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        PLAINTIFF'S UNPLEADED ARGUMENT REGARDING A "CAPTIVE
        LABOR ORGANIZATION" FAILS AS A MATTER OF LAW. . . . . . . . . . . 11

    POINT V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        PLAINTIFF'S AMENDED COMPLAINT SHOULD BE DISMISSED
        WITH PREJUDICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## TABLE OF AUTHORITIES

### Cases

Atkinson v. Sinclair Refining Co., 370 U.S. 238 (1962) ....passim

Baxt v. Liloia, 155 N.J. 190 (1998) ..........................7

Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101 (7th
    Cir. 1984)................................................6

Carino v. Stefan, 376 F.3d 156 (3d Cir. 2004) ...........passim

Clements v. Sanofi-Aventis, U.S., Inc., 111 F.Supp. 3d
    586 (D.N.J. 2015)........................................6

Fletcher-Harlee Corp. v. Pote Concrete Contrs., Inc., 482
    F.3d 247 (3d Cir. 2007).................................13

Northeast Revenue Servs., 685 Fed. Appx. at 102 .............14

Northeast Revenue Servs., LLC v. Maps Indeed, Inc., 658
    Fed. Appx. 96 (3d Cir. 2017)...........................14

Pennsylvania ex.rel. Zimmerman v. Pepsico, Inc., 836 F.2d
    173 (3d Cir. 1988)...................................6, 10

Peterson v. Kennedy, 771 F.2d 1244 (9th Cir. 1985) ..........7

Petrillo v. Bachenberg, 139 N.J. 472 A.2d 1354, 1359-60
    (1995)...................................................9

Phillips v. County of Allegheny, 515 F.3d 224 (3d Cir.
    2008)...............................................14, 15

United States v. Local 30, United Slate, etc., 871 F.2d
    401 (3d Cir. 1989)......................................12

### Statutes

29 U.S.C. § 185 .............................................5

29 U.S.C. § 411 .........................................2, 11

29 U.S.C. § 501 .............................................3

Labor Management Recording and Disclosure Act ..........passim

### Rules

A.B.A. Model Rule of Professional Conduct ...............5, 7, 8

Fed.R.Civ. P. 11(c)(4) .....................................4

Model Rules of Professional Conduct, Scope (1992) ...........7

New Jersey Rule of Professional Conduct 1.13(a) ................ 8

R. 1.13 ...................................................... 5

RPC 1.13 ..................................................... 8

RPC 1.13(d) .................................................. 8

Rule 1.13 of the American Bar Association ("A.B.A.")
    Model Rules of Professional Conduct ...................... 2, 5

Section 301(b) of the LMRA ................................... 9

## PRELIMINARY STATEMENT

The motion of Cohen, Weiss and Simon LLP ("*CWS*") to dismiss Plaintiff's Amended Complaint is based upon the clear and unequivocal holding by the Third Circuit in Carino v. Stefan, 376 F.3d 156 (3d Cir. 2004), and other courts of appeal which have addressed the issue, that an attorney hired by a union to perform services on behalf of a union member in connection with an arbitration hearing conducted as part of a grievance process is immune from suit for malpractice by that member.  Carino, 376 F.3d at 159.

Because the law on this issue is so well settled against him, Plaintiff does not attempt to refute the holding in Carino and the other cases cited by Plaintiff which uniformly dismissed legal malpractice cases against the attorneys hired by a union to perform services on its behalf as part of the grievance process under a collective bargaining agreement.

Instead, Plaintiff makes four untenable and legally unavailable arguments not relevant to the critical issue before the Court.  First, implicitly recognizing the lack of legal merit to his position and the likelihood of the Amended Complaint being dismissed, Plaintiff argues that no sanctions should be awarded against his counsel.  However, the issue of Rule 11 sanctions is

- 1 -

Case 2:20-cv-12880-JMV-JSA   Document 120-2   Filed 01/17/22   Page 286 of 299 PageID:
4287
Case 2:20-cv-12880-JMV-JSA   Document 82   Filed 05/12/21   Page 6 of 19 PageID: 1812

not before the Court on this motion but will rather be addressed at another day.

Second, Plaintiff argues that Rule 1.13 of the American Bar Association ("*A.B.A.*") Model Rules of Professional Conduct created an attorney client relationship between Plaintiff and Defendant. This argument is not supported by any case law, is directly contrary to the holding in Carino, and is contrary to New Jersey law holding that a violation of a Rule of Professional Conduct does not by itself create civil liability. Moreover, this theory of liability is not pleaded anywhere in Plaintiff's Complaint.

