Patrick Trainor, Esquire (Attorney ID 242682019)
**LAW OFFICE OF PATRICK TRAINOR, ESQ., LLC**
19 Union Avenue, Suite 201
Rutherford, New Jersey 07073
P: (201) 777-3327
F: (201) 896-7815
pt@ptesq.com
*Attorney for Plaintiff Daniel D'Ambly*

| | |
|---|---|
| DANIEL D'AMBLY,<br><br>             Plaintiff,<br><br>    vs.<br><br>CHRISTIAN EXOO a/k/a ANTIFASH GORDON; ST. LAWRENCE UNIVERSITY; TRIBUNE PUBLISHING COMPANY, LLC; NEW YORK DAILY NEWS; VIJAYA GADDE; TWITTER, INC; COHEN, WEISS AND SIMON, LLP; UNNAMED ASSOCIATES 1 – 100,<br><br>             Defendants. | **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**<br><br>CIVIL ACTION NO.: 2:20-cv-12880<br><br>      (ELECTRONICALLY FILED) |

---

**PLAINTIFF'S BRIEF IN SUPPORT OF HIS OPPOSITION TO COHEN, WEISS, AND SIMON LLP'S MOTION TO FOR SANCTIONS**

---

**Motion Day: February 7, 2021**

## <u>TABLE OF CONTENTS</u>

Table of Authorities .............................................................................. ii

Introduction ...................................................................................... 2

I.   Legal Standard For Rule 12(b)(6) ................................................. 2

II.  Onspiracy to Violate 18 U.S.C. § 1962(d) ................................... 5

III. Twitter is Not a Neutral Conduit Entitled to Section 230 Immunity
     Because They Contributed to the Development of Exoo's Content ........ 9

IV.  Conclusion ................................................................................. 17

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Apex Oil Co v. United States,*
    530 F.2d 1291 (8th Cir. 1976)................................................................... 10, 17

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................................. 3

*Banks v. Wolk,*
    918 F.2d 418, 421 (3d Cir. 1990)............................................................. 8

*Barnes v. Yahoo!, Inc.,*
    570 F.3d 1096, 1100 (9th Cir. 2009)....................................................... 13

*Beck v. Prupis,*
    529 U.S. 494, 505-06 (2000)................................................................... 7

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................................. 3

*Calder v. Jones,*
    465 U.S. 783, 789-790 (1984)................................................................. 5

*Carafano v. Metrosplash.com, Inc.,*
    339 F.3d 1119, 1122 (9th Cir. 2003)....................................................... 10, 12

*Chi. Lawyers' Comm. For Civ. Rights Under Law, Inc. v. Craigslist, Inc.,*
    519 F.3d 666 (7th Cir. 2008)................................................................... 13

*Colorado Riv. Water Conserv. Dist. v. United States,*
    424 U.S. 800, 817 (1976)........................................................................ 4

*Crosby v. Twitter, Inc.,*
    303 F. Supp. 3d 564 (E.D. Mich. 2018)................................................... 11

*Davis v. Wells Fargo,*
    824 F.3d 333 (3d Cir. 2016)..................................................................... 3

*Dimeo v. Max,*
    433 F.Supp. 2d 523 (E.D. Pa. 2006) ....................................................... 11

*Doe v. Myspace,*
    528 F.3d 413 (5th Cir. 2008)................................................................... 12

*Fields v. Twitter, Inc.,*
    217 F.Supp. 3d 1116 (N.D. Cal. 2016).......................................................... 12

*Envtl. Tectonics v. W.S. Kirkpatrick, Inc.,*
    847 F.2d 1052, 1067 (3d Cir. 1988)............................................................... 17

*Doe v. GTE Corp.,*
    347 F.3d 655 (7th Cir. 2003)........................................................................... 12

*Fair Hous. Council v. Roommates.com, LLC*
    521 F.3d 1157, 1162 (9th Cir. 2008)....................................................... *passim*

*Federal Trade Comm'n. v. Accusearch, Inc.,*
    570 F.3d 1187, 1199 (10th Cir. 2009)..................................................... *passim*

*Green v. Am. Online (AOL),*
    318 F.3d 465 (3d Cir. 2003)........................................................................... 11

*Gulf Oil Corp. v. Gilbert,*
    330 U.S. 501, 508 (1947)................................................................................. 3

*Huon v. Denton ,*
    841 F.3d 733, 741 (7th Cir. 2016).......................................................... *passim*

*In re Asbestos Prods. Liab. Litig (No. VI),*
    822 F.3d 125, 133-34 (3d Cir. 2016) ............................................................... 3

*Int'l Shoe Co. v. Washington,*
    326 U.S. 310, 316 (1945)................................................................................. 4

*IMO Indus. v. Kiekert AG,*
    155 F.3d 254 (3d Cir. 1998)............................................................................. 4

*Jaguar Cars v. Royal Oaks Motor Car Co.,*
    *46 F.3d 258 (3d Cir. 1995)* ............................................................................. *8*

*Jane Doe No. 14 v. Internet Brands, Inc.,*
    767 F.3d 894, 898 (9th Cir. 2014).......................................................... *passim*

*Laurel Gardens, LLC v. McKenna,*
    948 F.3d 105 (3d Cir. 2020)............................................................................. 4

*Miller Yacht Sales, Inc. v. Smith,*
    384 F.3d 93, 97 (3d Cir. 2004)............................................................. 3-4

*Meyer v. Grant,*
    486 U.S. 414, 422 (1988)................................................................... 25

*Obado v. Magedson,*
    612 Fed. App'x 90(3d Cir. 2015)....................................................... 11

*O'Connor v. Sandy Lane Hotel Co.,*
    496 F.3d 312, 317 (3d Cir. 2007)...................................................... 4-5

*Pace v. Baker-White,*
    432 F.Supp. 3d 495 (E.D. Pa. 2020)............................................. *passim*

*Petro-Tech, Inc. v. Western Co. of North America*
    824 F.2d 1349, 1357 (3d Cir. 1987).................................................... 8