Third, Plaintiff invokes sections of the Labor Management Recording and Disclosure Act ("*LMRDA*") in an effort to circumvent the clear immunity provided to CWS under Atkinson / Carino. This argument is procedurally defective since nowhere in the original or Amended Complaint is there any claim relating to the LMRDA. Substantively, the argument is unavailing because the sections of the LMRDA cited by Plaintiff do not apply to a dispute between a union member and the attorney who represented the union in a grievance process under a collective bargaining agreement. 29 U.S.C. § 411 is a union bill of rights which protects a member's right to free speech and assembly within the union. It provides no safeguard to a member's speech outside the union.

- 2 -

29 U.S.C. § 501 imposes a fiduciary duty on union officers and a fine / prison sentence on union officers who embezzle union assets.  It has no applicability to an employer's termination of a union member from employment, which is governed solely by the collective bargaining agreement.  It in no way circumvents the immunity provided to CWS under Carino for its representation of the union as part of the grievance procedure in the collective bargaining agreement.

Finally, Plaintiff again makes an argument not pleaded anywhere in its original or Amended Complaint that the Teamsters Union was a "captive labor organization" and that therefore the Atkinson / Carino immunity does not apply.  Plaintiff cannot amend his Complaint (again) by way of his reply brief.  Even if he could, Plaintiff acknowledges the cases he cited relate to control of a union by violent gangsters and have no applicability here.  It is not the union which was allegedly influenced by the Exoo Enterprise which deprived Plaintiff of any union rights, but rather it was the Plaintiff's employer which was allegedly so influenced resulting in his termination of employment.  Such a claim of wrongful termination is governed by the collective bargaining agreement, not the LMRDA.  Plaintiff offers no case law (as there is none) to support the unpleaded argument that the immunity

- 3 -

Case 2:20-cv-12880-JMV-JSA   Document 120-2   Filed 01/17/22   Page 288 of 299 PageID:
4289
Case 2:20-cv-12880-JMV-JSA   Document 82   Filed 05/12/21   Page 8 of 19 PageID: 1814

provided under Atkinson / Carino does not apply to an attorney's representation of a "captive labor organization."

## LEGAL ARGUMENT

### POINT I

**THE ISSUE OF RULE 11 SANCTIONS IS NOT PRESENTLY BEFORE THE COURT.**

Legitimately concerned about sanctions being imposed against Plaintiff's counsel for violating Rule 11 by filing a Complaint against CWS that is patently frivolous and legally unsustainable, Plaintiff argues that sanctions should not be issued because Plaintiff had a good faith belief that the facts support his Complaint.   See Plaintiff's opposition brief at pp. 12-13. However, the issue of Rule 11 sanctions is not before the Court on this motion.   Rather, the Rule 11 motion has been served upon Plaintiff, without being filed with the Court, in order to give Plaintiff the protection of the 21-day safe harbor period provided under Fed.R.Civ. P. 11(c)(4).

### POINT II

**NO ATTORNEY CLIENT RELATIONSHIP EXISTED BETWEEN D'AMBLY AND CWS.**

As CWS demonstrated in its opening brief, the Third Circuit in Carino, and every other court of appeals which has addressed the issue, have unequivocally held that a lawyer who represents a union in a grievance procedure is immune from legal malpractice

- 4 -

liability to the constituent member on whose behalf the grievance was filed.  See pages 8-13 of Defendant's moving brief.  Plaintiff admits that every court which has addressed the issue has dismissed such legal malpractice complaints brought against the union's attorney under the immunity provided under Section 310 of the Labor Relations Management Act, 29 U.S.C. § 185.  See pp. 2, 7-8 of Plaintiff's opposition brief.

In implicit recognition that the Complaint, as pleaded, fails to state a cause of action against CWS, Plaintiff makes a new allegation which is nowhere pleaded in the Complaint.  At pages 5-7 of his brief, Plaintiff argues that an attorney client relationship was established between Plaintiff and Defendant because A.B.A. Model Rule of Professional Conduct, R. 1.13, requires an attorney to "explain the identity of the client when the lawyer knows or reasonably should know that the organization's interests are adverse to those of the constituents with whom the lawyer is dealing."

This new allegation fails for five independent reasons.