*Pinker v. Roche Holdings, Ltd.,*
    292 F.3d 361 (3d Cir. 2002)............................................................... 5

*Phillips v. County of Allegheny,*
    515 F.3d 224 (3d Cir. 2008)............................................................... 3

*Rose v. Bartle,*
    871 F.2d 331, 366 (3d Cir. 1989)....................................................... 6

*Saponaro v. Grindr, LLC,*
    93 F. Supp. 3d 319 (D.N.J. 2015)..................................................... 12

*Smith v. Berg,*
    247 F.3d 532, 534 (3d Cir. 2001).................................................... 5, 6

*Swistock v. Jones,*
    884 F.2d 755, 758 (3d Cir. 1989)....................................................... 3

*United States v. Adams,*
    759 F.2d 1099 (3d Cir. 1985)............................................................. 8

*United States v. Dixon,*
    658 F.2d 181 (3d Cir. 1981)............................................................... 8

*United States v. Fattah,*
    914 F.3d 112, 162 (3d Cir. 2019)....................................................... 6

*United States v. Local 560 Int'l Bhd. of Teamsters*,
   780 F.2d 267 (3d Cir. 1985)................................................................... 8

*United States v. Salinas*,
   522 U.S. 52, 63 (1997)........................................................................... 6

*United States v. Turkette*,
   452 U.S. 576, 583 (1981)....................................................................... 8

*Zeran v. Am. Online Inc.*,
   129 F.3d 327, 331 (4th Cir. 1997).......................................................... 10, 11

**Statutes**

18 U.S.C. § 1962(a)..................................................................................... *7*

18 U.S.C. § 1962(d)..................................................................................... 5, 6

18 U.S.C. § 1965(b) .................................................................................... 5

47 U.S.C. § 230 ........................................................................................... *passim*

**Other Authorities**

Federal Rile of Civil Procedure 4(k)(1)(A)................................................. 4

Federal Rile of Civil Procedure 8(a)(2)...................................................... 2

Federal Rule of Civil Procedure 12(b)(6)................................................... 2, 3

Phil McCausland, *Twitter suspends verifying accounts after white nationalist gets badge*, NBCNEWS.com, Nov. 9, 2017, https://www.nbcnews.com/news/us-news/twitter-suspends-verifying-accounts-after-white-nationalist-gets-badge-n819491 (last accessed Jan. 21, 2022). *See also* Jill Disis, Twitter suspends blue check mark verifications, CNN.com, Nov. 9, 2017, https://money.cnn.com/2017/11/09/technology/business/twitter-blue-check-mark-paused/index.html (last accessed Jan. 21, 2022)....................................................... 16

Twitter.com, Following FAQ's https://help.twitter.com/en/using-twitter/following-faqs#:~:text=Following%20someone%20on%20Twitter%20means,to%20send%20you%20Direct%20Messages (last accessed Jan. 19, 2022)..................................... 7

Twitter Rules, Following and unfollowing, Following FAQ's https://help.twitter.com/en/using-twitter/following-faqs (last accessed Jan. 18, 2022). ............................................................................................................ 9

## INTRODUCTION

Defendant, Cohen, Weiss and Simon, LLP (hereinafter "CWS") is not entitled to immunity from liability against Plaintiff Daniel D'Ambly's (hereinafter "Plaintiff" or "D'Ambly") state-law claim, because they did not represent D'Ambly pursuant to a breach or violation of his collective bargaining agreement. *Section 301(b)* of the *Labor Management Relations Act*, 29 U.S.C. § 185(b) ("LMRA") does not grant immunity to union officers and union representatives against state law claims brought by a union member when resolution of the state law claims does not require interpretation of the union member's collective bargaining agreement, and/or when the dispute does not arise out of the collective bargaining agreement ("CBA"). Resolution of D'Ambly's state-law claim against CWS concerning his employment termination and union expulsion[1] does not require interpretation of his CBA.

D'Ambly's termination was the product of stranger workplace violence committed by anarchist extremist domestic terrorists who threatened and intimidated D'Ambly's employer and union to cause his termination. In his *Termination of Employment* letter, D'Ambly's former employer, the New York Daily News' ("Daily News") stated that he had been "targeted by" antifa for "violent retaliation" and in order to prevent "counter attacks by antifa" against the Daily News' workplace and employees. The *Occupational Safety and Health Act of 1970* ("OSHA") 29 U.S.C. §§ 651-678, defines workplace violence as "any act or threat of violence, harassment, intimidation, or other threatening disruptive behavior that occurs at the worksite,"

---

[1] Reference is made to D'Ambly's expulsion, because his dues were current, and since his employment was terminated, D'Ambly's attempts to obtain union job referrals have been rebuffed, because he accepted a settlement.

including "verbal abuse to physical acts and even homicide" directed towards a person at work or on duty."[2]

Perpetrators of workplace violence are classified into four categories: (1) strangers with no legitimate relationship to the business; (2) persons with legitimate business relationships, such as customers/clients; (3) worker-on-worker violence; or (4) violence committed by someone with a personal relationship with the employee, such as a spouse.[3]  OSHA *Section 5(a)* has been construed to obligate employers to provide a workspace safe from acts of workplace violence. *29 U.S.C. § 654*.  The Teamsters Safety and Health Department, defines workplace violence as "not just limited to physical assaults," but also "near misses, verbal abuse, and sexual harassment" and "even the fear of assault."[4]

D'Ambly was terminated, because strangers with no legitimate business relationship to D'Ambly, his employer, or union perpetrated acts of workplace violence against him.  Under any definition of workplace violence, D'Ambly was the victim of workplace violence. Interpretation of D'Ambly's collective bargaining agreement ("CBA") is not required to determine that stranger workplace violence is not a valid provision in the CBA for which CWS could have represented D'Ambly as a representative of his union, who performed a function pursuant to his CBA.