First, the allegation appears nowhere in the Amended Complaint.  There is no citation in the Amended Complaint to A.B.A. Model Rule of Professional Conduct 1.13 or any other Rule of Professional Conduct.  There is no allegation of any conflict between the Union and Plaintiff which mandated CWS' recusal from

- 5 -

the grievance procedure.   The sole claim of legal malpractice asserted against CWS in Count XIII of the Amended Complaint relates to its alleged negligence in the grievance procedure, including the alleged failure to perform the necessary research and investigation in the grievance process.   See ¶¶ 239-245 of the Amended Complaint.   It is improper for Plaintiff to oppose the motion to dismiss, which is based solely on the allegations in Plaintiff's Amended Complaint, by raising new allegations not pleaded in the Complaint.   "It is one thing to set forth theories in a brief; it is quite another to make proper allegations in a complaint."   Pennsylvania ex.rel. Zimmerman v. Pepsico, Inc., 836 F.2d 173, 181 (3d Cir. 1988) "It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss."   Id. citing Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1107 (7th Cir. 1984).   Likewise, "inadequate factual allegations in a complaint cannot be remedied by statements in the plaintiff's briefs."   Clements v. Sanofi-Aventis, U.S., Inc., 111 F.Supp. 3d 586, 601 (D.N.J. 2015).

Second, Plaintiff fails to cite to any case law that supports the untenable position that CWS formed an attorney client relationship with Plaintiff.   This unsupported conclusory allegation is directly contradicted by the clear holding in Carino, and the other courts of appeal which have addressed the issue,

- 6 -

that an attorney does not enter into an attorney client relationship with the constituent member of the Union by representing the Union in the grievance process. Citing to the Ninth Circuit's decision in Peterson v. Kennedy, 771 F.2d 1244 (9th Cir. 1985), the Third Circuit in Carino made it clear:

> If the union chooses to make use of an attorney, that attorney has not 'entered into an "attorney client" relationship in the ordinary sense with the particular union member who is asserting the underlying grievance', but merely 'assume[s] a function that often is performed by a union's business agents or representatives.' Id.

[Carino, 376 F.3d at 161.]

Third, even if Plaintiff had alleged a violation of a Rule of Professional Conduct in the Complaint, the New Jersey Supreme Court has held that a violation does not, in and of itself, provide the basis for civil liability against an attorney. Baxt v. Liloia, 155 N.J. 190 (1998). In reaching this conclusion, the New Jersey Supreme Court noted that the A.B.A. Model Rules explicitly provide that, "Violation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached." Id. at 197-98 (quoting Model Rules of Professional Conduct, Scope (1992)). As the court explained, "the New Jersey disciplinary system is designed to protect the public and the integrity of the profession", id., and not to form the pretext for malpractice claims.

- 7 -

Fourth, the provision of the A.B.A. Model Rule of Professional Conduct upon which Plaintiff relies has not been adopted in New Jersey. New Jersey Rule of Professional Conduct 1.13(a) provides, "A lawyer employed or retained to represent an organization represents the organization as distinct from its directors, officers, employees, members, shareholders or other constituents." This makes further clear that CWS represented the Teamsters Union, and not Plaintiff in the grievance process. RPC 1.13(d) further provides, "In dealing with an organization's directors, officers, employees, members, shareholders or other constituents, a lawyer shall explain the identity of the client when the lawyer believes that such explanation is necessary to avoid misunderstanding on their part." Here, even if Plaintiff had pleaded a violation of RPC 1.13, there was no violation of the Rule as Plaintiff was fully aware that it was the Union that filed the grievance on his behalf and the Union that retained CWS with regard to the grievance. See ¶ 68 of Plaintiff's Amended Complaint. Plaintiff cannot pursue a claim that CWS was ethically required to recuse itself; Plaintiff has already conceded that CWS represented the Teamsters Union, not him, in the grievance process. CWS had no conflict with its client, the Teamsters Union.

Finally, in Carino the Third Circuit rejected a similar argument finding that even if the union attorney could be

considered to owe a duty of care to the constituent member, this does not circumvent the broad immunity under Section 301(b) of the LMRA first announced by the United States Supreme Court in <u>Atkinson v. Sinclair Refining Co.</u>, 370 U.S. 238 (1962).  The Third Circuit stated:

> Lastly, Carino notes that under New Jersey law 'a lawyer's duty may run to third parties who foreseeably rely on the lawyer's opinion or other legal services.' <u>Petrillo v. Bachenberg</u>, 139 <u>N.J.</u> 472, 655 A.2d 1354, 1359-60 (1995).  As a result, she argues that while Stefan was retained by the Union, he still owed a duty of care to her.  While this may indeed be true, this does not alter the fact that he was acting on behalf of the Union.  The fact that he may also have owed a duty to her does not remove the <u>Atkinson</u> bar.