---

[2] U.S. Dept. of Labor, Occupation Safety and Health Administration, *Workplace Violence*, https://www.osha.gov/workplace-violence,(last visited Jan. 12, 2022).  *See also* Centers for Disease Control and Prevention, The National Institute for Occupational Safety and Health (NIOSH), *Occupational Violence*, https://www.cdc.gov/niosh/topics/violence/, (last visited January 12, 2022).
[3] Centers for Disease Control and Prevention, The National Institute for Occupational Safety and Health, *Types of Workplace Violence*, https://wwww.cdc.gov/WPVHC/Nurses/Course/Slide/Unit1_5, (last visited Jan. 12, 2022).
[4] International Brotherhood of Teamsters, Safety and Health Department, Workplace Violence, https://teamster.org/workplace-violence/ (last accessed Jan. 17, 2022).

In this Amended Complaint, D'Ambly puts forth new information that proves anarchist extremists influenced his labor union to cause his termination. D'Ambly obtained communications, between Exoo and an elected labor union official from D'Ambly's union from the day D'Ambly was doxed. The labor union official approved of Exoo's demand that the Teamsters expel D'Ambly. CWS knew that D'Ambly's labor union and their decisions concerning D'Ambly were unlawfully influenced by anarchist extremists, but CWS remained silent when they were obligated to inform D'Ambly to seek independent counsel.

## I.   SUMMARY OF EVENTS THAT REQUIRED CWS TO ADVISE D'AMBLY TO SEEK INDEPENDENT COUNSEL

Before he was doxed D'Ambly was a well-respected, dues paying 27-year member of the Teamsters, and the elected sitting Chairman of his local's Referendum Board that oversaw the local's elections. Beginning on October 29, 2018, anarchist extremist domestic terrorists led by named co-defendant Christian Exoo a/k/a @AntiFashGordon ("Exoo" or "AFG") conspired with co-defendant Torch Antifa Network ("Torch") and carried out criminal and violent acts against D'Ambly, Daily News, and his union Local One-L Amalgamated Lithographers of America, affiliated with Graphic Communications Conference/International Brotherhood of Teamsters ("Teamsters"), in a coordinated effort to intentionally cause D'Ambly's employment termination and union expulsion. Exoo and Torch self-identify as antifa. The New Jersey Department of Homeland Security ("NJDHS") identifies antifa as anarchist extremist domestic terrorists, who "condone[s] violence and the use of force" to "carry out criminal and violent acts" against their "perceived enemies" and "advocate violence in furtherance" of "their respective agendas." *See below New Jersey Department of Homeland Security*, *Anarchist Extremists, 2019 Terrorism Snapshots*. *See also* Exhibit A.

 

# ANARCHIST EXTREMISTS

## Background

- Anarchism is the belief that society should exist absent of "oppressive" governments, laws, police, or any other authority. Anarchist extremists advocate violence in furtherance of this idea, typically focusing on sub-movements such as anti-racism, anti-capitalism, anti-globalism, and environmental extremism.

- Anarchist extremists, or those subscribing to the ideology that condones violence and the use of force, do not have a central leadership and lack organizational hierarchy. These extremists are event-driven and often take advantage of otherwise legal protests to conduct violent counter-protests, destroy public and private property, and attack law enforcement.

- Common attack targets, chosen for their symbols of capitalism and government, include commercial infrastructure and the financial sector. Vandalism and arson are the most common attack types.

- A majority of New Jersey-based anarchist extremists are affiliated with Antifa and focus on issues of racism, immigration, and other perceived social injustices. There are three loosely organized chapters in New Jersey, known as North Jersey Antifa, South Jersey Antifa, and HubCity Antifa based in New Brunswick (Middlesex County).

 

*Anarchist extremist propaganda targeting the alt-right movement*

*Anarchist extremist slogans found in Princeton (Mercer County) in January*

## Additional Resources
2019 Terrorism Threat Assessment

## Threat to New Jersey: Moderate

*Anarchist extremists will mobilize in response to issues they believe are unjust, carry out criminal and violent acts during otherwise First Amendment-protected events and protests, and target perceived enemies.* Throughout 2018, anarchist extremists were actively engaged in criminal activities in the tri-state region, resulting in at least 20 arrests.

- In November, several hundred people, including a number of anarchist extremists, mobilized at the "We the People" rally in Philadelphia, which they perceived as a white supremacist event. That same month, an Antifa-related group, Smash Racism DC, vandalized and protested outside the home of the founder of the Daily Caller, stating that he was "promoting hate" and "an ideology that has led to thousands of people dying."

- Following the "We the People" rally in Philadelphia in November, a group of individuals, including anarchist extremists, Maced, punched, and kicked US Marine Corps reservists not affiliated with the event while calling them "Nazis" and "white supremacists." In October, anarchist extremists protested outside a Proud Boys event in New York City and engaged in acts of vandalism. After the event, one of the anarchist extremists threw a bottle at the Proud Boys, resulting in a fight.

- In June, a Nebraska-based anarchist extremist group tweeted a link to the names and photos of nearly 1,600 Immigration and Customs Enforcement (ICE) officials. Following the release, another individual disseminated the names, pictures, and home addresses of seven ICE employees and their spouses in Oregon, stating, "It's the public's right to know the faces of the gestapo and who is creating, enforcing, and filling concentration camps in our name."

  

*Thomas Keenan, Thomas Massey, and Joseph Alcoff (pictured from left), anarchist extremists charged with assaulting military service members in Philadelphia in November*

## ANTIFA

Antifa, or anti-fascists, is a movement that focuses on issues involving racism, sexism, and anti-Semitism, as well as other perceived injustices. The majority of Antifa members do not promote or endorse violence; however, the movement consists of anarchist extremists and other individuals who seek to carry out acts of violence in order to forward their respective agendas.


Anarchist extremists use the circle-A as one of their primary symbols. "A" represents "anarchism," while "O" stands for "order." Together, the letters mean "society seeks order in anarchy," which stems from 19th century French literature.


The red flag was one of the first anarchist symbols, used until the 1917 October Revolution in Russia when it became primarily associated with communist ideologies.


Since the late 19th century, anarchist groups have used the black flag as a rejection of the concept of representation or the idea that an institution can adequately represent a group of individuals.