[<u>Carino</u>, 376 F.3d at 162.]

## POINT III

**PLAINTIFF'S CLAIMS RELATING TO THE LMRDA, WHICH WERE NOT PLEADED IN HIS AMENDED COMPLAINT, DO NOT APPLY TO THE FACTS OF THIS CASE.**

At pp. 7-8 of his brief, Plaintiff recognizes that <u>Carino</u> and the other cases cited by CWS uniformly hold that attorneys employed by a union to perform services for a union related to a collective bargaining agreement are immunized from malpractice claims by a union member.  Plaintiff seeks to circumvent the clear holding of these cases by arguing that Plaintiff could have pursued a claim under § 501(a) of the LMRDA.  This argument fails for two reasons.

- 9 -

First, nowhere in Plaintiff's Complaint does he make such an allegation.  Plaintiff cannot raise a claim via a brief in opposition to a motion to dismiss when such claim is not pleaded in the Amended Complaint.  <u>Pennsylvania ex rel Zimmerman v. Pepsico</u>, 836 F.2d at 181.

Moreover, the LMRDA is a federal statute that governs the relationship between a union and its members.  It does not govern the relationship between a union and an employer, or between the union's members and an employer.  The LMRDA contains standards for free and fair union elections; safeguards for protecting union funds and assets; a reporting requirement for unions and their employees and vendors; and a bill of rights.

At p. 8 of his brief, Plaintiff argues that he could have pursued a claim under § 501(a) of the LMRDA.  However, § 501 has no applicability to the facts of this case.  This section of the LMRDA imposes a fiduciary duty on union officers and a fine / prison sentence on union officers who embezzle union assets.  The statute has no applicability to a union member's termination from employment by his employer.  D'Ambly's rights with regard to the alleged wrongful termination are governed by the collective bargaining agreement.  In accordance with the collective bargaining agreement, the Teamsters Union filed a grievance with Plaintiff's employer and hired CWS as its attorney in the grievance

- 10 -

Case 2:20-cv-12880-JMV-JSA   Document 120-2   Filed 01/17/22   Page 295 of 299 PageID:
4296
Case 2:20-cv-12880-JMV-JSA   Document 82-9   Filed 05/12/21   Page 15 of 19 PageID: 1821

proceeding.    It  is  this  representation  by  CWS  of  the  union,
relating  to  D'Ambly's  termination  from  employment,  for  which  CWS
is  fully  immunized  under  Carino.

Plaintiff  further  argues  at  pp.  10-12  of  his  brief  that  the
union  could  not  punish  D'Ambly  for  his  political  speech  because  of
the  broad  free  speech  protections  provided  union  members  under  the
bill  of  rights  section  of  the  LMRDA  at  29  U.S.C.  §  411.    However,
this  statute  only  protects  a  union  member's  right  to  free  speech
and  assembly  within  the  union.    It  does  not  safeguard  a  plaintiff's
speech  outside  the  context  of  a  union  meeting  or  a  union  election
or  dissident  union  activity.    It  does  not  prohibit  the  Daily  News
from  disciplining  or  discharging  the  Plaintiff  because  of  his
speech.    It  simply  has  no  applicability  to  the  Daily  News'
termination  of  Plaintiff  which,  once  again,  is  governed  by  the
terms  of  the  collective  bargaining  agreement.    The  union  challenged
the  Plaintiff's  termination  as  without  just  cause,  filed  a
contractual  grievance  and  advanced  it  to  arbitration.    CWS
represented  the  union  in  that  process  for  which  it  is  immune  from
liability  to  Plaintiff  under  Carino.

### POINT IV

**PLAINTIFF'S  UNPLEADED  ARGUMENT  REGARDING  A
"CAPTIVE  LABOR  ORGANIZATION"  FAILS  AS  A  MATTER
OF  LAW.**

- 11 -

At pp. 9-10 of its brief, Plaintiff argues that the <u>Carino</u> immunity does not apply because the Teamsters Union was a "captive labor organization."   As with Plaintiff's other arguments, this argument was not pleaded in the original or Amended Complaint and the allegation cannot be raised for the first time by way of a brief in opposition to a motion to dismiss.

Moreover, as Plaintiff recognizes at p. 10 of his brief, the cases upon which Plaintiff relies, involving primarily labor organizations controlled by violent gangsters, do not apply. Plaintiff cites <u>United States v. Local 30, United Slate, etc.</u>, 871 F.2d 401, 406 (3d Cir. 1989) for the proposition that "a captive labor organization exists when there is evidence that any persons controlled the union through violence, intimidation or extortion of union member's rights."   Plaintiff argues that the Exoo Enterprise gained control and influence over the Teamsters which caused the relinquishment of Plaintiff's LMRDA rights.   <u>See</u> p. 10 of Plaintiff's brief.