Antifa consists of individuals who adhere to some form of the far-left school of thought, encompassing communists, anarchists, socialist groups, and others. Red and black flags flying together represents coming together against a perceived enemy.

*Information cutoff: February 4, 2019*                                                    UNCLASSIFIED

Anarchist extremists use Twitter's direct messaging feature to secretively share among each other private information they have compiled of persons that they intend to dox. They then leverage the public reach of Twitter to dox and dogpile their target in a coordinated effort to cause maximum economic harm. Although Tweets are not usually associated with violence, doxing is universally accepted as violent conduct intended to endanger the person that is doxed. The Department of Justice defines doxing as "the act of gathering, by licit and illicit means, and posting on the internet personal identifying information ("PII") and other sensitive information about an individual," that "endanger[s] the safety of many others" by enabling "harassers and assailants" to "know how and where to contact victims." Press Release, Department of Justice, *New York Man Sentenced to 24 Months in Prison For Internet Offenses, Including "Doxing," "Swatting," Making False Bomb Threat, and Cyber-Stalking.* (Jul. 11, 2016) (https://www.justice.gov/usao-dc/pr/new-york-man-sentenced-24-months-prison-internet-offenses-including-doxing-swatting). The United States Department of Homeland Security

("DHS") similarly defines doxing as "gathering an individual's Personally Identifiable Information (PII) and disclosing or posting it publicly, usually for malicious purposes such as public humiliation, stalking, identity theft, or targeting an individual for harassment."[5]

Exoo is a well-known and leading antifa doxer, who conspires with Torch members to dox, dogpile, and conduct direct-action campaigns against their perceived enemies to cause economic harm. Torch is based in New Brunswick, New Jersey, but has nationwide membership and chapters. All doxes are embedded instructions to the doxer's associates to commence dogpiling Tweets, emails, phone calls, social media posts, at their target's employer, school, etc. Dogpiling is a form of harassment conducted by a large number of people against one person. Direct action is physical attacks against persons and/or property.[6] Torch members Thomas Keenan, Thomas Massey, and Joseph Alcoff, are spotlighted in NJDHS' *2019 Anarchist Extremists Snapshots* due to their propensity for violence, and are currently facing charges for aggravated assault and bias intimidation for attacking two Marines to disrupt the November 2018 "We the People" rally in Philadelphia that was organized by co-Plaintiff Zachary Rehl. *See* Exhibit A.

On October 29, 2018, D'Ambly was doxed by Exoo, and anarchist extremists commenced to dogpile the Daily News and Teamsters to force D'Ambly's employment termination and union expulsion. On the same day, elected Teamster Joint Council Trustee Bernadette Kelly communicated her agreement with Exoo concerning D'Ambly's rights as a

---

[5] United States Department of Homeland Security, *How to Prevent Online Harassment from Doxxing*, (Apr. 2017). https://www.dhs.gov/sites/default/files/publications/How%20to%20Prevent%20Online%20Harassment%20From%20Doxxing.pdf. (last accessed Nov. 30, 2021).
[6] *Direct Action Definition*, TheFreeDictionary.com, *The use of immediately effective acts, such as strikes, demonstrations, or sabotage, to achieve a political or social end.* https://www.thefreedictionary.com/direct+action (last visited Jan. 15, 2022).

union member.  On October 31, 2018, without taking steps to protect D'Ambly from workplace violence, the Daily News hired private investigation firm Insite Risk Management ("Insite") to investigate D'Ambly's background.

On December 4, 2018, Insite turned over an investigation report that acknowledged Exoo's dox was the genesis of the investigation.  Insite interviewed Exoo and repeated Exoo's false claim that D'Ambly published YouTube channel "The Jersey Goyz."  Insite never interviewed D'Ambly, and to the best of our knowledge, Insite did not investigate Exoo or Torch, or disclose their designation as violent anarchist extremist domestic terrorists, which information was readily available at the NJDHS website.

On or about January 8, 2019, the anarchist extremists became enraged, and threatening dogpiling intensified when an organization D'Ambly is associated with, Tweeted that they were having an "It's okay to be white" march in Princeton, NJ on January 12, 2019.  On January 10, 2019, D'Ambly was interviewed by James Brill, of the Daily News, and Jean Nechvatal, Vice President of the Daily News' parent the Tribune Company, during which interview he was informed of the dogpiling.  The next morning, January 11, 2019, D'Ambly was the victim of stranger workplace violence when the Daily News received at least two phone messages that called for D'Ambly's termination and threatened violence if he were not terminated.  The Daily News captured one caller's phone number ((732) 744-4937), which number belongs to Torch associate co-defendant John "Nick" Strickland ("Strickland").

In the afternoon of January 11, 2019, after the Daily News captured Strickland's call, Brill issued D'Ambly a *Last and Final Warning* letter ("LFW"), but did not act to protect D'Ambly's safety from the threatening calls received that morning.  The *LFW* was D'Ambly's first disciplinary infraction, but the *LFW* ironically confirmed that D'Ambly had not violated the

CBA or made derogatory statements towards co-workers. *See* Exhibit B, *Last and Final Warning*.

On January 11, 2019, Exoo Tweeted that he was "going to spend the next week wrecking [D'Ambly's] your fucking life." On or about January 11, 2019, Strickland went to D'Ambly's home and "keyed" his car and sliced his tires as it was parked in his driveway. D'Ambly received a text message from Strickland's phone number (732) 744-4937 that mocked his damaged car. D'Ambly does not know Strickland and did not have a relationship with him. On January 14, 2019, the Daily News told D'Ambly not to report to work until further notice.

On January 16, 2019, during a phone conference call with Brill, D'Ambly was terminated. D'Ambly's *Termination of Employment* letter ("TOE") dated January 18, 2019, stated that he was "targeted by" antifa, and he was terminated in order to prevent "counter attacks by antifa" against Daily News' "workplace and employees." *See* Exhibit C, *Termination of Employment*. Neither the *LFW* or *TOE* stated that D'Ambly violated the CBA or insulted any co-workers. D'Ambly was terminated to prevent continued and future acts of workplace violence against the Daily News and their employees by anarchist extremists.