However, it was not the union which is claimed to have been controlled by the Exoo Enterprise, or which took any action adverse to Plaintiff which was protected under the LMRDA bill of rights or elsewhere in the LMRDA.   Rather the alleged actions by the Exoo Enterprise did not control or influence the union, such as to make it a "captive labor organization."   To the contrary, the allegation

- 12 -

Case 2:20-cv-12880-JMV-JSA   Document 120-2   Filed 01/17/22   Page 297 of 299 PageID:
4298
Case 2:20-cv-12880-JMV-JSA   Document 82   Filed 05/12/21   Page 17 of 19 PageID: 1823

is that such actions by the Exoo Enterprise influenced the Daily
News to terminate Plaintiff.  Again, Plaintiff's termination from
employment is not a right governed by the LMRDA, but rather is
governed by the collective bargaining agreement.  Plaintiff cites
no case law (as there is none) for the proposition that if a union
agent or attorney is acting on behalf of a "captive labor
organization", the rules set out in Atkinson / Carino do not apply.

<div align="center">POINT V</div>

**PLAINTIFF'S AMENDED COMPLAINT SHOULD BE DISMISSED WITH
PREJUDICE.**

Despite the overwhelming precedent contrary to his position,
Plaintiff opposes the motion to dismiss, arguing that he has
adequately pleaded a viable cause of action.  Plaintiff does not
seek to amend the Complaint.

In Fletcher-Harlee Corp. v. Pote Concrete Contrs., Inc., 482
F.3d 247 (3d Cir. 2007), the Third Circuit affirmed the district
court's dismissal of plaintiff's complaint with prejudice.  As in
this case, the defendant elected to oppose the motion to dismiss
on the merits and did not seek leave to amend the complaint.
Plaintiff argued that it should have been allowed to amend its
complaint to correct any deficiency.  It argued it was reversible
error for the district court not to offer this unrequested relief
*sua sponte*.  The Third Circuit rejected this argument stating,
"Because Fletcher-Harlee never properly requested that the

<div align="center">- 13 -</div>

District Court allow it to amend its complaint, the court did not err in dismissing the case with prejudice, as it had no duty here even to consider allowing a right to amend." Id. at 253. The Third Circuit limited the *sua sponte* amendment rule to the context of civil rights cases, recognizing that it had "implicitly rejected any argument that, outside of civil rights cases, district courts must *sua sponte* grant leave to amend before dismissing a complaint for failure to state a claim." Id. at 251. The court further found that the failure to submit a draft amended complaint, in order that the court could evaluate whether an amendment would be futile, was fatal to the request for leave to amend. Id.

In Northeast Revenue Servs., LLC v. Maps Indeed, Inc., 658 Fed. Appx. 96, (3d Cir. 2017), the Third Circuit again affirmed the dismissal of a complaint with prejudice where the plaintiff opposed the motion on its merits and did not seek to amend the complaint. The court recognized that its holding in Phillips v. County of Allegheny, 515 F.3d 224, 245 (3d Cir. 2008), that "a district court must permit a curative amendment unless such an amendment would be inequitable or futile", was limited to civil rights cases. Northeast Revenue Servs., 685 Fed. Appx. at 102.

As Plaintiff has elected to oppose the motion to dismiss on its merits, and has not sought leave to amend the Complaint, the dismissal should be with prejudice. Even if Plaintiff did seek

- 14 -

leave to amend the Complaint, under the <u>Phillips</u> standard such a request would have to be denied as it would be futile.  No proposed Amended Complaint can alter the overwhelming and un-contradicted controlling precedent which immunizes CWS from Plaintiff's legal malpractice claim.

<u>CONCLUSION</u>

This is a textbook <u>Atkinson</u> / <u>Carino</u> case.  The sole allegation against CWS in the Amended Complaint relates to its representation of the Teamsters Union as part of the grievance proceeding under the collective bargaining agreement.  It is immunized from liability from such claim and the Amended Complaint should be dismissed with prejudice.

GIORDANO, HALLERAN & CIESLA, P.C.
Attorneys for Defendant Cohen,
Weiss and Simon LLP

By: _____
MICHAEL J. CANNING, ESQ.

Dated:  May 12, 2021

Docs #5084047-v1

- 15 -