## II.   <u>LEGAL ARGUMENT</u>

### A.  NEW INFORMATION OBTAINED AND CONFIRMED PRIOR TO REFILING THIS AMENDED COMPLAINT

Prior to refiling this Amended Complaint, D'Ambly obtained information that confirmed his termination and union expulsion did not arise out of the collective bargaining agreement, rather anarchist extremists influenced the Teamsters to cause his termination. Newly learned is that on October 29, 2018, less than two hours after Exoo doxed him, Bernadette Kelly, an elected Trustee for Teamsters Joint Council 16, approved Exoo's dox that called for D'Ambly to be

expelled by liking the Tweet from her Twitter account "@TeamsterNYC."[7]  Kelly

communicated with Exoo until D'Ambly was terminated, which communications were never

disclosed to D'Ambly.



Kelly communicated with Exoo while his associates dogpiled.  Exoo's associates,

retweeted the initial dox at least 253 times and dogpiled the Daily News' Twitter account

"@NYDailyNews" and the Teamsters Twitter account "@Teamsters" as seen below on left.

Dogpiling grew exponentially as associates embedded the original dox into their own Tweets

directed to the Daily News and Teamsters.  An example is on the right.





---

[7] Reference is made to D'Ambly as being expelled from his labor union, because since his employment was
terminated by the New York Daily News when he has attempted to obtain union employment in his trade, he was
told he could not work because he accepted a settlement.

Effective dogpiling must be infused with threats of violence. For instance, this dogpiled re-tweet to the Teamsters on the right referenced the Minneapolis Teamsters Strike of 1934, where a total of four people were killed, including on "Bloody Friday" when 67 people were injured and 2 people killed. The "Bloody Friday" re-tweet "tagged" or included, New Brunswick based violent anarchist extremists and Torch member, Hub City Antifa.



Dogpiled Tweets demanded D'Ambly's termination, because "@Teamsters you know what to do," and that the Teamsters should do "what Hoffa would do?"







Kelly was communicating with Exoo on January 11, 2019, when Exoo Tweeted that he would spend the "next week wrecking" D'Ambly's "fucking life." And the same day Exoo pledged to wreck D'Ambly's life, he was the victim of a bias crime when Strickland caused approximately $600 in property damage.



Exoo's communications with Kelly meant that unlike all of his other doxes he was not required to demand a public statement of termination from D'Ambly's employer, because he had inside knowledge of D'Ambly's pending termination due to his communications with Bernadette Kelly.



As seen above in the thumbnail photograph on the left, the name "BKelly" refers to the Twitter account "@TeamsterNYC" seen above on the right.  TeamsterNYC is published and controlled by Teamster Joint Council 16 Trustee Bernadette Kelly.  Kelly also was the reliable source, who informed Exoo that D'Ambly was no longer with the Daily News, which announcement Exoo remarkably made at least twenty-four hours before the Daily News claimed that they learned of the alleged event that triggered D'Ambly's termination.



This Amended Complaint was filed because newly learned information concerning Kelly's communications with Exoo was confirmed that shows Exoo exerted wrongful influence over the Teamsters to deprive D'Ambly of his rights as a union member.  Exoo's influence of the

Teamsters, which included a Teamsters official being the source of his advance notice of D'Ambly's termination, shows that CWS' representation of D'Ambly did not flow from a legitimate function of his CBA.

### B.   An Attorney-Client Relationship Existed Between D'Ambly and CWS

Here an attorney-client relationship was formed between D'Ambly and CWS.  D'Ambly was a healthy 62-year-old man, who desperately wanted his employment terminated, so that he could continue working until he was eligible to receive the maximum union pension and social security benefits upon retirement.  CWS had knowledge of Kelly's communications with Exoo and Exoo's influence of the Teamsters' decision.  Had D'Ambly known that the Teamsters' decisions were influenced by anarchist extremists that threatened him, he would have sought independent counsel.

The American Bar Association ("ABA"), MODEL RULES OF PROF'L CONDUCT ("RPC") R. 1.13(f) requires the attorney to "explain the identity of the client when the lawyer knows or reasonably should know that the organization's interests are adverse to those of the constituents with whom the lawyer is dealing."  When the organization's interests and the constituent's interests are adverse or may become adverse, the lawyer should inform any "adverse" constituent "that the lawyer cannot represent" him and he "may wish to obtain independent representation." RPC. 1.13(f) cmt. 10.  The lawyer must carefully assure the adverse constituent that "the lawyer for the organization cannot provide legal representation for that constituent individual, and that discussions between the lawyer for the organization and the individual may not be privileged." *Id.*

An implied attorney-client relationship exists when a party shows "(1) that it submitted confidential information to a lawyer, and (2) that it did so with the reasonable belief that the

lawyer was acting as the party's attorney." *Montgomery Academy v. Kohn*, 50 F. Supp. 2d 344, 350 (D.N.J. 1999) (quoting *Pain Prevention Lab, Inc. v. Electronic Waveform Labs, Inc.*, 657 F. Supp. 1486, 1495 (N.D. Ill. 1987). No formal "writing or speech" is necessary to confirm an attorney's agreement to represent a client, "under certain circumstances [representation can] be inferred from the conduct of the parties." *In re Palmieri*, 76 N.J. 51, 58-59 (1978). The attorney-client relationship begins with a non-lawyer's reliance on the professional skills of an attorney, who, in turn, knows of this reliance and accepts responsibility for it. *Delso v. Trustees for Ret. Plan for Hourly Employees of Merck & Co., Inc.*, No. 04-3009, 2007 U.S. Dist. LEXIS 16643 *22, 2007 WL 766349 (D.N.J. 2007). The client must demonstrate from an identifiable action or manifestation, reliance on an attorney in his professional capacity. *Herbert v. Haytaian*, 292 N.J. Super, 426, 436-37 (App. Div. 1996).

In this case, unrelated anarchist extremists wrongfully applied pressure to influence a labor union's decision making in order to cause D'Ambly's termination. D'Ambly believed that CWS represented him, and shared personal and confidential information with CWS in furtherance of his belief that they represented him, including his desire and reasons for wanting to be reinstated. The anarchist extremists conduct is unquestionably not a legitimate bargaining subject, and the Teamsters prejudged D'Ambly as worthy of expulsion. CWS ignored the anarchist extremists unlawful conduct not related to a bargaining process, but seeks to invoke an immunity provision intended for lawful functions under the collective bargaining process.

### C.  CWS is not Entitled to *Section 301(b)* Immunity Against D'Ambly's State-Law Claim Because They Did Not Perform a Function Under the CBA

State-law claims, such as D'Ambly's against CWS are preempted by *Section 301(b)* if "such claims rely upon an interpretation of a collective bargaining agreement." *Pennsylvania Nurses Ass'n v. Pennsylvania State Educ. Ass'n*, 90 F.3d 797 (3d Cir. 1996). Or when

13

"resolution of a state-law claim is substantially dependent upon analysis of the terms in an agreement between the parties in a labor contract." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985). The Supreme Court has been "clear that when the meaning of contract term is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." *Livadas v. Bradshaw*, 512 U.S. 107, 124 (1994). The fact that D'Ambly's employment relationship was covered by a CBA does not preempt his state law claim, because the "state-law claim can be resolved without interpreting the agreement itself, the claim is "independent" of the agreement for § 301 pre-emption purposes." *Lingle v. Norge Div. of Magic Chef*, 486 U.S. 399, 410 (1988).

Furthermore, D'Ambly agrees with CWS' position that case law is clear that when a union member's claim implicates a *§ 301(a)* agreement, *Section 301(b)* "evidences a congressional intention that the "union as an entity…be the sole recovery for injury inflicted by it." *Atkinson v. Sinclair Refining Co.,* 370 U.S. 238, 249 (1962). And that "attorneys who perform services for and on behalf of a union may not be held liable in malpractice to individual grievants where the services the attorneys perform constitute a part of the collective bargaining process." *Peterson v. Kennedy*, 771 F.2d 1244, 1256 (9th Cir. 1985). In *Peterson,* the court stated that the union's attorney is immune under *§ 301(b)*, because the attorney performs a "function in the collective bargaining process that would otherwise be assumed by the union's business agents or representatives." *Id.* at 1258. In *Complete Auto*, the Court held that individual union officers and members are exempt "from liability for damages arising from their breach of…a collective bargaining agreement." *Complete Auto Transit, Inc. v. Reis*, 451 U.S. 401 (1981). The courts have consistently held that when acts are related to a CBA "only the

union was to be made to respond for union wrongs," not individual members.  *Veggian v. Camden Bd. Of Educ.*, 600 F.Supp.2d 615, 627 (D.N.J. 2009).

Yet, the existence of a *§ 301(a)* agreement covering the party's relationship is imperative, because immunity only exists for persons providing services "within the ambit of the collective bargaining process."  *Montplaisir v. Leighton*, 875 F. 2d 1, 4 (1st Cir. 1989).  And *Section 301(b)* immunity applies to "individuals acting as union representatives within the ambit of the collective bargaining process."  *Felice v. Sever*, 985 F.2d 1221, 1229 (3d Cir. 1993).  The Third Circuit has held that *Section 301(b)* "immunizes attorneys employed by or hired by unions to perform services related to a collective bargaining agreement."  *Carino v. Stefan*, 376 F. 3d 156, 162 (3d Cir. 2004).  *Section 301(b)* immunity also extends to in-house counsel who provide services under a CBA.  *Breda v. Scott*, 1 F.3d 908, 909 (9th Cir. 1993).

The Third Circuit has found that a bargaining relationship pursuant to *§ 301(a)* must govern the relationship.  In order for CWS to be granted *§ 301(b)* immunity, they must have rendered services to persons covered by a bargaining agreement, or performed a CBA function as a union representative would have, however, "not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is pre-empted by § 301."  *Allis-Chalmers Corp.*, 471 U.S. at 211.  In *Crilly*, the Third Circuit held "that individual immunity is a corollary to a section 301 bargaining agreement."  *Felice*, 985 F.2d at 1230 (*citing Crilly v. Southeastern Pa. Transp. Auth.*, 529 F.2d 1355, 1361 (3d Cir. 1976).  The absence of a bargaining relationship prevented individual union members from claiming *§ 301(b)* immunity against state law claims for tortious interference of a non-union coal producer's business.  *Kerry Coal Co. v. United Mine Workers*, 637 F.2d 957 (3d Cir. 1981).  In *Kerry Coal*, a non-union coal

producer won a jury verdict against union organizers and members, who harassed its employees and destroyed its equipment. *Id*. at 964-66.

Individual immunity exists for disputes on issues that are within the purview of a CBA. For instance, in *Atkinson*, the Court stated that "when Congress passed § 301, it declared its view that only the union was to be made to respond," and the individual union members were not financially liable for costs related to a strike. *Atkinson*, 370 U.S. at 247-48. In *Peterson*, the union attorney was immunized, where the union member was harmed when the assistant to the union's staff counsel and the executive director, who was "a recent law school graduate" advised Peterson to file the wrong type of grievance. *Peterson*, 771 F.2d at 1255. The mistake in *Peterson* was caused by confusion over the applicability of two different clauses in the CBA, which "was not as simple" as it appeared. *Id.* In *Carino*, a union attorney was granted immunity, when he convinced a union member to sign a waiver of her rights prior to an arbitration hearing. In *Carino*, the union member was investigated by the FBI for criminal misconduct in the sale of insurance products. The court found immunity appropriate, because the union's decision not to pursue the members grievance "flow[ed] from the union's political or tactical choices." *Carino*, 376 F.3d at 161.

In all precedent cases, *§ 301(b)* immunity was granted to protect the "individual union officers or members have done so where there was a collective bargaining contract or relationship out of which the damage claim arose." *Felice*, 985 F.2d at 1231. In *Felice*, the union member ran for union office and the winning ticket retaliated against him and caused him to lose his job and be withdrawn from the union. The union officers were not granted *§ 301(b)* immunity, because the plaintiff's union withdrawal meant the parties were not covered by a CBA. The Third Circuit concluded that a state law claim "that does not implicate a collective

bargaining agreement covered by section 301(a) does not give rise to section 301(b) immunity. When section 301(a) is inapplicable, the immunity provided by section 301(b) is also inapplicable." *Felice*, 985 F.2d at 1231.

Here, interpretation and consultation of D'Ambly's CBA is not required, because his state-law claim concerning CWS' representation did not arise out of collective bargaining agreement.  D'Ambly was terminated because his employer feared counterattacks by antifa after D'Ambly was doxed and dogpiled by anarchist extremists.  In *Kerry Coal*, during a national coal miner strike, a coal miner union conducted illegal picketing, and letter campaign against non-union coal mines advising them not to break the strike.  Individual immunity was not granted to union officers, who threatened the non-union coal producer that they would "bring 200 men to wreck his equipment," where the non-union coal producer's contracts were interfered with and its equipment damaged, because there was no evidence the acts were "actually authorized or subsequently ratified" by the union.  *Kerry Coal*, 637 F.2d at 961-62.  As in *Kerry Coal*, CWS is not entitled to immunity, because anarchist extremists threatened the Teamsters to fire D'Ambly or else, and there is no evidence that the Teamsters authorized or subsequently ratified the anarchist extremists' acts, which action does not arise out of the CBA.

Moreover, anarchist extremists' threats and influence over the Teamsters could not be considered a function of the CBA.  Pursuant to *Section 8* of the *National Labor Relations Act* ("NLRA") bargaining subjects are either mandatory or nonmandatory.  Mandatory bargaining subjects concern pay rates, wages, employment hours, or other conditions of employment.  *29 U.S.C. § 158(d)*.  Nonmandatory bargaining subjects are subjects not directly related to work, such as negotiation of ground rules or whether display of a union flag is allowed.  Bargaining subjects that violate state or federal laws are illegal and cannot be bargained over.

Here, an illegal bargaining subject would be present if D'Ambly's bargaining agreement contained a provision that permitted the Daily News to ignore worker safety laws promulgated under the *Occupational Safety and Health Act of 1970*, 29 U.S.C. §§ 651-678.  The OSHA General Duty Clause, *Section 5(a)(1)* is construed to require employers to provide a workspace safe from acts of workplace violence.  *29 U.S.C. § 654*.  As stated above, D'Ambly was the victim of category one (1) workplace violence committed by anarchist extremists with no legitimate relationship to the Daily News.

If or when an employer experiences workplace violence, the employer should "inform victims of their legal right to prosecute perpetrators" and "report violent incidents to the local police promptly."  *OSHA Fact Sheet* at 2,

https://www.osha.gov/sites/default/files/publications/factsheet-workplace-violence.pdf.

Here, the Daily News breached the General Duty Clause, by not providing a safe workspace, by not warning or informing D'Ambly he was threatened, and to the best of our knowledge they did not contact law enforcement.  Daily News' response to workplace violence was to terminate D'Ambly to prevent further and future workplace violence counter attacks by anarchist extremists, which was a proper issue for law enforcement involvement.  The Teamsters and Daily News could not have bargained to ignore OSHA worker safety regulations concerning workplace violence attacks against employees and union members, even if the particular union member had politically unpopular opinions.  CWS seeks immunity for D'Ambly's representation although his termination did not arise out of the CBA, workplace violence was committed against him by persons not covered by a CBA, and when the Daily News and Teamsters ignored OSHA worker safety regulations.

**D.  Anarchist Extremists Threatened Violence and Intimidation Rendered the Teamsters a Captive Labor Organization**

D'Ambly was terminated and deprived of the property rights of his labor contract,
because the Teamsters were a labor organization captive to anarchist extremists. Anarchist
extremists committed criminal and violent acts to prevent the Teamsters' right to "make a
business decision free from outside pressure wrongfully imposed." *United States v. Santoni*, 585
F.2d 667, 673 (4th Cir. 1978). In D'Ambly's *TOE*, the Daily News stated that D'Ambly had not
violated the CBA or discriminate against co-workers, rather the Daily News stated they feared
workplace violence "counterattacks by antifa." Fear of these attacks was used to deprive
D'Ambly of procedural due process protections afforded by his labor contract.

The Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA") *29 U.S.C.
§§ 401, et seq*., ("LMRDA") guarantees union members' membership rights, including equal
protection and democratic participation in their union. The LMRDA's "primary objective [is]
ensuring that unions [are] democratically governed and responsive to the will of their
memberships." *Finnegan v. Leu*, 456 U.S. 431, 436 (1982). Congress' intent when it enacted
the LMRDA was "to preserve for union members the right of free expression secure from
interference by force or threat of force from any person." *United States v. Roganovich*, 318 F.2d
167, 170 (7th Cir. 1963). It is "unlawful for any person through threats or use of violence to
attempt to or to in fact interfere with or prevent the exercise of any or all rights that a union
member may have." *Tomko v. Hilbert*, 288 F.2d 625, 627 (3d Cir. 1961). Outside influence of
unions is not permitted, "the internal operations of unions are to be left to the officials chosen by
the members to manage those operations." *Gurton v. Arons*, 339 F.2d 371, 375 (2d Cir. 1964).

A "captive labor organization" is an organization that has been "dominated through fear
and intimidation" by persons who "used its control…to victimize both individual members of the
Local" and industry segments. *United States v. Local 560 Int'l Bhd. of Teamsters*, 581 F. Supp.

19

279, 319 (D.N.J. 1984). A captive labor organization exists when there is evidence that any persons controlled the union through violence, intimidation, or extortion of union members' rights. *United States v. Local 30, United Slate, etc.,* 871 F.2d 401, 406 (3d Cir. 1989). A union local is a captive labor organization when persons, insiders, or outsiders use "a pervasive and compelling climate of intimidation" to control union decisions. *United States v. Local 560 (I.B.T.)*, 694 F. Supp. 1158, 1163 (D.N.J. 1988).

The deprivation of the union members' rights under the LMRDA is the lynchpin of whether a labor organization is captive, not the character, nationality, or ethnic background of the persons that have captured it. *United States v. Local 560, I.B.T.*, 581 F. Supp. 279 (D.N.J. 1984) *aff'd*, 780 F.2d 267 (3d Cir. 1985). Anarchist extremists controlled and influenced the Teamsters "through violence, intimidation and extortion of the members' rights." *Local 30*, 871 F.2d at 406. The Teamsters were captive to anarchist extremists, who caused "the relinquishment of the union members' LMRDA rights." *United States v. Gotti*, 459 F.3d 296, 320-326 (2d Cir. 2006). D'Ambly was deprived his union member rights, irrespective of the persons who intimidated the Teamsters to cause the deprivation of his rights.

This case intertwines union acts and non-union member acts as in *Kerry Coal*. In *Kerry Coal*, the union members accused of illegal picketing and causing physical damage were not granted *§ 301(b)* immunity, because the parties were not covered by a CBA under *Section 301(a)*. *Kerry Coal* dictates that the absence of a *§ 301(a)* agreement preempts *§ 301(b)* immunity. In this case, non-union anarchist extremist used threats and acts of violence to interfere with D'Ambly's labor contract and deprive him rights as a union member.

Moreover, as evidence that the Teamsters were a captive labor organization prohibited from following routine CBA discipline procedures, D'Ambly received the harshest discipline

possible, employment termination and union expulsion that immediately deprived him of his salary, health insurance, and fringe benefits guaranteed by his labor contract without procedural due process. Consistent with the LMRDA the Third Circuit has held that union members are entitled to due process before discipline can be levied. The LMRDA ensures that before a union member can be disciplined, he receives a "full and fair hearing" that is "determined from the traditional concepts of due process of law." *Knight v. Int'l Longshoremen's Ass'n.*, 457 F.3d 331, 339-40 (3d Cir. 2006). The Third Circuit has held the guarantee to a full and fair hearing includes the right to a hearing before an unbiased committee, "and the failure to adhere to the traditional concepts of a fair hearing by an impartial tribunal, e.g., a tribunal of which a member is biased or has prejudged the case, as here," is not a full fair hearing. *Falcone v. Dantinne*, 420 F.2d 1157, 1165 (3d Cir. 1969). A full and fair hearing is one that "attempts to ensure procedural process" is provided to union members. *Kowaleviocz v. Local 333 of Int'l Longshoremen's Ass'n*, 942 F.2d 285, 288 (4th Cir. 1991).

Here, as stated in his *LFW* and *TOE*, D'Ambly did not commit acts for which discipline was appropriate, but still he was terminated without procedural process that resembled a full and fair hearing. CWS was brought in to create the appearance of CBA compliance, however, the Teamsters had prejudged D'Ambly on October 29, 2018, when Bernadette Kelly communicated her agreement to Exoo's demand that D'Ambly be expelled from the Teamsters. Clearly, not acts arising out of the CBA for which CWS is entitled to immunity.

### E. D'Ambly Introduced New Information With this SecondAmended Complaint That Creates a Good-Faith Belief the Teamsters Were A Captive Labor Organization Unable To FreelyMake A Decision Concerning D'Ambly

With this Amended Complaint, D'Ambly puts forth newly obtained evidence that shows an elected Teamsters official agreeing with the anarchist extremists demand that the Teamsters

expel D'Ambly. Bernadette Kelly communicated with Exoo during the time his associates were actively threatening D'Ambly, and the Teamsters informed Exoo that D'Ambly was terminated before the actual event that the Daily News claimed triggered his termination.

Rule 11 identifies three grounds for sanctions: (1) either affirmative claims or denials lack evidentiary support Fed. R. Civ. P. 11(b)(3)-(4); (2) legal arguments must either be warranted under existing law or present a good-faith argument to reverse or extend the law Fed. R. Civ. P. 11(b)(2); and (3) the paper must not be filed for an improper purpose. In order to satisfy its obligations under Rule 11, a party must conduct a reasonable inquiry into the facts alleged in its pleadings. *Lincoln Benefit Life Co. v. AEI Life, LLC*, 800 F.3d 99, 108 (3d Cir. 2015). Reasonableness is an "objective knowledge or belief at the time of the filing of a challenged paper that the claim was well-grounded in law and fact. *Ford Motor Co. v. Summit Motor Prods., Inc*., 930 F.2d 277, 289 (3d Cir. 1991).

Here, Plaintiff has introduced new evidence of the Teamsters' communications with Exoo from October 29, 2018, that was never disclosed and not previously known. The new information reasonably supports the claim CWS' was required to recuse itself from this matter due to the conflict created by its knowledge that the Teamsters were a captive labor organization that agreed to an illegal bargaining subject with the Daily News that caused D'Ambly's termination and deprived him of his rights as a union member.

## III. <u>CONCLUSION</u>

CWS is not entitled to § 301(b) immunity, because there is no § 301(a) CBA covering the litigants' relationship. The Daily News fear of counterattacks from antifa does not arise out of the CBA. The illegal agreement between the Daily News and Teamsters cause by anarchist extremists prevents CWS' claim that they performed a function under the CBA. The Teamsters

could not have made a political or tactical decision in this case, because they were under threat from anarchist extremists, because Exoo and Torch undoubtedly directed threats at Daily News and Teamsters to achieve their goal of forcing D'Ambly's termination.  Immunity for CWS requires a § 301(a) bargaining agreement is in place, or that the Teamsters freely made political or tactical choices in regard to D'Ambly, which they did not.

For the foregoing reasons, defendants' motions for sanctions should be denied in its entirety.

Respectfully Submitted,

Dated: January 21, 2022      _____

Patrick Trainor, Esq.
*Attorney for Plaintiff Daniel D'Ambly*